# EXHIBIT 6

| | |
|---|---|
| **From:** | Lane, Patrick |
| **To:** | Wong, Chee-Tuck |
| **CC:** | Eckroth, Kim; Ulrich, Linda; Yeager, Dawn |
| **Sent:** | 8/1/2007 2:34:56 PM |
| **Subject:** | RE: Summary Domtar's WC Payments |

Unless Kim has other advice, please send to your normal HR Contacts.

We need it on a separate invoice as they're disputing this liability - and won't pay the invoice. So we don't want to mix Workers Compensation in with other amounts as this might generate partial payments, or even worse, no payment even for the items we're in agreement with.

Thanks,

Patrick

-----Original Message-----
From: Wong, Chee-Tuck
Sent: Tuesday, July 31, 2007 1:55 PM
To: Lane, Patrick
Cc: Eckroth, Kim; Ulrich, Linda; Yeager, Dawn
Subject: RE: Summary Domtar's WC Payments

No problem. We'll start invoice them starting with June's payments. We'll use the existing 3rd party invoicing process and book to the following receivable account 0060-WA895-1180000-7000007085 (Paper Co Divestiture - WC Receivable).

Does anyone have a contact and address to send the invoice to?

Chee

-----Original Message-----
From: Lane, Patrick
Sent: Tuesday, July 31, 2007 1:14 PM
To: Wong, Chee-Tuck
Cc: Eckroth, Kim; Ulrich, Linda
Subject: RE: Summary Domtar's WC Payments

Please invoice Domtar for Workers Compensation - I believe that we just need to invoice June.

Please ensure the invoice is for WC only and not blended with other amounts that they will continue to pay.

Give me a call if you have any questions.

Thanks,

Patrick

-----Original Message-----
From: Wong, Chee-Tuck
Sent: Monday, July 30, 2007 5:09 PM
To: Lane, Patrick
Subject: RE: Summary Domtar's WC Payments

Patrick,

we're not invoicing Domtar for these payments but are booking them to a receivable account in Profit Center WA895 - Fine Paper Divestiture and there is a separate Internal Order setup.

We were told to book the payments to this account so they can be included in the Working Capital settlement.

WEY00000588

Let me know if I need to change the process.

Chee


-----Original Message-----
From: Lane, Patrick
Sent: Monday, July 30, 2007 3:21 PM
To: Wong, Chee-Tuck
Subject: RE: Summary Domtar's WC Payments


Are you still invoicing this Workers compensation to Domtar? I'd like it separate from our other (and less controversial) billings - but still accumulate the aging on the accounts receivable.

Thanks,

Patrick

-----Original Message-----
From: Wong, Chee-Tuck
Sent: Monday, July 30, 2007 9:42 AM
To: Lane, Patrick
Subject: Summary Domtar's WC Payments

Patrick,

attached file shows the WC payments that we have made on behalf of Domtar for March through June. The cost summary is shown at a summary level by location.

Let me know if you need further details.

Chee

WEY00000589

# EXHIBIT 7

**▲ Weyerhaeuser**

INVOICE

INVOICE NO: 08-02TA
_X_ Debit ___ Credit
DATE: August 22, 2007
** TERMS: Due Aug 31, 2007

TO:
Domtar
Attn: John.Mclean@Domtar.com
395, boul. de Maisonneuve Ouest
Montreal QC H3A 1L6  Canada

PLEASE Remit To:
Weyerhaeuser Company
P.O. Box 9777
Attention I/C Accountant EC4-3A9
Federal Way, WA 98063-9777

| DESCRIPTION | AMOUNT DUE |
|---|---|
| June WC current mnth clms payment | |
| ASBE facilities | 145,076.89 |
| Closed facilities | 367,632.65 |
| Corp Retained Excess | 15234.1 |

| Total Amount Due | $527,943.64 |
|---|---|

| | By: | Telephone No.: | | |
|---|---|---|---|---|
| | Tammy Bonney | (253)924-5547 | | tammy.bonney@weyerhaeuser.com |
| **Debit** | | | | |
| PC WA895 | 3264000 | 7000004037 | $ | 145,076.89 |
| PC WA895 | 3120000 | 7000004782 | | $367,632.65 |
| PC WA895 | 3120000 | 7000004774 | | $15,234.10 |

WEY00020174

| EE Stays | no |
|----------|----|

| | Data | |
|-----------|-----------------------------------------|------------------------------------|
| Acct Desc | Sum of Sum of Claim payments This Month | Sum of Sum of Remaining Reserves |
| ASBE | 145076.89 | 1660423.15 |
| CLOSED | 367632.65 | 4222543.85 |
| CREX | 15234.1 | 1849765.99 |
| XOFX | 0 | 135779.53 |
| Grand Total | 527943.64 | 7868512.52 |

WEY00020174

# EXHIBIT 8

| | |
|---|---|
| **From:** | Lane, Patrick |
| **To:** | Dorneval, Martine (Domtar) |
| **CC:** | Wong, Chee-Tuck; Mason, Heather; Powell, Marney; Bacon, Steve (Domtar); Sinclair, Christine (Domtar); McLean, John (Domtar); Hart, Tom (Domtar); Cross, Michael (Domtar) |
| **Sent:** | 10/3/2007 11:19:18 PM |
| **Subject:** | RE: Domtar_09-14TA.xls |

It seemed that we should add to the information provided by Tammy Bonney to you. We've also added Tom Hart and Michael Cross of Domtar to the distribution as this does involve balances between the 2 companies.

You need to know that Domtar and WY do not agree on the treatment of certain US workers compensation liabilities that relate to the period before acquisition.

This issue remains to be resolved by Domtar and WY. This meeting has not yet been scheduled to my knowledge.

Although WY might like it, you should not pay this amount without direction from Michel Dagenais or Gilles Pharand. You can expect to see regular invoices from WY for our expenditures relating to this liability and we expect you will be instructed to do nothing with them until the issue is resolved.

There are no other invoices relating to HR/benefits etc. that we're aware of that shouldn't continue to be invoiced and paid as your normal practice.

You can check this information with Michael Cross - who is familiar with the issue.

Regards,

Patrick

_____

From: Dorneval, Martine [mailto:Martine.Dorneval@domtar.com]
Sent: Tuesday, October 02, 2007 7:54 AM
To: Bonney, Tammy
Cc: Lane, Patrick; Wong, Chee-Tuck; Mason, Heather; Powell, Marney; Bacon, Steve (Domtar);
Sinclair, Christine (Domtar); McLean, John (Domtar)
Subject: RE: Domtar_09-14TA.xls
Importance: High

Hi Tammy,

Please explain me that invoice. That is the first time that I see it.

Thanks!

Martine Dorneval

Benefits Administrator/Administratrice av. sociaux

Domtar inc.

Tel. : (514) 848-5555, ext./poste 85279

martine.dorneval@domtar.com

WEY00000671

_____

From: Bonney, Tammy [mailto:tammy.bonney@weyerhaeuser.com]
Sent: Monday, October 01, 2007 5:55 PM
To: Bacon, Steve; Dorneval, Martine; Mason, Heather; McLean, John; Powell, Marney; Sinclair, Christine; Trabelsi, Christiane
Cc: Lane, Patrick; Wong, Chee-Tuck
Subject: Domtar_09-14TA.xls
Importance: High


Wire will be sent shortly.

WEY00000672

# EXHIBIT 9

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3     WEYERHAEUSER COMPANY, a        )

4     Washington corporation,        )

5                    Plaintiff,      )

6        v.                          )   C.A. No. 14-00024-SLR

7     DOMTAR CORPORATION, a          )

8     Delaware corporation, and      )

9     DOMTAR PAPER COMPANY,          )

10    LLC, a Delaware limited        )

11    liability company,             )

12        Defendants.                )

13    _____    )

14

15

16        The deposition of ANNE GIARDINI, taken in the

17    above-entitled cause, before Barbara Neuberger, BCSRA No.

18    582, official reporter, on the 3rd day of June, 2015, at

19    925 West Georgia Street, Vancouver, B.C.

20

21

22

23

24    Job NO. 93963

25

1    APPEARANCES:

2              HILLIS CLARK MARTIN & PETERSON

3              1221 Second Avenue

4              Seattle, WA  98101

5              BY:  LAURIE CHYZ, ESQ.

6                   JAKE EWART, ESQ.

7                      On behalf of the Plaintiff;

8

9

10             DEBEVOISE & PLIMPTON

11             919 Third Avenue

12             New York, NY  10022

13             BY:  COURTNEY DANKWORTH, ESQ.

14                  ETHAN ROMAN, ESQ.

15                     On behalf of the Defendant;

16

17             WEYERHAEUSER

18             33663 Weyerhaeuser Way South

19             Federal Way, WA  98003

20             BY:  CONRAD SMUCKER, ESQ.

21                     Weyerhaeuser In-house Counsel.

22

23

24

25

1                          I N D E X

2    INDEX OF EXAMINATIONS

3

4    EXAMINATION                                    PAGE

5         Ms. Dankworth                        7

6         Ms. Lootens Chyz                   169

7         Ms. Dankworth                      170

8

9                        E X H I B I T S

10

11   NUMBER                DESCRIPTION              PAGE

12   Exhibit 66  Document entitled SigNAL Notification dated

13               May 7, 2007                          28

14   Exhibit 67  Letter dated June 6, 2007 to Sandy McDade

15               from Gilles Pharand                  43

16   Exhibit 68  Letter dated July 23, 2007 to Gilles

17               Pharand from Sandy McDade            47

18   Exhibit 69  Letter dated June 3, 2008 to Gilles Pharand

19               from Anne Giardini                   49

20   Exhibit 70  Letter dated June 11, 2008 to Anne Giardini

21               from Zygmunt Jablonski               53

22   Exhibit 71  Letter dated July 17, 2008 to Zygmunt

23               Jablonski from Anne Giardini, with attached

24               Milliman letter dated January 4, 2007   56

25

1                      Anne Giardini

2       A.   Craig Neeser, N-e-e-s-e-r.

3       Q.   Can you describe your relationship with Sandy

4  McDade?  It sounds like you reported in part to him.  What

5  was his role in the U.S.?

6       A.   He was general counsel for Weyerhaeuser U.S.

7       Q.   As president of Weyerhaeuser Company Limited, to

8  whom did you report?

9       A.   Just to Sandy.

10       Q.   So as president you reported into Sandy as

11  general counsel in the U.S.?

12       A.   Yes.

13       Q.   What was your working relationship with Patrick

14  Lane during the period that we'll be focussing on today,

15  roughly 2006 through 2014?

16       A.   What do you mean by "working relationship"?

17       Q.   Did you have any -- were you in the same

18  department, for example?

19       A.   No, we were in different departments.

20       Q.   Okay.  How often did you work together?

21       A.   Hourly.

22       Q.   What types of matters did you work on together?

23       A.   Any matter in which there was a financial, legal,

24  strategic or business interest involving Weyerhaeuser that

25  required a sharing of information.

1                    Anne Giardini

2       Q.   Was Mr. Lane also located here in Vancouver?

3       A.   By and large, yes.

4       Q.   Were you and Mr. Smucker in the same department?

5       A.   No.

6       Q.   How often did you work with him?

7       A.   Not often.

8       Q.   What types of matters did you work with

9   Mr. Smucker on?

10      A.   Competition and anti-trust matters mainly.  Maybe

11  one or two other matters.

12      Q.   If I refer to the "fine paper transaction," would

13  you understand that as the Domtar/Weyerhaeuser transaction

14  in 2007?

15      A.   Yes.

16      Q.   What were your responsibilities for the fine

17  paper transaction leading up to the transaction itself?

18      A.   Primarily my responsibilities were commenting on

19  drafts of documents from the point of view of Canadian

20  knowledge, and the largest role I played was negotiating

21  the fiber supply agreements between the companies after

22  the transaction.

23      Q.   So what were your responsibilities for the fine

24  paper transaction following its closing?  You mentioned

25  the --

1                      Anne Giardini

2        A.   Following its closing?

3        Q.   Following its closing.

4        A.   Patrick Lane was taking a lead role in the

5   working capital discussions and resolution, and from time

6   to time I assisted him in that work.  There's always a

7   number of follow-up items after a closing of a

8   transaction.  I just put my fingers up and made the quote

9   marks because "closing" is a bit of a misnomer.

10            There's always a million and one follow-up items,

11  many of them having to do with working capital and with

12  what are called shared services where one company, usually

13  the seller company, will provide services to the other.

14  You always find that although you've tried to be complete

15  in the documents, there are matters that are not finished,

16  and so in-house counsel and business people devote time to

17  resolving those matters.  And this was a transaction like

18  any other.  There were a number of post-closing matters

19  that needed to be attended to, so they are attended to and

20  I took on some of those.  At this distance in time, I

21  certainly cannot recall them all.

22       Q.   You mentioned that you did some negotiations with

23  Domtar it sounds like following the transaction.  Who was

24  the corresponding person on the Domtar side with whom you

25  negotiated?

1                      Anne Giardini

2      A.  Well, I don't remember.  I certainly do remember

3 dealing on one or two matters with Zyg, I can't remember

4 his last name, Jablonski is his last name, and Ania

5 Brzezinski and one or two others.

6      Q.  Were you responsible for negotiating any of the

7 post-closing disputes that you mentioned?

8      A.  Yes.

9      Q.  Which ones?

10      A.  Goodness, I'd have to see the letters that went

11 back and forth.  There were a large number of post-closing

12 issues to be resolved having to do with IT was a big area,

13 IT; certain lawsuits and employee matters; transfer of

14 files; corporate signage; there was some fiber supply

15 issues that came up; there was missing equipment at some

16 sites; and there was interpretation issues arising out of

17 the agreement, one of them being the responsibility for

18 U.S. employees on workers' compensation.  There were a

19 large number.  That's only a subset.

20      Q.  We'll certainly look at some of the letters

21 later.  Would you consider yourself the lead negotiator

22 for Weyerhaeuser on those issues that were in some of your

23 letters?

24      A.  For some of them, yes.  Not for others.

25      Q.  And how were the matters allocated within

Anne Giardini

1    A.   No.

2    Q.   Do you have reason to doubt that you did send it

3  on September 9th, 2008?

4    A.   I've got no reason to doubt it.  I just don't

5  recall.

6    Q.   Looking at the attachment, it's titled "Domtar -

7  Weyerhaeuser Meeting September 11th, 2008, Domtar House".

8  What is this document?

9    A.   Just what it appears to be.  I can only tell you

10  what it appears to be.

11    Q.   It appears to me to be an agenda.  Would you

12  agree with that?

13    A.   It appears to be an agenda.  I would agree with

14  that.

15    Q.   Do you recall a meeting between Domtar and

16  Weyerhaeuser on September 11th, 2008?

17    A.   I didn't recall it until I was preparing for this

18  deposition and then I recalled it.

19    Q.   So preparing for this deposition refreshed your

20  recollection about the meeting?

21    A.   Yes.

22    Q.   Who was at the meeting from each side?

23    A.   I did not recall until I was preparing for this

24  deposition and, on reviewing some material about this

Anne Giardini

meeting, it appears that Patrick Lane and I attended for

Weyerhaeuser, and Zyg and Michel and Michael from Domtar

attended for Domtar, and I believe one or two others

attended for parts of that meeting for Domtar.

Q.  It appears from this email that you made some

edits to the agenda at this meeting; correct?

A.  It appears from this email that I made some edits

to the agenda for this meeting, correct.

Q.  It actually appears that you added workers'

compensation to the topics to be discussed in the morning;

is that right?

A.  It appears so.

Q.  What do you recall about the substance of the

discussion regarding workers' compensation?

A.  When?

Q.  At the meeting on September 11th, 2008?

A.  I recalled nothing about it until refreshing my

memory for this deposition by looking at documents, and

then just what appears in the documentation.  I have no

independent recollection of the meeting other than

attending it.

Q.  What documents did you review regarding this

meeting?

A.  I don't recall right at this moment.  I'd have to

1          Anne Giardini

2   have them in front of me, but I believe there were letters

3   subsequent -- exchanged subsequent to the meeting that

4   reflects on what was talked about at the meeting.

5        Q.   Based on your preparation for today's deposition,

6   what is your current recollection of what happened at that

7   meeting regarding workers' compensation?

8        A.   I believe Zyg made a pitch for his interpretation

9   on workers' compensation liability concerning employees

10  who were working for Domtar now for the fine paper

11  business and employees who were going to be returning

12  back, and that at the time I found his views persuasive

13  and so said I would come back to Weyerhaeuser and review

14  his views with others.

15       Q.   Do you recall telling Zyg at that meeting that

16  you found his views persuasive?

17       A.   No, I don't.

18       Q.   Do you recall presenting Weyerhaeuser's view on

19  workers' compensation liabilities at that meeting?

20       A.   No, I don't.

21       Q.   Do you recall whether workers' compensation was

22  discussed once that day or more than once?

23       A.   No, I don't recall.

24       Q.   Were you authorized to agree with Domtar's

25  position at this meeting?

Page 68

1                      Anne Giardini

2      A.  I don't recall what the scope of my authorization

3   was going into that meeting.

4      Q.  You indicated you needed to go back to others at

5   Weyerhaeuser to discuss the interpretation.  Who else did

6   you need to discuss it with?

7      A.  I don't recall.

8      Q.  Did you indicate you needed to confirm the

9   position with Laurie Scott?

10      A.  Do I recall that or did I indicate it?

11      Q.  Do you recall that?

12      A.  I don't recall.

13      Q.  What was Laurie Scott's role as of September

14   2008?

15      A.  I don't recall what date she left Weyerhaeuser.

16   She left working -- we were working for the affiliated

17   companies and she went to work for another real estate

18   company, I believe, and I would have thought it would be

19   before this, but I'd be speculating.

20      Q.  You would have thought she'd departed

21   Weyerhaeuser before this?

22      A.  Meeting.

23      Q.  Did you have -- before Laurie Scott departed

24   Weyerhaeuser, did you have any reporting relationship with

25   her?

1                        Anne Giardini

2        A.   No.

3        Q.   Based on your refreshed recollection, what was

4   the status of the workers' compensation issue following

5   the September 2008 meeting?

6        A.   Still open.

7        Q.   And what aspect of the issue was still open?

8        A.   All of it.

9        Q.   It was still open pending your discussions with

10  others at Weyerhaeuser?

11       A.   It was still open until it was concluded, until

12  we reached an agreement on it and, until that point, it

13  was still open.

14       Q.   So you indicated at the meeting that you found

15  Zyg's view persuasive but you considered the issue still

16  open?

17       A.   Yes, I believe we all did.

18       Q.   To whom at Weyerhaeuser did you report following

19  this meeting?

20       A.   I don't recall.  I certainly would have spoken

21  with Patrick -- sorry, with Sandy McDade.  I don't recall

22  who else.

23       Q.   If Laurie Scott were still working for

24  Weyerhaeuser, would you have discussed it with her as

25  well?

Page 70

Anne Giardini

1    A.   I just don't recall.  That I have no recollection

2    about one way or the other.

3    Q.   And what was the substance of the discussions you

4    had following the September 2008 meeting with others at

5    Weyerhaeuser?

6    A.   I don't recall.

7    Q.   Did you take any steps following the September

8    2008 meeting regarding the workers' compensation issue

9    other than the discussions we've just mentioned?

10   A.   I don't recall what specific steps I took.

11        (Exhibit No. 74 was marked for identification and

12         is attached hereto)

13        THE WITNESS:  I believe -- you want me to focus

14   on the workers' compensation portion of this?

15        MS. DANKWORTH:

16   Q.   Yes, please.  I know they're long notes, but

17   that's the section I'll be asking you questions about.

18   A.   If you want me to read the whole thing I might

19   have to take a break to do that.

20   Q.   I understand.

21   A.   What do you want to do?

22   Q.   Just the workers' compensation section.

23   A.   All right.

24   Q.   That's the part we'll focus on.

1                        Anne Giardini

2        A.   All right.

3        Q.   This is marked as Exhibit 74, which begins an

4   email dated September 16th, 2008 from Michael Cross.  Have

5   you seen this document before?

6        A.   I saw a version of these notes in preparing for

7   this deposition.  Whether it's the same version or not, I

8   don't know.

9        Q.   This email is from Michael Cross.  Do you know

10  who Michael Cross is?

11       A.   I don't recall his title.  He was at Domtar.

12       Q.   The beginning of his notes reflect attendees of

13  the September 11th, 2008 meeting.  Is that consistent with

14  your recollection of who attended?

15       A.   I have no independent recollection of who

16  attended, but it's consistent with the documents I've seen

17  relating to this meeting.

18       Q.   Focussing on section 5, the workers' compensation

19  and vacation payments section, take as much time as you'd

20  like to review that section and let me know if you think

21  any of Mr. Cross' notes regarding what happened at this

22  meeting regarding workers' compensation are incorrect.

23       A.   I can't do that, I'm sorry, because I don't have

24  enough independent recollection of what happened at that

25  meeting to verify what's here against what happened at the

1          Anne Giardini

2   meeting.

3       Q.  So based on your recollection, sitting here

4   today, you can't tell us whether anything in here is

5   inconsistent with what took place at the meeting; is that

6   right?

7       A.  I can't say that it's consistent or inconsistent

8   because I recollect so little of the meeting itself.

9       Q.  You have mentioned that you recalled that Zyg is

10  the one that presented Domtar's position at this meeting;

11  is that right?

12      A.  That's a very vague recollection.  It could have

13  been somebody different.

14      Q.  Directing your attention to the top of -- well,

15  there's no page numbers, but to the little subsection that

16  says "After discussion with Weyerhaeuser team in the

17  afternoon".  Do you see where I am?

18      A.  Yes.

19      Q.  It says:

20          "Weyerhaeuser thinks our position is

21          correct but need to convince a few more

22          internally -- need to have Laurie Scott

23          sign off."

24          Is that something that you think you would have

25  said or Mr. Lane would have said?

1                     Anne Giardini

2        A.  I don't think either of us said it, neither I nor

3   Patrick Lane because I don't know what he's referring to,

4   because I don't recollect the tenor of the meeting or the

5   specific discussions of the meeting.  It could be right,

6   it could be wrong, I have no recollection, and I certainly

7   can't attribute it to anybody.

8        Q.  You indicated earlier that you found Zyg's view

9   persuasive on this issue at the meeting.  Is that based on

10  your review of documents or your independent recollection?

11       A.  I think both, limiting that to the non-retired

12  Domtar employees, which I don't believe any of us turned

13  our mind to.  The non-retired fine paper employees I don't

14  think anybody turned their mind to.

15       Q.  You don't think anyone turned their mind to

16  non-retired employees?

17       A.  Sorry, to retired, retired fine paper employees.

18       Q.  So you indicated that after this meeting you

19  believed the issue was still open.  Which part of the

20  issue did you think was still open after this meeting?

21       A.  I believe I indicated that all issues related to

22  workers' compensation were still open.

23       Q.  All issues meaning -- well, for example, was

24  there a dispute between the parties about employees who

25  had returned to work at Domtar and their workers'

Anne Giardini

1    compensation claims?

2        A.   As far as I can recall, none -- we never entered

3    into an agreement with respect to any aspect of workers'

4    compensation.  There was never an agreement reached in the

5    form of an agreement between the parties.  So the issues

6    likely remain open to this day.

7        Q.   What I'm asking, though, is whether Domtar ever

8    disputed that it had the liability for workers'

9    compensation claims filed by employees that came to work

10   at Domtar following the transaction?

11       A.   I don't know.  I don't recollect at this point in

12   time.  Certainly they didn't pay the bills, so I guess I

13   took that as a dispute, yes.

14       Q.   To your knowledge, Domtar didn't pay the bills

15   for employees who had gone to work at Domtar following the

16   transaction?

17       A.   There was a problem with getting them to pay

18   bills, yes, but Weyerhaeuser was still managing workers'

19   compensation claims and Domtar was not paying them.  Now

20   whether you characterize that as a dispute or not, it's

21   simply a failure to pay, whatever it is.

22       Q.   Was the failure to pay issue a question of this

23   allocation substantively of liability or a timing problem

24   in that they were late in paying their bill?

1               Anne Giardini

2   Zyg's view persuasive?

3        A.   At this length of time, I probably did, but who I

4   told and when, I don't know.

5        Q.   Then it says in the next bullet:

6             "Weyerhaeuser to send revised list to DTC

7             (Michel D)."

8             Do you know what the revised list there refers

9   to?

10        A.   No.

11        Q.   Would there be a reason following this meeting

12   that Weyerhaeuser would need to send revised invoices to

13   Domtar?

14        A.   Invoices?  Does it say "invoices"?

15        Q.   It says "list".

16        A.   So what's your question?

17        Q.   Would there be a reason following this meeting

18   that Weyerhaeuser would need to send revised invoices of

19   workers' compensation claims to Domtar?

20        A.   I have no idea.

21        Q.   Can you tell me what your position was on

22   workers' compensation -- the allocation of liability for

23   workers' compensation claims before this September 11th,

24   2008 meeting?

25        A.   I have no independent recollection.  It would

1                      Anne Giardini

2   just be as reflected in the correspondence.

3        Q.   Based on what you have seen in the documents and

4   your refreshed recollection, did your view change based on

5   the September 2008 meeting?

6        A.   I believe that my view became that with respect

7   to at least the two groups that I referred to, that being

8   employees who went to work for -- stay with the fine paper

9   business as active employees, sort of an active

10  transaction, and with respect to employees who went to

11  join the fine paper business after because they were on

12  some sort of leave at the time of the transaction, that

13  with respect to those people, Zyg's interpretation was

14  accurate.

15          My belief at the time was that those were the two

16  categories of employees we were dealing with and I believe

17  those were Zyg's beliefs too.  Subsequently I learned that

18  we're dealing with another -- there is another group of

19  employees that we did not turn our mind to, that being

20  prior employees of the fine paper business.

21       Q.   And by "prior employees," you mean employees who

22  retired before the transaction?

23       A.   I mean employees who had left for some reason

24  before the transaction and who might then or in the future

25  have workers' compensation claims.

Anne Giardini

1

2   Q.  So based on the letters that we've reviewed today

3   and what you just told me is your recollection following

4   the meeting, did your view change based on the September

5   2008 meeting?

6   A.  That's a hard question to answer.  My thoughts

7   coalesced around those first two groups of employees and I

8   believe Zyg's did too, and we did not turn our minds to

9   the third group of employees.  And there's a reason for

10  that.  In Canada, the workers' compensation system is very

11  different and we are both Canadian trained and we simply

12  did not turn our minds to that third group.

13  Q.  Based on the two groups that you just mentioned

14  that Domtar would accept liability for, did Domtar state

15  that they would accept liability for those two groups of

16  employees?

17  A.  I don't recall at this length of time.

18  Q.  But you recall that you and Zyg seemed to be in

19  agreement about those two groups of employees following

20  this meeting?

21  A.  Yes.  How we got to that exact state of agreement

22  at this length of time many years later I don't recall the

23  exact iteration of getting there.

24  Q.  You mentioned that you didn't turn your minds to

25  another group of employees.  When is the first time that

1               Anne Giardini

2   being billed to Domtar.

3       Q.  But you don't recall today who gave you that

4   advice?

5       A.  No.

6       Q.  And you don't recall what they said was being

7   included in those invoices?

8       A.  I do not have an independent recollection, no,

9   just what's on the page here.

10          (Exhibit No. 77 was marked for identification and

11           is attached hereto)

12          THE WITNESS:  All right.

13          MS. DANKWORTH:

14      Q.  Exhibit 77 is an email chain, at the top there's

15   an email from Patrick Lane dated November 4th, 2008.  Have

16   you seen this document before?

17      A.  I don't recall it.  I may have.  I may not have.

18      Q.  Drawing your attention to Chee-Tuck Wong's

19   October 21st email at the very bottom of the page, he

20   says:

21          "Hi Anne and Patrick, sorry for taking so

22          long to get back to you but we wanted to

23          double check the claim list based on the

24          employees who transferred to Domtar."

25   Do you know what prompted Mr. Wong to double check the

1              Anne Giardini

2    claim list?

3         A.  No.

4         Q.  Drawing your attention to Patrick Lane's November

5    4th, email at the top of the string, he says in the second

6    paragraph:

7              "Just so we're consistent, my understanding

8              is that our previous invoices were based on

9              our understanding that all workers'

10             compensation liability transferred to

11             Domtar - whereas our September discussions

12             with Domtar clarified that the workers'

13             compensation liability went to Domtar only

14             for employees that showed up to work at

15             Domtar..."

16   Is his characterization of why the previous invoices were

17   incorrect consistent with your understanding of the issue?

18        A.  Yes, and it was based on mistaken advice from me.

19        Q.  Okay.  The previous invoices were mistaken based

20   on mistaken advice from you?

21        A.  No.  The conclusion that workers' compensation

22   liability went to Domtar only for employees that showed up

23   to work at Domtar is mistaken advice from me.  That

24   conclusion is based on mistaken advice from me and

25   misreading of the agreements.

1              Anne Giardini

2      Q.  Patrick says:

3          "...our September discussions with Domtar

4          clarified that the workers' compensation

5          liability went to Domtar only for employees

6          that showed up to work at Domtar..."

7      A.  Right.

8      Q.  And Mr. Lane was at the September meeting;

9  correct?

10     A.  Yes, but that refers to other discussions, I

11 believe, not just the meeting.

12     Q.  And why do you think that Mr. Lane is referring

13 to discussions with you here?

14     A.  I'm sorry, what's the question?

15     Q.  Why do you believe that Mr. Lane is referring to

16 discussions with you when he states this?

17     A.  I didn't say that.  What I said was other

18 discussions.  Oh, why is he coming to that conclusion?

19     Q.  No.  What's the basis for your understanding that

20 his statement here reflects mistaken advice from you?

21     A.  Because I remember giving him the mistaken

22 advice.

23     Q.  When did you give him the mistaken advice?

24     A.  In approximately this time frame.

25     Q.  Why was your advice mistaken?

1              Anne Giardini

2      A.   Because it was based on simply focussing on

3 section 6.09, the transferred employees section instead of

4 focussing on the correct overall transaction transfer of

5 liabilities was the mistake.

6      Q.   When did you come to the conclusion that your

7 advice was mistaken?

8      A.   I don't recall, but I subsequently came to the

9 conclusion my advice was mistaken.

10      Q.   Did you tell Patrick Lane you believed your

11 previous advice was mistaken?

12      A.   I didn't tell him that.  I believe others did.

13      Q.   Do you recall telling anyone that your previous

14 advice was mistaken?

15      A.   Yes, I've told counsel in this room and I've told

16 Conrad, and I may have told others.  I certainly told

17 Patrick.

18      Q.   But just to be clear, as of November 2008 does

19 Patrick's email reflect your view of the allocation of

20 workers' compensation liabilities?

21      A.   I just don't recall at any specific point in time

22 what my view was so it's hard to pin that down.  I think

23 -- I just can't specify a date.  I might have changed my

24 mind again.  I just don't recall at this point.

25      Q.   You're included on this email chain.  If you

Anne Giardini

1

2    believe that Patrick was mistaken, would you have reached

3    out to him to correct his understanding?

4         A.   It's hard to say.  It's hard to say.

5         Q.   What's your understanding of how the invoices for

6    billings made by Weyerhaeuser to Domtar changed before and

7    after the September meeting?

8         A.   In preparation for this deposition, I have been

9    shown documents that showed that Weyerhaeuser returned to

10   its books liability reflecting previously -- employees who

11   had previously worked for the fine paper business who did

12   not effectively become transferred employees.

13        Q.   And by "returned to its books," do you mean added

14   to its reserves?

15        A.   I can't give you the specifics of the accounting

16   terminology.  That would be best left to an accountant.

17        Q.   And in terms of billings or invoices that went

18   from Weyerhaeuser to Domtar, is it your understanding that

19   those changed in the fall of 2008 following the September

20   2008 meeting?

21        A.   That would be my broad understanding, yes.

22        Q.   And how did they change?

23        A.   I'm not the right person to talk to about that.

24        Q.   Do you believe that different categories of

25   employees were included in those invoices before and

                        Anne Giardini

1  after?

3       A.   I can't comment on them.  I don't recall that I

4  saw them or had anything to do with them.  I may have and

5  I may not.  It's hard to answer.

6       Q.   But you do recall that during this period of time

7  you gave legal advice regarding which categories of

8  employees should be included in those invoices?

9       A.   Which period of time do you mean?

10      Q.   In the fall of 2008 following the September 11th

11 meeting?

12      A.   Yes.

13           (Exhibit No. 78 was marked for identification and

14            is attached hereto)

15           MR. EWART:  Courtney, this Bates number was on

16 the letter we sent you.

17           MS. DANKWORTH:  Oh, it was?

18           MR. EWART:  Yes, I've checked it.

19           MS. DANKWORTH:  Apologies, then it was our

20 mistake.  We will reserve our rights with regards to the

21 document.  May I ask whether the attachment is something

22 that you also intend to withhold?  If we want to take a

23 break, that's fine.

24           MR. EWART:  Why don't we take a short break.

25           (PROCEEDINGS RECESSED AT 11:25 A.M.)

1              Anne Giardini

2        (PROCEEDINGS RECONVENED AT 11:36 A.M.)

3        MS. DANKWORTH:  So I think the understanding of

4    counsel is that Exhibit 78 will be replaced with only the

5    second page of the exhibit.

6        THE WITNESS:  All right.

7        MS. DANKWORTH:

8        Q.  I'm showing you what's been marked as Exhibit 78.

9    It's a single page chart with the Bates number

10   WEY00019289.  Have you seen this document before?

11       A.  I don't know.

12       Q.  I will represent to you that this came from

13   Patrick Lane's files.  Do you know under item -- about six

14   items down what "WC settlement" refers to?

15       A.  No.

16       Q.  Do you know what the $360,000 to be received that

17   corresponds to "WC settlement" refers to?

18       A.  No.

19       Q.  So does that number seem familiar to you from any

20   workers' compensation liability discussions?

21       A.  No.

22           (Exhibit No. 79 was marked for identification and

23            is attached hereto)

24           THE WITNESS:  All right.

25           MS. DANKWORTH:

Anne Giardini

1

2      Q.  Exhibit 79 is a letter from you to Mr. Jablonski

3   dated November 26th, 2008.  Have you seen this letter

4   before?

5      A.  I assume so.

6      Q.  Do you know who else was involved in preparing

7   the letter?

8      A.  No.

9      Q.  Directing your attention to page 3, section 5 is

10   the workers' compensation section, and your first sentence

11   says:

12          "Our Chee-Tuck Wong has sent to your Michel

13          Dagenais a list of workers' compensation

14          payments made on behalf of Transferred

15          Employees from March 2007 to October 2008

16          and a list of claims (open and closed)

17          where the claimant is a Transferred

18          Employee."

19   Did you see the records that Mr. Wong sent to

20   Mr. Dagenais?

21      A.  I don't recall.

22      Q.  Have you seen them since this time?

23      A.  I don't recall.

24      Q.  Your next sentence says:

25          "Previous invoices were based on our

1                    Anne Giardini

2           employees' understanding that all workers'

3           compensation liability transferred to

4           Domtar."

5    Which Weyerhaeuser employees were previously under the

6    impression that all workers' compensation liability went

7    to Domtar?

8        A.  I would say me at one point, Patrick Lane, Kim

9    Eckroth, Laurie Scott, and others.

10       Q.  Do you know why they had that previous

11   understanding?

12       A.  Because they were reading the agreements

13   correctly.

14       Q.  Who told you that the previous invoices were

15   based on misunderstanding?

16       A.  I don't recall.

17       Q.  You had previously told Domtar that the invoices

18   included only transferred employees; right?

19       A.  I had previously told Domtar what?

20       Q.  That the invoices included only transferred

21   employees.

22       A.  I don't recall what I told them.  Can you refer

23   me back to a document?

24       Q.  Exhibit 75 at the bottom of page 2.

25       A.  Yes, 75, the bottom of page 2.

1                    Anne Giardini

2        Q.   Right.  You said:

3             "I have made enquiries and am advised that

4             Weyerhaeuser has been invoicing Domtar only

5             for Workers' Compensation for transferred

6             employees..."

7        A.   And what was your question?

8        Q.   My question was:  Your statement in Exhibit 79

9    reflects a different understanding of what was contained

10   in previous invoices; right?

11       A.   Where am I looking in Exhibit 79?

12       Q.   Where it says:

13            "Previous invoices were based on our

14            employees' understanding that all workers'

15            compensation liability transferred to

16            Domtar."

17       A.   So, again, what is your question?

18       Q.   So my question is:  Do Exhibits 75 and 79 reflect

19   contradictory statements about what was in those previous

20   invoices?

21       A.   Well, I don't know which -- at this length of

22   time, which invoices they were reflecting.  There were a

23   number of invoices back and forth and I'm very likely

24   referring to different sets of invoices.  This second

25   letter is a great distance in time from the transaction.

1                       Anne Giardini

2        Q.   This letter is -- Exhibit 79 is two months after

3    Exhibit 75; correct?

4        A.   Right.

5        Q.   At the time that you wrote Exhibit 79, did you

6    believe that the previous invoices Weyerhaeuser had been

7    sending Domtar included all workers' compensation

8    liability?

9        A.   I don't recall what I believed at the time.

10       Q.   Did you believe that the previous invoices sent

11   to Domtar were incorrect?

12       A.   I don't recall what I believed at the time, just

13   based on what's written here.

14       Q.   Based on what's written here, does it seem that

15   you believed that the previous invoices were incorrect?

16       A.   In which letter?

17       Q.   79.

18       A.

19            "Previous invoices were based on our

20            employees' understanding that all workers'

21            compensation liability transferred to

22            Domtar."

23   So what are you asking me?

24       Q.   Whether you understood at the time that you wrote

25   this letter -- whether you believed at the time you wrote

1                    Anne Giardini

2  this letter that the previous invoices sent to Domtar were

3  incorrect?

4        A.   I believe that some of them were incorrect, yes.

5  Which specific ones, I can't say.

6        Q.   The next sentence says:

7             "In fact, we are all agreed that US

8             workers' compensation liability went to

9             Domtar only for employees who became able

10            to work in some capacity at Domtar."

11 Did you believe this statement when you wrote it?

12       A.   That was my -- I believe this statement reflects

13 my incorrect understanding of the agreement, yes.

14       Q.   So regardless of whether your understanding was

15 correct or incorrect, this is what you believed at the

16 time that you wrote this?

17       A.   That "US workers' compensation liability went to

18 Domtar only for employees who became able to work in some

19 capacity at Domtar"; you're asking me that question?

20       Q.   Yes.

21       A.   Yes, it reflects my belief, turning my mind, as I

22 have said, only to the two groups of employees referred to

23 in section 6.09.

24       Q.   Okay.  You have indicated that you believe your

25 statement here is incorrect, today you believe the

1                      Anne Giardini

2    statement is incorrect?

3        A.  Yes.

4        Q.  At any time did you notify Domtar that your

5    statement in Exhibit 79 was incorrect?

6        A.  I'm not sure I did, but, as I've said also, it

7    remained an open matter.  It was an unresolved matter, so

8    there really wasn't a need to do so.

9        Q.  You didn't feel any need to correct your

10   statement to Domtar?

11       A.  It remained an open matter.  This is a document,

12   it's without prejudice, includes discussion of various

13   items.  So, no, as matters went forward when they were

14   finalized, they were documented in an agreement.

15       Q.  Was it your practice -- strike that.

16           In your practice as general counsel when you were

17   negotiating with a counter party, if a counter party

18   changed their mind on something, would you expect them to

19   notify you?

20       A.  Not in negotiations, no.

21       Q.  How would you expect them to notify you?

22       A.  It depends on the context.

23       Q.  Did you ever tell Domtar -- strike that.

24           Did anyone at Weyerhaeuser ever tell Domtar that

25   what you wrote in Exhibit 79 wasn't Weyerhaeuser's

# EXHIBIT 10

| | |
|---|---|
| **From:** | Jablonski, Zygmunt |
| **To:** | Pharand, Gilles; Buron, Daniel; Dagenais, Michel; Parent, Yves L.; Loulou, Patrick |
| **CC:** | Cross, Michael; Cooper, Marvin (Domtar); Nassiry, Ladan; Patenaude, Line |
| **Sent:** | 6/3/2008 7:00:56 PM |
| **Subject:** | Weyerhaeuser and Domtar/Areas of Disagreement |
| **Attachments:** | Giardini 3June08 FAX to G Pharand.pdf |

Gentlemen:

We have received the enclosed letter from W today.  It appears that the meeting I proposed (1 – 1+1/2 hour) for us to have while we are in Kingsport may be timely.  I have asked Line Patenaude to see if she can work such a meeting into our Kingsport schedule, and she said she would address it with Patrick.  I trust that Michael Cross (in place of Daniel, who will be on the West Coast) and Tom Hart would be able to join us by phone.

I will meet with Ladan Nassiry and Tom Hart this week to review W's letter in the context of our own list of issues, so that we are prepared to discuss specific issues as well as a general approach.

Best regards,

ZJ

---

**From:** Nassiry, Ladan
**Sent:** Tuesday, June 03, 2008 2:47 PM
**To:** Hart, Tom
**Cc:** Jablonski, Zygmunt
**Subject:**

Tom,

Please find attached a fax we received from Weyerhaeuser, just in time for our meeting tomorrow!

Regards

Ladan Nassiry

Senior Legal Counsel

Direct line: (514) 848-5151

Fax: (514) 848-6850

Email: ladan.nassiry@domtar.com

"Confidentiality Notice : This message is intended for the sole use of the addressee. It may contain information that is privileged and confidential or protected under solicitor-client privilege. If you are not the intended recipient, any dissemination of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately and delete this message and destroy all copies."

"Avis de confidentialité: Ce message est à l'usage exclusif du destinataire ci-dessus, est confidentiel et peut être protégé par le secret professionnel. Si vous n'êtes pas un destinataire désigné, toute diffusion du message est interdite. Si vous avez reçu ce message par erreur, veuillez aviser l'expéditeur immédiatement et détruire ce message et toute copie de celui-ci. "

DOMWEY00011324

06/03/2008  10:20  6046872314  WEYERHAEUSER  PAGE  01/09

 **Weyerhaeuser**
*The future is growing*

# *Facsimile Cover Sheet*

*DATE: June 3, 2008*

| | | | |
|---|---|---|---|
| **To:** | **Gilles Pharand** | **Phone:** | |
| **Company:** | Domtar Corporation | **Fax:** | 514.848.6850 |
| **From:** | *Anne Giardini, Vice President and General Counsel* | | |
| | Law Department | | |
| **Phone:** | 604-661-8086 | | |
| **Fax:** | 604-687-2314 | | |
| **CC:  To:** | **Alan H. Paley/Paul S. Bird** | **Phone:** | |
| **Company:** | | **Fax:** | **212.909.6836** |

**Total pages sent including cover sheet:  9**

This facsimile transmission is intended for the addressee indicated above. It may contain information that is privileged, confidential, or otherwise protected from disclosure. Any review, dissemination or use of this transmission or its contents by persons other than the addressee is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone, and mail the original to us at the above address.

*Re:*  Certain Outstanding Issues – Purchase Agreement among Domtar
Paper Company, Domtar Pulp and Paper Products, Inc., Domtar
(Canada) Paper Inc., Weyerhaeuser Company Limited and
Weyerhaeuser Saskatchewan Ltd.

Please see attached.  Original to follow by mail.

Confidential

DOMWEY00011325

 Weyerhaeuser

**Vancouver, British Columbia**

Law Department, Canada

> 925 West Georgia Street
> 5th Floor
> Vancouver BC  V6C 3L2
> 604.661.8086 phone
> 604.687 2314 fax
> anne.giardini@weyerhaeuser.com

June 3, 2008                                        **VIA FACSIMILE and MAIL**

Gilles Pharand
Senior Vice President, Corporate Affairs
and General Counsel
Domtar Corporation
395 de Maisonneuve Blvd West
Montreal, QC  H3A 1L6

Dear Gilles:

**Re:     Certain Outstanding Issues – Purchase Agreement among Domtar Paper Company, Domtar Pulp and Paper Products, Inc., Domtar (Canada) Paper Inc., Weyerhaeuser Company Limited and Weyerhaeuser Saskatchewan Ltd.**

We are writing to set dates on which to meet to discuss open issues between Domtar and Weyerhaeuser.  On the agreed date, we propose that a small team from each company meet to endeavour to close all outstanding issues.  I ask that you please provide dates on which your team will be available in the next few weeks.

I have included a summary of issues to be discussed below.  Please provide your comments on these items, and please advise of any other issues you may be aware of or wish to review at our meeting.

| No. | Issue | Domtar Position | Weyerhaeuser Response |
|---|---|---|---|
| 1. | Worker's Compensation Liabilities | *"Amongst other things, Domtar is in disagreement with the reference in the Post Closing Working Capital Adjustment to the 'assumed workers' compensation liabilities' totaling $13,594,814.* | As previously advised, we disagree with Domtar's position regarding workers' compensation liabilities for the following reasons. Section 2.03(a) of the Contribution Agreement transfers liabilities to Domtar other than "Retained Liabilities" and Section 2.03(a)(vii) in particular transfers to Domtar all liabilities relating to any action, suit or proceeding arising out of the Newco |

Confidential

06/03/2008  10:20    6046872314              WEYERHAEUSER                    PAGE  03/09

▲ Weyerhaeuser

| No. | Issue | Domtar Position | Weyerhaeuser Response |
|-----|-------|-----------------|------------------------|
|  |  | *Domtar did not assume this liability and, as such, disagrees with Weyerhaeuser's treatment of this as a reduction to the Post-Closing Working Capital Adjustment. Please be further advised that Weyerhaeuser does not have the right to set-off the workers' compensation liabilities from any amounts owed to Domtar."* | business, whether before or after closing. Section 2.03(b)(iv) of the Contribution Agreement includes as "Retained Liabilities" all Liabilities to be expressly retained by Weyerhaeuser pursuant to the Transaction Documents. Section 6.09(a)(iii) of the Transaction Agreement requires Weyerhaeuser to retain the obligation to pay worker compensation benefits to employees of the transferred business not transferred to the business at closing until the time they are eligible to return to work and join Domtar.  There is no provision in either the Contribution Agreement or the Transaction Agreement that requires Weyerhaeuser to retain any other worker compensation liabilities. As a result, all outstanding and future worker compensation claims relating to the businesses combined with Domtar belong to Domtar, except only worker compensation payments due and owing to US employees who were absent from work on the closing date and receiving workers comp benefits related to such absence, but in those cases solely for the period leading up to the time such employees join Domtar. The outstanding amount due from Domtar with respect to this issue is approximately $3,543,789 plus accumulated interest. |
| 2. | Profit Participation Fee |  | Weyerhaeuser owned the business between May 5 and March 7, 2007 and remains entitled to profits from that period. In order to avoid dispute, Weyerhaeuser and Domtar agreed to a profit participation fee comprising a flat fee plus a price adjustment mechanism for actual pricing in March.  The price adjustment was calculated by Domtar staff in Fort Mill and reviewed by Peter Martin.  Domtar has failed to pay the bill notwithstanding that the price |

Confidential

DOMWEY00011327

06/03/2008  10:20   6045872314            WEYERHAEUSER                PAGE   04/09

▲ Weyerhaeuser

| No. | Issue | Domtar Position | Weyerhaeuser Response |
|-----|-------|-----------------|-----------------------|
|     |       |                 | adjustment was at Domtar's request. The amount outstanding is $203,890.00 plus accumulated interest. |
| 3.  | Reconciliation to the Opening Domtar Balance sheet | *"Further, the supporting work papers which correspond to the Post Closing Working Capital Adjustment do not reconcile to the 'opening working capital in the opening Domtar balance sheet' delivered on May 7, 2007.* | We are having difficulty determining the nature of Domtar's specific disagreement with our Working Capital Statement.  Weyerhaeuser is not required to reconcile the Closing Working Capital to the opening working capital in the opening Domtar balance sheet.  Section 2.04(a) of the Contribution Agreement requires Weyerhaeuser to deliver to Domtar within 60 days after the Closing Date a statement setting forth the Working Capital (as defined in the Contribution Agreement) and the amounts of Shared Inventory, Shared Accounts Receivable and Shares Accounts Payable. "Working Capital" is defined in Section 2.04(d) of the Contribution Agreement as "Current Assets minus Current Liabilities."  "Current Assets and Current Liabilities" are defined as current assets and liabilities of the Newco Business, calculated in the same way, using the same methods, policies, principles and methodologies as the Interim Newco Balance Sheet (dated March, 2006), subject to adjustment in accordance with the working capital principles set forth in Section 2.04(d) and Schedule 2.04(d) to the Contribution Agreement. We note that the methods, policies, principles and methodologies used to prepare the Interim Newco Balance Sheet are not identical to the methods, policies, principles and methodologies used to prepare the Domtar opening balance sheet. Weyerhaeuser prepared the Closing Working Capital on the same basis as the Newco Balance Sheet and adjusted the Working Capital as required by Section 2.04 of the Contribution |

DOMWEY00011328

**▲ Weyerhaeuser**

| No. | Issue | Domtar Position | Weyerhaeuser Response |
|---|---|---|---|
| | | | Agreement. Attached to the Working Capital Statement sent by Weyerhaeuser to Domtar on May 7, 2007 was a reconciliation of the Closing Working Capital to the opening Newco Balance Sheet. |
| 4. | Calculation of the Shared Payment Amount | *"In the Shared Payment Amount included with the Post-Closing Working Capital Adjustment, $51,936,939 was calculated as a cash portion of the total settlement amount of $66,353,609. Please note that Domtar is in disagreement with these calculations. Amongst other things, Domtar does not agree that the inventory items (Shared Inventory; LIFO and 5% adjustment) in the "Total Settlement Due from Weyerhaeuser for Shared Payment Amounts" were calculated in accordance with Section 2.04(f) of the Amended and Restated Contribution and Distribution Agreement."* | We do not understand Domtar's disagreement with the calculation of the Shared Payment Amount. Section 2.04(f) of the Contribution Agreement requires Weyerhaeuser to pay to Domtar an amount equal to the Shared Payment Amount *plus*, the "Pulp Inventory Adjustment Amount." "Pulp Inventory Adjustment Amount" is defined in Section 2.04(f) of the Contribution Agreement to equal 100% of the sum of:<br>1. the LIFO reserve applicable to the Shared Inventory reflected on the Statement (in this case ($3,045,574)); and<br>2. an amount equal to 5% multiplied by the sum of the Shared Inventory plus the LIFO reserve amount (in this case, $522,517).<br>The Shared Inventory reflected on the Statement is $13,495,916 and when added to a LIFO reserve applicable to such Inventory of ($3,045,574), yields a net value of $10, 450,342. Five percent of $10,450,342 equals $522,517.<br>If Domtar's disagreement relates to the difference between the amount of Shared Inventory for purposes of Section 2.04(f) of the Contribution Agreement and the actual amount of shared inventory at the time of Closing, Domtar's disagreement is with the terms of the Contribution Agreement, not our calculations. The Contribution Agreement defines "Shared Inventory" as "all finished pulp manufactured at the Transferred Real Property owned by Weyerhaeuser or any other member |

Confidential

DOMWEY00011329

06/03/2008 10:20 6046872314 WEYERHAEUSER PAGE 06/09

▲ Weyerhaeuser

| No. | Issue | Domtar Position | Weyerhaeuser Response |
|-----|-------|-----------------|------------------------|
| | | | of the Weyerhaeuser Group and that, as of the close of business on the Contribution Date, is located at Weyerhaeuser's facilities other than the Transferred Real Property to the extent allocated to Newco in accordance with Schedule 2.04(d). Schedule 2.04(d) of the Contribution Agreement sets forth a methodology for allocation that was agreed by the parties, and was followed by Weyerhaeuser in determining the Shared Inventory. |
| 5. | Pulp Marketing Agreement | *"Additionally, Domtar requires further clarification from Weyerhaeuser with respect to the $17,334,100 of inventory acquired by Domtar in the Shared Payment Amount pursuant to the 'Pulp Marketing Agreement."* | When Section 2.04 of the Contribution Agreement was negotiated, the parties contemplated that Weyerhaeuser would purchase from Domtar all of the Shared Inventory at Closing to facilitate the transition. Domtar elected to sell some of the inventory to third-parties. The sale price from Weyerhaeuser to Domtar was determined on a lot by lot basis, which has been provided to you previously. |
| 6. | Disagreements Generally | *"Domtar further reserves the right to reject the transference of any liabilities not in accordance with the Amended and Restated Contribution and Distribution Agreement and other Transaction Documents."* | Section 2.04(a) of the Amended and Restated Contribution Agreement requires Domtar to submit to Weyerhaeuser a Notice of Disagreement within 30 days following delivery of the Working Capital Statement, specifying in reasonable detail the nature of any disagreement. The Working Capital Statement becomes final and binding on Domtar when the items specified in the Notice of Agreement are resolved by the parties or by the Accounting Firm. Domtar cannot reserve the right to further disagree with the Working Capital Statement. |
| 7. | Prince Albert FMA | | We have written several times to ask Saskatchewan to finalize the formal transfer of the Prince Albert FMA from Weyerhaeuser to Domtar. The Saskatchewan Government has |

Confidential

DOMWEY00011330

06/03/2008 10:20 6046872314 WEYERHAEUSER PAGE 07/09

▲ Weyerhaeuser

| No. | Issue | Domtar Position | Weyerhaeuser Response |
|-----|-------|-----------------|------------------------|
|  |  |  | said that consent is dependent on: 1. consultation with aboriginal groups; and 2. Domtar confirming that it has assumed all of the obligations of the FMA including planning, public and First Nation consultation and forest renewal. We ask that Domtar confirm to the Saskatchewan Government that Domtar has assumed these obligations. |
| 8. | Kerfoot et al v. Weyer-haeuser Company Limited |  | Weyerhaeuser has asked Domtar to assume the defence of and indemnify Weyerhaeuser liabilities and costs arising in this matter. Weyerhaeuser looks to Domtar for all fees, costs and expenses and may elect to join Domtar in the action. Weyerhaeuser has asked Domtar to fulfill its obligation to use reasonable best efforts to minimize losses from third party claims and to act in good faith in responding to, defending against, settling or otherwise dealing with claims, to cooperate in any defence, and to give each other reasonable access to all information relevant to the defence. We have made several requests for all relevant information including a copy of work done by Domtar and/or its advisors with respect to the comparability of Domtar's employment offer before or after closing but have not had any response to date. |
| 9. | Employees on disability |  | We have encountered several situations in which employees have been deemed medically able to return to graduated work and Domtar has declined to accommodate medically documented limitations. In one instance, by way of example, the Dryden operations sought assurance that a staff person on long term disability who had almost completed a prescribed program) was able to return to work 100%. The law |

Confidential

DOMWEY00011331

06/03/2008 10:20 6046872314 WEYERHAEUSER PAGE 08/09

**▲ Weyerhaeuser**

| No. | Issue | Domtar Position | Weyerhaeuser Response |
|---|---|---|---|
| | | | provides that employee on long-term disability plan who present themselves for re-employment shall be offered continuing employment, to the extent such employee is able to return to employment (including with any reasonable accommodation). |
| 10 | Interest | | Weyerhaeuser invoices provide for interest if unpaid on the date due. Domtar has not kept its payments current, thus incurring interest.<br><br>On May 15, 2008, Weyerhaeuser delivered notice to terminate the TSA for non-payment including interest. Although Domtar has paid the face value, Domtar has not paid the interest component. Weyerhaeuser has proposed a resolution of the interest issue, but has not had a response. At this time, nine days remain under the termination notice. |
| 11 | Wapawekka | | All liabilities of Weyerhaeuser to Wapawekka were assigned to and assumed by Domtar Pulp and Paper Products, Inc. pursuant to the Canadian Purchase Agreement. By a letter dated February 15, 2007, Wapawekka consented to the assignment by Weyerhaeuser to Domtar of all outstanding agreements with Wapawekka and released Weyerhaeuser from any further liability under these agreements. These potential liabilities were reflected in the working capital that was transferred to Domtar Corporation and its subsidiaries at Closing.<br><br>At closing, there were several outstanding issues, which Weyerhaeuser assumes (without knowing) that you have resolved:<br>1. An estimate in the amount of $680,000 as at the beginning of March, 2007 of the 6.06 liability |

Confidential

DOMWEY00011332

06/03/2008 10:20 6046872314 WEYERHAEUSER PAGE 09/09

**Weyerhaeuser**

| No. | Issue | Domtar Position | Weyerhaeuser Response |
|-----|-------|-----------------|-----------------------|
|     |       |                 | (under the Custom Cutting Contract). Domtar was to determine the amount of this liability at the end of June 2007. <br> 2. A proposed payment to Wapawekka in the amount of $457,000 for interest on CVD/AD refunds. <br><br> In addition, Weyerhaeuser anticipates receiving one or more demands or claims with respect to Wapawekka including a claim by the Bank of Nova Scotia under Weyerhaeuser's guarantee and from the municipality for unpaid taxes. Domtar has assumed all of Weyerhaeuser's obligations with respect to Wapawekka and Weyerhaeuser will pass on to Domtar all such demands or claims. Please advise who Weyerhaeuser should notify of any such matters. |

We propose that our companies meet within a reasonable period of time and endeavour to resolve all of the issues as set out above, as such list may be amended in our further discussions and correspondence. To the extent resolution is not achieved, it would be our intention to:

1. Submit any Working Capital issues to Deloitte & Touche for arbitration;
2. Seek to recover our reasonable fees, costs, outlays and expenses incurred in defending any third party claims; and
3. Seek such other orders or rulings as are relevant and appropriate to any unresolved dispute.

I would be grateful if we could hear from you at your earliest opportunity.

Yours sincerely,

Anne Giardini
Vice President and General Counsel

AEG/dls

cc: Alan H. Paley and Paul S. Bird, Debevoise & Plimpton LLP – 1.212.909.6836

Confidential

# EXHIBIT 11

Domtar Inc.
395, boul. de Maisonneuve Ouest
Montréal QC  H3A 1L6  Canada
Tél.: (514) 848-5400

Domtar Inc.
395 de Maisonneuve Blvd. West
Montreal, QC  H3A 1L6  Canada
Tel.: (514) 848-5400



# Domtar

July 11, 2008

Anne Giardini, Esq.
Vice President and General Counsel
Weyerhaeuser Company
925 West Georgia Street, 5th Floor
Vancouver, BC V6C 3L2

Re:  <u>Your Letter Dated June 3, 2008</u>

Dear Ms. Giardini:

I am writing to follow up on our discussions concerning the issues raised in your letter dated June 3, 2008. We share your desire to resolve the issues between our two companies promptly through a meeting among relevant members of our senior management teams.

As I explained during our telephone call earlier today, those discussions will be more productive if certain information is exchanged in advance of the meeting. In particular, we ask that Weyerhaeuser make available relevant personnel to discuss the following issues and share related documentation:

1.  <u>Workers' Compensation Liabilities/Vacation</u>. We would like to understand with greater specificity, on an employee-by-employee basis, the derivation of (i) the $13,594,814.00 reduction in Closing Working Capital shown in the Statement delivered by Weyerhaeuser, and the $3,543,789 cash amount Weyerhaeuser claims is owed to it, in each case in respect of workers' compensation claims, and (ii) the $72,541.86 amount charged by Weyerhaeuser for the vacation payments it had made. We would wish to see the underlying lists of workers and how the amounts related to each of them add up to these figures.

2.  <u>Shared Payment Amount</u>. We would like to understand with greater specificity the basis for Weyerhaeuser's calculation of the Shared Payment Amount and the Pulp Inventory Adjustment Amount (as those terms are defined in the Contribution and Distribution Agreement).

3.  <u>Set-Offs</u>. For a period of time after closing, Weyerhaeuser received funds from Domtar's customers that Weyerhaeuser was obliged to remit to Domtar. Weyerhaeuser deducted from those funds certain amounts that it alleged were owed to it by Domtar. In particular, Weyerhaeuser deducted (i) from the payment

Mixed Sources - Sources Mixtes
Product group from well-managed forests
and other controlled sources
Groupe de produits issu de forêts bien gérées
et d'autres sources contrôlées
www.fsc.org · Cert no. SW-COC-812
© 1996 Forest Stewardship Council
FSC

www.domtar.com

DOMWEY00004550

made on June 8th, 2007 (cash settlement, week 11) an amount of, $1,624,000 and (ii) from the payment made on May 16th, 2007 (cash settlement, week 9) an amount of $2,315,000 that in each case Weyerhaeuser claims were owed to it by Domtar.  We need a detailed explanation of Weyerhaeuser's deductions and of the reasons why these amounts were withheld.

The team leaders for Domtar will be Michel Dagenais (to the extent the issues pertain to the HR area) and Michael Cross (to the extent the issues pertain to finance).

The matters that are subject to this letter clearly do not represent all of the issues to be resolved by Domtar and Weyerhaeuser; rather they represent the issues, with regard to which Domtar needs information in advance of a meeting designed to address the totality of the disputed items.

My colleague Ladan Nassiry stands ready to coordinate the calls with your team regarding the information requested in this letter.  She will call you next week.  Please feel free to forward in advance of the calls any documentation that you think it would be helpful for us to review.

We are looking forward to resolving the disputes between our companies expeditiously and in a cooperative fashion, and appreciate your assistance.

Sincerely,

Zygmunt Jablonski
Vice President – Legal Services


cc:     Cravath, Swaine & Moore LLP
        Attention: Richard Hall, Esq.
        (By Fax: 212-474-3700)

2

**Domtar**

Confidential

DOMWEY00004551

# EXHIBIT 12

**From:**       Giardini, Anne
**To:**         Nassiry, Ladan (Domtar)
**CC:**         Stad, Deanna; Lane, Patrick
**Sent:**       9/9/2008 9:21:44 PM
**Subject:**    Agenda v2.doc

Thank you Ladan. My comments are marked.

Anne Giardini

WEY00024095

**Domtar – Weyerhaeuser Meeting**

**September 11th, 2008**

**Domtar House**

| | |
|---|---|
| 9:00 – 9:30 a.m. | Preliminary Discussions |
| 9:30 – 11:30 a.m. | Meeting with Michel Dagenais, Senior Vice-President Human Resources<br>Topics:<br>  -   Kerfoot matter<br>  -   Employees on Disability<br>  -   Early Retirement Pension Subsidy<br>  -   Worker's Compensation and vacation payments |
| 11:30 a.m. – 2:30 p.m.<br>(including working lunch) | Meeting with Michael Cross, Vice-President Financial Reporting<br>Topics:<br>  -   Worker's Compensation and vacation payments<br>  -   Working Capital: Shared Payment Amount/ Pulp Inventory Adjustment Amount/ Settlement Deduction<br>  -   Profit participation |
| 2:30 p.m. – 5:30 p.m. | Topics:<br>  -   Wapawekka loan/ CVD and AD/ FMA<br>  -   Right of Set-off<br>  -   Thune Press Screw missing in Columbus Mill<br>  -   Interest on WY invoices<br>  -   Outstanding credits owed to Domtar<br>  -   Steam supply at Plymouth<br>  -   Transfer of Prince Albert FMA<br>  -   SignageOther? |

**Formatted:** Bullets and Numbering

WEY00024096

# EXHIBIT 13

| | |
|---|---|
| **From:** | Cross, Michael |
| **To:** | Brzezinski, Ania |
| **CC:** | Archer, Dominik |
| **Sent:** | 7/29/2013 3:59:21 PM |
| **Subject:** | FW: Sept 11 meeting with WY - Notes and Resolution/take away points |
| **Attachments:** | WY discussions Sept 11.doc |

**From:** Cross, Michael
**Sent:** Tuesday, September 16, 2008 1:36 PM
**To:** Nassiry, Ladan; Jablonski, Zygmunt; Dagenais, Michel
**Cc:** Buron, Daniel
**Subject:** Sept 11 meeting with WY - Notes and Resolution/take away points

I have edited and cleaned up my notes as i had indicated I would do

regards

Mike

Confidential

DOMWEY00011856

# WY discussions Sept 11, 2008

**Attendees:**

| Domtar | WY |
|---|---|
| Zygmunt Jablonski | Anne Giardini |
| Ladan Nassiry | Patrick Lane |
| Michel Dagenais | |
| Michael Cross | |

1. **Kerfoot Matter**
   - Have sent information to Anne; sent info to outside council
   - Issue from employees is that there is a gap re the replacement compensation they have from Domtar
   - our position is found in section Sec 4.02(iv)
   - WY believes this is our matter to manage - look to the abundant case law on the matter
   - We both agree that we are giving comparable compensation
   - WY believes that the claim is misguided by employees
   - WY proposal is to focus on shared endeavor to prove to employees that they are being comparably compensated
   - We can argue about the legal bills afterwards
   - Zyg noted that he will guarantee to have an open mind
   - WY – we offered a early retirement subsidy (to pension 65) – was a requirement in Ont and Sask and they voluntary gave it in BC
     - Anne to check this point again

Resolution / Next Steps:
   - Amount is not significant at this time
   - Focus on the defense (mutual cooperation)
   - DTC representative = M Dagenais
   - DTC outside counsel to be assigned
   - Review WY legal argument and DTC to respond if not agreed
   - Zyg will provide DTC position in writing

2. **Disabled Employees**
   - Will share information as to who has tried to return to work but and has not been allowed (thwarted)
   - No $ stated
   - Copy of information to be sent to DTC legal department

3. **Early Retirement Pension Subsidy (ERS)**
   - Unionized employees in the US; 11 collective agreements
   - WY would  not pay as the employees are not there at the time the employee retires

- However, WY has an actuarially determined liability that would have accumulated based on the benefits owed to employees
- P. Lane noted – good point – he will sort it out; there is an actuarial number.
- DTC will have to pay the subsidy (we assume the portion of the benefit) when they reach 55 but the assets has not followed that liability in the transfer of the assets for the plans
- DTC position is that the agreement requires assets to come to us re liability

After discussion with WY team in the afternoon
- The HR position is that there are no amounts owing and that is a DTC liability
- Anne wants to look at the agreement

Resolution / Next Steps:
- Amount is large
- Anne to look at legal position that Zyg
- Contact is Michel D.


4. **Signage**
- Took down sign at PA
- Kevin Belanger email to Zyg: 2 remote shipyards where 2 signs are remaining (its etched into it); off in the woods; will do so in the fall
- Mike Edwards – email to all ops to take down all WY; Report back is that it is done; if anything left its not due to lack of due dil.
- See hand out of photos before and after

Resolution / Next Steps:
- Issue resolved (other than the remote shipyards signage that will be dealt with in the fall 2008)


5. **Workers Comp and Vacation Payments**
- We have the WC liability but there is a carve out that retains with WY
- Carve out is found in the Transaction agreement section 6.09 (a) (iii)
- We will pay for transferred employees
- WY has given us the list of employees for the $3 million.- however the issue is this is a list of what?  We should only have to reimburse for employees who showed up for work.
- WY these are for paid items (not accrued)
- We will need to do a mutual audit exercise
- Manner in which the amounts were offset to the cash account – see handed out documents; for $1.089M and $1.6 million; don't have the breakdown for audit;
- Have list from WY to reconcile the claim – can WY explain how it works?  Need to work with the person.

Confidential

- Working Capital adjustment to Cash = $535,000;
  - Wood products division; was all given to Graham Pepper in Jan in 2008; they tell us; WY started to pay the invoices and then re-billed
- Vacation pay liability= $72,000
  - Might have been one that we deducted early

After discussion with WY team in the afternoon

- WY thinks our position is correct but need to convince a few more internally – need to have Laurie Scott sign off
- Need to send list for final accounting / admin true up

**Resolution / Next Steps:**

- Amount = large
- Anne – will go back re interpretation of the agreement (6.09 (a) (iii) of the transaction agreement with US counsel – Anne needs to get sign off from Laurie Scott
- WY to send revised list to DTC (Michel D)
- Michel and WY team – to audit
- Mike will validate to Graham Pepper re facts re $535,000
- Patrick to get detail on $72,000; Ladan to id where this was from

## 6. **Share Payment / Pulp Inventory**

SHARED PAYMENT AMOUNT (Section 2.04 (f)) as required by the Contribution and Distribution Agreement between Weyerhaeuser Company and Domtar
May 6, 2007 (60 days from March 7, 2007)

| | | | |
|---|---|---|---|
| **Shared Accounts Receivable** | | | $62,831,834 |
| **Shared Prepaid Freight** | | | 1,207,468 |
| **Shared Inventory** | | | 13,495,916 |
| | | | |
| | Subtotal | | 77,535,218 |
| | | | |
| **Shared Payment Amount** | | | -8,658,552 |
| **LIFO adjustment** | | | -3,045,574 |
| **5% adjustment** | | | 522,517 |
| | | | |
| **Total Settlement due from Weyerhaeuser for Shared Payment** | | | **66,353,609** |

DOMWEY00011857_0003

| Amount | | | |
|---|---|---|---|
| | | | |
| | | | |
| **Settled as follows:** | | | |
| | | | |
| **Pulp Marketing Agreement** | Inventory acquired by Domtar consistent with the Pulp Marketing Agreement | | 17,334,100 |
| | Assumption of rebate liabilities consistent with the Pulp Marketing Agreement | | -72,922 |
| | Adjustment to the 5% adjustment above for inventories acquired by Domtar | | 201,066 |
| | | | |
| **LIFO transfer** | | | -3,045,574 |
| | | | |
| **Balance in Cash** | | | 51,936,939 |
| | | | |
| | | | |
| **Total Settlement** | | | **66,353,609** |
| | | | |

- The inventory amount in the calculation in the top part of the schedule ($13,495,916 ) is based on an "allocation" per the agreement; however, the "settled" portion (at the bottom) is based on actuals = $17,334,100
- No debate that we actually got volume and cost of pulp worth $17,334,100
- Issue was that WY used an allocation when after the fact we agreed on the fact we would take an actual amount – would have changed the $66.353 number by approx $4 million
- We decided to market the pulp
- WY lost the margin on that pulp
- Believe that not in the spirit of the deal – should have augmented the amount of shared inventory to the $17,334,100
- We believe that we do not have any solid argument against the use of an allocation for the inventory numbers – this is what the deal called for;
- WY position is they could have done this allocation and then in turn sold us the extra pulp and we would have cut them a cheque – thus its like these 2 transactions are netted together.

<u>Resolution / Next Steps:</u>
- Dropped
- Don't have legal argument to challenge agreements;

DOMWEY00011857_0004

7. **Profit Participation fee**
- US$203,890 true up is the amount claimed by WY
- Chose November as the data to be used (no shut downs) for the comparable period for the 2 days of march
- WY – Daniel Buron insisted on a price adjustment mechanism;

**Resolution / Next Steps:**
- Get the feedback from Daniel, Gilles, Tom Stocks and Sandy McDade.
- One page outline of respective position
- Goal is recapture the meeting of the minds on the issue


8. **Wapawekka Loan  guarantee and the CVD / AD refund owing by WY**
- Anne letter to us re WY has wired $ to the bank and would like to be reimbursed
- See hand out from Zyg – bank states to Wapawekka; expecting CVD refunds; Bank considers them of importance; to be applied to indebtedness
- P Lane commitment letter to the bank to reimburse the bank for CVD / AD refunds that Wapawekka gets
- There is a covenant re carrying on business in regular course
- DTC view should have happened before closing
- Wapawekka had no CVD as they produced rough green lumber for WY – WY lumber was commingled
- Custom cutting agreements with WY; WY makes some weak commitments if WY gets refunds on lumber produced and after WY got back all losses
- Custom cutting agreements – sole discretion to refund $ to Wapawekka
- On opening BS there is a liability = estimated amount for custom cutting agreement = March 5 balance – that is indicating that amounts were owed to Wapawekka
- Wapawekka – if they get $ from WY then we commit to give to the bank
- June 2007 = end of custom cutting agreement; then at the sole discretion at WY to calculate how much would be reimbursed to Wapawekka (and they are allowed to use the CVD / AD refund); WY noted that given the on going losses of Wapawekka there would have been no $ by WY at end of June
- The $400,000 was WY best estimate as to what was owing to Wapawekka but this was at March 5.  They would have incurred losses from March 6 – June 30.
- Obligation was payable at end of June
- PL = Wapawekka and WY at the same time
  - Problem we have is that it is PL on both sides – promised to pay the bank but on the other side never intended
- BNS loan guarantee = $1.5 million but was open but agreed to PL interpretation = facility #2
- Wapawekka has been insolvent since 2004
- If 3rd party withholds consent then WY holds on DTC behalf = still a transferred liability
- WY noted that DTC should send a note re section 6.09 of the custom cutting agreement to show that losses in the

**Resolution / Next Steps:**
- DTC to review bank documentation (includes the custom cutting agreement)
- Zyg will come back to Anne


9. **Right of offset;  Interest;  BANN exit; IT TSA Exit**
- Have not always the best in the past with each other re paying what we owe each other
- We are now looking to the future to be better with each other and will drop the interest issue
- DTC IT intends to short pay the IT TSA for $165,000?
    - WY noted that we are still using WIA which indicates we are not fully off the BANN TSA; thus WY entitled to keep charging for BANN TSA...
    - Agreement says that if we are still using the service then we still get billed – objective is to not have WY left hanging for some small stuff at the end
- Invoice is due September 14, 2008
- Issue is that we have exited the TSA for BANN = DTC IT position
- IT is talking to WY in Federal Way this week
- We think the reasonable approach is to have peaceful discussion and agree the story
    - No need to get into throwing around of letters of notice of termination given that this is a legitimate disagreement with the IT TSA
- P Lane noted that DTC has a legitimate complaint
- WY wants to have DTC off the TSA ASAP given their plans to right size federal way.
- DTC IT belief that we have paid $2M for WY delays and inefficiencies
- Perception of WY is that DTC has not allocated enough resources to get off the IT TSA
- Best interest of all to "wean" each other off the WY TSA
- WY – no problem with IT staff; problem is the IT Consultants and the performance towards their commitments' that involve WY
- WY took hard line because we did not pay our bills for 90 days
- Reasonable now but reserve the right to not be in the future - will serve notice of termination in the future
- Yves P believes March 15 to April 15 was delaying us in doing what we needed to do re TSA exit and ultimately moving us into the escalation portion of the agreement ($2.3 million of loss)
    - Opening networks to 2-way trust
    - Precursor to Rock Hill disaster (WY – we were poorly planned anyways so we did not lose any time anyways)
    - WY – it was a request and they were managing the business they believed; this was a change in the service
- WY – will be reasonable on helping us; will not be reasonable on price – will be sticking it to us as much as we can.
- WY – did 140 site conversion for IP deal in 2 months

DOMWEY00011857_0006

**Resolution / Next Steps:**
- WY will go back and look at the $165,000 and give us a number for the WIA (will be reasonable); we will deduct the $165,000 and they will add it to the next bill for the actual cost (Ladan to advise Kevin)
- Zyg & Anne – should be involved in the discussions as detached observers – discussion with Yves Parent – look at last several months of the agreement
- Connect next week re what the IT guys came up with in Federal Way
- PL will go back and see if IT is being unreasonable – if its counter productive

### 10. Thune Press Screw
- Ops guys did not get the screw
- WY - Ops guys let it get stolen from the Columbus site
- Don't think there is a remedy under the agreement
- Book value is $45,000; New = $100,000
- No remedy in the agreement

**Resolution / Next Steps:**
- Zyg will follow up
- P Lane to check with pulp mill to see if it is not somewhere else

### 11. Steam Supply at Plymouth
- Upgrading boiler that will be ready next year
- Sawmill working at less than capacity – do not believe that there are major outages
- WY – have not met the min commitments
- Smaller boiler will work – business level have not worked out what would be needed as a boiler
- WY side = Plymouth Manager;
- WY – differential load shedding?
- Compensation to WY because of the outages??
- WY -Best case would be to provide reliable steam

**Resolution / Next Steps:**
- Anne to go back people to get the story and if there are any direct cost – will WY present a claim
- Ladan to contact Roger on our side

### 12. Sask. Forest Management Area (FMA)
- Gov't wont get WY off the FMA until DTC confirms we are the holder of the FMA
- WY wants us to confirm to the gov't that we are the holders of the FMA
- DTC has done so per agreement with WY already

- Sask has said they will not give DTC the FMA until we commit to a business plan and restart the facilities
- WY wants us to confirm that they are off of the FMA
- WY – Sask wanted to have us commit to reopen the mill and consultation with first nations before they take WY name off
- We have already agreed to take the FMA already
- Zyg has to speak to P Lou Lou

Resolution / Next Steps:
- Anne to send us some language that we could use to the government to get them off but may not help us get on
- Zyg would look to send to the letter


13. **Outstanding Credits / and Receivable**
- PL has updated list
- Net owed to DTC
- Cell phone and demurrage are the 2 big remaining issues
- Should not be netting things that do not net – only complicating things

Resolution / Next Steps:
- Mike and Patrick to meet within a week to settle up
- Will get back to the group


14. **Other**
- Anne and Zyg to meet to recap on the 18th; perhaps again the 29th to the 3rd
- Keeping talking until we are completed

DOMWEY00011857_0008

# EXHIBIT 14

Page 1

1

2

3            IN THE UNITED STATES DISTRICT COURT

4                OF THE DISTRICT OF DELAWARE

5

6

7    WEYERHAEUSER COMPANY,          )
                                     )
8                                    )
                                     )
     Plaintiff,                      )
9                                    )
     -VS-                            ) C.A. No. 14-00024-SLR
10                                   )
                                     )
     DOMTAR CORPORATION,             )
11   DOMTAR PAPER COMPANY LLC,       )
                                     )
12                                   )
     Defendants.                     )
13

14

              DEPOSITION OF PATRICK MICHAEL LANE
15                 TUESDAY, JUNE 9, 2015
                 MONTREAL, QUEBEC, CANADA
16

17

18   COURT REPORTER: CHERIE KLEIN

19

20   JOB NO. 94103

21

22

23

24

25

1

APPEARANCES

2

3      FOR DEFENDANT DOMTAR
4      DEBEVOISE & PLIMPTON
       BY:   GARY KUBEK, ESQUIRE
5            ALEX GINSBERG, ESQUIRE
       919 Third Avenue
6      New York, NY 10022
7

8

9

       FOR PLAINTIFF WEYERHAEUSER AND THE WITNESS
10

       HILLIS CLARK MARTIN & PETERSON
11     BY:   JAKE EWART, ESQUIRE
             LAURIE CHYZ, ESQUIRE
12     1221 Second Avenue
       Seattle, WA 98101
13

14

15

16     ALSO PRESENT:   ANIA BRZEZINSKI, ESQUIRE
                       IN-HOUSE COUNSEL FOR DOMTAR
17

                       CONRAD SMUCKER, ESQUIRE
18                     IN-HOUSE COUNSEL FOR WEYERHAEUSER
19

20

21

22

23

24

25

1                    PATRICK MICHAEL LANE

2      remember that.

3           Q.     Who decided to change the way in

4      which -- to change the substance of what you were

5      invoicing to Domtar for workers compensation

6      liabilities following the September 2008 meeting?

7           A.     I would have got that direction from

8      our legal department, and that would have been --

9      yes.  Not so much just Anne, but yes.

10          Q.     Anne Giardini?

11          A.     Yes.

12          Q.     And what was the substance of the

13     change in the invoicing following the

14     September 2008 meeting?

15          A.     There was a narrow sub-set of

16     workers compensation that we could justify

17     invoicing to Domtar and get paid.

18          Q.     When you said that you could justify

19     to Domtar, what did you mean?

20          A.     I mean that we, being ourselves and

21     Domtar, agreed that they owed that money.

22          Q.     Did you attend the meeting in

23     September 2008?

24          A.     Yes.

25          Q.     That was a meeting in Montreal?

1               PATRICK MICHAEL LANE

2          A.     Yes.

3          Q.     Who else participated from the

4   Weyerhaeuser side?

5          A.     Anne Giardini.

6          Q.     Just the two of you?

7          A.     Yes.

8          Q.     And did that meeting cover a variety

9   of topics?

10         A.     Yes, it did.

11         Q.     What do you recall of the topics

12  that were being discussed?  Well, withdraw.

13  Workers compensation liability was one of the

14  topics, I take it.

15         A.     Yes.

16         Q.     Do you recall any other topics that

17  were discussed?

18         A.     There was a profit participation

19  fee.  There was -- there was six or seven agenda

20  items.  I can't remember what the rest were.

21         Q.     What do you recall of the discussion

22  about workers compensation at that meeting?

23         A.     It was brutally short.

24         Q.     What do you recall of the brutally

25  short discussion?

PATRICK MICHAEL LANE

1

2       A.      Domtar had a position and couldn't

3  -- we didn't have a counter that said why they

4  were wrong, so there wasn't much of a discussion.

5  Reiteration of points and move on.

6       Q.      Was there a discussion during that

7  meeting about whether Weyerhaeuser would in fact

8  change the way in which it was invoicing Domtar

9  for workers compensation liabilities?

10      A.      I don't remember.

11      Q.      Was there any sort of agreement that

12 came out of that meeting with respect to workers

13 compensation liabilities?  And I don't mean a

14 written agreement.  Just a meeting of the minds

15 on any portion of that?

16      A.      I don't think there is an agreement.

17 I mean, I was looking to Anne for after the

18 meeting to give me direction.

19      Q.      And did Anne give you such

20 direction?

21      A.      I don't know.  I am assuming she

22 did.

23      Q.      You don't recall?

24      A.      I don't recall specific direction,

25 no.

1              PATRICK MICHAEL LANE

2         Q.    At some point though, you were

3    directed by someone to only invoice for a portion

4    of the workers compensation liabilities that were

5    previously being invoiced.  Is that correct?

6         A.    I am not sure exactly how that came

7    about, so I don't know.  There is two ways it

8    could go.  She could direct me or I could go back

9    and say:  I want to invoice.  What can I invoice?

10   So I am not sure which way it went.

11              MR. EWART:  Let's take a quick

12   break.

13              Upon recessing at 9:57 a.m.

14              Upon resuming at 10:10 a.m.

15   BY MR. KUBEK:

16        Q.    Weyerhaeuser changed -- following

17   the September 2008 meeting, when Weyerhaeuser

18   changed what it was invoicing Domtar for or which

19   claims it was invoicing Domtar for with respect

20   to workers compensation, what claims were

21   included in what you were then invoicing for?

22        A.    I believe it would have been

23   transfers to employees who actually went to work

24   for Domtar only.

25        Q.    And you stopped invoicing for other

1              PATRICK MICHAEL LANE

2    people who had not gone to work for Domtar;

3    correct?

4         A.    That's right.

5         Q.    And that would include former

6    employees who retired from the fine paper

7    business before the closing; correct?

8         A.    As I subsequently found out, yes.

9         Q.    And did that also include persons

10   who had left the Weyerhaeuser -- had left their

11   employment with Weyerhaeuser's fine paper

12   business for other reasons as well as retirement

13   prior to the closing?

14        A.    I don't remember.

15        Q.    As a logical matter, if you were

16   only invoicing for people who transferred, it

17   wouldn't have included anyone who had left the

18   business for whatever reason prior to the

19   closing; correct?

20        A.    I would think so, yes.

21        Q.    And you may have already testified

22   on this, but did anyone explain to you why you

23   were -- or explain to you who it was that going

24   to be included in the group that was being

25   invoiced?

1                    PATRICK MICHAEL LANE

2         A.      I don't remember.

3         Q.      Did you make that decision on your

4    own?

5         A.      No, that wouldn't be my decision.

6    Anne would clarify it for me.

7         Q.      Okay.  So to the best of your

8    recollection, it was Anne Giardini who decided or

9    instructed you, rather, to invoice only for

10   what's called the transferred employees, people

11   that went to work for Domtar?

12        A.      That's my recollection.

13        Q.      Do you recall whether there was any

14   written instruction to that effect?

15        A.      I don't remember.

16        Q.      Do you recall a conversation in

17   which you were told that?

18        A.      No.  It's a long time ago.

19        Q.      Did you notify Domtar that you were

20   changing the scope of the employees for whom you

21   were going to be sending them invoices?

22        A.      I don't remember.

23        Q.      Do you know if anyone did?

24        A.      I don't know.

25        Q.      Did you have any conversation

1                  PATRICK MICHAEL LANE

2     following the September 2008 meeting with Mr.

3     Cross concerning changing the way in which you

4     were -- in which Weyerhaeuser was going to be

5     invoicing Domtar for workers compensation

6     liabilities?

7          A.     I don't remember.

8          Q.     If there was such a communication,

9     would you have been the person to have made that

10    communication to Mr. Cross?

11         A.     Since it involved workers

12    compensation, no.

13         Q.     Who do you think would have been the

14    appropriate person?

15         A.     If I had to guess, it would be Kim

16    Eckroth, going to whoever HR counterpart in

17    Domtar would have been.

18         Q.     Do you know whether there was such a

19    communication from Ms. Eckroth?

20         A.     No.

21         Q.     Do you have an understanding as to

22    whether this litigation, in addition to a dispute

23    over the substantive liability for workers

24    compensation claims, also involves a claim by

25    Weyerhaeuser with respect to administrative fees

1                    PATRICK MICHAEL LANE

2   for workers compensation claims?

3          A.      Yes, I do.

4          Q.      And what's your understanding of

5   that portion of the dispute?

6          A.      We have never been compensated, to

7   my knowledge, I believe, for any of the support

8   we have provided for the last seven or

9   eight years on some of those outstanding items.

10         Q.      When you say some of those

11  outstanding items, are you referring to only

12  workers compensation or other claims?

13         A.      A number of things.

14         Q.      Specifically with respect to workers

15  compensation, is it your understanding that

16  Weyerhaeuser has never been compensated for any

17  of the administrative charges?

18         A.      I am not certain of that, but I am

19  not aware of -- that we included administrative

20  charges in the transition services fee.

21         Q.      Are you aware of whether any

22  invoices or bills were sent to Domtar by

23  Weyerhaeuser for administration fees or charges

24  with respect to workers compensation claims?

25         A.      I am not aware of any.

1              PATRICK MICHAEL LANE

2        Q.      Who would have been the people who

3    would generate this portion of a SigNAL

4    notification?

5        A.      Lisa Wilson would have been involved

6    with this, and Chee-Tuck Wong.

7        Q.      And Mr. Wong in fact is indicated as

8    the key contact on top of the notification;

9    correct?

10       A.      Yes.

11       Q.      Do you know what was meant by the

12   statement that:

13                   "Prior to the closing it was

14                   interpreted that all workers

15                   compensation claims would

16                   remain with Weyerhaeuser."

17       A.      I can only assume that they are

18   documenting that prior to the close of the

19   transaction, the accounting organization thought

20   that the compensation claims remained with

21   Weyerhaeuser.

22                   Exhibit 118 was marked for

23   identification.

24   BY MR. KUBEK:

25       Q.      I ask the reporter to mark as

1              PATRICK MICHAEL LANE

2    Exhibit 118 a two-page document with Bates

3    numbers WEY 5787 and 5788.  Before I ask you

4    about Exhibit 118, actually there is something I

5    meant to ask you before.  You mentioned that

6    following the May 2008 meeting change was made in

7    how Weyerhaeuser was invoicing or what --

8    September 2008 meeting, sorry, what claims,

9    workers compensation claims Weyerhaeuser was

10   invoicing Domtar for; correct?

11        A.      Yes, we changed after September.

12        Q.      Do you know whether there was ever a

13   subsequent change to that approach in the

14   invoices at any point between then and when you

15   retired?

16        A.      For workers compensation?

17        Q.      Yes, the invoices for workers

18   compensation.

19        A.      I don't remember any.  You know, we

20   did try and settle some things with Domtar, and I

21   can't remember whether that was included in the

22   settlement with Domtar or not.

23        Q.      So far as you recall, through the

24   time you retired Weyerhaeuser was continuing to

25   invoice Domtar only for the employees who

1                    PATRICK MICHAEL LANE

2    transferred to Domtar.  Is that correct?

3         A.    As far as I am aware, yes.

4         Q.    Okay.  Let's go back then to

5    Exhibit 118.  And do you recall seeing this

6    e-mail?

7         A.    No, I don't.

8         Q.    Do you have any reason to believe

9    that you didn't in fact receive it and in fact

10   send the e-mail that's indicated on the first

11   page?

12        A.    I have no reason to think that.

13        Q.    If you look at the second page of

14   the Exhibit 118 there is an e-mail from Lisa

15   Wilson to Chee-Tuck Wong, and you were not copied

16   on that e-mail.  And Ms. Wilson refers to:

17                      "Let's approach the WC

18                      liability buckets as follows."

19                 Do you have an understanding as to

20   what she meant by "WC" or "workers comp liability

21   buckets"?

22        A.    I am not exactly sure what she

23   meant, no.

24        Q.    Looking at the document now, what do

25   you believe she meant?  What's your understanding

1               PATRICK MICHAEL LANE

2  of what she meant?

3      A.     Weyerhaeuser accounts are for

4  different categories of workers compensation in

5  different levels of the organization.  So white

6  paper business workers compensation liability

7  might be in a couple of different levels in the

8  company.

9      Q.    And she indicates three different

10  buckets.  Do you know what she means or what is

11  referred to by "business reserve transferred to

12  corporate account"?

13      A.    I am afraid I can't tell you much

14  about U.S. workers compensation.

15      Q.    How about with respect to "corporate

16  retained access"?  Any understanding of what that

17  means?

18      A.    No.

19      Q.    How about "IBNR/SOP 97-3 held in

20  corporate"?

21      A.    I can only tell you what IBNR refers

22  to, how Weyerhaeuser accounts for IBNR.

23      Q.    What is that?

24      A.    Incurred but not reported.

25      Q.    And how does Weyerhaeuser account --

```
1                PATRICK MICHAEL LANE
2    you will see there is a reference to a
3    September 2012 workers compensation invoice for
4    Domtar; right?
5         A.    Yes.
6         Q.    And then above that Sally Graupman
7    is asking someone:
8                     "Do you know if Domtar is
9                     up-to-date on their payments?"
10              The response is:
11                    "It appears so, with only
12                    August and September
13                    outstanding."
14              And at the top, e-mail Sally
15   Graupman says to you:
16                    "FYI, it looks like Domtar is
17                    current with their invoice
18                    payments."
19              Do you recall this communication?
20        A.    I don't recall it, no.
21        Q.    Is it consistent with your
22   understanding that at that point in time, in
23   early fall of 2012, that Domtar was current with
24   paying the invoices they had been sent for
25   workers compensation?
```

1                 PATRICK MICHAEL LANE

2         A.      Well, current would normally be paid

3    in 30 days, so technically it's not.  It's just

4    documenting they are close to current.

5         Q.      Other than disagreeing with Sally's

6    use of the word "current" encompassing two months

7    rather than one month, do you have any reason to

8    think that the statement was incorrect?

9         A.      No, I don't.

10        Q.      And the invoices that we are talking

11   about here were with respect to claims relating

12   only to employees who had gone to work for

13   Domtar.  Is that your understanding?

14        A.      I am not totally clear on that.

15   Sometimes when we say they are all workers comp

16   current, or benefits workers comp or all of them,

17   or it's just a group of invoices that were due,

18   so I don't know whether Rita was dealing with

19   workers comp or she was dealing with benefits,

20   but that being said I assume we read it as it

21   says, which is workers comp.

22        Q.      But my question is:  Was it your

23   understanding that the invoices being sent with

24   respect to workers compensation at this point in

25   October 2012 or let's say August/September 2012

1                    PATRICK MICHAEL LANE

2    only involved employees who had claims relating

3    to employees who had gone to work for Domtar?

4         A.    I have no reason to believe

5    otherwise.

6         Q.    I ask the reporter to mark as

7    Exhibit 139 a document Bates numbered WEY 2940

8    through 2943.

9                    Exhibit 139 was marked for

10   identification.

11   BY MR. KUBEK:

12        Q.    And this is a series of e-mails, the

13   last chronologically of which looks like Leslie

14   McIntosh, but with a number of other e-mails

15   below some of which you were not originally

16   copied on, although they were included -- you

17   were included later in the chain.  Do you have

18   any recollection of this e-mail chain?

19        A.    No.

20        Q.    At the end of the last page -- at

21   the bottom of page 2942, the beginning of the

22   first e-mail chronologically, which is actually

23   back in April of 2012, there is a reference in

24   here to Sally Graupman at Weyerhaeuser says to

25   Kim Rogerson -- and Kim Rogerson was someone at

1                    PATRICK MICHAEL LANE

2    Domtar; correct?

3         A.      That's correct.

4         Q.         "As I mentioned on the

5                       phone our actuaries had

6                       already received on

7                       Domtar claims which

8                       included development

9                       triangles through year

10                      end 2007."

11             Do you know what development

12   triangles are with respect to workers

13   compensation claims?

14        A.      No.

15        Q.      Do you know what the context is or

16   have a recollection of what the context is in

17   which Sally and Kim were communicating in April

18   2012 about losses and other information?

19        A.      Specifically, no.

20        Q.      Generally?

21        A.      Generally, in this time frame Kim

22   had asked:  If we are going to have a discussion,

23   I would like to see data, and so Sally was

24   requested to provide the data to Kim.

25        Q.      And when Kim was saying:  Can I have

# EXHIBIT 15

1                              M. CROSS

2              IN THE UNITED STATES DISTRICT COURT

3                 FOR THE DISTRICT OF DELAWARE

4        _____

5    WEYERHAEUSER COMPANY, a              )

6    Washington corporation,             )

7              Plaintiff,                 )  Case No.

8                                         )  C.A. No. 14-00024-SLR

9    DOMTAR CORPORATION, a               )

10   Delaware corporation,               )

11   and DOMTAR PAPER COMPANY, LLC, )

12   a Delaware limited liability  )

13   company,                            )

14              Defendants.               )

15   _____  )

16

17              Oral deposition of MICHAEL CROSS, a

18   representative of the Defendants, called by the

19   Plaintiffs herein, held before a stenographic court

20   reporter at the offices of Domtar Corporation, 395 Boulevard

21   de Maisonneuve Ouest, Hong Kong Room, Montréal, Canada

22   on Wednesday, the 28th day of May, 2015, at 9:00 a.m.

23

24   Job No. 93999

25   Reported by: KARIN A. JENKNER

Page 2

1                        M. CROSS

2    A P P E A R A N C E S:

3    For the Plaintiff:

4    HILLIS CLARK MARTIN & PETERSON

5    BY:  Laurie Chyz, Esq.

6              1221 Second Avenue

7              Seattle, WA 98101

8

9

10

11

12   For the Defendants:

13   DEBEVOISE & PLIMPTON

14   BY:  Courtney Dankworth, Esq.

15        Alex Ginsberg, Esq.

16             919 Third Avenue

17             New York, NY 10022

18

19

20

21

22   ALSO PRESENT:

23   Conrad J. Smucker (Sr. Legal Counsel, Weyerhaeuser)

24   Ania Brzezinski (VP Legal Affairs, Domtar)

25

1                          M. CROSS

2    at the time Michel left, that first issue about the

3    contract interpretation was not resolved?

4              A.    When Michel left?  Michel left in...

5              Q.    2009.

6              A.    I don't remember exactly when he left.

7              MS. DANKWORTH:  I can't help you, sorry.

8    BY MS. CHYZ:

9              Q.    He left in 2009.

10             A.    My understanding, though, this was

11   resolved at the meeting in September of 2008.

12             Q.    Okay.  And when you described two

13   different issues, the first issue is the contract

14   interpretation issue?

15             A.    Yes.

16             Q.    Is that correct?

17             A.    Yes.

18             Q.    And then the second issue is the

19   administrative reimbursement issue?

20             A.    That's how I've been referring to it,

21   yeah.

22             Q.    Okay.  And going back to my question

23   about:  Who was charged with resolving these?  The

24   first issue sounds like it was a combination of Michel

25   and Zyg?

1                         M. CROSS

2          A.    Correct, and I guess any other legal

3     counsel that Zyg may have used.

4          Q.    Okay.  And who was responsible for

5     resolving the second issue?

6          A.    The administrative side?  The -- it was

7     Michel Dagenais and, I guess, his people.

8          Q.    You talked about the meeting in

9     September 2008.  Did you attend that meeting?

10         A.    I did, yes.

11         Q.    Did you attend the entire meeting?

12         A.    I believe I was there for the whole,

13    yes.  The whole meeting.

14         Q.    What is your recollection of the

15    discussion about the Workers' Compensation issue at

16    that meeting?

17         A.    Again, it was the two parts of it:  The

18    reserve related to the transferred versus

19    non-transferred employees, and the administrative

20    side.

21              I had reviewed my notes before coming here,

22    of that meeting that I took.  It was clear from that

23    that we had resolved the -- at least we had resolved

24    at a handshake level at that moment.  And the

25    Weyerhaeuser lawyer had said, well, she'll go back and

1                    M. CROSS

2    clear it with her own people, or whatever the exact

3    language was.  She had to talk to her own people about

4    it.

5              But they were in agreement with us that the

6    non-transferred employees was a retained liability of

7    Weyerhaeuser; and that all the discussions, then, or

8    all the effort would then focus on the administrative

9    side.  Because I think by this point, amount owing was

10   in excess of $2 million.

11             Q.    Okay.  Let's break that down a little

12   bit and tell me what you actually remember about the

13   conversation.

14             Who spoke on behalf of Domtar at that

15   meeting, in connection with the Workers' Compensation

16   issue?

17             A.    Probably Zyg.

18             Q.    Do you remember what he said?

19             A.    I do not.  It was seven, six and a

20   half, years ago, so I don't remember every detail.

21             Q.    And did anyone else speak for Domtar in

22   connection with the Workers' Comp issue?

23             A.    Ladan was a lawyer working with him,

24   may have spoken; but again, I don't remember every

25   aspect of the meeting.  I mean, I remember that I took

1                        M. CROSS

2    notes and that I reviewed my own notes before this

3    meeting, but I don't remember every little nuance of

4    the conversations.

5            Q.   And I understand that there will be

6    much that you don't remember.  I am just trying to ask

7    questions so that I get an understanding of the scope

8    of what you remember.  So I'm not trying to be a pest.

9            A.   No, no, I understand.

10           Q.   I'm just trying to explore what you do

11   remember.

12           A.   I understand.

13           Q.   Do you remember who spoke for

14   Weyerhaeuser?

15           A.   Patrick Lane.  Never shy to speak.  So,

16   and he had -- he was running point on all these

17   things, so Patrick Lane and Laurie Scott, I think, was

18   the lawyer on the other side.  I can't remember

19   exactly the...

20               (looking at reporter) I'm looking at you...

21                   (query by reporter)

22           Laurie Scott, I think, was the lawyer on the

23   other side.

24           Q.   Was Anne Giardini there?

25           A.   I don't know, I'd have to go back to my

1                    M. CROSS

2    notes.

3            Q.    Okay.

4            A.    There was whoever the lawyer was on the

5    other side.

6            Q.    Okay.  And what did they say?

7            A.    I don't recall.

8            Q.    Did you discuss retired employees at

9    that meeting?

10           A.    The first time that I've heard

11   reference to this "retired employee" thing is

12   recently.  So, no.

13           Q.    How recently?

14           A.    Like yesterday, the day before

15   yesterday.  The nuance, if you like, or the

16   categorization like that was never something.  It was

17   transferred/non-transferred.  It was never this --

18   well, I guess I would call it a third category of

19   "retired."  I never, never, never heard that until two

20   days ago.

21           Q.    Okay.  So at the September 11th

22   meeting, there was not a discussion of retired

23   employees?

24           A.    Transferred and non-transferred.  So,

25   no.  No.  But it was always

1                         M. CROSS

2    transferred/non-transferred.

3              Q.   Okay.  And it sounds like what you're

4    telling me is that both parties agreed to an

5    interpretation of the contract?

6              A.   At that meeting and confirmed quickly,

7    well, I guess how quickly, I don't know exact dates

8    but shortly thereafter by a fax from Anne Giardini.

9              Q.   Okay.  So, so the discussion led to an

10   agreement of what the contract required?

11             A.   It led to a fax from Anne Giardini

12   saying, we're in agreement on the position on

13   transferred employees.  Let's now keep talking about

14   the administrative.

15             Q.   Okay.  And in terms of the second

16   issue, the claims administration issue, what's your

17   understanding of how that process works?

18             MS. DANKWORTH:  Objection to the form.

19             A.   How it -- the last word you said?

20   BY MS. CHYZ:

21             Q.   Of how that process works?

22             A.   Works?  Well, it was a back-and-forth

23   between Michel and his people and their Weyerhaeuser

24   counterparts to demonstrate the list of employees and

25   what was paid for them, so that we would reimburse

1                    M. CROSS

2    them.

3            So it's some sort of supporting

4    documentation we would use to wire or cut them a

5    cheque.

6            Q.    Okay.

7            A.    So it's the:  How do you validate that

8    they actually paid that?  And that is, you know, an

9    error on the list.  It's not an employee, it's just

10   from -- you know, it's just a straight-up clerical

11   error, that there is an employee transferred to us,

12   that they are on our, I guess, on our payroll.

13           And so whatever validation I would have

14   done -- I definitely would have done -- would have

15   been to go back to the payroll system, make sure they

16   were actually an active employee, or contact the

17   location, or I would have done something to

18   substantiate that it's a valid employee and not a

19   clerical error; and then get some sort of supporting

20   documentation from Weyerhaeuser that they actually

21   paid that.

22           And again, not a -- I put an extra "1" on

23   the -- you know, or an extra zero on the list or what

24   have you.

25           Q.    Okay.  And in terms of the

M. CROSS

1
2  reimbursement, the reimbursement covered both the
3  payment on the claim and an administration fee?
4       MS. DANKWORTH:  Objection to the form.
5       A.   Yeah, I don't recall the whole
6  administrative -- I never saw the invoice.  I never
7  was involved in paying the bill.  And that was a
8  detail -- you know, I was aware, through this whole
9  process and through the court documents of this
10 "administrative fee" potential issue, but I never saw.
11 I never saw the bill, I never saw the back-and-forth.
12 I never -- I didn't -- I wasn't really aware of that
13 kind of detail.
14 BY MS. CHYZ:
15      Q.   Okay.  Are you aware of any legal basis
16 on which Domtar should receive the administration
17 services for free?
18      MS. DANKWORTH:  Objection to the form.
19      A.   Well, I'm not a lawyer, so I don't know
20 if I could make a legal note to your legal basis.  And
21 it's -- your question is what again, I'm sorry?
22      Q.   Was it part of the transaction that
23 Domtar was entitled to receive administration services
24 for free?
25      MS. DANKWORTH:  Objection to the form.