# EXHIBIT 16

1

2   IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

3    - - - - - - - - - - - - - - - -x

WEYERHAEUSER COMPANY, a Washington

4   corporation,

5                           Plaintiff,

6           -against-

7   DOMTAR CORPORATION, a Delaware corporation,

and DOMTAR PAPER COMPANY, LLC, a Delaware

8   limited liability company,

9                           Defendant.

10   - - - - - - - - - - - - - - - -x

11

12

13

14

15      DEPOSITION OF ZYGMUNT JABLONSKI

New York, New York

16         June 30, 2015

17

18

19

20

21

22

23

Reported by:

24   Pessi Goldstein

JOB NO. 95056

25

1

2                          June 30, 2015

                            9:05 a.m.

3

4

5          DEPOSITION of ZYGMUNT JABLONSKI, on

6   behalf of the Defendant herein, held at the

7   offices of Debevoise & Plimpton, 919 Third

8   Avenue, New York, NY  10022, taken before

9   Pessi Goldstein, a shorthand reporter and

10  Notary Public within and for the State of

11  New York.

12

13                  *        *        *

14

15

16

17

18

19

20

21

22

23

24

25

1

2  A P P E A R A N C E S:

3

4      HILLIS CLARK MARTIN & PETERSON
           Attorneys for Plaintiff
5          1221 Second Avenue
           Seattle, Washington  98101
6      BY:  LAURIE LOOTENS CHYZ, ESQ.

7

8      WEYERHAEUSER
           Chief Competition Counsel &
9          Senior Legal Counsel
           33663 Weyerhaeuser Way South
10         Federal Way, Washington  98003
       BY:  CONRAD SMUCKER, ESQ.

11

12

       DEBEVOISE & PLIMPTON
13         Attorneys for Defendant
           919 Third Avenue
14         New York, New York  10022
       BY:  GARY KUBEK, ESQ.
15         ALEX GINSBERG, ESQ.
           GENA MILLER, Law Clerk

16

17

18

19              *      *      *

20

21

22

23

24

25

1                    ZYGMUNT JABLONSKI
2    with Steptoe for about a year and then I
3    joined the trade practice at Willkie Farr &
4    Gallagher in Washington D.C., I was there
5    until 1992.
6                    In 1992, I joined Skadden Arps in
7    Washington D.C. in their trade group.  1994,
8    I went in-house with Georgia-Pacific
9    Corporation, the title I don't recall right
10   now but it was throughout my engagement with
11   Georgia-Pacific was either chief or
12   principal counsel, I forget what that
13   exactly was.
14                   At the beginning, responsible for
15   the pulp and bleachboard division and
16   international, and then in 1999, or '98,
17   after the acquisition of Georgia-Pacific of
18   Unisource Worldwide, I became the chief of
19   principal counsel for Unisource.
20                   In 2002, Unisource was partly
21   sold to Bank Capital of Georgia-Pacific.  GP
22   maintained a more than 40 percent interest
23   in it but I moved with Unisource.  And there
24   I became either senior executive VP general
25   counsel and secretary.  I was in that

1              ZYGMUNT JABLONSKI

2    position until 2008.  I left Unisource in

3    February 2008 and joined Domtar in April of

4    2008.

5              I joined Domtar as the vice

6    president of legal services, then in March

7    or April of 2009, I became senior vice

8    president and general counsel.  And then

9    after the departure of my predecessor Gilles

10   Pharand, I became senior vice president of

11   law and corporate services.

12             As of early this year, in

13   addition to the other functions that I had

14   with this position which were law,

15   secretariat, communications, investor

16   relations, for some time, environment

17   assistant ability, internal audit government

18   relations.

19             In addition to these functions,

20   at the beginning of this year I also am

21   responsible for corporate human resources,

22   and my title has changed to senior vice

23   president and chief legal and administrative

24   officer.

25        Q.   Chief legal officer?

1              ZYGMUNT JABLONSKI

2      A.    Chief legal and administrative

3  officer, and that's where I am today.

4      Q.    Okay.  When did Gilles Pharand

5  leave Domtar?

6      A.    I think it was either June or

7  July of 2009.

8      Q.    So in March or April of 2009, you

9  were senior vice president and general

10  counsel.  And then it was June or July of

11  2009, that you became senior vice president

12  for law and corporate services?

13      A.    Correct.  The function was split,

14  Gilles handled the corporate affairs piece

15  and I handled the legal piece and

16  secretariat and environmental, and he held

17  the other functions.  And then he retired

18  and I had what he had before he split the

19  function with me.

20      Q.    So you assumed all of those

21  responsibilities as of June or July of 2009?

22      A.    Right.

23      Q.    And you say that as of early this

24  year you have also assumed the corporate HR

25  function.  Tell me what that involves.

1              ZYGMUNT JABLONSKI

2         Q.    Okay.  And so that would also

3    apply to employees, former employees of

4    sites that were taken over by Domtar after

5    the close of the fine paper transaction?

6         A.    I misunderstood your statement.

7         Q.    That analysis that the

8    non-transferred employees were not broken

9    down into categories?

10        A.    Right.

11        Q.    That analysis would also imply to

12   former employees of locations that Domtar

13   took over after the close of the fine paper

14   transaction?

15        A.    Yes.

16        Q.    Do you recall Weyerhaeuser's

17   response to the comments here about the

18   scope of Domtar's liability for Workers'

19   Compensation claims?

20        A.    I don't remember this response

21   with any specificity as an independent

22   matter.

23        Q.    Do you recall who spoke on

24   Weyerhaeuser's behalf?

25        A.    The two people that I remember

1                    ZYGMUNT JABLONSKI

2       from the meeting were Anne Giardini and

3       Patrick Lane.  And I can't think of anybody

4       else who would have spoken about this,

5       either one or the other, or both.

6            Q.   And you don't remember anything

7       that they said other than what is reflected

8       in this document; is that correct?

9            A.   I don't remember anything

10      specific, no.

11           Q.   On the next page of Exhibit 74,

12      there is an entry there that says, "After

13      discussion with the Weyerhaeuser team in the

14      afternoon."  Do you have any recollection of

15      a discussion with the Weyerhaeuser team in

16      the afternoon?

17           A.   No, nothing independent of this

18      document.

19           Q.   Okay.  And this document says,

20      "Weyerhaeuser thinks our position is correct

21      but need to convince a few more internally,

22      need to have Laurie Scott sign off."  Is

23      that an accurate statement of the discussion

24      with the Weyerhaeuser team in the afternoon?

25           A.   I don't remember the discussion

1            ZYGMUNT JABLONSKI

2  specifically but that statement is

3  consistent with Weyerhaeuser's subsequent

4  actions, so I have no reason to believe that

5  it's incorrect.

6        Q.   Okay.  Do you recall any other

7  discussions with Anne Giardini about the

8  liability for Workers' Compensation claims

9  during the course of the September 11, 2008,

10  meeting?

11        A.   I have no specific recollection.

12        Q.   I am handing you what has been

13  previously marked as Exhibit 75 (handing).

14  And I will ask if you recognize this

15  document?

16        A.   When I saw it yesterday, it

17  looked familiar.

18        Q.   Okay.  So this is a letter from

19  Anne Giardini, appears to be to you dated

20  September 23, 2008.

21        A.   It so appears.

22        Q.   Okay.  And do you have a

23  recollection of seeing this letter on or

24  about September 23, 2008?

25        A.   I have no specific recollection

1               ZYGMUNT JABLONSKI

2    of seeing it, but since we were involved in

3    this type of direct exchange, it's almost

4    certain that I read it.

5         Q.   And if you look at the second

6    page under heading number 4 where it says,

7    "Employees and Workers' Compensation."  It

8    says, "Our invoices remain unpaid and have

9    been outstanding for a considerable period."

10             Do you recall that Domtar was not

11   paying the invoices for the Workers'

12   Compensation claims for employees who had

13   transferred to Domtar?

14        A.   I don't have a specific

15   recollection of when Domtar paid and when it

16   didn't pay.  What sticks in my mind is, as

17   an independent recollection, was that

18   throughout the process up to a certain

19   point, I had a repeated request and demand

20   to my faults that any bill or any invoice

21   that is sent be reconciled with facts.

22             Because from the very beginning,

23   figures were thrown out, there was 13 and a

24   half million, three and a half million,

25   whatever the figure was.  And my

# EXHIBIT 17

1                          M. DAGENAIS

2             IN THE UNITED STATES DISTRICT COURT

3                FOR THE DISTRICT OF DELAWARE

4    _____

5    WEYERHAEUSER COMPANY, a          )

6    Washington corporation,          )

7              Plaintiff,             )   Case No.

8                                     )   C.A. No. 14-00024-SLR

9    DOMTAR CORPORATION, a            )

10   Delaware corporation, and        )

11   DOMTAR PAPER COMPANY, LLC,        )

12   a Delaware limited liability     )

13   company,                         )

14              Defendants.           )

15   _____    )

16

17           Oral deposition of MICHEL DAGENAIS, a

18   representative of the Defendants, called by the

19   Plaintiff herein, held before a stenographic court

20   reporter at the offices of Domtar Corporation, 395

21   Boulevard de Maisonneuve Ouest, Hong Kong Room,

22   Montréal, Canada on Wednesday, the 27th day of May,

23   2015, at 10:00 a.m.

24

25   Job No. 93998

1                    M. DAGENAIS

2    A P P E A R A N C E S:

3    For the Plaintiff:

4    HILLIS CLARK MARTIN & PETERSON

5    BY:  Laurie Chyz, Esq.

6              1221 Second Avenue

7              Seattle, WA 98101

8

9

10

11

12   For the Defendants:

13   DEBEVOISE & PLIMPTON

14   BY:  Courtney Dankworth, Esq.

15        Alex Ginsberg, Esq.

16              919 Third Avenue

17              New York, NY 10022

18

19

20

21

22   ALSO PRESENT:

23   Conrad J. Smucker (Sr. Legal Counsel, Weyerhaeuser)

24   Ania Brzezinski (VP Legal Affairs, Domtar)

25

1                        M. DAGENAIS

2                  INDEX OF PROCEEDINGS

3

4   WITNESS:  MICHEL DAGENAIS:  AFFIRMED

5   EXAMINATION                                    PAGE

6            By Ms. Chyz                           8

7

8

9   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER: 82, 151

10  INFORMATION TO BE SUPPLIED: N/a

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    M. DAGENAIS

1

2   was after resolve easy.

3           I would say that the second easiest one was

4   Kerfoot, more complex because of legal and all the

5   prep work that we need to do.

6           And the third one, the most difficult one,

7   was Workers' Comp.

8           Q.   Do you remember -- tell me what you

9   remember about the discussion about Workers' Comp?

10          A.   Well, the discussion, it was around,

11  you know:  What was the concept?  How should we

12  understand the concept of transferred employees?

13          And, concerning the liability, so who was

14  right by saying that, okay, under the transaction

15  agreement, well, then, you know, you retain that

16  liability or you didn't retain that liability?

17          And our position was that, well, we retained

18  the liability for those employees who were transferred

19  on day one, and for those employees who were

20  eventually -- no, who could eventually be transferred

21  if they become fit to work.

22          That is exactly what I said at that meeting,

23  I'm sure.

24          Q.    Okay.  So the focus -- as I understand

25  what you're telling me, the focus was on the

1                         M. DAGENAIS

2     correction interpretation of the agreement?

3              A.    Yes.

4              Q.    And there was a focus on employees that

5     transferred at closing and then employees that were on

6     Workers' Comp but then later transferred; is that

7     correct?

8              MS. DANKWORTH:   Objection to the form.

9              A.    Could be transferred.

10    BY MS. CHYZ:

11             Q.    Could be transferred?

12             A.    Yeah.

13             Q.    Okay.

14             A.    Because if you were on Comp -- on

15    Workers' Comp, and if, you know, your disability was

16    such that you could not come back to work, then you

17    would never be transferred.   Then you were not part of

18    Newco's liability.   You will be with Weyerhaeuser.

19             Q.    Okay.   Was there any discussion of

20    future Workers' Compensation claims filed by retired

21    Weyerhaeuser employees?

22             A.    No.

23             Q.    And what was the outcome of the

24    discussion?

25             MS. DANKWORTH:   Objection to the form.

1                        M. DAGENAIS

2            A.   The outcome of the discussion was, if I

3    recall correctly, that, you know, since all the

4    arguments have been put on the table, both parties

5    will think about it.  And I recall very well that

6    after a while, then Weyerhaeuser came back and say:

7    Okay, we agree on -- you know, on the way you believe

8    that we should address the Workers' Comp issue.

9            And that triggered a list, okay, or an

10   invoice, from Weyerhaeuser that -- you know, that

11   included all the employee -- that should include only

12   the employees that were transferred, okay, to Newco,

13   to Domtar.

14           So if that invoice, we will have to check

15   the invoice, we will have to have all the background

16   information concerning that invoice.  And once this

17   would have been checked, then we will pay Weyerhaeuser

18   for the money that we will due to them because those

19   employees will have been transferred employees --

20   would become transferred employees, if I can...

21   BY MS. CHYZ:

22           Q.   Okay.  So when Weyerhaeuser came back,

23   who was speaking on behalf of Weyerhaeuser?

24           MS. DANKWORTH:  Objection to the form.

25           A.   Anne Giardini.

1                           M. DAGENAIS

2     BY MS. CHYZ:

3                Q.   Okay.  And tell me again what she said.

4                A.   Well, as I said, you know, if my

5     recollection is right, and if you look at some

6     documents that I looked last week, she said that, you

7     know, exactly what I just said.

8                We will agree on the concept of what will be

9     the transferred employees, who will be -- and the

10    liabilities; and Domtar will retain the liabilities

11    for the employees that, you know, will eventually be

12    transferred or has been transferred.  But those that

13    were not yet transferred, they would not be included

14    in the invoice.

15               Q.   Okay.  And did Anne indicate that that

16    was Weyerhaeuser's understanding of what the agreement

17    required?

18               MS. DANKWORTH:  Objection to the form.

19               A.   That's what I think, yes.

20    BY MS. CHYZ:

21               Q.   Okay.  Did she give any indication that

22    she continued to disagree about that interpretation

23    but was willing to compromise on it?

24               A.   Well, she wrote a letter saying that,

25    okay, we will agree on that.  I cannot read in her

1                         M. DAGENAIS

2    mind what she meant.  But, you know, for us, this was

3    settled.  We had an agreement.

4              Q.   Okay.  And I wasn't asking you to read

5    her mind.  I was trying to get your recollection of

6    what she said to you.

7              A.   Well, she didn't say anything to me.

8    She wrote a letter.

9              Q.   Okay.  And in the meeting, when she

10   said there was an agreement, was she saying that there

11   was an agreement on the interpretation of the

12   contract?  Is that what she was saying?

13             MS. DANKWORTH:  Objection to form.

14             A.   No.  At the meeting, okay, we left each

15   other saying that we are going to think about it.  And

16   later on, okay, because I may be sick at that time, it

17   was with Zygmunt, maybe he had discussion with Anne.

18             And finally she wrote a letter saying that,

19   Okay, this is the way that we will handle this issue.

20   BY MS. CHYZ:

21             Q.   Did you see that letter when it came

22   in?

23             A.   Oh, yes.

24             Q.   Was the letter written to you?

25             A.   No, no.  The letter was written by Anne

1                          M. DAGENAIS

2    to Zygmunt, and Zygmunt gave me a copy of the letter.

3            Q.   Okay.  When you saw that letter from

4    Anne Giardini, what steps did you take on the HR side?

5            MS. DANKWORTH:  Objection to the form.

6            A.   Okay.  Well, since, okay, this issue

7    was resolved, it was an outstanding issue since a

8    while, and there was some money involved.  So this is

9    why, as I said, you know, that trigger an invoice from

10   Weyerhaeuser to Domtar to finally, you know, get the

11   money that -- you know, that we should pay to them, to

12   Weyerhaeuser.

13           So we had a lot of work to do.  We had to

14   check the invoice.  So the invoice was checked by the

15   different mills, you know, to make sure that those

16   were really, you know, employees of the mill.  And

17   then after, okay, I put my name on it saying that,

18   okay, this has been checked, okay, and it's all okay.

19   And I sent it to finance, okay, for payment.

20   BY MS. CHYZ:

21           Q.   Was there anything else on the HR side

22   that was done in response to Anne's letter?

23           A.   No.

24           Q.   Okay.  What's your understanding of the

25   claims administration process for the transferred

1                        M. DAGENAIS

2     employees?

3              MS. DANKWORTH:  Objection to the form.

4              A.   This, I'm really not the specialist,

5     okay?  I understand that, you know, in the States, the

6     way it is administered, you must make some choices

7     with the -- can I say the insurance carrier?  This I'm

8     not sure but, you know.  You're either... you can be

9     self-insured or you can be insured.  And this is, you

10    know, more of the domain of Kim Rogerson.

11             But I knew, okay, that this was an issue

12    because the way Weyerhaeuser had made some choices, it

13    was a problem, okay, with some States law and with the

14    way Domtar wanted to administer that.

15             So this is -- that has triggered some

16    discussions between HR of both companies.  And we find

17    a way to resolve that.  Okay?  So.

18    BY MS. CHYZ:

19             Q.   And how was it resolved?

20             A.   Well, we had -- with Kim Eckroth, okay,

21    what we decided, that we're going to keep -- well, not

22    to keep, but to pay the cost for the employees that

23    were transferred but in the case where Weyerhaeuser

24    was self-insured.

25             So they -- legally speaking and technically

M. DAGENAIS

1  speaking, it was, you know, the best avenue for both

2  companies, if they were going to pay that and charge

3  us, okay, for those costs, which we were going to

4  reimburse with, you know, all the pertaining documents

5  to support the payment.

6  But, you know, we just agreed to pay.  But

7  there was going to be, you know, that third party

8  involved in, you know, that provider that Weyerhaeuser

9  was using, and we would have access to that provider

10  so they can give us, you know, the pertaining

11  documents and, you know, we will process the payment.

12  Q.   Okay.  And you said that it was decided

13  because it was the best for both companies.

14  What do you mean by that?

15  A.   Because we were not going to administer

16  the claims in the same way than Weyerhaeuser were

17  doing for our employees.  Okay?  The new claims were

18  administered in the different manner.  But don't ask

19  me for the details, because that is Kim Rogerson's,

20  you know, specialty.  But this is a choice that was

21  made by this group.

22  And, also, because, you know, as I said,

23  Weyerhaeuser were self-insured.  And if I recall

24  correctly, there was even one State that says that,

1                          M. DAGENAIS

2     you know, once you've started to administer the claim,

3     you're self-insured, you need to keep that for you,

4     okay, as long as there are claims from those employees

5     that were, you know, in that group.

6              So we say, okay, but nevertheless, they have

7     been transferred.  We say that we were going to pay,

8     so just pay them and charge us, and we will pay the

9     bill.  Okay?  No problem.

10             Q.   Okay.  And in addition to paying the --

11    well, explain to me what you mean by "pay the bill."

12    What were you willing to pay?

13             A.   Well, we were willing to pay the cost,

14    okay, the real cost.  Plus, okay, I was trying to find

15    out what -- you know, this was one of the process that

16    I was trying to put in place.  But I had to leave --

17    well, I retired before it was finished, but my

18    discussion with Kim was that we were going to pay the

19    fee -- the administration fee that Weyerhaeuser was

20    paying.

21             But the problem that we had, it's not her

22    fault or my fault.  You know, Weyerhaeuser was

23    changing the provider.  And they were in negotiation

24    with this provider.  So they have to finalize the

25    fees, okay?  So she couldn't tell me exactly what were

# EXHIBIT 18

▲ Weyerhaeuser

**Vancouver, British Columbia**

Law Department, Canada

VIA FACSIMILE (original by mail)
1 514 848 6850

925 West Georgia Street
5th Floor
Vancouver BC  V6C 3L2
604.661.8086 phone
604.687.2314 fax
anne.giardini@weyerhaeuser.com

**WITHOUT PREJUDICE**

September 23, 2008

Domtar Inc.
395 de Maisonneuve Blvd. West
Montreal, Quebec H3A 1L6

Attention:  Mr. Zygmunt Jablonski

Dear Sirs and Mesdames:

**Re:        Update on Issues**

This letter sets out an update on the issues we discussed at our meeting in Montreal, and includes information and requests concerning several other issues.

1.  Kerfoot
We have previously provided you with copies of the writ, claim and correspondence concerning this matter.  In our meeting, we agreed that the first priority was to work together to defend the underlying claim.  We thank you for the information you have recently provided.  Outside counsel, Ron Skolrood, will contact Michel Dagenais for the additional information he requires.

As we have discussed, Domtar Inc. assumed all liabilities of the transferred business, including (as set out in 2.03 (viii) of the Contribution and Distribution Agreement) all employment and employee benefit-related liabilities with respect to transferred employees regardless of when or whether such liabilities arose.  Pursuant to section 6.09 of the transaction agreement amended and restated as of January 27, 2007 (the "Transaction Agreement"), the parties agreed that transferred employees were to have continuous and uninterrupted employment before and immediately after closing, and that for purposes of any severance or termination benefits, the transaction was not to constitute a severance of the employment of any transferred employee. Pursuant to section 6.09(c) of the Transaction Agreement, Domtar agreed to establish compensation and benefit plans, programs and arrangements for the benefit of the transferred employees that provide benefits that are substantially as favorable in the aggregate as the plans, programs and arrangements that were in effect for the benefit of the employees immediately before closing.

WEY00022316

Weyerhaeuser

You have suggested that the claim triggers the Weyerhaeuser warranty that the transactions contemplated by the Transaction Documents "effected prior to or at Closing [would not] give rise to any severance or other similar benefits with respect to, or constitute an actual or constructive termination or severance of employment of, any Transferred Employee or any employee of Weyerhaeuser Canada or Weyerhaeuser Saskatchewan who is not a Transferred Employee". We disagree and see no basis for your claim. This is an agreement to indemnify Domtar only if there is a claim from a Transferred Employee that the original transfer of employees to the subsidiaries and their combination with Domtar created circumstances constituting constructive termination or actually resulted in the employee's severance from Domtar. That is not the claim. Even if it were the claim, it would be effective against Weyerhaeuser only if Domtar had complied with its obligations under the agreement to provide equivalent salary and benefits to the transferred employees. Since this is a claim that the employee is not being paid equivalent benefits, Domtar is in breach of the agreement and will owe us money if the employees' claim prevails.

It remains our view that, pursuant to sections 4.01 and 4.03 of the Contribution and Distribution Agreement, Domtar is to indemnify Weyerhaeuser against all liabilities including third party claims incurred by Weyerhaeuser arising out of the transferred business or assets or the failure by Domtar to discharge the transferred and assumed liabilities, including, pursuant to section 4.03(iii) "any claim that any action taken or omission by [Domtar] after Closing with respect to any Transferred Employee gives rise to any severance or other similar benefits with respect to, or constitutes an actual or constructive termination or severance of employment of, any Transferred Employee."

Pursuant to section 4.06 of the Contribution and Distribution Agreement, Domtar should assume the defence of the Claim, and indemnify Weyerhaeuser in full for our (to date relatively modest) costs to date. Failing this Weyerhaeuser looks to Domtar for all associated fees, costs and expenses and may also be forced to join Domtar in the action.

2. Employees on disability
This issue relates to reports that employees were having difficulty returning to work at Domtar sites. It appears that whatever difficulties were being experienced have been resolved, so we can delete this issue from our discussions.

3. Early retirement subsidy for US hourly workers
We look to you to provide your arguments why you believe that there should be a funds transfer.

4. Employees on Workers Compensation
Weyerhaeuser has been invoicing Workers' Compensation payments to Domtar regularly and advising of reserves. Our invoices remain unpaid, and have been outstanding for a considerable period.

I have made enquiries and am advised that Weyerhaeuser has been invoicing Domtar only for Workers' Compensation for transferred employees and has not been charging Domtar for employee Workers' Compensation payments for those employees who have not returned to work. I understand that at the transition date last year, there were 12 claims (11 claimants) for claimants who were disabled and placed on leave. We did not bill Domtar for the liabilities for

2

WEY00022317

⚠ Weyerhaeuser

these claims. Since then, four claimants have returned to work and so have been included in our invoicing. Eight claims remains outstanding and we have excluded these from our monthly invoicing. We are checking on an ongoing basis to see if the status of these remaining claimants has changed. You should be able to verify from the list we provided that the employees listed are employees of Domtar by referring to the name, the month the payment relates to, and the amount of the payment made during the month. Note that not all employees receive a payment in each month. It is important to note too that employees can return to work *and also* receive Workers' Compensation payments.

The amount Weyerhaeuser has paid and invoiced to the end of August, 2008 for Domtar Workers' Compensation is $4,632,810.

Weyerhaeuser has effectively advanced to Domtar a very substantial amount of money to cover these costs. These amounts have been outstanding for an extended period of time, at substantial cost to Weyerhaeuser, and the amount owed is growing. Weyerhaeuser has also incurred considerable costs for administering these payments, claims, reporting, and reserves. We look to Domtar to cover those costs. In addition, we are concerned about continuing to provide claim administration services for Domtar. Among our concerns are the risks of acting as claim administrator for another party, including making claim decisions, reserving, payments and claim settlement for Domtar. We need to establish an end date for this service and transfer all closed or open claims to Domtar or to a party designated by Domtar. We see no reason to continue in this manner beyond October, given the magnitude of the unpaid disbursements and reserve, and the facts that Domtar has resisted paying interest and is not compensating Weyerhaeuser for its costs and risk.

5.  Vacation pay
We look to you to provide an understanding of your concerns with respect to vacation pay.

6.  Working Capital adjustment on Canadian Working Capital
Mike Cross is to talk to Graham Pepper about outstanding issues.

7.  Pulp inventory
This dispute brought by Domtar was dropped.

8.  Profit participation
We agreed to exchange short outlines of perspectives including senior recollection. Our goal was to see if there was commonality between the 2 companies' recollection and use the commonality to arrive at a resolution.

We have reviewed the emails exchanged before closing, and have asked for the recollections of the people involved. The documentation places this issue before the joint transition team a full month before closing, and ongoing exchanges followed thereafter. There was documented direction to specific Weyerhaeuser and Domtar employees to arrive at a common solution, there is ample evidence that the mechanism was worked on by both parties, and the emails show that the proposed agreement was for a $3.5 million settlement subject to a true up for product pricing, using November and March average prices. The recollection of our negotiating team at New York (Tom Stocks, Sandy McDade and Lorrie Scott) is that this proposal by the delegates of the

3

WEY00022318

Weyerhaeuser

Transition Steering Team was the final jointly proposed mechanism.  They have no recollection of agreeing to any *different* pricing mechanism before closing.  As it happens, this mechanism resulted in a small adjustment in Weyerhaeuser's favour, which was not expected at the time because both parties believed transaction prices would be lower for fine paper.  You have the same email trail that we do.  Can you please review your material and advise if you see evidence that any other agreement was reached.

The amount payable pursuant to this adjustment is $203,890.

9.  Wapawekka
Our position is that there is no reason to delay reimbursing Weyerhaeuser for the payments made to the Bank of Nova Scotia after the bank called the promissory note to Wapawekka.  The amount payable is $1,172,828 and this amount has been outstanding since our letter dated August 11, 2008.

At our meeting, you asked if there were amounts due to Wapawekka from Weyerhaeuser relating to CVD/AD refunds that were owned by Wapawekka.  We have told you that Wapawekka was not entitled to CVD/AD refunds but that there was a residual claim against Weyerhaeuser's refunds under the Custom Cutting Agreement arising in June, 2007.  Domtar's opening balance sheet reflected an estimate of Weyerhaeuser's calculation of the potential liability at the transaction date, but Domtar needed to perform an appropriate calculation at June, 2007 in accordance with the Custom Cutting Agreement.  As Wapawekka has a complicated history, we have offered to make knowledgeable personnel available to assist you in dealing with the bank.

10. IT/BaaN exit
Domtar has requested a number of pricing adjustments outside the pricing schedule in the Transitional Services Agreement (the "TSA"), specifically:

1) A reduction in the July invoice for BaaN costs.  Although Domtar had successfully transitioned BaaN off the TSA, the WIA component (the application integration program that was included in the BaaN pricing) was still in use.  The TSA requires complete exit of a service before the service fee is eliminated.  Domtar is however asking to pay for the WIA component only.  Weyerhaeuser agreed on a one-time and without prejudice basis to reduce the July billing by the requested $165,000 and invoice Domtar with the cost of the WIA access, which we expect to be $92,000.
2) A reduction in the network access fees for transitioned sites.  Although Domtar is transitioning sites, Domtar has also requested failsafe access to the Weyerhaeuser network.  This effectively keeps the transitioned sites part of the Weyerhacuser network (with much of the work maintaining the access for Weyerhaeuser).  Domtar is requesting a reduced fee for the network access.
3) A reduction in the Domtar 2000 (D2K) pulp sales system support costs to reflect a reduction of the service.  Weyerhaeuser agreed to provide a credit that would be made available to Domtar at the end of the TSA service, providing all outstanding items were resolved between Domtar and Weyerhaeuser.
4) Mike Cross has indicated that there are some pricing concerns with the Finance component of the TSA that need to be documented between John Merle (WY) and Tom Hart (Domtar).  The concern as we understand is that the TSA scope for specific services turned out to be

WEY00022319

Weyerhaeuser

smaller than the service request and that Domtar would like certain services priced lower accordingly.

11. IT/TSA Issues
Zygmunt Jablonski and Anne Giardini have agreed to speak in order to try to resolve outstanding issues. Both IT and Domtar IT teams have confirmed that there appear to be no major issues between the organizations other than pricing.

12. Lost Thune Screw
This appears to have been stolen at an unknown date and by persons unknown. We have enquired and have been advised that it is not located at this or another Weyerhaeuser site. We do not view this as something that our teams will be able to resolve.

13. Plymouth steam supply
I am continuing to seek instructions about Weyerhaeuser's damages and will advise of any claim that may be forthcoming. Domtar agreed to ensure that your local people are communicating well with Weyerhaeuser. I understand that there are three areas under review. The first is Domtar's failure to meet threshold volumes for steam for, as I understand, a period of approximately two months. However, with respect to this matter we are agreeable at present to remain focused on achieving a longer term working relationship. A second issue is the cost of steam, which is approximately 30% higher than this time last year. A third and related issue is when to undertake the work to increase boiler capacity, the costs of which would be shared. Our current plan is to continue to leave these issues at a site level and monitor them as needed.

14. Transfer of Prince Albert FMA
We propose that Domtar send a letter to the Saskatchewan government in a mutual effort to get Weyerhaeuser's name removed from the Prince Albert FMA.

We propose that in such a letter Domtar:
i.      make specific reference to the transaction agreements with Weyerhaeuser;
ii.     state that Domtar has thereby irrevocably assumed all of Weyerhaeuser's liabilities pursuant and related to the FMA, past, present and future;
iii.    request that Saskatchewan (a) substitute Domtar for Weyerhaeuser in all respects with respect to the FMA; (b) execute and deliver to Weyerhaeuser an acknowledgement of the valid and effective assumption by Domtar of the FMA; and (c) amend the FMA to reflect Domtar as the licence holder.

15. Outstanding Credit to Domtar
Patrick and Mike met on these items and have reported back.

Additional items:

16. Big River severance
Weyerhaeuser is required to pay severance to employees with respect to severances that occurred *before* the transaction date. We have asked Terry Jean (Weyerhaeuser) and Mari Joiner (Domtar) to investigate the nature of calculation differences between our companies, which we think might be related to employees working for Domtar after the transaction and subsequently

WEY00022320

Weyerhaeuser

having had their employment terminated.  With respect to any employee who worked for Domtar after the transaction date, severance would be payable by Domtar.  Can you please ask Michel Dagenais to advise us which employees – hourly or salaried - have worked for Weyerhaeuser since the closing of our transaction.

17. EPA Bonds
Enclosed is an invoice for two EPA bonds to reflect return premium for cancellation prior to expiration.  This invoice replaces 06-005 DTA issued June 27, 2008.  We have provided backup for the credits and have been promised payment, however this amount remains outstanding and apparently tied up in the Domtar legal department.

The total amount immediately payable to Weyerhaeuser pursuant to the above, net of credits, is in excess of five million dollars.  Patrick Lane and I are prepared to work with you to crystallize the number.  It is an urgent priority to Weyerhaeuser that these amounts be paid immediately.

Yours sincerely,

for:  Anne Giardini
President and General Counsel

6

WEY00022321

# EXHIBIT 19

| | |
|---|---|
| **From:** | Lane, Patrick |
| **To:** | Cross, Michael (Domtar) |
| **Sent:** | 10/28/2008 10:06:17 PM |
| **Subject:** | RE: Wapawekka Loan Guarantee - wire transfer for Cdn$1,172,828.04 |

got it, thanks

I think we finally got the workers comp about sorted out. As you probably guessed - our invoices were not consistent with the definition of "transferred employee" we talked about in Montreal either.

---

From: Cross, Michael [mailto:Michael.Cross@domtar.com]
Sent: Tuesday, October 28, 2008 1:50 PM
To: Lane, Patrick
Subject: RE: Wapawekka Loan Guarantee - wire transfer for Cdn$1,172,828.04

My treasury confirms it was wired Oct 10.

Can you confirm you see it on your side - if not I will ask my treasury tomorrow to send us the bank confirmation.

thanks

---

From: Lane, Patrick [mailto:patrick.lane@weyerhaeuser.com]
Sent: Tuesday, October 28, 2008 4:18 PM
To: Cross, Michael
Subject: RE: Wapawekka Loan Guarantee - wire transfer for Cdn$1,172,828.04

did you remit the money?

thanks

patrick

---

From: Cross, Michael [mailto:Michael.Cross@domtar.com]
Sent: Tuesday, October 07, 2008 3:23 PM
To: Lane, Patrick
Cc: Giardini, Anne
Subject: RE: Wapawekka Loan Guarantee - wire transfer for Cdn$1,172,828.04

I have the attached letter from you indicating that you were to wire the funds to the bank. However, do you have anything from the Bank indicating funds received, have been applied against loan in question and the guarantee is effectively settled? In another words, a release

WEY00000923

or confirmation that all is in order? I had asked Nick and he did not have anything. Not a lack of trust - just want to ensure we have our documentation in order.


Apologies if you had sent already.


Thanks


Mike


_____

From: Lane, Patrick [mailto:patrick.lane@weyerhaeuser.com]
Sent: Tuesday, October 07, 2008 5:09 PM
To: Cross, Michael
Cc: Giardini, Anne
Subject: RE: Wapawekka Loan Guarantee - wire transfer for Cdn$1,172,828.04


thanks


_____

From: Cross, Michael [mailto:Michael.Cross@domtar.com]
Sent: Tuesday, October 07, 2008 1:34 PM
To: Lane, Patrick
Subject: Wapawekka Loan Guarantee - wire transfer for Cdn$1,172,828.04

FYI


The wire is a WIP - just chasing down signatures from CEO and CFO who are traveling.


Will advise shortly


Regards


Mike

WEY00000924

# EXHIBIT 20

| | |
|---|---|
| **From:** | Lane, Patrick |
| **To:** | Eckroth, Kim |
| **CC:** | Yeager, Dawn; Wong, Chee-Tuck; Giardini, Anne |
| **Sent:** | 11/4/2008 7:44:52 PM |
| **Subject:** | RE: Domtar WC - Claim list and revised payment amount |

Anne and I discussed this and we'd like you to contact Michel Dagenais and review the updated invoices for workers compensation explaining the reason for the change from our previous invoice. Michel should understand that Anne will be writing a letter to Domtar (Zyg) and providing these invoices for workers compensation and indicating that you (Kim unless you advise otherwise) will be contacting Michel directly to help him understand the invoice and how he might satisfy himself the invoices are appropriate.

Just so we're consistent, my understanding is that our previous invoices were based on our understanding that all workers compensation liability transferred to Domtar - whereas our September discussions with Domtar clarified that the workers compensation liability went to Domtar ONLY for employees that showed up to work at Domtar (I think the term in the agreement is transferred employees - so they're not transferred until they show up for work at Domtar).

Could you let us know when you've had the discussion with Michel?

Thanks,

Patrick

---

**From:** Eckroth, Kim
**Sent:** Monday, November 03, 2008 11:52 AM
**To:** Eckroth, Kim; Giardini, Anne; Lane, Patrick
**Cc:** Yeager, Dawn; Wong, Chee-Tuck
**Subject:** RE: Domtar WC - Claim list and revised payment amount

Hi Anne - wanted to check back with you on the next steps for this?

Thanks

---

**From:** Eckroth, Kim
**Sent:** Wednesday, October 22, 2008 3:48 PM
**To:** Giardini, Anne; Lane, Patrick
**Cc:** Yeager, Dawn; Eckroth, Kim; Wong, Chee-Tuck
**Subject:** RE: Domtar WC - Claim list and revised payment amount

Anne - as you and I discussed last week I talked with Michel Degnais about the fact that this work was happening. Now that we have the list, what process would you like to use in transitioning this to Domtar? I assume you or Patrick will share the information below with them and then I can reach out to talk more about the process steps required to transition the claims and the files. Or if you prefer another approach just let me know.

Thank you.

---

**From:** Wong, Chee-Tuck
**Sent:** Tuesday, October 21, 2008 3:15 PM
**To:** Giardini, Anne; Lane, Patrick
**Cc:** Eckroth, Kim; Yeager, Dawn
**Subject:** Domtar WC - Claim list and revised payment amount

Hi Anne and Patrick,

sorry for taking so long to get back to you but we wanted to double check the claim list based on the employees who transferred to Domtar. Attached are the claim files related to Domtar.

This is the list of claim files where the claimants have transferred to Domtar. The claim files could be active or closed but they tie to employees who are currently working for Domtar. For this purposes, the transferred employees are identified via employee

WEY00020136

record in PeopleSoft. The claims that are not included at this point are the ones where employees are disabled.

<< File: Domtar Claim List Revised 092008.xls >>

Based on the list above, attached is a revised list of claims that should be invoiced to Domtar. You will need to back out the amount settled ($1,089,241.99) for the March-May invoice.

<< File: Domtar Claim Detail Revised 092008.xls >>

Also based on the above information, attached are accounting entries that were made to revised the gain/loss and receivable balance. The entries were made in Q3.

<< File: Revised Rsv and IBNR #2.xls >>
Let me know if you have any questions.

Chee

WEY00020137

# EXHIBIT 21

 **Weyerhaeuser**

**Vancouver, British Columbia**

Law Department, Canada

VIA FACSIMILE
1 514 848 6850

925 West Georgia Street
5th Floor
Vancouver BC V6C 3L2
604.661.8086 phone
604.687.2314 fax
anne.giardini@weyerhaeuser.com

November 26, 2008                                       **WITHOUT PREJUDICE**

Domtar Inc.
395 de Maisonneuve Blvd. West
Montreal, Quebec H3A 1L6

Attention: Zygmunt Jablonski

Dear Sir:

**Re:      Update on Issues**

Further to our recent internal enquiries and the exchanges of information and perspectives
between our companies, this is an update on outstanding issues we discussed in Montreal in
September and have since advanced by correspondence, and includes updated information and
comments.

1. Wapawekka

Thank you for your reimbursement in the amount of $1,172,828.00.

2. Kerfoot

In your letter of October 3, 2008, you assert that Weyerhaeuser and Domtar agreed during the TA
negotiations that "substantially as favourable in the aggregate" means compensation and benefits
on a level of at least 80% of the level of the pre-Transaction compensation and benefits provided
by Weyerhaeuser. Can you kindly provide evidence of this assertion as soon as possible. No such
agreement has been previously raised by you, and such an agreement is not reflected in any of the
documentation. Further, the Contribution and Distribution Agreement expressly provides:

> SECTION 9.05. Entire Agreement. This Agreement, taken together with the other Transaction
> Documents, constitute the entire agreement, and supersede all prior agreements and
> understandings, both written and oral, among the parties hereto with respect to the
> Contribution and the Distribution.

Please provide your further response on this issue. If it appears we are unable to agree, then it
appears this will need to be resolved using the dispute resolution procedures set out in the
Contribution and Distribution Agreement.

WEY00022324

▲ Weyerhaeuser

3. Early retirement subsidy for US hourly workers

Section 2.02(a)(xvi) of the Contribution and Distribution Agreement provides:

> Newco Assets. (a) For purposes of this Agreement, "Newco Assets" means all the business, properties, assets, goodwill and rights (including lease, license and other contractual rights) of whatever kind and nature, real or personal, tangible or intangible, that are owned by Weyerhaeuser or any other member of the Weyerhaeuser Group immediately prior to the Contribution and used or held for use primarily in the operation or conduct of the Newco Business, other than (A) the Excluded Assets and (B) as otherwise provided for in this Section 2.02(a), which Newco Assets shall include (in each case, other than the Excluded Assets):
> …
> (xvi) all assets to be transferred to Newco or any member of the Spinco Group set forth on Schedule 2.02(a)(xvi) (the "Benefit Plan Assets").

The applicable schedule expressly contemplates the transfer to Domtar of certain specified accounts. This makes sense because these are real accounts that were in existence at closing. The schedule also provides for the transfer to Domtar of Weyerhaeuser's interests in the collective bargaining agreements described. The Canadian version provides for the transfer of pension funds that were, again, actually in existence at closing.

We understand you to be saying that this potential future contingent cost was or should have been a funded liability at the time of the transaction and that Domtar is therefore entitled to the assets that fund this liability. The problem with this argument is that there are no such assets or fund that could have been transferred. There is simply no separate reserve set up for this.

There is no requirement in the collective bargaining agreements or otherwise for a fund to be in place to fund any early retirement subsidy. Are you able to point to something that requires that the employer establish or maintain such a fund?

4. IT Transition Services Agreement ("TSA")

Domtar has made requests for lower IT transaction fees, in particular lower network connectivity and access fees. These requests seem to us to have increased after Weyerhaeuser agreed to a one-time, without prejudice reduction for July. Our position with respect to the continued provision of access to the Weyerhaeuser private network, and the payment of the TSA fees is:

1) Weyerhaeuser will continue to support Domtar's conversion from Weyerhaeuser's IT Transition services.
2) Specific to networks, Weyerhaeuser will continue to invoice for network connectivity and access until Domtar is completely off our networks as provided in the TSA. Weyerhaeuser has not been unreasonable in considering Domtar's requests for lower fees in the context of our overall resolution of the outstanding transaction and transition issues on the basis of a mutual understanding that any such reductions are outside the fee schedule of the TSA and that Weyerhaeuser may elect not to provide any fee reductions. I have, as you know, made several such concessions on this basis.

2

WEY00022325

▲ Weyerhaeuser

3) Failures to pay Weyerhaeuser TSA invoices as required in the agreement will result in the issuance of a termination notice unless other arrangements are made and agreed to in a written document executed by the parties after legal review.

4) Weyerhaeuser's Transition Services Manager, Patrick Lane, will work on any issues associated with discontinuing the network connectivity and access as provided in the TSA.

5) With the Fort Mill conversion in November, we are working on the assumption that all but *approximately* eleven sites will be off the Weyerhaeuser network and as such no longer subject to the TSA invoice for network connectivity after November. I understand that Domtar has asked that Weyerhaeuser keep two other subnets open, at Montreal and at Dorval. We would need to work out fees for this if agreed to.

6) Regarding our discussion Domtar's Voice circuit transition that is being performed by Verizon under Domtar's new calling plan contract, it appears that the number of sites (excluding the MacPac sites) that are involved is greater than we had believed. There are nine outstanding T1 VNet circuits that were supposed to be migrated in November, but were not completed by Domtar's service provider. The circuits are now scheduled to be transferred on December 5. Six of those circuits are at three non-MacPac sites as follows: Rothschild, Plymouth and Kingsport. I have agreed on a without prejudice basis that notwithstanding that the TSA calls for charging for full months (i.e., no partial months), a fixed fee, "no step down" in a service category for service components, and the 25% escalation fee schedule at 18 months and 24 months, Weyerhaeuser will charge Domtar the network connection fee for the portion of December that the voice ports (T1s) are on Weyerhaeuser's calling plan. This is notwithstanding that some costs comprising the TSA fee structure are average costs that were distributed over the services Weyerhaeuser provides, or are fixed. In some cases, the cost is not reflective of Weyerhaeuser's actual costs. My agreement is dependent on Domtar achieving circuit cutover by December 5, 2008. Domtar signed its own contract with Verizon in mid October and transitioned most of the ports and services in November, but some sites extended into December.

7) Can you please advise of any IT issues you are aware of that will need to be discussed or resolved.

5. Employees on Workers Compensation

Our Chee-Tuck Wong has sent to your Michel Dagenais a list of workers compensation payments made on behalf of Transferred Employees from March 2007 to October 2008 and a list of claims (open and closed) where the claimant is a Transferred Employee. Previous invoices were based on our employees' understanding that all workers compensation liability transferred to Domtar. In fact, we are all agreed that US workers compensation liability went to Domtar only for employees who became able to work in some capacity at Domtar. Please confirm that you are in agreement with the information provided by Mr. Wong.

6. Vacation pay

We are still waiting for you to provide an understanding of your concerns with respect to vacation pay.

3

WEY00022326

Weyerhaeuser

7. Working Capital adjustment

Patrick Lane and Michael Cross have met to resolve outstanding a number of Working Capital settlement issues. I understand that they are agreed that these items would be netted and settled with Weyerhaeuser making a payment to Domtar of CDN$142,407.89 and US$ 168,612,26 for the Canadian and US operating companies respectively. Can you please confirm.

8. Profit participation

We are still waiting for you to provide an understanding of your internal documentation in support of your position as well as the recollections from the Domtar officials who were present in New York when the final issues were resolved. We have previously provided our documentation and the recollection from our officials.

9. Plymouth steam supply

It appears that there are several open issues. I will provide these in a follow up letter.

10. Transfer of Prince Albert FMA

We have provided our proposed language for a letter from Domtar that could go to Saskatchewan government in a mutual effort to get Weyerhaeuser's name off the Prince Albert FMA. We look to you for your response. We draw your attention to the positive obligation in the Contribution and Distribution Agreement for each party to execute and deliver as and when requested by any party such documents and instruments, and to take, or cause to be taken, all such further or other actions, as such other party may reasonably deem necessary or desirable to consummate the transactions contemplated by the agreements between the parties. It is unclear to us why this matter has not been resolved.

11. EPA Bonds

Enclosed is an invoice (Invoice 07-006 DTA) for two EPA bonds to reflect return premium for cancellation prior to expiration. This invoice replaces 06-005 DTA issued June 27, 2008. We have provided backup for the credits and have been promised payment from Mr. Michael Maiorino. However Michael informs us that the reimbursement requires approval from Domtar's legal department and the approval has not been forthcoming.

Yours sincerely,

Anne Giardini
President

WEY00022327

 **Weyerhaeuser**

**INVOICE**

Invoice Date:   08/04/08
Invoice Number: 07-006 DTA

**Bill To:**   Domtar
Attn: Michael Maiorino

**Remit Payment To:**
Weyerhaeuser Company
General Accounting I/C Accountant
Mailstop: EC4-2 D 3
PO Box 9777
Federal Way, WA  98063-9777

TIN No. 91-0470860
Payment Terms: Net 30 days

| Description | Amount |
|---|---|
| To revise invoice **06-005 DTA** for US EPA Bonds as follows: | |
| | |
| 1)  Bond 104354448 with Travelers Surety: | |
|     Plymouth Chlorine Plant | |
|     Bond Amount $5,624,000 | |
|     Annual Premium $44,992 | |
|     3/7/07-9/8/07 = 185 days/366 days X $44,992 | $22,721 |
|     9/8/07-9/8/08 | $44,992 |
|     Less credit for cancellation July 8, 2008 | ($7,622) |
| | |
| | |
| 2)  Bond 6198213 with Safeco Surety: | |
|     Plymouth Wood Treatment Plant Landfill | |
|     Bond Amount $11,935,000 | |
|     Annual Premium $77,578 | |
|     3/7/07-9/18/07= 195 days/366 days X $77,578 | $41,349 |
|     9/18/07-9/18/08 | $77,578 |
|     Less credit for cancellation July 16, 2008 | ($13,568) |
| | |
| NOTICE: A service charge at the rate of 1-1/2% per month | |
|   (or the maximum allowed by State Law) on the unpaid balance will be made | |
| on all past due accounts. | |
| | |
| Weyerhaeuser Accounting Only | |
| | |
| Credit:  0060-6575000-9000002743 | **Please pay this amount:**  $165,450.00 |
| Weyerhaeuser Contact: mark.taylor@weyerhaeuser.com | |

WEY00022328

# EXHIBIT 22

1                    Chee-Tucker Wong
2           IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF DELAWARE
3

_____
4  WEYERHAEUSER COMPANY, a                )
   Washington corporation,                )
5                                         )
                      Plaintiff,          ) Case No.
6                                         ) C.A. No.
                                          ) 14-00024-SLR
7  DOMTAR CORPORATION, a                  )
   Delaware corporation,                  )
8  and DOMTAR PAPER COMPANY, LLC,         )
   a Delaware limited liability           )
9  company,                              )
                      Defendants.         )
10 _____)
11
12
13                    DEPOSITION
14                       OF
15                  CHEE-TUCK WONG
16           33663 Weyerhaeuser Way South
17                 Federal Way, WA
18                  JUNE 18, 2015
19
20
21
22
23
24 Reported by:
   Monna J. Nickeson, CCR, CLR, RPR, CRR
25 Job No. 94143

1                    Chee-Tucker Wong

2

3

4

5                     June 18, 2015

6                      9:12 a.m.

7

8

9

10

11

12          Deposition of CHEE-TUCK WONG, held at

13    the offices of 33663 Weyerhaeuser Way South, Federal

14    Way, WA, before Monna J. Nickeson, a Certified Court

15    Reporter, Certified Livenote Reporter, Registered

16    Professional Reporter and Certified Realtime

17    Reporter.

18

19

20

21

22

23

24

25

```
1                    Chee-Tucker Wong
2      A P P E A R A N C E S
3
4

            DEBEVOISE & PLIMPTON
5           Attorneys for the Plaintiff
            BY:  Gary Kubek, Esq.
6               Jeff Hughes, Esq.
            919 Third Avenue
7           New York, NY 10022
8
9
10          HILLIS CLARK MARTIN & PETERSON
            Attorneys for the Defendant
11          BY:  Laurie Lootens Chyz, Esq.
            1221 Second Avenue
12          Seattle, WA 98101
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    Chee-Tucker Wong

2    Compensation WC claims as of February of 2007 were

3    reviewed to determine whether the claimant transferred

4    to Domtar at the close of the transaction.

5            Do you have any recollection of, in fact,

6    there being a review to determine which claimants

7    transferred to Domtar's employments and which one

8    didn't?

9        A.    No, uh-uh (negative response).

10       Q.    Did you have any involvement in reviewing a

11   list of employees in any connection?

12       A.    I did review or create a list of employees

13   or list of claims.

14       Q.    And what was the purpose for preparing that

15   list of claims?

16       A.    I think, if I recall, it was to show which

17   employee transferred and which didn't.

18       Q.    And why were you doing that?

19       A.    I think it was, you know -- I think based

20   on information that was given to me that we were

21   trying to determine which reserve stays and which one

22   should be passed to Domtar.

23       Q.    And was it your understanding that, in

24   connection with that, the reserves for the employees

25   who went to work for Domtar would be transferred, but

1                    Chee-Tucker Wong

2     the reserves for the other employees would stay with

3     Weyerhaeuser?

4          A.   Yeah, I don't remember what -- all the

5      specifics.

6          Q.   It then goes -- you then go on to describe

7     the IBNR SOP 97-3 reserve and how that was to be

8     calculated and you say, quote:  As a result, the

9     revised W.C. liability that was recorded against the

10    gain/loss of this transaction should be $4.3 million,

11    a decrease of 9.2 million dollars.

12               What do you understand that sentence to

13    mean?

14         A.   It looks like there was a decrease of 9.2

15     million dollars in that account.

16         Q.   In the receivable account from Domtar?

17         A.   Gain/loss account.

18         Q.   Did that reflect a decrease in the amount

19    that Weyerhaeuser was booking as a receivable from

20    Domtar?

21         A.   I mean, it says here that gain/loss

22     account, so I don't know if that's the receivable

23     account or not.

24         Q.   It's a revised Workers' Compensation

25     liability --

1                  Chee-Tucker Wong

2        A.    Right.

3        Q.    -- that was recorded against the

4    gain/loss --

5        A.    Uh-huh (affirmative response).

6        Q.    -- account?

7        A.    Right.

8        Q.    Do you have an understanding as to whether

9    that amount relates to the amount of money that

10   Weyerhaeuser was expecting to receive from Domtar as a

11   receivable?

12       A.    I mean, like I said, based on this, it just

13    wasn't recorded against the gain/loss and I don't

14    remember how those account works anymore.

15       Q.    And how about when it says revised Workers'

16   Compensation liability, revised W.C. liability, what

17   do you understand that to mean?

18       A.    I mean, this was a change in the liability

19    amount.  So --

20       Q.    The liability amount owed by Domtar?

21       A.    I assume that's the case here.

22       Q.    After that, on the next paragraph, you say:

23   In addition, the invoices for W.C. payments were

24   reviewed.

25             Do you recall that you or anyone else, in

1                    Chee-Tucker Wong

2   fact, reviewed the invoices for those payments?

3       A.   I don't remember.  I mean, according to

4   this, this is what it says.

5       Q.   Do you think you would have been the one

6   who reviewed those invoices or someone else?

7       A.   I don't remember.

8       Q.   You then go on to write:  Revising the list

9   of claims that should transfer to Domtar, a

10  significant number of claims will remain with

11  Weyerhaeuser.

12            Do you recall that there was a, as part of

13  this review, that a significant number of claims were

14  going to remain with Weyerhaeuser, that Weyerhaeuser

15  was previously expecting to transfer to Domtar?

16      A.   Yeah, because I don't remember what

17  occurred in this -- at this time timeframe, in this

18  timeframe.

19      Q.   Is that your understanding of what you

20  wrote, that a significant number of claims are going

21  to stay with Weyerhaeuser that previously were

22  expected to go to Domtar?

23      A.   That's what I see here, yes.

24      Q.   Do you know who decided that?

25      A.   No, I don't.

1                     Chee-Tucker Wong

2         A.   I don't remember this.

3         Q.   I'm going to show you what was previously

4    marked as Exhibit 102.  Again, this is -- Exhibit 102

5    is a series of the e-mails including yourself and

6    various other persons at Weyerhaeuser.

7              Do you recall ever sending or receiving any

8    of these e-mails?

9         A.   I don't remember.

10        Q.   If you look at the bottom e-mail on the

11   first page of Exhibit 102, you write to Ms. Giardini

12   and Mr. Lane:  Sorry for taking so long to get back to

13   you, but we wanted to double-check the claim list

14   based on the employees who transferred to Domtar.

15   Attached are the claim files related to Domtar.

16             Do you have any recollection of putting

17   together or of double-checking the claim list of

18   employees who transferred to Domtar?

19        A.   No, I don't remember.

20        Q.   Do you have any recollection at all of what

21   this relates to?

22        A.   No, but it looks like I'm checking the

23    list.

24        Q.   Do you know why?

25        A.   No.

1      Chee-Tucker Wong

2  Q. You then go on to say:  This is the list of

3 claim files where the claimants have transferred to

4 Domtar.

5    Do you know who prepared that list?

6  A. I don't remember.

7  Q. Do you know why it was prepared?

8  A. No, I don't.

9  Q. Any idea how it was prepared?

10  A. No, I don't.

11  Q. If you look at Mr. Lane's e-mail at the top

12 of Exhibit 102, he tells Ms. Eckroth:  Anne and I

13 discussed this and we'd like you to contact Michel

14 Dagenais and review the updated invoices for Workers'

15 Compensation explaining the reason for the change from

16 our previous invoice.

17    Do you know who Michel Dagenais was?

18  A. No, I don't remember.

19  Q. Do you recall him as being someone at

20 Domtar?

21  A. Yeah, vaguely, I mean...

22  Q. And where it refers to reviewing the

23 updated invoices for Workers' Compensation, do you

24 know what he's referring to?

25  A. Which one are you looking at?

1                    Chee-Tucker Wong

2        Q.    Very first line of Mr. Lane's first e-mail.

3   It talks about contact Mr. -- Michel Dagenais and

4   review the updated invoices for Workers' Compensation.

5        A.    No, but from what I'm reading, just to talk

6    about the workers' comp claims.

7        Q.    Do you know why there were updated

8   invoices?

9        A.    I don't remember.

10       Q.    It says -- it talks about explaining the

11   reason for the change from our previous invoice.

12       A.    Right.

13       Q.    Any idea what the reason for the change

14   was?

15       A.    I don't remember.

16       Q.    In this next paragraph Mr. Lane says:  Just

17   so we're consistent, my understanding is that our

18   previous invoices were based on our understanding that

19   all Workers' Compensation liability transferred to

20   Domtar.

21             Was -- is the understanding that he

22   describes there correct?

23       A.    I don't know.  I don't remember.

24       Q.    You have no recollection of whether at any

25   point Weyerhaeuser was sending invoices to Domtar that

1                    Chee-Tucker Wong

2    included all Workers' Compensation liability for the

3    fine paper business?

4         A.    Yeah, I don't recall.

5         Q.    He then goes on to say:  Whereas our

6    September discussions with Domtar clarified that the

7    Workers' Compensation liability went to Domtar only

8    for employees that showed up to work at Domtar.

9              Do you have any recollection of there being

10   a clarification or a change that only employees who

11   went to work for Domtar or that Domtar was only going

12   to be responsible for employees who went to work for

13   it?

14        A.    Vaguely, yeah, I know there was at some

15    point where we talked about, you know, when the

16    Domtar employees need to work at Domtar.

17        Q.    And do you recall that there was a point

18   after these September discussions that Mr. Lane is

19   referring to where it became clear that Domtar was

20   only taking liability for the employees who showed up

21   to work at Domtar?

22        A.    I don't remember that specific.

23        Q.    Do you recall who you ever discussed this

24   topic with?

25        A.    No.

1                          Chee-Tucker Wong

2           Q.    Did you discuss it with Mr. Lane?

3           A.    Could have.

4           Q.    But you don't recall?

5           A.    No.

6           Q.    How about Ms. Eckroth?

7           A.    Yeah, I could have.  You know, if I -- over

8    this issue, the people I would, you know, Patrick

9    Lane would be one, Kim Eckroth, Dawn Yeager, you

10   know, these are the people who really are involved

11   in -- with this issue.

12          Q.    But you don't recall any e-mails or

13   conversations with any of them about the topic of

14   Workers' Compensation liability going to Domtar?

15          A.    Not specific conversation.  I mean, we

16   have -- I mean, we had conversation, but I don't

17   remember all the specific conversation we've had.

18          Q.    And you don't recall what was decided?

19          A.    No.

20          Q.    Do you recall how you were instructed to

21   prepare invoices?

22          A.    I don't remember.

23          Q.    I'm going to show you what was marked

24   yesterday as Exhibit 232.  And the first page of

25   Exhibit 232 is an e-mail from you to Michel Dagenais

1                        Chee-Tucker Wong

2    at Domtar.

3            Does that refresh your recollection at all

4    as to whether you had any communications with Mr.

5    Dagenais?

6        A.    From this e-mail it looks like I did.

7        Q.    Does it -- do you remember anything about

8    it now having seen the document as opposed to just

9    simply saying, yes, I must have had that e-mail?

10       A.    No.

11       Q.    And you say in the first sentence:  Below

12   are the files that I mentioned I would send to you.

13   And it goes on to say:  The first file is a list of

14   W.C. payments made on behalf of transferred employed

15   from March 2007 to October 2008.

16           Do you remember sending him a list of

17   Workers' Compensation payments made on behalf of

18   transferred employed?

19       A.    No, I don't remember sending this file to

20   him.

21       Q.    Any idea why you sent him this file?

22       A.    No.  It was probably because of, based on

23   the previous document, to support the claims.

24       Q.    It was to support the claim that was being

25   made for workers' comp by Weyerhaeuser for Workers'

1                     Chee-Tucker Wong

2    Compensation payments made to just the employees who

3    transferred to Domtar?

4         A.    Right, the employees to Domtar, right.

5         Q.    Would you look at the attachments?  Do any

6    of these look familiar to you?

7         A.    No.

8         Q.    Would you have prepared these list or would

9    someone have sent these to you?

10        A.    I don't remember if I was the one who

11    actually prepared it or someone else did it.

12        Q.    Let me show you what's been marked

13    previously as Exhibit 79.  And Exhibit 79 is a letter

14    from Ms. Giardini to Mr. Jablonski.

15              Have you ever seen this before?

16        A.    No.

17        Q.    If you turn to the third page of the

18    Exhibit 79, item 5 is listed there.

19        A.    Okay.

20        Q.    And Ms. Giardini says:  Our Chee-Tuck Wong

21    has sent to Michel Dagenais a list of Workers'

22    Compensation payments made on behalf of transferred

23    employees from March 2007 to October 2008 and a list

24    of claims, open parens, opened and close, closed

25    parens, where the claimant is a transferred employee.

1                    Chee-Tucker Wong

2            Do you see that?

3        A.    Yes.

4        Q.    And do you believe that she's referring

5    there to the exhibit we just looked at a minute ago

6    with the list of claims and your e-mail to Mr.

7    Dagenais?

8        A.    I assume it is.

9        Q.    Are you aware of any other list of claims

10   that you sent to Mr. Dagenais at or about this time?

11       A.    I don't remember.

12       Q.    And then Ms. Giardini goes on to say:

13   Previous invoices were based on our employee's

14   understanding that all Workers' Compensation liability

15   transferred to Domtar.

16            Do you have any recollection of whether

17   that statement is correct about how the previous

18   invoices were prepared?

19       A.    No, I don't.

20       Q.    She then goes on to say:  In fact, we're

21   all agreed that U.S. Workers' Compensation liability

22   went to Domtar only for employees who became able to

23   work in some capacity at Domtar.

24            Do you have any recollection of learning

25   that at some point in time that the parties were

1                    Chee-Tucker Wong

2      agreed that Workers' Compensation liability went to

3      Domtar only for the employees who became able to work?

4           A.    Yeah, at some point that was the -- how we

5       interpreted -- how we provided the information.

6           Q.    And is that also how you then invoiced

7      claims after that point?

8           A.    I believe so.  I can't remember.

9           Q.    I'm going to show you what was marked at

10     Ms. Yeager's deposition as Exhibit 233.

11               Does Exhibit 233 appear to be an invoice

12     from Weyerhaeuser to Domtar for certain Workers'

13     Compensation claims?

14          A.    That's what it appears to be.

15          Q.    Do you recall whether you prepared this

16     invoice?

17          A.    I don't remember this.

18          Q.    There's a reference at the bottom to the

19     Weyerhaeuser contact being Jake Yoon.

20          A.    Right.

21          Q.    Who is Mr. Yoon?

22          A.    He worked for me at the time.

23          Q.    And based on that reference, do you believe

24     he's the one who sent out this invoice?

25          A.    Either he sent it out or our corporate

1                    Chee-Tucker Wong

2    accounting group sent it out or general accounting,

3    but we would have probably provided the information.

4         Q.   If you look at the text under the heading

5    description, the middle of the first page of Exhibit

6    233, it refers to May workers' comp current month

7    claims.

8              This appears to be May 2008, would you

9    agree, based on the invoice date at the top?

10        A.   Right, right.

11        Q.   And it refers to asbestos facilities.  Do

12   you have any idea what that number refers to or what

13   that heading means?

14        A.   From looking at this it looks like the

15   asbestos claims payments, so this would be what was

16   paid to claimants who has claims classified as

17   asbestos.

18        Q.   Do you know why it says asbestos facilities

19   rather than asbestos claims?

20        A.   I don't.

21        Q.   Next line:  Closed facilities.  Do you have

22   any idea what that refers to?

23        A.   Closed the sites that are no longer

24   operational.

25        Q.   And do you know whether that number, in

1                      Chee-Tucker Wong

2    our claims system.

3         Q.   I notice in looking at the cover, the first

4    page of the exhibit, it refers to claims paid March

5    2007 to October 2008, but then if you go back to the

6    materials behind that, the first invoice, they appear

7    to relate to November 2008 through February 2009.

8              Does that appear to be correct?

9         A.   Right.

10        Q.   Does that suggest to you that the backup

11   that's attached to this invoice, in fact, does not

12   relate to March of 2007 to October of 2008?

13        A.   I don't know.  If you look at -- I don't

14   remember.  It looks like the one after that is from

15   November, November 2008.

16        Q.   So the backup seems to cover a different

17   period than the cover invoice does, correct?

18        A.   Correct.

19        Q.   Any idea how that would have happened?

20        A.   No, I don't.  I don't.

21             MR. KUBEK:  I'm going to ask the reporter

22   to mark as 240 a document Bates Numbered WEY 19083

23   and 19084, although 19084 is a multipage spreadsheet.

24             (WHEREUPON, Wong Deposition Exhibit

25             240, Bates Numbered WEY 19083 and 19084

1                    Chee-Tucker Wong

2             was marked for identification.)

3    BY MR. KUBEK:

4        Q.   Mr. Wong, the first page of Exhibit 240 is

5    an e-mail from you to Anne Giardini, Patrick Lane, Kim

6    Eckroth with a copy to Deanna Stad.

7             Any recollection of having seen this

8    document?

9        A.   No.

10       Q.   But you assume you, in fact, had sent it?

11       A.   Yes, I assume I sent it.

12       Q.   The who was Deanna Stad?

13       A.   I don't remember the name.

14       Q.   You say in the text of the e-mail:  Here's

15   the final reconciliation of the W.C. claims for period

16   2/2007 to 2/2009.  As you will see, we have invoiced

17   Domtar for claims 11/2008 to 2/2009.  The claims for

18   periods from 10/2008 and prior are for the claims that

19   we originally had a discrepancy on which claim to

20   include which we'll need to re-invoice Domtar for.

21            Do you have any understanding of what you

22   were explaining there?

23       A.   Well, from this e-mail, it looks like we're

24   invoicing for claims that were paid from November

25   2008 to February of 2009 and we need to re-invoice

1                    Chee-Tucker Wong

2    for any claims prior to October 2008.

3         Q.   And why did you need to re-invoice those

4    claims?

5         A.   I don't remember why.

6         Q.   Do you believe that that was because at

7    this point Weyerhaeuser had determined it should only

8    invoice Domtar for claims relating to transferred

9    employees, the employees who came to work for Domtar?

10        A.   I presume that's what's going on here.

11             MR. KUBEK:  I probably only have half an

12   hour.  Want to take a break and we can get done

13   before lunch?

14             MS. CHYZ:  That would be great.

15                  (A recess was taken.)

16   BY MR. KUBEK:

17        Q.   During the break, we realized that the

18   version of Exhibit 125 that we showed Mr. Wong earlier

19   this morning was not complete.  Looking back at the

20   transcript of when that deposition -- when Mr. Lane's

21   transcript when that exhibit was first introduced, it

22   included a transmittal e-mail with the Bates number

23   WEY 19047.  So we have now corrected the version of

24   Exhibit 125 here by adding that page to the front.

25             And Mr. Wong, I'd like you to take a look

Chee-Tucker Wong

1    at this new first page, 19047.  I believe you had

2    testified that the signal notification form itself was

3    essentially a proposal that needed someone's approval,

4    correct?

5       A.    Correct.

6       Q.    And if you look at Page -- first page now

7    of Exhibit 125, Bates number 19047, does that show

8    that, in fact, Gene Hillman did approve that signal

9    notification change?

10      A.    Yes.

11      Q.    Thank you.  Let me show you -- is this a

12   new exhibit?

13           MR. HUGHES:  131.

14   BY MR. KUBEK:

15      Q.    What was previously marked as Exhibit 131,

16   and Exhibit 131 is a series of e-mails, I guess most

17   of which -- some of which you are on.

18           Taking a look at this, do you recall this

19   series of communications?

20      A.    I don't remember this.

21      Q.    If you look at the first -- well, last

22   e-mail in the exhibit, the first one chronologically

23   on the second page at the bottom, there's an e-mail

24   from you to Mr. Dagenais saying:  Checking on the

# EXHIBIT 23

# REDACTED IN ITS ENTIRETY