# EXHIBIT 38



THE CANADIAN
BAR ASSOCIATION
L'ASSOCIATION DU
BARREAU CANADIEN

INFLUENCE. LEADERSHIP. PROTECTION.

# Solicitor-Client Privilege in Canada
## Challenges for the 21st Century

**Professor Adam Dodek, B.A., J.D., LL.M.**
**University of Ottawa**

**Discussion Paper for the Canadian Bar Association**
February 2011

# Solicitor-Client Privilege in Canada
Challenges for the 21st Century

**Professor Adam Dodek B.A., J.D., LL.M., University of Ottawa**
**Discussion Paper for the Canadian Bar Association**

February 2011

**Author:** Professor Adam Dodek, B.A., J.D., LL.M., University of Ottawa
**Staff Liaison:** Tamra L. Thomson, Director, Legislation and Law Reform
**Production:** Louise Brunet-Hermus

## Acknowledgements

This project could not have been completed without the contributions of several outstanding J.D. students at the University of Ottawa's Faculty of Law.  Niklas Holmberg and Jarrod Olson were the lead researchers on this project who devoted their entire summer to researching Solicitor-Client Privilege issues.  Lars Brusven, Flora Stikker and Katelyn Wiley also contributed to this project. Many of the issues raised in this paper owe their genesis to discussions with Professor Alice Woolley of the University of Calgary over the past few years and I owe her a great debt of gratitude for all of her help.

Adam Dodek

ISBN  978-1-897086-94-0

© Canadian Bar Association
500 – 865 Carling Avenue, Ottawa, ON K1S 5S8
613-237-2925
www.cba.org

February 2011

*This paper was prepared by Professor Adam Dodek for the Canadian Bar Association. It has not been approved as official CBA policy.*

TABLE OF CONTENTS

# Solicitor-Client Privilege in Canada
## Challenges for the 21st Century
### by Professor Adam Dodek

Executive Summary ..................................................................................... iii

I.   Introduction:  Solicitor-Client Privilege in Canada – Under Attack or
     Stronger than Ever? ............................................................................ 1

II.  The CBA and Solicitor-Client Privilege ................................................ 3

     A. The CBA at the Supreme Court of Canada ........................................ 3
     B. The CBA's Submissions to Government ............................................. 3

III. The State of Solicitor-Client Privilege in Canada ................................ 6

     A. The Evolution of Solicitor-Client Privilege in Canada ....................... 6
     B. Solicitor-Client Privilege and Related Concepts ............................... 8
     C. Exclusions and Exceptions to Solicitor-Client Privilege ................... 11

IV.  The State of Solicitor-Client Privilege Internationally ....................... 15

     A. United States:  Privilege under Attack ............................................ 15
     B. United Kingdom:  Common Law and Parliamentary Supremacy ........ 18
     C. Australia:  Dominant Purpose Test and the Influence of
        Legislation .................................................................................. 20
     D. New Zealand:  English Influence and Legislative Specification ......... 22
     E. South Africa:  Between Common Law and Constitution ................... 24
     F. Europe:  A Human Rights Approach and No Privilege for
        In-House Counsel ........................................................................ 25
        1.   A Rights-Based Approach .......................................................... 26
        2.   No Privilege for In-House Counsel .............................................. 28

V.   Solicitor-Client Privilege in Specific Contexts ................................... 30

     A. Issues in the Corporate Context .................................................... 30
     B. The Public Sector ......................................................................... 32

i

    C.  Administrative Law and Open Government ............................................36

VI.    Current Challenges and Opportunities for the CBA ............................................ 40

    A.  Solicitor-Client Privilege and Other Professionals ................................40
        1.    A Paralegal Privilege? .....................................................................40
        2.    Notaries in Common Law Provinces and Territories...................41
        3.    Patent Agents ..............................................................................42
        4.    Tax Accountants ..........................................................................44
        5.    Immigration Consultants ..............................................................45
        6.    The Doctrine of Professional Secrecy in Quebec .......................46
    B.  Solicitor-Client Privilege and Professionalism........................................47
    C.  Solicitor-Client Privilege and New Technology .....................................48
    D.  The Privilege and the Changing Practice of Law...................................51

VII.  Conclusion......................................................................................................... 53

## Executive Summary

The context for this Discussion Paper is the need to take stock of the state of Solicitor-Client Privilege in Canada in light of developments internationally and at home.  There is no single court decision, government action or event that has precipitated the need for reflection but that should not be an invitation for complacency.  The Supreme Court of Canada's jurisprudence is consistent and predictable in strongly protecting Solicitor-Client Privilege (the Privilege).  It generally aligns with the positions taken by the Canadian Bar Association (CBA) before the high court.  However, the court's jurisprudence does not provide an adequate framework for addressing the multitude of issues that currently exist and that are likely to arise regarding the Privilege.  Moreover, the Canadian approach to the Privilege is in many ways at odds with how the Privilege is treated in other common law jurisdictions.  In an increasingly globalized legal world, the time is ripe to identify issues for the Privilege in Canada and begin to start to think about how they should be addressed.  This is the *raison d'être* of this Discussion Paper.

Over the past three decades, Solicitor-Client Privilege has been elevated from a limited evidentiary privilege into a quasi-constitutional right.  Wigmore's classic definition of the Privilege continues to prevail: "Where legal advice of any kind is sought from a professional legal adviser, in his capacity as such, the communications relating to that purpose, made in confidence by the client, are at his instance permanently protected from disclosure by himself or by the legal adviser, except the privilege be waived."  In a series of cases between 1999 and 2002, the Supreme Court greatly strengthened the Privilege.  It is now best understood as a quasi-constitutional right to communicate in confidence with one's lawyer which can be invoked in any circumstances.

Solicitor-Client Privilege is associated with and at times confused with other concepts.  It is therefore necessary to distinguish it from the ethical duty of confidentiality, Litigation Privilege, Joint Client Privilege, Common Interest Privilege and the Implied Undertaking Rule (also referred to as the deemed undertaking rule or discovery privilege).

The Supreme Court has only recognized two exceptions to the Privilege: public safety and innocence at stake.  In practice, there exist a group of other exceptions often referred to as "Lawyers' exceptions" or "self-defence exceptions".  These allow lawyers to reveal privileged information to defend themselves or their associates from charges of malpractice or misconduct or to collect a fee.  The Supreme Court has also left open the possibility of other exceptions, *e.g.* for national security.  By far, the area most in flux is the rule that communications in aid of a crime or fraud are not privileged.  Recent cases have shown a willingness to expand the exception to include communications in furtherance of a tort or breach of contract.  There are significant consequences to expanding the crime-fraud exception into these areas.

Solicitor-Client Privilege in law and in practice looks very different in other jurisdictions.  In a globalized legal world, international pressures will impact on the Privilege in Canada and Canadian clients and lawyers will engage in transnational transactions or litigation where the Privilege will apply differently.  Moreover, Canadian courts are likely to consider the law in other jurisdictions either because foreign law will be directly engaged or because of the need to consider persuasive authority in other common law countries to deal with new Privilege issues for which there is a dearth of Canadian authority.

In the United States, strong pressures have been exerted on the Privilege over the past decade.  The War on Terror and the response to corporate scandals have seriously weakened the

*Solicitor-Client Privilege in Canada:  Challenges for the 21st Century*

Privilege.  The aggressive prosecution of corporate fraud by the federal Department of Justice has created a "culture of waiver" for the corporate Attorney-Client Privilege.  The Department of Justice has eroded the Privilege for corporations without changing a single law; it has all been done through the executive's policy-making powers.

In the United Kingdom, Australia, New Zealand and South Africa, Solicitor-Client Privilege falls under the doctrine of Legal Professional Privilege which contains two branches: legal advice privilege (what we would call Solicitor-Client Privilege) and litigation privilege.  This structure is significant because a dominant purpose test generally applies to both branches of Legal Professional Privilege whereas in Canada it only applies to Litigation Privilege.

In the United Kingdom, the Privilege remains a common law doctrine which the courts have been vigilant in protecting.  However, under parliamentary supremacy, Parliament can and has expressly abrogated the Privilege.  In setting up the Iraq Inquiry, the government of former Prime Minister Gordon Brown broadly waived the Privilege and as a result senior government legal advisers have testified as to the legal advice that they provided regarding the legality of the war.

In Australia, the Privilege is both a common law and a statutory doctrine.  Legislation in Australia sets out a complete code for the Privilege:  its parameters, exclusions, exceptions and circumstances of waiver.  New Zealand law has generally followed the English and there are some notable differences with Canadian law, especially regarding waiver.  South Africa is interesting in that the Privilege is not protected under that country's Constitution but it can be used as a reasonable limit to justify the infringement of a right under that country's limitations clause which was modeled after our own section 1 of the *Charter*.

In Europe, the Privilege is considered a fundamental human right under the *European Convention on Human Rights*.  However, it may also be overridden on various grounds and has been in the name of national security and protection against money laundering.  The biggest Privilege issue in Europe has attracted interest around the world and will likely come as a surprise to many Canadian lawyers: under European Union law, the Privilege generally does not apply to communications with in-house counsel.

The Privilege applies differently in various contexts.  This section of the Discussion Paper addresses some of the issues that arise in three areas: corporate; public sector; and administrative law and open government.  In the corporate context, one current issue is the operation of the Privilege within the corporate family.  The U.S. Court of Appeals for the Third Circuit addressed a number of issues in the 2007 *Teleglobe* decision.[1]  The decision is a likely starting point for consideration of issues that will eventually come before Canadian courts such as: When in-house counsel communicates with the parent company and one or more corporate affiliates, who is the client?  Is there only one client, or are there several joint clients?  Is advice that is given to the parent company privileged as against the subsidiaries?  Can one member of the corporate family waive privilege for all?  Does in-house counsel's advice remain privileged when the interests of corporate affiliates are divergent?  What happens to the Privilege when the affiliates sue one another?  What practices should companies and their in-house counsel follow to protect privilege on a day-to-day basis?[2]

---

[1]   *In re Teleglobe Communications Corp.*, 493 F.3d 345 (3d. Cir. 2007).

[2]   See Wendy Matheson, David Outerbridge & Laura Day, "Preserving Privilege in a Corporate Group: Lessons from *In re Teleglobe Communications Corp*" (paper presented at Ontario Bar Association, *Privilege, Confidentiality and Conflicts of Interest: Traversing Tricky Terrain*, 23 October 2008, Toronto).

When it comes to the Privilege in the public sector, the first question to grapple with is determining who the client is in a given situation. This is especially important when it comes to issues of waiver and court decisions reach different conclusions. Perhaps the greatest future challenge for the application of the Privilege to the public sector lies in the increasing tendency to articulate the Privilege as a quasi- or full constitutional right because generally governments do not have *Charter* rights. A further challenge comes from the Open Government movement where access to information and government watchdogs frequently clash with the Privilege. Court decisions have protected the Privilege in various administrative settings, limiting the powers of administrative officials and adjudicators to access or adjudicate Privilege claims. There is growing concern about the negative impact that this could have on administrative proceedings.

The last section of the discussion paper addresses current challenges and opportunities for the CBA regarding the Privilege. Other professionals have and will continue to seek a class privilege like Solicitor-Client Privilege. The CBA will have to consider what its position should be on whether Solicitor-Client Privilege should extend to paralegals or to other professionals providing legal advice such as immigration consultants. There are also patent agents and tax accountants who seek analogous privilege. The common law in Canada has been reticent to recognize privilege for these other professionals. This approach contrasts with a more inclusive approach under the doctrine of professional secrecy in Quebec and under legislation in other countries.

Technological changes are likely to challenge how we think about the Privilege more over the next decade than they have over the last several. The touchstone of the Privilege is confidentiality and technological changes have brought unparalleled access and connectivity at the cost of confidentiality. Communications over the internet may provide a false sense of confidentiality where none exists. A fundamental question that we as a profession have to face is whether the doctrine of the Privilege will adapt to new circumstances or whether lawyers' behaviours will have to adapt to deal with the strict rules of the Privilege.

Finally, as the practice of law changes, it will bring new challenges for the Privilege. It is not clear how outsourcing and many of the changes predicted by legal futurist and CBA Special Advisor Richard Susskind will impact the Privilege. But we need to start thinking about them.

# Solicitor-Client Privilege in Canada
## Challenges for the 21st Century

I.  **Introduction: Solicitor-Client Privilege in Canada – Under Attack or Stronger than Ever?**

Depending on one's perspective, Solicitor-Client Privilege in Canada is either "almost absolute"[3] or "fraying . . . under assault".[4] Which is it? Canadian lawyers have differing views about the state of Solicitor-Client Privilege (the Privilege) in Canada. One thing is certain, Canadian lawyers are passionate about the Privilege and view it as vital to the lawyer-client relationship and to the administration of justice. The courts in Canada largely share these views. The position of governments in Canada is mixed, however. From coast to coast, governments at all levels are aggressive in asserting the Privilege on their behalf. At the same time, they are not shy about attempting to encroach on the Privilege of others when it serves other identified public policy goals.

While Solicitor-Client Privilege is an ancient concept dating back to the 16th century,[5] it is also dynamic. Just over a decade ago, it was simply a rule of evidence, albeit a very strong one. However, the Supreme Court has dramatically strengthened the Privilege. As Freya Kristjanson has written, "[o]ne of the notable features of the McLachlin Court has been the expansion, constitutionalization, and protection of Solicitor-Client Privilege in all its applications . . ."[6] At the same time, the practice of law has seen significant changes over the past decade through the impact of globalization and technology, changes are likely to accelerate rather than arrest in the coming decades. In short, the Privilege faces new challenges in its application which can be demonstrated by two examples.

The first example relates both to individual lawyers and to the profession as a whole. In *Dublin v. Montessori*,[7] the Ontario Superior Court accepted that an e-mail written by a member of the board to the organization's lawyer was not privileged because it was made in furtherance of tortious conduct. This decision extends the boundaries of the crime-fraud exception to the Privilege into a highly controversial area. The ramifications of this decision are significant and require serious analysis which this Discussion Paper begins to undertake. However, there is another aspect of the case that warrants consideration. The client sent the e-mail to her lawyer from a home e-mail address that she shared with her husband who was not a member of the Board. The court accepted that this did not disqualify the communication from being privileged. Such action raises a number of questions. Does sending an e-mail from a shared home computer have the necessary confidentiality to make the communication privileged? What if a lawyer sends an e-mail from a personal e-mail account shared with their spouse? How does such practice impact on the doctrine of inadvertent disclosure or waiver? What if such communications are sent by lawyer

---

3    Michael McKiernan, "SCC Reinforces Solicitor-Client Privilege" 21:22 *Law Times* (28 June 2010).

4    Sandra Rubin, "Privilege under assault: Auditors and regulators are both knocking on the door" *National Post* (1 November 2006), online: <http://www.canada.com/nationalpost/news/story.html?id=e38ce793-e12d-437e-b08e-bb24f0ab01bd>

5    See Jonathan Auburn, *Legal Professional Privilege: Law and Theory* (Oxford: Hart Publishing, 2000).

6    Freya Kristjanson, "Procedural Fairness at the McLachlin Court" in David A. Wright & Adam M. Dodek, eds., *Public Law at the McLachlin Court: The First Decade* (Toronto: Irwin Law, forthcoming 2011).

7    85 O.R. (3d) 511, [2007] O.J. No. 1062 (S.C.J.).

or client over an unsecured wireless internet network?  Are they still privileged?  Should they be?  In short, this one case raises a host of Privilege issues for consideration.

The second example is more straightforward but represents a fundamental challenge to our conception of the Privilege as something that only lawyers have.  In Ontario, paralegals have now been recognized as authorized to provide designated legal services under the regulation of the Law Society of Upper Canada.  Simply put, should Solicitor-Client Privilege extend to paralegals?  What should the CBA's position on this be?  In the U.S., tax preparers have been extended privilege through legislation.  In the United Kingdom, the Court of Appeal ruled in October 2010 that communications with accountants do not fall within the common law of legal professional privilege.  In Canada, patent agents seek the protection of the Privilege.  Many professions seek the protections of the Privilege and the Bar usually opposes such efforts.  On what basis?

The list of issues goes on and many of them are considered in this Discussion Paper.  This Discussion Paper reviews the current state of the Privilege in Canada and the challenges that it faces.  It includes an environmental scan of the state of Solicitor-Client Privilege law and practice in the U.S., the U.K., Australia, New Zealand, South Africa and Europe.  It identifies and assesses issues raised in the scan that have implications for Canadian lawyers and for the legal profession.  It also proposes areas for further consideration by the CBA.

Lawyers face issues relating to Solicitor-Client Privilege in their daily practices.  To this end, readers are also referred to the guidance document "Frequently Asked Questions on the Duty of Confidentiality and Solicitor-Client Privilege" prepared contemporaneously with this Discussion Paper.

It is not the aim of this Discussion Paper to answer all possible questions regarding Solicitor-Client Privilege in Canada.  Rather, it is hoped that through identifying some of the issues faced by lawyers in Canada and the profession as a whole, this Discussion Paper will contribute to greater reflection about Solicitor-Client Privilege in our practices and in our justice system.

## II.   The CBA and Solicitor-Client Privilege

### A.   The CBA at the Supreme Court of Canada

Over the past decade, the CBA has intervened in most of the leading cases at the Supreme Court of Canada involving Solicitor-Client Privilege.  It has argued forcefully and consistently for maximum protection of the Privilege.  For example, in *Blood Tribe*, the CBA asserted that "[s]olicitor-client privilege is paramount and should be given priority to ensure public confidence in the administration of justice."[8]  In *R. v. Cunningham*, the CBA contended that "[i]ndependence of the bar, and preservation of the privilege that protects solicitor-client communications are twin pillars in the fair and proper administration of justice in Canada."[9]  Further, the CBA has argued that Solicitor-Client Privilege "must be as close to absolute as possible" and that it is "essential to the rule of law."[10]

Most recently, in *Ontario (Public Safety and Security) v. Criminal Lawyers' Association*, the CBA invoked strong language to convey the importance of Solicitor-Client Privilege.  It argued that without a strict application of Solicitor-Client Privilege, "access to justice and the quality of justice in this country would be *severely compromised*."[11]  The CBA further asserted that Solicitor-Client Privilege is an all-or-nothing venture: "[d]isclosure of privileged information is all or nothing: once privileged information is disclosed, the privilege is lost."[12]  Lastly, the CBA commented that it may be possible for the legislature to infringe on Solicitor-Client Privilege if legislation clearly intends to do so; however, the CBA notes that "[t]he Court has left open whether even *express* legislation could abrogate the privilege."[13]  This last point is one of many open questions regarding the status of the Privilege in Canada.

### B.   The CBA's Submissions to Government

The CBA frequently intercedes with Government when it perceives Solicitor-Client Privilege to be implicated or threatened.  Since 2002, the CBA has made three dozen submissions to the federal government relating to the Privilege.  Provincial and territorial branches of the CBA have also been active in interceding with their governments when issues involving the Privilege arise.  Part of the CBA's work involves educating government officials about the importance of the Privilege.  For example, in welcoming a new Minister of Justice, the CBA wrote that "[a] fundamental aspect of the rule of law is the protection of the relationship between clients and their solicitors" and further remarked that clients "need the ability to tell their solicitors all of the facts of the case, truthfully and without fear that those facts will be disclosed to others."[14]  In a 2005

---

8    *Canada (Privacy Commissioner) v. Blood Tribe Department of Health*, 2008 SCC 44, [2008] 2 S.C.R. 574 (Factum of the Intervener, Canadian Bar Association at para. 33) [*Blood Tribe*].

9    *R. v. Cunningham*, 2010 SCC 10 (Factum of the Intervener, Canadian Bar Association at para. 11) [*Cunningham*].

10   *Lavallee, Rackel & Heintz v. Canada (Attorney General); White, Ottenheimer & Baker v. Canada (Attorney General); R. v. Fink*, 2002 SCC 61, [2002] 3 S.C.R. 209 (Factum of the Intervener, Canadian Bar Association at para. 10) [*Lavallee*].

11   *Ontario (Public Safety and Security) v. Criminal Lawyers' Association*, 2010 SCC 23, [2010] 1 S.C.R. 815 (Factum of the Intervener, Canadian Bar Association at para. 6) [*Criminal Lawyers' Association*].

12   *Ibid.* at para. 27.

13   *Ibid.* at para. 24.

14   "Justice Portfolio Priorities" (January 2002), online: Canadian Bar Association <http://www.cba.org/CBA/submissions/pdf/02-02-eng.pdf> (Justice Portfolio Priorities).

submission, the CBA commented that "[s]olicitor-client privilege is a fundamental tenet of the rule of law; people must be able to obtain independent legal advice without fear that their lawyer will disclose the nature of their inquiry to government authorities."[15]  At times, the CBA's submissions regarding the importance of the Privilege attempt to cross the boundaries between prose and poetry, for example, describing the Privilege as "the sacred foundation upon which the law, fundamental liberties and business in the modern world have flourished for centuries."[16]

The CBA's submissions to government span a wide range of topics from anti-terrorism legislation to assisted reproduction.  Many of the government initiatives that attract the CBA's attention have their source in Canada's international obligations such as money laundering and terrorist financing.  On the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act*[17], the CBA expressed concern that "[c]ompelling a lawyer to assist the state by providing access to confidential or privileged client information is antithetical to that duty [to their clients], and would undermine the fair and proper administration of justice."[18]  Litigation involving this requirement was settled but lawyers continue to challenge various aspects of this Act and its regulations. Further demonstrating how global developments impact the practice of law in Canada, the CBA made submissions to the U.S. Securities and Exchange Commission (SEC) regarding the "Rules for Attorney Conduct" that the SEC was required to enact pursuant to the *Sarbanes-Oxley Act*.[19]

Concerns about Solicitor-Client Privilege frequently arise in statutes that authorize an administrative official to conduct searches of premises.  Thus, the CBA made submissions regarding the *Biological and Toxin Weapons Convention Act*[20] because it believed that the Act was deficient in failing to include a section to allow parties to refuse an inspector access to documents that are protected by Solicitor-Client Privilege.  The CBA expressed a similar concern regarding search powers contained in the *Assisted Human Reproduction Act*.[21]  In other situations, the CBA has expressed concern about the procedure for claiming privilege under particular legislation such as the *Competition Act*.[22]

The CBA's submission on the *Lobbying Act* that was enacted pursuant to the *Federal Accountability Act* demonstrates the tension between open government and Solicitor-Client Privilege, a subject that is addressed in this Discussion Paper.  The CBA supports more transparency in lobbying activities, but is concerned with the effect this will have on the Privilege. The CBA asserted that "the current requirements of the Act to report lobbying activities might already conflict with solicitor-client privilege by giving third parties information about communications between lawyers and their clients."[23]  Further, the CBA argues that "[d]isclosing

---

15   "Three Year Review of the *Anti-terrorism Act*" (May 2005), online: Canadian Bar Association
     <http://www.cba.org/CBA/submissions/pdf/05-28-eng.pdf> (Three Year Review of the *Anti-terrorism Act*).

16   "Professional Standards for Attorneys (Rules under *Sarbanes-Oxley Act*)" (December 2002), online: Canadian Bar
     Association <http://www.cba.org/CBA/submissions/pdf/02-51-eng.pdf> (Rules under *Sarbanes-Oxley Act*).

17   *Proceeds of Crime (Money Laundering) and Terrorist Financing Act*, S.C. 2000, c. 17.

18   "Proceeds of Crime and the Legal Profession" (November 2006) online: Canadian Bar Association
     <http://www.cba.org/CBA/submissions/pdf/06-49-eng.pdf> (Proceeds of Crime and the Legal Profession).

19   *Supra* note 16.

20   *Biological and Toxin Weapons Convention Act*, S.C. 2004, c. 15.

21   *Assisted Human Reproduction Act*, S.C. 2004, c. 2.

22   "Information Bulletin on Section 11 of the *Competition Act*" (February 2007) online: Canadian Bar Association
     <http://www.cba.org/CBA/submissions/pdf/07-08-eng.pdf> (Information Bulletin on Section 11 of the
     *Competition Act*).

23   "Bill C-2 – *Federal Accountability Act*" (June 2006), online: Canadian Bar Association
     <http://www.cba.org/CBA/submissions/pdf/06-25-eng.pdf> (Submission on *Federal Accountability Act*).

the subject-matter of the communications between the public office holder and a lawyer may indirectly breach the privilege by giving insight into what client discussions or instructions may have instigated the contact."[24]  The CBA concluded that regardless of the objectives of the Act, considerations regarding the Privilege must take precedence.  The frequency and the breadth of the CBA's submissions demonstrate the wide variety of contexts in which issues relating to Solicitor-Client Privilege arise.

---

[24]     *Ibid.*

## III.     The State of Solicitor-Client Privilege in Canada

### A.     The Evolution of Solicitor-Client Privilege in Canada[25]

Solicitor-Client Privilege is one of the oldest and most venerated doctrines under the common law.  Over the past three decades, Canadian courts have elevated this limited evidentiary privilege into a quasi-constitutional right.  Since 1999, the Supreme Court of Canada has rendered no less than thirteen decisions in cases directly involving the Privilege.[26]  In 2010, the Supreme Court described Solicitor-Client Privilege as "one of the most ancient and powerful privileges known to our jurisprudence" stating that the Privilege "is generally seen as a 'fundamental and substantive rule of law', rather than as 'constitutional' even though solicitor-client privilege is supported by and impressed with the values underlying s. 7 of the *Charter*."[27]

Thus, the term Solicitor-Client Privilege is now somewhat of a misnomer in Canada because conceptually a privilege is distinct from a right.[28]  As an evidentiary concept, a privilege allows a litigant to resist the introduction of otherwise admissible evidence in court proceedings.  While a privilege may be asserted outside the courtroom, for example in the course of discovery, the touchstone of a privilege is the nexus between litigation and the "privileged" information.  Information that is protected by a privilege is protected from disclosure in the course of legal proceedings.

Solicitor-Client Privilege began as a privilege but has developed into a right which can be asserted even in the absence of legal proceedings.[29]  In 1927, the Supreme Court of Canada adopted the noted American Evidence scholar John Henry Wigmore's formulation of the Privilege.[30]  Wigmore's classic definition of the Privilege is that "*[w]here legal advice of any kind is sought from a professional legal adviser, in his capacity as such, the communications relating to that purpose, made in confidence by the client, are at his instance permanently protected from disclosure by himself or by the legal adviser, except the protection be waived.*"[31]  In an age before discovery or pre-trial motions,

---

[25]     This section is based on portions of Adam M. Dodek, "Reconceiving Solicitor-Client Privilege" (2010) 35 Queen's Law Journal 493. Reprinted with permission.

[26]     See *Criminal Lawyers' Association, supra* note 11; *Cunningham, supra* note 9; *Blood Tribe, supra* note 8 ; *Blank v. Canada (Minister of Justice)*, 2006 SCC 39, [2006] 2 S.C.R. 319 [*Blank*]; *Celanese Canada Inc. v. Murray Demolition Corp.*, 2006 SCC 36, [2006] 2 S.C.R. 189 [*Celanese Canada*]; *Goodis v. Ontario (Ministry of Correctional Services)*, 2006 SCC 31, [2006] 2 S.C.R. 32 [*Goodis*]; *Pritchard v. Ontario (Human Rights Commission)*, 2004 SCC 31, [2004] 1 S.C.R. 809 [*Pritchard*]; *Maranda v. Richer,* 2003 SCC 67, [2003] 3 S.C.R. 193 [*Maranda*]; *Lavallee, supra* note 10; *R. v. Brown*, 2002 SCC 32, [2002] 2 S.C.R. 185 [*Brown*]; *R. v. McClure,* 2001 SCC 14, [2001] S.C.R. 445 [*McClure*]; *R. v. Campbell*, [1999] 1 S.C.R. 565 [*Campbell*]; *Smith v. Jones*, [1999] 1 S.C.R. 455 [*Jones*].  See also *Foster Wheeler Power Co. v. Société intermunicipale de gestion et d'élimination des déchets (SIGED) inc.*, [2004] 1 S.C.R. 456, 2004 SCC 18 [*Foster Wheeler*] (on the related concept of professional secrecy under Quebec civil law).  In one case an issue relating to the Privilege existed in the lower courts but the litigant no longer relied upon it by the time the case reached the Supreme Court.  See *London (City) v. RSJ Holdings*, 2007 SCC 29, [2007] 2 S.C.R.588.

[27]     *R. v. National Post*, 2010 SCC 16 at para. 39, quoting *McClure, ibid.* at para. 17.

[28]     See generally W.N. Hohfeld, "Some Fundamental Legal Conceptions as Applied in Judicial Reasoning" (1913) Yale Law Journal 16 at 28-58.

[29]     See *Lavallee, Rackel and Heintz v. Canada (A.G.)*, [2000] A.J. No. 159 at para. 4 (C.A.) ("until recent years there was an impression in some provinces that privilege was merely the right of a trial witness (or one asked for an affidavit of documents) to decline to disclose certain communications.")

[30]     See *R. v. Howley*, [1927] S.C.R. 529 at para. 11 [*Howley*], citing with approval *R. v. Prentice and Wright* (1914), 7 Alta. L.R. 479, 23 C.C.C. 436 (S.C.A.D.)

[31]     *Wigmore on Evidence*, McNaughton, rev. ed. (Boston: Little Brown, 1961) vol. 8 at s. 2292. This definition has been adopted by the Supreme Court of Canada in *Campbell, supra* note 26 at para. 49; *McClure, supra* note 26 at para. 29; *Descôteaux v. Mierzwinski*, [1982] 1 S.C.R. 860 at 872-73; *Canada v. Solosky*, [1980] 1. S.C.R. 821 (SCC) at 835 [*Solosky*]; and *Howley, ibid.*

it was implicit in this formulation that the protection from disclosure referred to disclosure during the course of legal proceedings.  However, as the courts have broadened the reach of the Privilege, this aspect of Wigmore's articulation is no longer valid.  Nevertheless, Wigmore's formulation still provides the working definition of the Privilege in Canada.

In the 1970s Canadian courts were expanding the Privilege beyond its classic evidentiary privilege function, most notably in the area of law office searches.  In 1980, the Supreme Court liberated the Privilege from its evidentiary foundations and recognized it as "a fundamental civil and legal right" in *Solosky v. The Queen*.[32]  Two years later in *Descôteaux v. Mierzwinski*,[33] Justice Lamer (as he then was) articulated the rule in the following terms:

1. The confidentiality of communications between solicitor and client may be raised in any circumstances where such communications are likely to be disclosed without the client's consent.

2. Unless the law provides otherwise, when and to the extent that the legitimate exercise of a right would interfere with another person's right to have his communications with his lawyer kept confidential, the resulting conflict should be resolved in favour of protecting the confidentiality.

3. When the law gives someone the authority to do something which, in the circumstances of the case, might interfere with that confidentiality, the decision to do so and the choice of means of exercising that authority should be determined with a view to not interfering with it except to the extent absolutely necessary in order to achieve the ends sought by the enabling legislation.

4. Acts providing otherwise in situations under paragraph 2 and enabling legislation referred to in paragraph 3 must be interpreted restrictively.[34]

Between 1982 and 1999, the Supreme Court rarely addressed the Privilege.[35]  However, since then a significant shift in the Privilege has occurred with minimal analysis undertaken by the Court.  Between 1999 and 2002, the Supreme Court decided no less than five cases on the Privilege.  This "Quintology" of cases effectively elevated the Privilege from a fundamental civil and legal right to quasi-constitutional status under the *Charter*.  In *Smith v. Jones*, the Court recognized a public safety exception to the Privilege which would permit disclosure of client communications where a lawyer reasonably believes that a clear, serious and imminent threat to public safety exists.[36]  In *R. v. Campbell*, the Court reviewed the "crime-fraud exception" and the doctrine of waiver of the Privilege in the context of a "reverse sting" operation where undercover police posed as large-scale drug dealers in order to sell hashish to known "senior executives" of a drug-trafficking organization.[37]  In *McClure*, the Supreme Court recognized innocence at stake exception to the

---

[32]   *Solosky, ibid.* at 839.

[33]   *Descôteaux, supra* note 31.

[34]   *Ibid.* at 875.

[35]   The Court did have occasion to consider an aspect of the privilege in *Geffen v. Goodman Estate*, [1991] 2 S.C.R. 353 at 381-388, recognizing a true exception to the Privilege to allow testimony from solicitors in wills cases where the client is deceased.

[36]   *Jones, supra* note 26.

[37]   *Campbell, supra* note 26.

Privilege. *McClure* was also notable because in it the Supreme Court, for the first time, expressly recognized the Privilege as a principle of fundamental justice under section 7 of the *Charter*.[38] This led Brian Morgan and Mahmud Jamal to assert that Solicitor-Client Privilege had crossed "the constitutional rubicon".[39]

Following closely on the heels of *McClure*, *Brown* clarified and amplified a number of aspects of *McClure*. The Court held that a *McClure* application could seek not only the disclosure of solicitor-client file (as in *McClure*) but also solicitor-client communications through the testimony of the solicitor. The Court also set a high barrier for success on such applications. Although not an issue in the case before it as the Court found that the *McClure* test was again not satisfied, *Brown* recognized a right to immunity under section 7 of the *Charter* for the Privilege holder who has information disclosed pursuant to a *McClure* application.

Finally, in *Lavallee*, the last case in the Quintology, the Supreme Court gave the strongest protection to the Privilege, again without much explanation. The Court struck down section 488.1 of the *Criminal Code* dealing with law office searches[40] as constituting an unreasonable search under section 8 of the *Charter* that was not justified under section 1. The Court also accepted that section 488.1 constituted a deprivation of liberty under section 7 of the *Charter* which did not accord with the principles of fundamental justice. Justice Arbour held that the Privilege had to remain as close to absolute as possible to retain its relevance. This compelled the Court to "adopt stringent norms to ensure its protection."[41] An infringement will only pass *Charter* scrutiny if it minimally impairs the Privilege.[42] The Court held that section 488.1 did not minimally impair the Privilege and the provision was struck down.[43]

Cases since *Lavallee* have reaffirmed the contours of the Privilege set out in the Quintology. The Privilege as it currently exists in Canada is best understood as a quasi-constitutional right to communicate in confidence with one's lawyer. This right comprises the protection against the voluntary or compelled disclosure by one's lawyer absent the client's consent or court order. It also includes a protection against the client being compelled to disclose information covered by the Privilege. It can be invoked by the client or the lawyer on the client's behalf in the midst of or in the absence of court proceedings.

### B.    Solicitor-Client Privilege and Related Concepts

Solicitor-Client Privilege is often associated with and at times confused with other related concepts such as the duty of confidentiality, litigation privilege and conflicts of interest. There is significant overlap between Solicitor-Client Privilege and the duty of confidentiality and they are often conflated, at times used interchangeably or cumulatively. This is seen most often in the

---

[38]    *Ibid.* at para. 41.  On the Privilege as a principle of fundamental justice see generally Hamish Stewart, "The Principles of Fundamental Justice and S. 488.1 of the Criminal Code" (August 2001) 45 Criminal Law Quarterly 233.

[39]    Mahmud Jamal & Brian Morgan, "The Constitutionalization of Solicitor-Client Privilege" (2003) 20 S.C.L.R. (2d) 213.

[40]    *Criminal Code*, R.S.C. 1985, c. C-46, s. 488.1.  Challenges to s. 488.1 had been brought in three provinces and were consolidated in *Lavallee*, supra note 10. See *Lavallee, Rackel & Heintz v. Canada (Attorney General)* (2000), 255 A.R. 86, 184 D.L.R. (4th) 25 (C.A.), *White, Ottenheimer & Baker v. Canada (Attorney General)*, [2000] N.J. No. 196 (C.A.) and *R. v. Fink* (2000), 51 O.R. (3d) 577, 193 D.L.R. (4th) 51 (C.A.).

[41]    *Lavallee*, supra note 10 at para. 36.

[42]    *Ibid.* at paras. 36-37.

[43]    *Ibid.* at paras. 38-46.

disclaimers contained at the bottom of most lawyers' e-mails warning that the information contained therein may be confidential or privileged.  It is important to separate the two concepts and also explain their linkage.

The starting point for the distinction between Solicitor-Client Privilege and the duty of confidentiality is the recognition that the Privilege only applies to *communications* between clients and their lawyers whereas the duty of confidentiality applies to all *information* obtained by the lawyer about the client's affairs during the retainer, however obtained.  Strictly speaking, according to most Law Society codes of conduct, if during the course of representing a client, a lawyer read about the client's affairs in the newspaper or on a blog, the lawyer would still have an ethical obligation to keep that information confidential.  The information is not, however, covered by Solicitor-Client Privilege because it is not a communication between the client and the lawyer.

Similarly, if a client e-mailed information to her lawyer and copied her accountant, publicist, investment advisor and others on the e-mail, that information is unlikely to be privileged, but is still covered by the lawyer's duty of confidentiality.  It is a communication from the client to the lawyer. However, it would either not be considered confidentiality or confidentiality would be considered waived.  It is as if the client was speaking to the lawyer at a group meeting outside the client's office with other professionals present.  The mere fact that there is a communication to a lawyer is not enough to make the communication privileged.  Conversely, the mere fact that a communication is received from the client by a lawyer is enough to trigger the duty of confidentiality, as long as there is an existing relationship between the lawyer and client.  Both lawyers and clients overuse and misuse the terms "privileged" and "confidential" in a manner that blurs the distinctions and at times the usefulness of the terms.

Similarly, Litigation Privilege and Solicitor-Client Privilege are often used together, especially in the discovery context where it is not uncommon to see the phrase "Litigation Privilege/Solicitor-Client Privilege" listed next to the disclosure of a document on an Affidavit of Documents.  In the past, we often spoke of Solicitor-Client Privilege having two "branches": the Legal Advice Privilege and Litigation Privilege and this is still the state of the law in other common law countries.  In 2006, the Supreme Court of Canada clarified that this is no longer the case in Canada.  In *Blank v. Canada (Minister of Justice)*, Justice Fish explained that Solicitor-Client Privilege and Litigation Privilege are related but conceptually distinct: "They often co-exist and one is sometimes mistakenly called by the other's name, but they are not coterminous in space, time or meaning..."[44]

Justice Fish explained that unlike Solicitor-Client Privilege, Litigation Privilege is not directed at or restricted to communications between solicitor and client: "It contemplates, as well, communications between a solicitor and third parties or, in the case of an unrepresented litigant, between the litigant and third parties.  Its object is to ensure the efficacy of the adversarial process and not to promote the solicitor-client relationship.  And to achieve this purpose, parties to litigation, represented or not, must be left to prepare their contending positions in private, without adversarial interference and without fear of premature disclosure."[45]  There are a number of important distinctions between the two privileges:

- Solicitor-Client Privilege applies only to confidential communications between client and solicitor.  Litigation Privilege, on the other hand, applies to communications of a non-confidential nature between the solicitor and third parties and even includes material of a non-communicative nature.

---

[44]    2006 SCC 39 at para. 1.

[45]    *Ibid.* at para. 27.

- Solicitor-Client Privilege exists any time a client seeks legal advice from a lawyer whether or not litigation is involved. Litigation Privilege, on the other hand, applies only in the context of litigation itself;

- The rationales for each privilege are distinct: Solicitor-Client Privilege is rooted in the confidential nature of the solicitor-client relationship whereas Litigation Privilege is concerned with the protecting privacy;[46] and

- Solicitor-Client Privilege lasts forever whereas Litigation Privilege ceases to exist upon termination of the litigation.

There is a strong connection between Solicitor-Client Privilege and other issues, most notably conflicts of interest. This is often because the same trigger question arises in examination for both: was confidential information imparted from client or prospective client to a lawyer? If so, the information will likely be considered privileged and it may suffice to conflict the lawyer out of acting against the client or prospective client. The CBA Task Force on Conflicts of Interest addresses these issues.

Related to Solicitor-Client Privilege is *Joint Client Privilege* which applies to solicitor-client communications where the lawyer is retained by more than one client in a matter in which they share a common legal interest. The most common example is a single lawyer representing multiple criminal defendants but the Joint Client Privilege frequently arises in the corporate context, especially in cases involving officers or employees and the corporation or corporate parents and subsidiaries.

*Common Interest Privilege* applies where separately represented parties share a common interest in the outcome of litigation. They may share privileged information without losing Solicitor-Client Privilege. Again, the paradigmatic example would be two lawyers representing co-accused in a criminal case. However, as discussed in the section on Issues in the Corporate Context, Canadian courts have been willing to apply Common Interest Privilege outside of litigation. In the absence of the Common Interest Privilege, the sharing of the privileged information would constitute waiver of Solicitor-Client Privilege. Thus, Common Interest Privilege is better conceived of as an exception to the waiver rules for Solicitor-Client Privilege.

Communications in furtherance of an attempt to settle a dispute will be protected by *settlement privilege.* This privilege will apply whether the discussions take place in a formal mediation or negotiation session or more informal discussions between clients or counsel, often under the familiar "Without Prejudice" heading on a lawyer's letter. However, it is not the "Without Prejudice" label that triggers settlement privilege but rather the content of the communication which must be in furtherance of an attempt to settle a dispute. Like the label "Privileged", the invocation of "Without Prejudice" is often overused by lawyers and in and of itself does not guarantee that the correspondence will not be disclosed in subsequent litigation.

Under the common law and many statutes, information that is disclosed during the discovery process is covered by some sort of privilege preventing its use outside of the litigation. Referred to variously as the *implied undertaking rule*, the *deemed undertaking rule*, or *discovery privilege*, it provides that evidence compelled during pre-trial discovery from a party to civil litigation can be

---

[46]     *Ibid.* at para. 28 citing R.J. Sharpe, "Claiming Privilege in the Discovery Process" in *Law in Transition: Evidence*, (1984) Special Lect. L.S.U.C. 163 at 164-65.

used by the parties only for the purpose of the litigation in which it was obtained.[47]  This rule or privilege does not apply to solicitor-client communications; indeed, it applies to documents that are not protected by other privileges and must be disclosed during the course of litigation.

## C.     Exclusions and Exceptions to Solicitor-Client Privilege

In 2010, the Supreme Court stated categorically that "the only exceptions recognized to the privilege are the narrowly guarded public safety and right to make full answer and defence exceptions".[48]  Strictly speaking this is correct, but it fails to reveal the complete story about exceptions to the Privilege.  This is an area where significant overlap between the duty of confidentiality and the Privilege exists.

Not much need be said about the above two exceptions.  On the right to make full answer and defence (also referred to as the innocence of the accused exception), the Supreme Court has construed this exception so narrowly that it is unlikely to apply except in the rarest of circumstances.  Indeed, since the 2001 *McClure* decision that established the exception (but found that it did not apply on the facts of that case), there has been no reported case of it being successfully applied.  To date, that exception exists in Canadian law only in theory.

In contrast, the public safety exception is more open ended.  It requires a "clear, serious and imminent" threat to public safety in order to override the Privilege.  There are subjective elements to each of these components, providing for flexibility or uncertainty in the hands of the lawyer.[49]  Every code of conduct has some form of public safety exception couched in terms of future harm or future crime.  For example, the CBA *Code of Professional Conduct* provides:

> Where a lawyer believes upon reasonable grounds that there is an imminent risk to an identifiable person or group of death or serious bodily harm, including serious psychological harm that would substantially interfere with health or well-being, the lawyer shall disclose confidential information where it is necessary to do so in order to prevent the death or harm, but shall not disclose more information than is required.[50]

The Federation of Law Societies has proposed a future harm exception in its draft Model Code of Conduct.[51]

While these are the only officially recognized exceptions to the Privilege, in practice there are others.  All codes of conducts contain "lawyers' exceptions", *i.e.* exceptions that allow lawyers to

---

[47]   See *Juman v. Doucette*, 2008 SCC 8, [2008] 1 S.C.R. 157 at para. 1.  For an explanation of the history and the rationale of the rule see John B. Laskin, "The Implied Undertaking" (paper presented to the CBA-Ontario, CLE Conference on *Privilege and Confidential Information in Litigation — Current Developments and Future Trends*, 19 October 1991, Toronto).

[48]   *Criminal Lawyers' Association, supra* note 11 at para. 53.

[49]   See Adam M. Dodek, "The Public Safety Exception to Solicitor-Client Privilege: *Smith v. Jones*" (2001) 34 University of British Columbia Law Review 293.

[50]   CBA, *Code of Professional Conduct*, c. 4, Rule 2, online: <http://www.cba.org/CBA/activities/pdf/codeofconduct.pdf>

[51]   See Federation of Law Societies of Canada, Advisory Committee on the Future Harm Exception, *Final Report* (June 2, 2010), online: <http://www.flsc.ca/en/whatsnew/whatsnew.asp#ModelReports>.  The author of this Discussion Paper was a member of that Advisory Committee.

disclose confidential information in circumstances where the lawyer's conduct is involved.  For example, the CBA *Code of Professional Conduct* provides that "Disclosure may also be justified in order to establish or collect a fee, or to defend the lawyer or the lawyer's associates or employees against any allegation of malpractice or misconduct, but only to the extent necessary for such purposes."[52]  These exceptions are very broad and they are difficult to justify under the "nearly absolute" nature of Solicitor-Client Privilege.  To the extent that such revelations involve communications between client and lawyer, they squarely fall within the Privilege.  In most circumstances, where a lawyer is seeking to establish or collect a fee or defend themselves against malpractice or misconduct, it would involve disclosure of lawyer-client communications.  Indeed, the Supreme Court has accepted that lawyers' accounts are protected by Solicitor-Client Privilege.[53]  The CBA took the position in the recent case of *R. v. Cunningham* that the mere fact that a client had not paid her lawyer's account was privileged.  However, the Supreme Court did not agree.[54]  Courts implicitly accept these exceptions without much pause, but they do not match up very well with the doctrine and the rhetoric on the sanctity of the Privilege.  As Gavin MacKenzie has noted, these "Lawyer self-interest exceptions" may lead the public to suspect that "the legal profession may not be free from self-interest."[55]

What other exceptions to the Privilege might there or should there be?  The Federation of Law Societies' Advisory Committee on the Future Harm Exception raised the prospect of additional exceptions to the lawyer's duty of confidentiality which could also impinge on Solicitor-Client Privilege: disclosure in the case of financial harm and wrongful conviction.[56]  The CBA *Code* requires a lawyer to disclose confidential information when "the lawyer has reasonable grounds for believing that a dangerous situation is likely to develop at a court tribunal facility…"[57]  While this may be considered a specific example of the more general future harm exception, it does raise the question that was specifically adverted to by the Supreme Court in *Smith v. Jones*: whether there should be an exception for cases of national security.[58]

The area most in flux is what is often termed "the crime-fraud exception".  It dates back to the 1884 English decision of *R. v. Cox and Railton* which is frequently invoked in Canada and around the Commonwealth, most notably by the Supreme Court in the 1999 case of *R. v. Campbell*.[59]  The crime-fraud rationale is straightforward:  communications in furtherance of a crime or fraud do not form part of the legal professional relationship and hence no privilege can apply.  This is also the reason why such communications should be considered excluded from the privilege rather than an exception to it.[60]  The difference between an exclusion and exception is a distinction with an important consequence.  Under the exceptions recognized by the Supreme Court to date (public

---

[52]   *Supra* note 50, c. 4, Rule 4.

[53]   See *Maranda v. Richer, supra* note 26 at para. 17.

[54]   *Cunningham, supra* note 9.

[55]   See Gavin MacKenzie, *Lawyers and Ethics: Professional Responsibility and Discipline*, 4th ed. (Toronto: Carswell, 2006) at 3-17.

[56]   See FLSC, *Final Report, supra* note 51, online: <http://www.flsc.ca/en/whatsnew/whatsnew.asp#ModelReports>.

[57]   *Supra* note, c.4, Rule 3.

[58]   *Jones, supra* note 26 at para. 53.  A limited exception may already exist in the form of the duty to prevent or report treason under section 50(1)(b) of the *Criminal Code*.  This provision makes it an offence for a person who "knowing that a person is about to commit high treason does not, with all reasonable dispatch, inform a justice of the peace or other peace officer thereof or make other reasonable efforts to prevent that person from committing high treason or treason", see *Criminal Code*, R.S.C. 1985, c. C-46, s. 50(1)(b).  No exception exists in the legislation for solicitor-client communications.

[59]   [1999] 1 S.C.R. 565.

[60]   David Paciocco & Lee Stuesser, *The Law of Evidence*, 4th ed. (Toronto: Irwin Law, 2005) 212.

safety and innocence of the accused), the communications remain privileged except for the limited basis of their disclosure; they cannot be used against the client. However, crime-fraud is no limited exception; it is a complete negation of the Privilege. The communications may be disclosed and used for any purpose, including against the client. Indeed, this is the basis for seeking to apply crime-fraud. The notion of communications in furtherance of a "crime" has been easier to defend conceptually and apply in practice than communications in furtherance of "fraud" or as is sometimes used "unlawful conduct".

There is a growing trend to try to expand the notion of "fraud" to include various torts. The law in this area is in conflict and as Robyn Ryan Bell & Rebecca Huang have written in a must-read paper for any lawyer dealing with this issue, clarification of the scope of the crime-fraud exception will have to await such time as the issue is squarely before an appellate court.[61] Since the Supreme Court's 1999 decision in *R. v. Campbell,* a number of lower courts have shown a willingness to extend the crime-fraud exception to tortious conduct.  Ryan Bell & Huang identify three lines of authority: the Broad View; the Narrow View; and the "Akin to Fraud"/Middle Ground Cases.[62]

The Broad View articulates the Crime-Fraud Exception as a "Crime-Fraud-Tort" Exception. Thus, in the 1999 *Goldman Sachs* case, the British Columbia Supreme Court equated the tort of abuse of process to "civil fraud".[63]  In obiter, Justice Smith went further, explaining how the Crime-Fraud exception extended to unlawful or tortious conduct:

> Accordingly, intended crimes and frauds are but instances of the application of the general principle that the privilege does not attach to communications in relation to unlawful conduct.  In this context, "unlawful conduct" has a broader meaning than simply conduct that is prohibited by the criminal law.  It includes breaches of regulatory statutes, breaches of contract, and torts and other breaches of duty. Breaches of contract and civil duties are "unlawful" because, although they are not prohibited by any enactment, they cause injury to the legal rights of other citizens and give rise to legal remedies. They are therefore contrary to law.[64]

In an earlier case the British Columbia Supreme Court found that breach of fiduciary duty and breach of contract were sufficient to warrant the override of Solicitor-Client Privilege.[65]

The Broad View was articulated by Justice Perell of the Ontario Superior Court in the 2007 case *Dublin v. Montessori Jewish Day School of Toronto,*[66] referred to in the introduction above. In that case, the plaintiff sued for intentional or negligent infliction of emotional harm, negligence, breach of trust and breach of confidence.  At issue was whether an e-mail between the defendant and her lawyer fell into the crime-fraud exception.  The plaintiffs argued that the e-mail was

---

61  Robyn M. Ryan Bell & Rebecca Huang, "Communications in Furtherance of Unlawful Conduct – an Exception to Solicitor Client Privilege" (paper presented at Ontario Bar Association, *Privilege, Confidentiality and Conflicts of Interest: Traversing Tricky Terrain,* 23 October 2008, Toronto).

62  The remainder of this section draws heavily and with appreciation on the excellent paper by Ryan Bell & Huang, *ibid.*

63  *Goldman, Sachs & Co. v. Sessions* (1999), 38 C.P.C. (4th) 143 (BCSC).

64  *Ibid.* at para. 16.

65  *Northwest Mettech Corp. v. Metcon Services Ltd* (1997), 78 C.P.R. (3d) 86 (BCSC).

66  *Dublin v. Montessori Jewish Day School of Toronto* (2007), 85 O.R. (3d) 511 (SCJ), leave to appeal granted [2007] O.J. No. 5239 (SCJ); notice of abandonment filed April 2, 2008 (*supra* note 44 in Ryan Bell & Huang, *supra* note 61).

"evidence of the defendants' malice and bad faith."[67]  Justice Perell essentially adopted the *obiter* from *Goldman Sachs* equating criminal or tortious acts with unlawful acts that vitiate the privileged nature of the communications between lawyer and client.[68]  Based on the fact that the e-mail *may* show the defendant's intent to inflict emotional harm on the plaintiff, Justice Perell found that the e-mail was not protected and ordered disclosure.  To his credit, Justice Perell acknowledged the controversial nature of his decision.  Leave was granted by the Divisional Court but the appeal was abandoned, leaving the issue unsettled.

The Narrow View refuses to extend the crime-fraud exception to cases involving allegations of breach of contract, bad faith or other tortious conduct.  For example, in a case involving allegations of bad faith on the part of a municipality in the issuance of a building permit, the plaintiff sought disclosure of the advice given by the city solicitor to council during in camera hearings.[69]  The court refused to extend the crime-fraud exception to "bad faith" in either breach of contract or the tort of inducing breach of contract.

As identified by Ryan Bell & Huang, there is a middle ground of cases that apply an "akin to fraud" test.  In these cases, courts have either demonstrated or expressed a willingness to extend the crime-fraud exception to some limited class of tort actions that include allegations of bad faith that are considered "akin to fraud", for example in breaching a court order.[70]

The distinction between these three approaches are significant and they represent the most dynamic and uncertain area regarding exceptions to the Privilege.  They show that despite its solid foundations in Canadian law for at least two centuries, Canadian courts are still struggling to define the proper parameters of the Privilege.  More thought is needed regarding the ramifications of bringing the guillotine down on communications made in furtherance of a tort and especially regarding breach of contract.  It is not uncommon for a client – whether a college student or a sophisticated business person – to ask a lawyer how to get out of a contract.  What if a victim of domestic violence seeks legal counsel as to how to get out of an abusive relationship when she is living in rented premises with her abusive partner?  The line is a thin one between the lawyer advising on the legal ramifications regarding breach of contract and the client seeking advice regarding how to breach the contract.  In the area of criminal and fraudulent activity, courts have been prepared to examine and define this line, with good reason.  The difficulties and the stakes are much higher when this exemption is applied more broadly to torts and breaches of contract.

---

[67]     *Ibid.* at para. 22.

[68]     *Ibid.* at para. 42.

[69]     *Rocking Chair Plaza (Bramalea) Ltd. v. Brampton (City)*, 1988 CarswellON 445 (Ont. H.C.).

[70]     See discussion at 11-13 in Ryan Bell & Huang, *supra* note 61.

## IV.    The State of Solicitor-Client Privilege Internationally

Solicitor-Client Privilege in Canada is related to international developments on several levels.  First, it is a common law concept that exists in other common law countries.  Courts in Canada have shown minimal interest in considering the doctrine in other jurisdictions, outside of frequent invocation of ancient precedents.  While 19th century English precedents are favoured by Canadian courts, it is probable that courts in Canada will eventually turn to a consideration of Solicitor-Client Privilege in other jurisdictions.  This is likely because of the second consideration.  The practice of lawyering in Canada is increasingly a transnational enterprise and when lawyers engage in cross-border transactions or in international litigation it will be critical to know that under European Community law there is no privilege for communications with in-house counsel or that under American law Common Interest Privilege does not exist outside of litigation.  Finally, pressures on Solicitor-Client Privilege in Canada are likely to come from international sources: Canada's membership in international organizations committed to combating terrorist financing, money laundering and corporate fraud.  For these and other reasons, it is important to sketch out the state of Solicitor-Client Privilege internationally.  In each of the jurisdictions that follow, I develop the key themes regarding privilege and identify important differences with Solicitor-Client Privilege in Canada.

### A.    United States:  Privilege under Attack

American law and practice on the Privilege are relevant because they provide a voluminous source of materials that address many situations in which Canadian lawyers and their clients may find themselves, often with an absence of Canadian authority on the subject.  Moreover, Canadian lawyers and their clients increasingly find themselves engaged in cross-border transactions where American law may apply.  Canadian lawyers may be concerned about two general trends in American Attorney-Client Privilege, one in law and the other in practice.  Both have significantly weakened the Privilege south of the border.

The American "War on Terror" has involved a number of assaults against the Privilege.  While the *USA PATRIOT Act of 2001* provided the U.S. Government with many powerful legal powers, its impact on the Privilege has been indirect.  Commentators have located its influence as a more subtle lack of assurance that clients' communications with their lawyer will not be protected: "the mere fact that client is concerned about the government listening in on confidential communications is what will surely cause some clients to withhold information from their attorneys in the first instance."[71]  A more direct attack on the Privilege occurred a month after 9/11 when Attorney General Ashcroft issued a Bureau of Prisons Order which allows for the  monitoring of attorney-client conversations in federal prisons on the standard of "reasonable suspicion . . . to believe that a particular inmate may use communications with attorneys or their agents to further or facilitate acts of terrorism."[72]  The rule has received heavy criticism, but was restated and finalized in 2007.[73]  The federal Government voluntarily ended the National Security Agency's warrantless wiretap program in 2007 but academics have argued that "as long as the Executive

---

[71]    Tom D. Snyder Jr. "A Requiem for Client Confidentiality?: An Examination of Recent Foreign and Domestic Events and Their Impact on the Attorney-Client Privilege" (2004) 50 Loy. L. Rev. 439 at 454.

[72]    *National Security; Prevention of Acts of Violence and Terrorism*, 66 Fed. Reg. 55,062 (Oct. 31, 2001) (codified at 28 C.F.R. §§ 501.2, 501.3 (2003).

[73]    Federal Register: April 4, 2007 (Volume 72, Number 64), online: <http://www.thefederalregister.com/d.p/2007-04-04-E7-6265>.

*Solicitor-Client Privilege in Canada: Challenges for the 21st Century*

Branch insists that it can legally intercept communications without judicial scrutiny, plaintiffs cannot be assured that their attorney-client communications are confidential."[74] It is argued that this specter of surveillance has a chilling effect on the willingness of clients to disclose information to their attorneys.[75]

The other defining event in 2001 for Attorney-Client Privilege was the collapse of Enron. In the wake of the corporate scandals of 2001 two separate but related government reactions acted to erode the effectiveness of corporate in-house counsel and the Attorney-Client Privilege enjoyed by corporations. The *Sarbanes-Oxley Act* conscripted corporate counsel as *de facto* government watchdogs, while shifts in the U.S. Department of Justice (DOJ)'s sentencing guidelines heavily incentivized prosecuted corporations to waive any existing Privilege. The combined effect of these measures has been a significant loss of protections allotted to corporations' communication with counsel and arguably a general degrading of the effectiveness of in-house counsel.

The *Sarbanes-Oxley Act* is well-known to Canadian lawyers and the CBA made submissions to the SEC, concerned about the impact of the proposed Rules of Professional Responsibility for Attorneys on the relationship between Canadian lawyers and their clients. These Rules imposed an "up the corporate ladder" reporting rule that has generally been perceived as a major shift away from the client-centered concept of lawyering and toward a 'gatekeeper' role -- protecting the public interest from the large corporations that employ them.[76] The threshold for reporting under the SEC rule is generally viewed as being relatively low and imprecise. In contrast, the American Bar Association's (ABA) revised Model Rule 1.13 requires *actual knowledge* of a material violation. The effect of the discrepancy between the substantive law and the ethical rule has been to exert pressure on lawyers to report a client for suspected violations of securities laws based upon the SEC's more stringent standard of *reasonableness*, rather than adherence to the ABA guidelines.[77]

*Sarbanes-Oxley* also acts to heighten the vulnerability of individual employees including in-house counsel. By expanding the definition of "obstruction" and raising the potential penalties for individual criminal misconduct,[78] the Act "increases the exposure of corporate managers and directors to criminal sanctions."[79] Paul Paton, formerly of Queen's Law School and currently the Director of the Ethics Across the Professions Initiative at McGeorge University of the Pacific, is currently researching the SEC's prosecution of General Counsel under *Sarbanes-Oxley*.

---

[74]    *Ibid.*

[75]    *Ibid.*

[76]    See e.g. Paul D. Paton, "Corporate counsel as corporate conscience: ethics and integrity in the post-Enron era" (2006) 84 Can. Bar Rev. 533; Paul D. Paton, "The Independence of the Bar and the Public Interest Imperative: Lawyers as Gatekeepers, Whistleblowers, or Instruments of State Enforcement?" in Law Society of Upper Canada, Task Force on the Rule of Law and the Independence of the Bar, *In the Public Interest: The Report and Research Papers of the Law Society of Upper Canada's Task Force on the Rule of Law and the Independence of the Bar* (Toronto: Irwin Law, 2007) 175.

[77]    Snyder Jr., *supra* note 71 at 453.

[78]    "The Act includes a "Corporate Fraud Accountability" section that expressly criminalizes tampering with a record or otherwise impeding an official proceeding and imposes penalties of up to twenty years in prison for anyone who "alters, destroys, mutilates or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding." Id. § 1102, 18 U.S.C. § 1512(c) (Supp. III 2003). The Act also imposes criminal liability on "[w]hoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States." Id. § 802, 18 U.S.C. § 1519." (see Lisa Kern Griffin, "Compelled Cooperation and the New Corporate Criminal Procedure" (2007) 82 NYU L.Rev. 311 at 331).

[79]    *Ibid.* at 334.

Whereas *Sarbanes-Oxley* may have had the net effect of discouraging communication with in-house counsel for fear of individual prosecution, revisions to the DOJ sentencing guidelines have further undermined the real-world value of Attorney-Client Privilege in the corporate context.  In 1999, the DOJ established a list of criteria to guide prosecutors faced with deciding whether or not to indict a corporation.  Among these factors the memorandum underlined the importance of corporation's cooperation with an investigation.  In particular, credit would be given for waiving the Privilege.  The DOJ also uses Deferred Prosecution Agreements (DPA) as a form of probation, under which the government agrees to suspend charges against a company "so long as the company fulfills obligations set forth in the detailed 'contract.'"[80]  The impact of DPAs on the Privilege is difficult to overestimate: nearly 80% of DPAs entered into before June 2006 reportedly included waiver of privilege.[81]  Between 2003 and 2007, the DOJ entered into twice as many of these DPAs as it did over the ten years previous.[82]  The federal Government had not enacted any legislation or regulations to impact the Privilege; however, through its policy-making powers it created a "culture of waiver" for the corporate Attorney-Client Privilege.

Because criminally culpable corporations cannot be punished in the same way that individuals can, a primary form of punishment for organizations is the levying of hefty fines.[83]  By earning "cooperation credit" a corporation may not only decrease potential fines under the sentencing guidelines, but may avoid indictment altogether.  For this reason, corporations subject to criminal investigation are under incredible pressure to earn as many points as possible, even if it means revealing privileged documents that leave their employees exposed to possible criminal prosecution.[84]

The DOJ has recognized the impact of its policies on the Privilege and has attempted to pull-back from them to some degree.  However, once entrenched, cultural habits are difficult to undo.  In 2008, the DOJ expressly prohibited prosecutors from requesting a waiver of the Privilege under any circumstances.  However, it is still felt by many that corporations under governmental investigations still feel pressure to voluntarily waive privilege.[85]  In 2007 and again in 2009, legislation has been introduced in the U.S. Senate to try to undo some of the impact of DOJ policies.  The *Attorney-Client Privilege Protection Act* would prohibit federal prosecutors from requesting waive of privilege and from using assertion of the Privilege as a factor for determining whether a corporation has cooperated with government.[86]

Some are suspicious of the *Attorney-Client Privilege Protection Act*, claiming it is "the child of the politically powerful corporate lobby trying to regain ground in a post-Enron environment."[87]  This is not an uncommon sentiment.  The general argument in favour of compelled waiver is that corporations simply do not require any more advantages than they already have.  Given the amount of documentation generated by corporations, the argument is that the government needs to rely on

---

[80]  *Ibid.* at 321.

[81]  Cindy A. Schipani, "The Future of the Attorney Client Privilege in Corporate Criminal Investigations" (2009) 34 DJCL 3 at 50.

[82]  Griffin, *supra* note 78 at 323.

[83]  Katherine M. Weiss, "*Upjohn Co. v. United States* as Support for Selective Waiver of the Attorney-Client Privilege in Corporate Criminal Investigations" 48 British Columbia Law Review 523.

[84]  Schipani, *supra* note 81 at 51.

[85]  Schipani, *ibid.* at 52.

[86]  Federal Evidence Review, online: <http://federalevidence.com/pdf/2009/Misc/S.445.ACPrivPro09.pdf>.

[87]  Liesa L. Richter, "The Power of Privilege and the Attorney-Client Privilege Protection Act: How Corporate America Has Everyone Excited About the Emperor's New Clothes" (2008) 43 Wake Forest L. Rev. 979 at 982.

existing internal reports, which are more routinely being created by corporate counsel.  It seems as though the "culture of waiver" may still exist, and may have shifted the general perception of how the Privilege should be applied to corporations.  As of August 2010, the new incarnation of the *Attorney-Client Privilege Protection Act* has been referred to the Senate Judiciary Committee.  It is supported by the ABA which has expressed the hope that it will be passed by Congress within the coming year.

There are many other aspects of the law and practice relating to Attorney-Client Privilege that are likely to be of interest to Canadian lawyers.  The entire area of the corporate attorney-client privilege is one that is under-analyzed in Canada and where there is much caselaw and analysis in the United States.  The above issues raise broader concerns for a Canadian audience.  First, they demonstrate the extent to which legislatures have been willing to infringe or override the Privilege, especially when rallied to a populist cause.  Second, they show the propensity of the executive to infringe on the Privilege through a variety of different means.  Third, they show the importance of the practice of privilege as demonstrated by the "culture of corporate waiver" that has developed in the United States over the past decade.  On the law books, the Privilege in the U.S. does not look that dissimilar from Canada.  In practice, it is very different.  This theme will continue when we turn later to the subject of Open Government.

### B.    United Kingdom:  Common Law and Parliamentary Supremacy

Solicitor-Client Privilege in Canada has its roots across the pond in the United Kingdom, but it has developed very differently in Canada.  Canadian courts and lawyers are wont to invoke 19th century English precedents but less likely to take note of more modern developments.  The Privilege has developed in different ways in each jurisdiction.  In the U.K., the Privilege remains a common law doctrine which is subject to legislative restrictions in accordance with the doctrine of parliamentary supremacy.

The U.K. no longer uses the term "Solicitor-Client Privilege" except in historical references.  Rather, Legal Professional Privilege is a single doctrine which consists of "two branches": the Legal Advice Privilege and Litigation Privilege.  Legal Advice Privilege covers "communications between lawyers and their clients whereby legal advice is sought or given",[88] *i.e.* what we recognize as Solicitor-Client Privilege.  In 2006, the Supreme Court of Canada explicitly rejected the "two branches of the same privilege tree" doctrine in *Blank*.  In Canada, we treat Solicitor-Client Privilege and Litigation Privilege as separate doctrines with separate rationales, rules and exceptions although they may overlap in application at times.  In the U.K. and the other Commonwealth jurisdictions that follow, both privileges are treated together under the rubric of Legal Professional Privilege.

The scope of what is covered by Legal Advice Privilege is narrower than under Solicitor-Client Privilege in Canada.  The Law Society of England and Wales explains that case law has held that the following are covered or not covered by the Legal Advice Privilege:

- conveyancing documents are not communications;
- neither is a client account ledger maintained in relation to the client's money;

---

[88]    *Three Rivers District Council and others v. Governor and Company of the Bank of England (No 6)*, [2004] UKHL 48, [2005] 1 AC 610 at para. 10.

- nor an appointments diary or time record on an attendance note, time sheet or fee record relating to a client;

- whereas a solicitor's bill of costs and statement of account is privileged; and

- notes of open court proceedings, or conversations, correspondence or meetings with opposing lawyers are not privileged, as the content of the communication is not confidential.[89]

Many of these would be considered privileged under Canadian law.

The test for Legal Professional Privilege is the dominant purpose test.  While it clearly applies to the litigation privilege branch,[90] its application to the legal advice branch is less certain. It has been applied to the legal advice branch on occasion.[91]  However, it has rarely been used in determining what is covered by Legal Advice Privilege.  It is usually unnecessary to apply in practice as English courts have created a significantly wide scope for legal advice privilege.[92]  It is notable, however, because Canadian courts have not identified any threshold test to apply for Solicitor-Client Privilege.  Some cases take an extremely broad view of Solicitor-Client Privilege and appear willing to allow it to be applied if a lawyer is present and legal advice could be provided at a later date even if legal advice is not the subject-matter of a meeting.[93]

The common law in the U.K. has been reticent to recognize any exceptions to Legal Professional Privilege.  In 1995, the House of Lords expressly rejected an "innocence at stake" exception noting that "if a balancing exercise was ever required in the case of legal professional privilege, it was performed once and for all in the 16th century, and since then has applied across the board in every case, irrespective of the client's individual merits."[94]  Needless to say, there is no public safety exception to the Privilege.  The only doctrine that would be recognized as an exception would be crime-fraud.  However, its treatment under British law reinforces the position above that crime-fraud should be treated as an exclusion rather than an exception to the Privilege.  Put simply, communications in furtherance of a crime or fraud are not considered privileged.[95]  The scope of the exclusion in the U.K. is uncertain, although not as unclear as in Canada.  One court stated that the exception covers hut is not limited to "the tort of deceit and includes all forms of fraud and dishonesty such as fraudulent breach of trust, fraudulent conspiracy, trickery and sham contrivances" but did not include "the tort of inducing a breach of contract or the narrow form of conspiracy pleaded in this case".[96]  The application of crime-fraud remains a fact-specific inquiry in U.K .courts.

---

[89]   Law Society of England and Wales, *Money Laundering Legislation: Guidance for Solicitors*, 3rd ed., c. 4, online: <http://www.lawsociety.org.uk/professional/conduct/guideonline/view=page.law?POLICYID= 225072>

[90]   *Waugh v. British Railways Board*, [1980] A.C. 521 at 533.

[91]   See *The Sagheera*, [1997] 1 Lloyd's Rep. 160 discussed in Colin Passmore, "The Dominant Purpose of Privilege" (1996) 146 NLJ 1687 at 1687.

[92]   Charles Hollander, "Privilege: Legal Professional Privilege" in Hodge M. Malek, eds. *Phipson on Evidence* (London: Sweet & Maxwell, 2010) at 687.

[93]   See e.g. *Ontario (Ministry of Environment) v. McCarthy Tétrault* (1992), 95 D.L.R. (4th) 94, [1992] O.J. No. 1680 (Prov. Ct.).  This case has been the subject of criticism.  See Allan C. Hutchinson, *Legal Ethics and Professional Responsibility*, 2nd ed. (Toronto: Irwin Law, 2006) at 116-17.

[94]   *R. v. Derby Magistrates Court, ex p. B*, [1995] UKHL 18, [1995] 4 All ER 526 at para. 63.

[95]   *Dubai Aluminum Co Ltd. v. Al Alawi*, [1999] 1 All ER 703.

[96]   *Crescent Farm (Sidcup) Sports Ltd. v. Sterling Offices Ltd and another*, [1971] 3 All ER 1192 at 1200.

While the U.K. has recognized Legal Professional Privilege, Parliament can override it either expressly or by necessary implication.[97]  The U.K. Parliament has done so on a number of notable occasions.  The *Freedom of Information Act 2000*[98] contains a public interest override for information covered by the Privilege, along the lines of what was unsuccessfully sought in *Criminal Lawyers Association*.[99]  In 2009, the House of Lords ruled that the *Regulation of Investigatory Powers Act 2000* allowed covert surveillance of communications between lawyers and their clients covered by Legal Professional Privilege, despite any statutory rights that persons in custody had to consult in private with their lawyers.[100]

An important development regarding the Privilege has been the establishment of the Iraq Inquiry and the wholesale waiver of the Privilege by the Government, resulting in the disclosure of privileged documents and the dramatic testimony of senior legal advisers in government regarding the legal advice that they provided.  This development conflicts with the strong rhetoric of the House of Lords that there can be no exceptions.

### C.     Australia:  Dominant Purpose Test and the Influence of Legislation

In Australia, Legal Professional Privilege is both a common law and statutory doctrine.  Its most notable characteristics are that it is defined and limited by legislation and that the "dominant purpose test" applies to it.  Australia's *Evidence Act*[101] defines the scope of the Privilege:

> Evidence is not to be adduced if, on objection by a client, the court finds that adducing the evidence would result in disclosure of:
>
> (a)   a confidential communication made between the client and a lawyer; or
>
> (b)   a confidential communication made between 2 or more lawyers acting for the client; or
>
> (c)   the contents of a confidential document (whether delivered or not) prepared by the client, lawyer or another person; for the dominant purpose of the lawyer, or one or more of the lawyers, providing legal advice to the client.[102]

This section thus protects both "confidential communication" and "confidential document" under the rubric of Legal Professional Privilege.  The Act previously defines both of these terms.[103]  The *Evidence Act* is a federal statute and only applies to proceedings in a federal court or in an Australian Capital Territory court.[104]  Some of the other states have adopted statutes with analogous provisions.[105]

---

97      *R. (on the application of Morgan Grenfell & Co Ltd.) v. Special Commissioner of Income Tax,* [2002] UKHL 21.

98      2000, c. 36 (U.K.).

99      *Supra* note 11.

100     *Re McE (Northern Island),* [2009] UKHL 15.

101     *Evidence Act 1995* (Cth.) (*Evidence Act*).

102     *Ibid.* s. 118.

103     *Ibid.* s. 117.

104     *Ibid.* at para. 3.

105     See *Evidence Act* (New South Wales) and *Evidence Act 2001* (Tasmania).

Australia's legislation only protects communications whose "dominant purpose" is for providing a client with legal advice[106] and the same test applies under Australian common law. Previously, Australia had used a "sole purpose" test, which was justified by the Australian High Court in the following basis:

> unless the law confines legal professional privilege to those documents which are brought into existence for the sole purpose of submission to legal advisers for advice or for use in legal proceedings the privilege will travel beyond the underlying rationale to which it is intended to give expression and will confer an advantage and immunity on a corporation which is not enjoyed by the ordinary individual.[107]

The dominant purpose test therefore represents a relaxation of the applicable test and results in more information being protected by Solicitor-Client Privilege.

In fashioning the applicable test for Solicitor-Client Privilege, Australian courts have been concerned with extending protection to corporate communications which individuals do not enjoy. The High Court of Australia abandoned the sole purpose test in favour of the dominant purpose test in 1999, in part because of the rigidity of the sole purpose test and the belief that it unjustly narrowed the scope of the privilege and was inconsistent with the common law in other jurisdictions.[108]

The *Evidence Act* sets out a complete legislative code regarding the Privilege.  The *Evidence Act* sets out the scope of the Privilege and circumstances where it will be lost.  The Privilege does not apply to the adducing of evidence relevant to a question concerning the intentions or competence of a client or party who has died.  It does not apply where a court would be prevented from enforcing a court order.  Nor does it prevent the adducing of evidence of a communication or document that affects a right of a person.  The Act contains explicit provisions for client consent and for waiver.  On waiver, the Act provides that the Privilege is waived if the client or party knowingly and voluntarily disclosed the substance of the evidence to another person; or the substance of the evidence has been disclosed with the express or implied consent of the client or party.  The common law of waiver of the Privilege in Australia mirrors the general law in Canada and other Commonwealth jurisdictions; waiver may be either express or implicit.

The Act also sets out circumstances where the client will not be deemed to have waived the Privilege including where the client has disclosed the substance of the advice:

- in the course of making a confidential communication or preparing a confidential document;

- as a result of duress or deception; under compulsion of law; or

- in the case of a public body or official, to the Minister administering the law, or part of the law, under which the body is established or the office is held.

The Act also addresses Joint Client Privilege and Common Interest Privilege.  It recognizes the common interest exception in the case of litigation but not outside litigation.  This is consistent with the American position but differs from the Canadian approach which has applied Common

---

[106]  First used by the U.K. House of Lords in *Waugh v British Railways Board*, [1980] AC 521, [1979] 2 All ER 1169.

[107]  *Grant v. Downs* (1976), 11 ALR 577.

[108]  *Esso Australia Resources Ltd v. Commissioner of Taxation of the Commonwealth of Australia*, [1999] HCA 67, (1999) 168 ALR 123 [*Esso*].

Interest Privilege outside of litigation.  On Joint Client Privilege, the Act takes different approaches for criminal and civil cases.  The Privilege will not be lost in the case of joint representation by the same lawyer of more than one client.  However, the Act prevents a criminal defendant from adducing evidence involving confidential communications or confidential documents between an associated defendant and a lawyer acting for that person in connection with the prosecution of that person.  In civil proceedings involving joint representation, the Act permits the introduction of evidence involving a communication or a confidential document involving one of them or their lawyer in connection with the matter.  This dichotomy is a reminder that in Canada much of the law of Solicitor-Client Privilege has developed in the criminal context and has often been applied unreflectively to the civil context.  There are different interests at stake in each context and the law of privilege should perhaps not be a once-size fits all doctrine.

The crime-fraud exception in Australia is well established in legislation and the common law.  It appears to be broader than in the U.K. although not necessarily as broad as "the Broad View" in Canada.  The *Evidence Act* excluded from privilege any communications that are used to further a crime or fraud or any civil offence by or under Australian law.[109]  The Act also excludes from privilege communications that are for a deliberate abuse of power.[110]  The Act states that any of these are to be found as fact if there are reasonable grounds for finding that a fraud, crime, offence, or abuse of power actually occurred or was intended to occur.[111]  The jurisprudence regarding the crime-fraud exception has essentially the same effect.[112]

In creating a complete code for the Privilege, the Australian *Evidence Act* reminds Canadians of the value of law reform initiatives.  A law reform initiative to codify the common law of privilege in Canada would force policy-makers and legislators to address various issues that are unclear.  It would provide direction to judges and more certainty to lawyers and clients.  The Australian *Evidence Act* provides a useful template of the issues that need to be addressed in fashioning such legislation.

### D.    New Zealand:  English Influence and Legislative Specification

Solicitor-Client Privilege in New Zealand largely mirrors its English counterpart.  This is because the Judicial Council of the Privy Council was the court of last resort in New Zealand until 2004 and prior to that the highest domestic court in New Zealand had explicitly chosen to follow English law regarding the Privilege.[113]

The general scope of the Privilege is the same in New Zealand and Canada.  However, there is one notable exception: under New Zealand law, conversations between a solicitor and client are still privileged even after they have been overheard by a third party.  That is, the third party is not allowed to give testimony of what he overheard.[114]  This is true regardless of how the third party overheard the communications.  In Canada, the rule is less favourable for the privileged information.[115]

---

[109]    *Evidence Act* s. 125(1)(a).

[110]    *Evidence Act* s. 125(1)(b).

[111]    *Evidence Act* s. 125(2).

[112]    *Attorney-General (NT) v. Kearney & Northern Land Council* (1985), 61 ALR 55.

[113]    *B. v. Auckland District Society,* [2003] UKPC 38, [2004] 4 All ER 269.

[114]    *R. v. Uljee,* [1982] 1 NZLR 561 at 570.

[115]    Jonathan Auburn, *Legal Professional Privilege: Law and Theory* (Oxford: Hart Publishing, 2000) at 239.

*Solicitor-Client Privilege in Canada: Challenges for the 21st Century*

As Solicitor-Client Privilege in New Zealand is a common law doctrine, it may be overridden by Parliament. A New Zealand court found that the Privilege "can be taken away or abrogated only by a statute which clearly expresses such to have been the intention of the legislature."[116] Therefore, there are instances in New Zealand law where privilege does not apply. One example of this is the *Tax Administration Act 1994*. The Act first provides a statutory definition of Solicitor-Client Privilege:[117]

> (a) it is a confidential communication, whether oral or written, passing between—
>
> > i) a legal practitioner in the practitioner's professional capacity and another legal practitioner in such capacity; or
> >
> > ii) a legal practitioner in the practitioner's professional capacity and the practitioner's client,— whether made directly or indirectly through an agent of either; and
>
> (b) it is made or brought into existence for the purpose of obtaining or giving legal advice or assistance; and
>
> (c) it is not made or brought into existence for the purpose of committing or furthering the commission of some illegal or wrongful act.

The definition of privilege in the statute allows the government to clearly describe which items are privileged and which are not. The Act expressly exempts various books and accounts from the definition of Privilege.

The *Evidence Act 2006* provides several instances where communications between a solicitor and client are not privileged, including instances of solicitors' trusts accounts.

More significantly, the Act provides a judge with powers to disallow certain privilege claims in cases of crime-fraud and fair trial, which is broader than our innocence at stake exception. A judge may disallow a privilege claim where there is a *prima facie* case that "the communication was made or received, or the information was compiled or prepared, for a dishonest purpose or to enable or aid anyone to commit or plan to commit what the person claiming the privilege knew, or reasonably should have known, to be an offence"[118]. On the right to a fair trial, a judge may disallow a privilege claim where the judge "is of the opinion that evidence of the communication or information is necessary to enable the defendant in a criminal proceeding to present an effective defence."[119] In either case the holder of the Privilege is entitled to use and derivative use immunity, along the lines set out by the Supreme Court of Canada in *R. v. Brown*.[120]

The test for loss of privilege through inadvertent disclosure appears stricter in New Zealand than in Canada. The New Zealand High Court concluded that the general rule is that once the other party has been able to examine the document that privilege is being claimed over, the privilege is lost.[121] However, there is some discretion with the court to maintain the Privilege if the disclosure

---

116   *Rosenberg v. Jaine*, [1983] NZLR 1 at 8.

117   *Tax Administration Act 1994* (N.Z.), 1994/166 s. 20(1).

118   *Evidence Act 2006* No 69 (NZ), s. 67(1).

119   *Ibid.*, s. 67(2).

120   *Brown, supra* note 26.

121   *Corporate Group Holdings Ltd v. Corporate Resources Group Ltd*, [1991] 1 NZLR 115 at 118 (H.C.).

came about as a result of obvious mistake, or if the disclosure was obtained by fraud.[122]  Canadian jurisprudence on the issue is mixed.  Both the New Zealand and Canadian courts' rules are descendents from the *Calcraft* rule. [123]  Whereas the Canadian courts have tended to split away from that decision and create stronger protection for privilege, the New Zealand courts have tended to follow the decision and place a greater onus on the solicitor and client to maintain confidentiality of all privileged communications.

New Zealand law offers a more nuanced or more specific analysis of the application of the Privilege to in-house counsel.  The Privilege applies to in-house counsel but the New Zealand courts have set out specific requirements that must be met.  First, the in-house counsel must be acting in the capacity of a legal adviser and not as a director or manager.[124]  If the work is done as a director or manager, then the advice given ceases to be legal advice, and as such, no privilege attaches. Secondly, the in-house counsel must be acting independently from the employer.[125]  That is, the advice given must be given as if the company was a client and not their employer.

### E.    South Africa:  Between Common Law and Constitution

Legal Professional Privilege in South Africa shares the same general boundaries as in other common law countries.  As in other commonwealth countries, Legal Professional Privilege in South Africa has two branches: Legal Advice Privilege and Litigation Privilege.[126]  Legal Professional Privilege has developed from a rule of evidence to a substantive right in South Africa.  In 1983, while Nelson Mandela was still in prison, the court found that documents between him and his lawyer that were assumed to be "privileged" did not override the Commissioner of Prison's general powers of taking articles from a prisoner.  Despite the fact the documents were for the purpose of legal advice, the Privilege did not protect them from being seized by government officials.[127]  The South African courts have since moved towards identifying Legal Professional Privilege as a substantive rule[128] and now consider it more of a fundamental right rather than a rule of evidence.[129]

Unlike the United Kingdom, there is no "purpose" test in South Africa for considering whether Legal Advice Privilege attaches.  This absence has attracted some commentary by lawyers in South Africa.[130]  Most courts simply comment that it is necessary that the communication is for the purpose of obtaining legal advice, but with no expansion on what that means.  In short, the South African position is similar to the Canadian.

The interaction with legislation is perhaps the most interesting aspect of Legal Professional Privilege in South Africa.  South African courts have held that legislation should be interpreted to protect the Privilege unless a statute expressly abrogates it.  At times, the legislature has expressly

---

122    *Ibid.*

123    See *Calcraft v. Guest,* [1898] 1 QB 759.

124    Brooke Whitaker & Mark Paton, "What flows from *Three Rivers?"* (2005)  N.Z.L.J. 237 at 240.

125    *Ibid.*

126    *Lane and Another NNO v. Magistrate, Wynberg,* 1997 (2) SA 869 (S. Afr. Const. Ct.).

127    *Mandela v. Minister of Prisons,* [1983] 1 SA 938.

128    See *Cheadle Thompson & Haysom and Others v. Minister of Law & Order and Others,* [1986] 2 SA 279 and *S v. Safatsa and Others,* [1987] ZASCA 150, [1988] 4 All SA 239 (S. Afr. S.C.).

129    See *Safatsa, ibid.* and *Jeeva v. Receiver of Revenue, Port Elizabeth,* [1995] 2 SALR 433 at 453-57.

130    Bowman Gilfillan Law Firm, "Corporate Internal Legal Advisers and the Legal Professional Privilege", online: The Legal 500 <http://www.legal500.com/c/south-africa/developments/3197>

protected the Privilege. For example, the *Protection of Personal Information Bill* that was introduced in 2009 provides broad search and seizure powers.[131] However, in the attempt to avoid confusion over whether privileged items are subject to the search warrants, the Bill includes a section that creates an exception for privileged items.[132]

Perhaps the most discussion around Legal Professional Privilege and legislation in South Africa revolves around the *Financial Intelligence Centre Act* (FICA).[133] FICA was enacted in 2001 and creates provisions for enforcement against money laundering. It explicitly exempts Legal Professional Privilege (but not the broader duty of confidentiality) from the requirements for reporting set out by the other sections of the Act.

Legal Professional Privilege is not protected under South Africa's new 1996 Constitution which was drafted with significant use of the *Charter* as a model. However, the Privilege may be used as a limit on a constitutional right under South Africa's limitations clause. For example, South Africa's Bill of Rights provides that everyone has a right of access to information against the state or against any person that holds information that is required for the individual to exercise or protect their rights.[134] A South African court found that Legal Professional Privilege constituted a reasonable and justifiable limitation on the right of access to information.[135] In other cases, courts have engaged in case-by-case balancing of the privilege against the right to access to information.[136] For example, in one case, the court ordered government disclosure of documents outlining the cause of a power surge resulting in damage. The court acknowledged that using Legal Professional Privilege as a defence to a constitutional right requires close scrutiny.[137] In short, the South African approach is a far cry from the English approach that any balancing regarding the Privilege was done "once and for all" in the 16th century.[138]

### F.    Europe:  A Human Rights Approach and No Privilege for In-House Counsel

There are two defining features to the Legal Professional Privilege in Europe. First, the Privilege is considered a fundamental human right under the *European Convention on Human Rights;*[139] and second, under European Union law there is no privilege for communications with in-house counsel. There are, in effect, two conceptions of Legal Professional Privilege in the European Community (EC). This has led one commentator to suggest describing Legal Professional Privilege in the EC as "Independent lawyer-client privilege," because of the stark difference between how in-house and independent lawyers are treated under EC law.[140] This section focuses on the EC law

---

131    B9-2009, *Protection of Personal Information Bill*, 2009, s. 80.

132    *Ibid.* s. 84.

133    *Financial Intelligence Centre Act 2001*, No. 38 of 2001.

134    *Constitution of the Republic of South Africa, Act 108 of 1996*, s.32.

135    *Jeeva, supra* note 129.

136    *Van Niekerk v. Pretoria City Council*, [1997] 3 SA 839.

137    *Ibid.*

138    *R. v. Derby Magistrates*, [1995] 4 All ER 526 at para. 63 (HL) "Legal professional privilege and public interest immunity are as different in their origin as they are in their scope. Putting it another way, if a balancing exercise was ever required in the case of legal professional privilege, it was performed once and for all in the 16th century, and since then has applied across the board in every case, irrespective of the client's individual merits."

139    ETS No. 5, November 4, 1950.

140    Gavin Murphy, "Is it time to rebrand legal professional privilege in EC competition law? An updated look" (2009) 35 Commonwealth Law Bulletin 443.

relating to the Privilege, rather than the law of the 27 individual member states of the European Union.[141]

## 1.   A Rights-Based Approach

Legal Professional Privilege is not explicitly protected under EC treaty or convention. However, the case law of various EC courts have developed and extended existing rights to provide some special protection for communications between lawyers and their clients.  These rights have been extended almost exclusively to relationships with independent counsel, rather than in-house counsel as described in more detail in the next section.

The EC doctrine of a rights-based lawyer-client privilege has developed from both the specific right to a fair trial (Art. 6) and the general right to privacy (Art. 8) set out by the *European Convention on Human Rights*.[142]  The European Court of Human Rights has interpreted the right to a fair trial to include a guarantee of confidentiality between an accused and their lawyer, stating that "if a lawyer were unable to confer with his client and receive confidential instructions from home without such surveillance, his assistance would lose much of its usefulness, whereas the Convention is intended to guarantee rights that are practical and effective."[143]  The right to a fair trial is often considered by the court in cases relating to prisoners' correspondence with lawyers, as many prisons in Europe have policies allowing for the inspection of correspondence between high-risk prisoners and their lawyers.[144]  The right to a fair trial has also been interpreted as including a general right not to incriminate oneself.[145]  This right presupposes that the prosecution in a criminal case will not resort to evidence obtained through methods that oppress or defy the will of the accused, including interference with communication with a lawyer that the accused expects to be kept confidential.[146]

The right to privacy under Article 8 of the *European Convention on Human Rights* provides the most clearly defined and most often used protections for the Privilege.  The Article consists of two paragraphs; the first outlines the four areas of privacy protection and the second sets out the public authority exceptions allowing for encroachment onto those rights:

> 1. Everyone has the right to respect for his private and family life, his home and his correspondence.
>
> 2. There shall be no interference by a public authority with the exercise of this right except as is in accordance with the law and is necessary in a democratic society in the interests of national security, public safety or the economic well-being of the country, for the prevention of disorder or crime, for the protection of

---

[141]   For an excellent jurisdiction by jurisdiction analysis of the privilege in Europe see the Council of the Bars and Law Societies of the European Union, "The Professional Secret, Confidentiality and Legal Professional Privilege in Europe"(CCBE,2003), online: <http://www.ccbe.eu/fileadmin/user_upload/NTCdocument/update_edwards_repor1_1182333982.pdf>

[142]   *Convention for the Protection of Human Rights and Fundamental Freedoms,* 4 November 1950, 213 U.N.T.S. 221 at 223.

[143]   *S. v. Switzerland*, App. No. 13325/87, 220 Eur. H.R. Rep. 670 (1991).

[144]   See *Campbell v. U.K.*, App. No. 13590/88, 233 Eur. H.R. Rep. 137 (1993).

[145]   See Taru Spronken, & Jan Fermon, "Protection of Attorney-Client Privilege in Europe" (2009) 28 Penn State International Law Review 439 at 447.

[146]   *Ibid.* See also *Niemietz v. Germany*, App. No. 13710/88, 251-B Eur. H.R. Rep. 97, (1992) para 37.

health or morals, or for the protection of the rights and freedoms
of others.

These two paragraphs have been construed to accommodate the relationship between clients and
their lawyers.  The European Court of Human Rights has expanded the definition of "home" and
"private life" to include some business premises generally, and law offices specifically.  The way in
which these terms have been interpreted is important because it has afforded special protections
for law offices.  The strongest protection for the Privilege has been provided by the European Court
of Human Rights' interpretation of Article 8's meaning of the right to privacy in correspondence
which the court has applied to correspondence between lawyer and client.[147]  This protection has
subsequently covered seizures over a variety of media, including hard disks as well as monitoring
telephone conversations.[148]

Unlike courts in Canada, the European Court of Human Rights has founded the Privilege on
a clearly-articulated rights basis.  However, in so doing, it has enabled the Privilege to be more
easily overcome by "public authority" exceptions.[149]  As a result, domestic laws drafted to fight
terrorism and organized crime have allowed for increasing intrusions into Article 8 protections.  In
applying a proportionality analysis, the European Court of Human Rights has been more willing to
balance public need against the Privilege in a way that is generally foreign to English or Canadian
courts.  Thus, the Court has stated that "[i]nherent in the whole convention is a search for a fair
balance between the demands of the general interest of the community and the requirements of the
protection of the individual's fundamental rights."[150]

In the past 25 years, government responses to two issues in particular have consistently
encroached on privacy rights generally, and by extension, the Privilege specifically: terrorism and
organized crime.  The European Court of Human Rights' deference to member states' domestic
motivations combined with its mandate to find shared principles in the EC, has allowed for a
balancing that more often than not encroaches on the Privilege.  In a 2002 decision,[151] the court
found that "prisoner-terrorist-lawyer" communications may not be protected under Article 8's
expressed protections of correspondence. In the Council of Europe's *Guidelines on Human Rights
and the Fight Against Terrorism*, the Council openly admits that when terrorism is at issue, it is
"possible to take measures which depart from ordinary law"[152] and that "the Court recognizes that
an effective fight against terrorism requires that some of the guarantees of a fair trial may be
interpreted with some flexibility."[153]  In 2001, the European Commission expanded its 1991
Directive on money laundering beyond financial institutions to include independent lawyers.[154]
There has been significant push-back from member states in relation to the above disclosure
requirements.  However, the European Court of Human Rights ultimately decided that there was no

---

[147]   Ursula Kilkelly, *The Right to Respect for Private and Family Life: A Guide to the Implementation of Article 8 of the European Convention on Human Rights* (Strasbourg: Directorate General of Human Rights Council of Europe, 2003).

[148]   *Sallinen v. Finland*, App. No. 50882/99, 44 Eur. H.R. Rep. 18 (2007); *Kopp v. Switzerland*, App. No. 23224/94, 27 Eur. H.R. Rep. 91 (1999), and *Aalmoes v. Netherlands*, Eur. Ct. H.R. 16269/02 (2004).

[149]   Spronken & Fermon, *supra* note 145 at 449.

[150]   Kilkelly, *supra* note 147 at 31.

[151]   *Erdem v. Germany*, App. No. 38321/97, 35 Eur. H.R. Rep. 15 (2002).

[152]   *Guidelines on Human Rights and the Fight Against Terrorism Adopted by the Committee of Ministers on 11 July 2002 at the 804th meeting of the Ministers' Deputies* (Strasbourg: Council of Europe Publishing, 2002) at 31.

[153]   *Ibid.* at 28.

[154]   Directive 91/308/EEC *On the Prevention of the use of the Financial System for the Purpose of Money Laundering*. There has subsequently been a third revision adopted: 2004/0137 (COD), PE- CONS 3631/05, 9th August 2005. The Directive is now published in the Official Journal L 309/15 25/11/2005.

infringement because the relevant sections of the Directive exclude communications meant to prepare for litigation.[155]

## 2.   No Privilege for In-House Counsel

Under EC law, Legal Professional Privilege only applies to "independent lawyers".[156]  That is, communications with in-house counsel are not protected by the Privilege.  The current criteria for determining which communications, and with whom, privilege applies, was set out in the 2007 Court of First Instance (CFI) judgment of *Akzo Nobel Chemicals Ltd and Akcros Chemicals Ltd v. Commission of the European Communities.*[157]  It is worth explaining the facts and the law of this case not only for its reasoning but because of the case's impact on the work of Canadian lawyers and clients who do business with European companies.

In February 2003 the European Commission and the Office of Fair-Trading conducted a "dawn-raid" of Akzo Nobel Chemical and Akcros Chemical in the U.K. searching for evidence of anti-competitive practices.  Some of the documents collected were claimed to be covered by Legal Professional Privilege.  In 2007, the Court of First Instance found that the documents were not protected by Legal Professional Privilege.[158]  It held that privilege is reserved for documents that were created with the sole aim of seeking legal advice from an *independent* lawyer.  The criteria for these communications are outlined in the two-part test developed in *AM & S Europe Ltd:* (i) such communications are made for the purposes of the exercise of the client's rights of defence; and (ii) they emanate from independent lawyers.[159]  Such documents do not actually need to be delivered to a lawyer, but they do need to be unambiguously created for that purpose – determined by the contents of the document and the context in which the documents were prepared and found.[160]

The concept of the independent lawyer, to whom privilege does apply, is defined in negative terms by the European Courts and echoed in the *Akzo Nobel* decision "such a lawyer should not be bound to his client by a relationship of employment... The test thus laid down is one of legal advice provided 'in full independence', which it identifies as that provided by a lawyer who, structurally, hierarchically and functionally, is a third party in relation to the undertaking receiving advice."[161]  The reasoning for this is direct and consistent with the European courts' decisions: the independent lawyer is considered to be collaborating in the administration of justice by the courts, by providing the legal assistance needed by their client.  In-house lawyers are not considered to be motivated by such noble collaboration, therefore are not afforded the same privilege.  The only time internal communication with in-house counsel is protected, is if those communications occur in contemplation of obtaining external legal advice.[162]  The absence of protection for in-house counsel privilege has been a very contentious issue in the EC, with various European law societies loudly

---

155   Case C-305/05, *Ordre des Barreaux Francophones and Germanophone & Others v. Conseil des Ministres* (ECJ, Grand Chamber) (2007) (unreported).

156   *AM & S Europe Ltd. v. Comm'n of the European Communities*, 1982 E.C.R. 1575, 2 C.M.L.R. 264.

157   Joined Cases T-125/03 and T-253/03, *Akzo Nobel Chemicals and Akcros Chemicals v. Commission*, 2007 E.C.R. The European Court of Justice dismissed Akzo Nobel's and Akcros Chemical's appeal in September 2010, Case C-550/07 P, online: http://curia.europa.eu/jcms/upload/docs/application/pdf/2010-09/cp100090en.pdf.

158   This decision was appealed to the ECJ. While not reported, the decision to uphold the Judgment was made in May 2010. See, Kiran S. Desai & Margarita Peristeraki, "In-House Lawyers May Not Enjoy Privilege in the EU," (Mary Brown Alert: May 2010) online: <http://www.mayerbrown.com/London/article.asp?id=8943&nid=369>.

159   *AM & S Europe Ltd, supra* note 156, paras. 21, 22 and 27.

160   *Ibid.*

161   *Akzo Nobel Chemicals, supra* note 157, Summary of Judgment, point 5.

162   Desai & Peristeraki, *supra* note 158.

opposing the rulings.[163] Considering the EC's human rights-based foundation for the privilege, however, it does seem to be a logically consistent position for the courts to take because organizations generally do not enjoy human rights.

The *Akzo Nobel* case and the European rights-based approach raise a number of issues for Canadian lawyers.  The most obvious ones involve the practical concerns of Canadian lawyers advising clients doing business in Europe that their in-house communications may not be treated as privileged under European law.  This will no doubt come as a surprise to many Canadian corporate counsel and may produce serious practical difficulties.  On a conceptual level, if the touchstone of the Privilege in Europe is independence from one's employer, then based on that rationale the Privilege should not apply to the largest organization: government and indeed to all public sector lawyers.  In Canada, the largest growth area over the past several decades has been precisely in the areas of public sector and corporate counsel.  Excluding them from the rubric of the Privilege would seriously divide the profession.  However, the rights-based approach in Europe raises the further issue of squarely focusing the analysis on the client and their rights.  In Canada, we tend to repeat the statement that the Privilege is necessary to ensure full and frank communication between lawyer and client, rather than articulating what rights of the client are at stake when the Privilege is impugned.

---

163   The Council of the Bars and Law Societies of the European Union (CCBE), The Algemene Raad van de Nederlandse
Orde van Advocaten, the European Company Lawyers Association (ECLA), the American Corporate Counsel
Association (ACCA) and the International Bar Association (IBA) had all intervened in the Akzo case, *supra* note
157, in support of a relaxation of the strict interpretation of AM&S. The resulting judgment generated many
specific criticisms as well: The ECLA president Bengt Gustafson suggested that companies are being disadvantaged
by the CFI's narrow definition of privileged communications and, as a result, the EU is losing a strong ally in the
fight against anti-competitive behaviour.

## V.     Solicitor-Client Privilege in Specific Contexts

In this section, I examine the application of the Privilege in three specific contexts: corporate; public sector; and administrative law and open government.

### A.     Issues in the Corporate Context

An examination of the application of the Privilege in the corporate context deserves a book devoted to the subject.  In this section, I hope to raise some issues where the law is unsettled and others where further consideration might be of assistance: the multiple roles of corporate counsel and the operation of the Privilege within the corporate family.

Canadian law on the Privilege has only begun to address the multiplicity of issues that can arise in the corporate context.  The Supreme Court has only determined the most fundamental question.  Privilege applies when in-house counsel is providing legal advice to a corporate client, as Justice Binnie explained:

> Solicitor-client communications by corporate employees with in-house counsel enjoy the privilege, although (as in government) the corporate context creates special problems: see, for example, the in-house inquiry into "questionable payments" to foreign governments at issue in *Upjohn Co. v. United States*, 449 U.S. 383 (1981), per Rehnquist J. (as he then was), at pp. 394-95.  In private practice some lawyers are valued as much (or more) for raw business sense as for legal acumen.  No solicitor-client privilege attaches to advice on purely business matters even where it is provided by a lawyer.[164]

While the Court stated that the Privilege only applies when corporate counsel is providing legal as opposed to business advice, attempting to discern the different roles is a difficult endeavour. Canadian courts have not demonstrated an eagerness to wade into this murky terrain.[165]

One current issue among corporate counsel is the operation of the Privilege within the corporate family.  The U.S. Court of Appeals for the Third Circuit addressed a number of issues in the 2007 *Teleglobe* decision.[166]  The decision is a likely starting point for consideration of issues that will eventually come before Canadian courts such as:

- When in-house counsel communicates with the parent company and one or more corporate affiliates, who is the client?

- Is there only one client, or are there several joint clients?

- Is advice that is given to the parent company privileged as against the subsidiaries?

- Can one member of the corporate family waive privilege for all?

---

[164]   *R. v. Campbell, supra* note 26 at para. 50.

[165]   For an exception, see *Toronto-Dominion Bank v. Leigh Instruments Ltd. (Trustees of)*, [1997] O.J. No. 1177, 32 O.R. (3d) 575 (Ont. Gen. Div.).

[166]   *In re Teleglobe Communications Corp., supra* note 1.

*Solicitor-Client Privilege in Canada:  Challenges for the 21st Century*

- Does in house counsel's advice remain privileged when the interests of corporate affiliates are divergent?

- What happens to the privilege when the affiliates sue one another?

- What practices should companies and their in-house counsel follow to protect privilege on a day-to-day basis?[167]

The Court held that corporate counsel for the parent company BCE jointly represented BCE and the subsidiary Teleglobe.  According to the court, "the co-client (or joint-client) privilege, applies when multiple clients hire the same counsel to represent them on a matter of common interest."[168]  This relationship must be clearly understood by all the parties, including the lawyer, and the lawyer must be certain that "no substantial risk of the lawyer's being unable to fulfill the lawyer's duties to all co-clients, whether because of conflicting interests among the co-clients or otherwise."[169]  In a joint client scenario, the two clients (BCE and Teleglobe here) are treated as one client for the purposes of Privilege.  Consequently, no waiver of privilege will occur, as it normally would, by disclosing communications between the parties.  In fact, there is an obligation for the shared lawyer to disclose all confidential communications between the joint clients.  If a lawyer representing co-clients discovers that the co-client's interests are diverging to an unacceptable degree, "the proper course is to end the joint representation."[170]  If, however, the lawyer fails to end the joint representation when such diverging interests arise, and continues to represent both clients, "the black-letter law is that when an attorney (improperly) represents two clients whose interests are adverse, the communications are privileged against each other notwithstanding the lawyer's misconduct."[171]  Considering this, the court decided that, despite the obvious divergent interests of the joint clients, privilege ought to be maintained, and consequently may not be shared with Teleglobe's subsidiaries.

The second challenge to the joint client privilege was that Teleglobe knowingly waived the privilege, and willingly shared the communications with their subsidiaries.  This was rejected by the court, which adopted the long-standing rule that "one holder of joint privilege may not unilaterally waive the joint privilege," and that, "a third party cannot invade the joint privilege if only one party to the privilege has waived it."[172]

The court did, however, acknowledge a "great caveat" of joint client privilege.  That is, "that it only protects communications from compelled disclosure to parties outside the joint representation.  When former co-clients sue one another, the default rule is that all communications made in the course of the joint representation are discoverable."[173]  While BCE argued against this, claiming that no parent company would want, or intend, its subsidiary to be able to invade privilege in subsequent litigation, the court held firmly that a lawyer in joint-client relationships is unable to shield certain information from one client and not the other, unless such a shield is explicitly

---

167   See Matheson, Outerbridge & Day, *supra* note 2.

168   *In re Teleglobe Communications Corp., supra* note 1.

169   Matheson, Outerbridge & Day, *supra* note 2 at 5.

170   *In re Teleglobe Communications Corp., supra* note 1.

171   *Ibid.*

172   Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine,* 5th edition (Chicago: American Bar Association Publishing, 2007) 53.

173   *In re Teleglobe Communications Corp., supra* note 1.

established during the course of consultation.[174]  In other words, parent companies and subsidiaries are on equal-footing in joint client privilege scenarios.

     The court then turned to the common interest privilege.  It explained that "the community-of-interest (or common-interest) privilege… comes into play when clients with separate attorneys share otherwise privileged information in order to coordinate their legal activities."[175] This allows for sharing of information between separately represented clients without waiver of privilege.  If the communications between Teleglobe, BCE and BCE's in-house counsel were to be classified as common interest, it was argued, Teleglobe may unilaterally waive privilege and share those communications with its subsidiaries.  The court found that no such privilege existed, because "in the parent-subsidiary context involving in-house counsel, the clients are not separately represented."[176]  The confusion, and abuse, of the concept of common interest privilege was somewhat resolved in *Teleglobe*, however it remains a point of some concern in the U.S., and by extension Canada.

     *Teleglobe* addresses other issues and raises additional ones.  For example, it raises the conflicts of law issue: in cross-border transactions, which jurisdiction's Privilege law applies?  The choice of law issue was not determinative in *Teleglobe* because the party asserting that Canadian law should apply (BCE) could not demonstrate that Canadian law differed significantly from Delaware law.  In other instances, perhaps on the expanding crime-fraud-tort exception to the Privilege, both the forum and the choice of law may be critical issues.  Moreover, how would a Canadian court apply the law of another jurisdiction which is not as protective of the Privilege as Canada?  Also, how would a Canadian court apply European Community law or the law of a member state that does not recognize the Privilege for in-house counsel?  We live in an increasingly international and transnational world, but we have not begun to grapple with the implications of these developments on the Privilege in Canada.

## B.     The Public Sector

     On the Privilege in the public sector, the fundamental starting point is that governments, and all public entities, are entitled to the full protections of the Privilege.  While seemingly straightforward, this concept runs into serious problems in application, because the foundational doctrines of the Privilege were constructed based on the paradigm of the lawyer and the individual (human) client.  Public bodies – especially provincial and federal governments – have become so big and diffuse that to speak of them in terms of being a single entity is problematic when considering Privilege issues.  Moreover, public bodies have a paradoxical relationship with the Privilege.  On the one hand they seek the full protections of the Privilege while on the other hand they are the chief protagonists in seeking to override the Privilege of others through regulation, legislation, search and seizure, orders for disclosure, etc.  This section addresses three key issues facing public sector lawyers when dealing with the Privilege:  (1) who is the client; (2) when are communications privileged; and (3) when is the Privilege waived.  These issues are most acute for government lawyers – those working for municipal, provincial, territorial and federal governments – but they may apply to some extent to lawyers working for larger public bodies.

---

174     *Ibid.* at 368.

175     *Ibid.*

176     Matheson, Outerbridge & Day, *supra* note 2 at 6.

Government lawyers are said to be "continually perplexed" by the issue of who is their client.[177] This issue is important because the Privilege belongs to the client and as discussed later, the client has the right to waive the Privilege. Often in Government, the Crown is said to be the client but this may raise more questions than it answers because the Crown is a concept, a symbol, a doctrine. It has been suggested that "[i]n essence, the government counsel's ultimate 'human' client will be the public official who has the legal authority to decide the Crown's interest in the matter."[178] In many cases, that public official will be a Minister or a high ranking official who will not deal directly with those providing legal advice. Legal advisers will only deal with delegates or agents of the Minister. Under accepted understandings of the Privilege such communications would be privileged.

The problem arises when information is shared beyond the direct link between the Minister (or public official) and agents and the legal advisers. How does, or how should, the Privilege apply in such circumstances? It is not clear. In most cases, the Government as a whole is treated as "the client", at least for the purposes of protecting the integrity of the Privilege. Thus, it is common in discussions as to a proposed course of action by a public official or Minister to convene meetings involving not only legal advisers but also officials from multiple ministries and from the Privy Council Office or Cabinet Office, as the case may be. To further complicate matters, the Prime Minister's Office or the Premier's Office may become involved and communicate instructions on a file for which, strictly speaking, the Prime Minister or the Premier is not the public official charged with the legal authority to make that decision. In many circumstances, it becomes difficult to designate an official as "the client" with any exactitude.[179]

The second issue is what communications from public sector lawyers will attract the protection of the Privilege. The general rule was set out by Justice Binnie in *R. v. Campbell* that legal advice provided by government lawyers will be privileged while policy and other advice will not be. He explained:

> It is, of course, not everything done by a government (or other) lawyer that attracts solicitor-client privilege. While some of what government lawyers do is indistinguishable from the work of private practitioners, they may and frequently do have multiple responsibilities including, for example, participation in various operating committees of their respective departments. Government lawyers who have spent years with a particular client department may be called upon to offer policy advice that has nothing to do with their legal training or expertise, but draws on departmental know-how. Advice given by lawyers on matters outside the solicitor-client relationship is not protected.[180]

The distinction between legal and policy advice provided by public sector lawyers is a challenging one which arises where disclosure is sought in the course of litigation, through an access to

---

[177]  Gavin MacKenzie, *Lawyers and Ethics: Professional Responsibility and Discipline*, 4th ed. (Toronto: Carswell, 2006) at 21-1 ("The issue of who is their client perplexes government lawyers continually").

[178]  Deborah MacNair, "In the Service of the Crown: Are Ethical Obligations Different for Government Counsel?" (2005) 84 Can. Bar Rev. 501 at 516.

[179]  This problem is exacerbated by the situation where the individual or group providing instructions to Government lawyers on a matter is different from the individual or group of who may make decisions about waiver of solicitor-client privilege on the same matter.

[180]  *Campbell, supra* note 26 at para. 50.

information requests, a review by a government oversight body such as the ombudsman or auditor general.  In the public sector, it is difficult to draw a line between what is considered policy and legal advice, as they are often intertwined to the same degree that business and legal advice are in the private sector.  However, the greater challenge to the Privilege in the public sector lies from a recent decision on the B.C. Court of Appeal.

In a 2009 decision involving the public inquiry into the death of Frank Paul, an Aboriginal man in Vancouver, the British Columbia Court of Appeal held that the "charge approval materials" prepared by Crown counsel were not protected by Solicitor-Client Privilege.[181]  The Attorney General had argued that in preparing charge approval materials, Crown counsel are acting as solicitors to the Assistant Deputy Attorney General.  In the critical portions of the judgment, the Court of Appeal explained:

> In examining relevant information and documents and deciding whether or not to approve a prosecution, Crown counsel is neither a client of another lawyer, nor a solicitor advising more senior officers in the Criminal Justice Branch. He or she is an officer of the Crown, independently exercising prosecutorial discretion. While he or she may well consult with and obtain information from others, he or she does not take legal advice from them.

> The fact that the Assistant Deputy Attorney General is able to review a subordinate's decision and override it does not convert the earlier decision into legal advice. The Commissioner was correct in finding that charging decisions made by Crown counsel are not covered by solicitor-client privilege, because they are not made within any solicitor-client relationship.[182]

The Supreme Court of Canada denied leave in this case and as result the Commission of Inquiry will be reconvened and Crown Counsel will now be called to testify about the reasons that they gave for not prosecuting various police officers.

On one hand, the decision is narrow because in the normal course of events, all of the charging decisions made by Crown Counsel involve the exercise of prosecutorial discretion which is not subject to disclosure or court review.  This case is anomalous because the Court held that in establishing the commission of inquiry, the Attorney General had considered the principle of prosecutorial independence and it therefore was not at issue in the disclosure of legal advice.

However, the decision is potentially far-reaching on two accounts.  First, the process of government decision making in this case mirrors how government makes decisions in many non-criminal cases.  The Court accepted the Commissioner's analogy of the Assistant Attorney General to a senior partner in a law firm.  This analogy applies to all internal advice within ministries of justice.  Most notably, it would apply to the process known as "blue stamping" where the Attorney

---

[181]    See *British Columbia (Ministry of Attorney General, Criminal Justice Branch) v. British Columbia (Commission of Inquiry into the Death of Frank Paul - Davies Commission)*, 2009 BCCA 337, 99 B.C.L.R. (4th) 26, [2009] B.C.J. No. 1469, leave to appeal dismissed [2009] S.C.C.A 421.

[182]    *Ibid.* at paras. 101-02.

General is required to independently determine whether every government bill introduced in Parliament and every regulation complies with the *Charter* and the *Canadian Bill of Rights*.[183]

Second, the B.C. Court of Appeal demonstrated a willingness to examine the purpose of the Privilege and its application to Crown Counsel.  As stated at the outset of this section, the purpose of the Privilege does not fit well with the provision of legal advice by government lawyers.  The B.C. Court of Appeal stated that "[s]olicitor-client privilege is designed primarily as a means to ensure that clients are not reluctant to obtain legal advice, or reticent in discussing their situations with their solicitors. It is a means to foster the proper taking and giving of legal advice. These considerations are not germane to the situation of Crown counsel in charge approval decisions."[184] As one Australian commentator has noted, public officials are expected to be frank and candid in their communications with each other, whether or not these communications may later be disclosed and these expectations should be the same whether the public official is a lawyer or a non-lawyer.[185]  From here we turn to the issue of waiver.

It is not clear who can effectively waive the Privilege for a public sector entity.  Absent formal waiver of the Privilege, it is difficult to predict when a court will find that the Privilege has been effectively waived.  Ontario court decisions appear to hold that a single city councillor is not in a position to waive the Privilege, by leaking privileged information.[186]  Somewhat differently, a Nova Scotia court held that a public official had impliedly waived the Privilege when he released a summary of the legal advice he had received.[187]  That case is instructive because of its detailed analysis of the authority to receive and to release legal advice within government as well as its willingness to find implied waiver.  It held that the public official's authority to waive privilege is coextensive with his authority to acquire the opinion in the first place.  In many ways, this assertion raises more questions than it does answers.  Within government, legal advice is requested and received in both informal and formal ways.  Legal advice is provided through formal legal opinions, but also through e-mail, phone conversations or meetings.  Functionally, those requesting the legal advice have the authority to do so.  Does this mean that they also have the authority to waive it? Complicating the matter further is the role of political staff, a group whose legal authority is often unclear.  If they are acting as agents of their Minister, they have the *de facto* authority to request legal advice.  Do they also have authority to waive the Privilege if they release the substance of that advice to someone outside of government?

Public officials are concerned that providing privileged information to government bodies such as the Auditor General may constitute waiver of the Privilege.  A dispute on this issue arose in 2010 between the Government and the Auditor General in Nova Scotia.  The Nova Scotia Government first refused to provide the Auditor General with privileged information.  It has since promised to introduce legislation which would state that disclosure of privileged information to the Auditor General does not constitute waiver of the Privilege.  In general, where statutory provisions

---

183    See *Department of Justice Act*, R.S.C. 1985, c. J-2, s. 4.1; *Canadian Charter of Rights and Freedoms Examination Regulations*, SOR/85-781; *Canadian Bill of Rights*, S.C. 1960, c. 44, s. 3; and *Canadian Bill of Rights Examination Regulations*, C.R.C., c. 394.

184    *Supra* note 181 at para. 105.

185    Chris Wheeler, "Rethinking the Legal Advice Privilege in the Public Sector Context" (2006) 50 AIAL Forum 31 at 36.

186    See *1784049 Ontario Ltd. (c.o.b. Alpha Care Studio 45) v. Toronto (City)*, 2010 ONSC 1204, [2010] O.J. No. 764 at para. 19 citing *Donofrio v. City of Vaughan* 2008 CanLII 37054 (Ont. S.C.J.); *Elliott v. City of Toronto* (2001), 54 O.R. (3d) 472 (S.C.J.); *City of Guelph v. Super Blue Box Recycling Corp.* (2004), 2 C.P.C. (6th) 276 (Ont. S.C.J.); *Imperial Parking Canada Corp. v. City of Toronto*, [2006] O.J. No. 3792 (S.C.J.).

187    *Peach v. Nova Scotia (Transportation and Infrastructure Renewal)*, 2010 NSSC 91, [2010] N.S.J. No. 121.

require disclosure to a public authority, courts have usually found that the Privilege is preserved as against outside parties.

There are two pressing challenges regarding the Privilege and its application to the public sector.  The first is the clash between the Privilege and Open Government which is the subject of analysis in the next section.  The second challenge is more conceptual but has the potential to undermine the Privilege in the public sector context (and beyond).  The more that courts, commentators and lawyers attempt to elevate the Privilege to the constitutional plane, the less it makes sense for the Privilege to apply to Government as a client.  When lawyers and judges speak of the Privilege as "a fundamental right" or try to attach it to certain sections of the *Charter*, it strengthens the Privilege for individual clients but risks diluting it for organizational ones.  If the Privilege is protected by sections 7 (life, liberty and security of the person), 8 (unreasonable search and seizure) or 10(b) (right to counsel) then it is difficult to talk about the Government having an equivalent *Charter*-based right.  This is as conceptually problematic as a Government claim to equality.  If the CBA continues to support a constitutionally-based protection for the Privilege, it will have to attempt to reconcile the anomalous position of Government in this respect.

### C.    Administrative Law and Open Government

In administrative law, the application of the Privilege creates somewhat of a paradox.  The Supreme Court clearly held in *Pritchard v. Ontario (Human Rights Commission)* that administrative agencies as adjudicative bodies are entitled to the full protections of the Privilege and that procedural fairness does not encompass the disclosure of legal advice received by such administrative bodies.[188]  In this respect, the Privilege has been characterized as "a shield against disclosure" for administrative bodies.[189]  This law is clear and settled.

On the other hand, the courts are increasingly restricting the power of administrative bodies to demand, review and disclose privileged documents and to adjudicate Privilege claims.  In *Goodis* ,[190] the Court held that privileged documents could not be disclosed to counsel for the requestor to challenge the refusal to disclose records under Ontario's *Freedom of Information and Protection of Privacy Act*.[191]  Speaking for the Court, Justice Rothstein held that legislation should only interfere to the extent "absolutely necessary" to achieve the objectives of the legislation.[192]  This phrase is critical in several respects.  First, it has been used by courts as the operative test for whether privileged documents should be disclosed.[193]  Second, the test is obviously very strongly protective of the Privilege.  Justice Rothstein wrote that the 'absolute necessity test' is as "restrictive a test as may be formulated short of an absolute prohibition in every case."[194]  Third, the test creates an anomaly for the Privilege in that it is granted greater protection than most *Charter* rights.  Some *Charter* rights are subject to internal limitations: the right to be free from *unreasonable* search and seizure (s. 8) and the right to life, liberty and security of the person and the right not to be deprived thereof *except in accordance with the principles of fundamental justice* (s.7).  All *Charter* rights are subject to the limitations clause under section 1.  The anomaly is that the "absolute

---

[188]    *Pritchard v. Ontario (Human Rights Commission)*, 2004 SCC 31, [2004] 1 S.C.R. 809.

[189]    Kristjanson, *supra* note 6.

[190]    *Goodis v. Ontario (Ministry of Correctional Services)*, 2006 SCC 31, [2006] 2 S.C.R. 32.

[191]    *Freedom of Information and Protection of Privacy Act*, R.S.O. 1990, c. F.31 ("*Ontario FIPPA*").

[192]    *Goodis, supra* note 190 at para. 15.

[193]    *Ibid.*

[194]    *Ibid.* at para. 20.

necessity" test for limiting the Privilege is stricter than the *Oakes*[195] test for enumerated constitutional rights.  This should strike a cautionary note for those who advocate for the full constitutionalization of the Privilege; such a development would necessitate a reconciliation of the *sui generis* doctrine of the Privilege with the general rules of constitutional interpretation.

The Privilege is increasingly clashing with the operation of the administrative justice system.  In *Goodis*, it was argued that one of the main reasons for the existence of the administrative tribunal is to lessen the workload of the court system.  As opposed to taking every grievance to a court of law, administrative tribunals allow for a more efficient disposal of issues of a specific nature.  It was argued that this rationale should allow the tribunal the ability to order production of documents that it sees as being required to settle the dispute before it.  If traditional rules of court were to be imported into such a situation, the efficiency rationale for administrative tribunals is defeated and the judiciary would be burdened with a significantly higher workload.  However, the court explicitly rejected the idea that judicial workload or other administrative considerations could be balanced against the Privilege and the only test to be applied in such situations is the "absolute necessity" test.[196]

The Supreme Court held in *Blood Tribe* that the statutory authority granted to the Privacy Commissioner under the *Personal Information Protection and Electronic Documents Act* (PIPEDA) did not give the Commissioner the power to access privileged documents.[197]  The statutory language in PIPEDA was very broad, granting the Commissioner the power to order the production of "any records and things that the Commissioner considers necessary to investigate the complaint, in the same manner and to the same extent as a superior court of record."[198]  The Supreme Court held that in order to compel the production of solicitor-client communications, explicit statutory authorization was required. The Federal Court has subsequently held that the Privacy Commissioner has no authority under PIPEDA to require an organization to justify its assertion of privilege.[199]  This decision is problematic under both an evidentiary conception of the Privilege and a rights-based conception of the Privilege.  Under either, the burden of establishing the Privilege/right lies on the party that is asserting it.  It is not enough to simply assert the existence of a right and force government to disprove it.  Faced with this situation, if the administrative official has doubts concerning a claim of privilege the only resort is to initiate proceedings in court.  For these reasons, some lawyers working in the administrative justice field have criticized the Supreme Court's Privilege decisions in administrative law as undermining the power of administrative tribunals and some of the advantages of administrative justice generally.[200]

Much of the case law regarding the Privilege and administrative law has developed out of access to information an area that is often described in terms of "Open Government" which attempts to capture the concept of transparency in how government conducts its affairs.  Openness and transparency are tools to foster accountability, captured in the famous aphorism by Louis Brandeis that "Sunlight is said to be the best of disinfectants..."[201]  As "the grand inquest of the

---

195    *R. v. Oakes*, [1986] 1 S.C.R. 103.

196    *Ibid.* at para. 24.

197    *Blood Tribe, supra* note 8.

198    *Personal Information Protection and Electronic Documents Act*, S.C. 2000, c. 5, s. 12.

199    *Privacy Commissioner of Canada v. Air Canada*, 2010 FC 429, [2010] F.C.J. No. 504.

200    See Peter Ruby & Lauren MacLeod, "Solicitor-Client Privilege and Administrative Agencies" (2009) 22 Canadian Journal of Administrative Law & Practice 1.

201    Louis D. Brandeis, "What Publicity Can Do" (1913) *Harper's Weekly* 10, quoted in *Criminal Lawyers Association, supra* note 11 at para. 37.

nation", one of Parliament's chief constitutional responsibilities is to hold government to account for its actions.[202]  Over the past several decades, Parliament and legislatures have created various officials to assist in this:  Ombudsmen, Auditors-General, Ethics Commissioners, Budget Officers, etc.  Public inquiries have always been a favorite public policy tool by governments to examine the conduct of government officials.  Legislatures have also enacted access to information legislation to enable citizens and the press to obtain access to government records.  Increasingly in the internet age, governments engage in proactive disclosure: publishing reports and expenses on their websites.  In each of these areas, the promise of Open Government may clash with the protections of Solicitor-Client Privilege.

The general theme of the developing case law is "[s]olicitor-client privilege trumps access to information".[203]  Some provinces, like Newfoundland and Labrador, have access legislation which specifically mandates the production of records notwithstanding the existence of an evidentiary privilege while still maintaining an exemption from disclosure of the records on the grounds of Solicitor-Client Privilege.[204]  Under such legislation, the standard procedure is for the government body to produce all the requested records to the requestor unless the body is relying on an exemption from disclosure, such as Solicitor-Client Privilege.  The requester can seek a review of the application of the exemptions with the Information and Privacy Commissioner.  The Information and Privacy Commissioner is authorized by statute to review all of the records and accept or reject the claim of Privilege.  If the claim of Privilege is not accepted, the government body may seek judicial review of the Commissioner's determination.

In a February 2010 decision that is under appeal, the Newfoundland and Labrador Supreme Court held that because Solicitor-Client Privilege was a fundamental right and not merely a rule of evidence, it was not captured by the statutory language of "evidentiary privilege".[205]  As a result, the court held that the legislation did not empower the Commissioner to order the production of Privileged documents.  The practical consequence of this ruling is twofold: first, the only avenue for a requester to challenge the validity of a Privilege claim is to seek judicial review in the courts which is costly and time-consuming.  Second, this ruling weakens the Office of the Information and Privacy Commissioner[206] and could galvanize proponents of open government to seek legislative change to explicitly authorize Information and Privacy Commissioners to demand the production of Solicitor-Client Privileged documents.  This would require the CBA and the courts to address the question that the CBA has raised in one of its Supreme Court interventions: whether explicit statutory authorization can override the Privilege.

The Privilege clashes with the mandates of other government watchdogs such as Ombudsmen and Auditors General.  In 2010, when the Ombudsman of Ontario vowed to investigate how a controversial regulation was enacted by the Executive Council of the Government of Ontario,[207] his declaration foreshadowed a future clash between his powers and the Privilege.

---

[202]   *House of Commons Debates (Hansard)* 27 April 2010 (Speaker Milliken, Ruling on Privilege).

[203]   See e.g. Donalee Moulton, "Solicitor-client privilege trumps access to information" *Lawyers Weekly* (28 May 2010) 11.

[204]   See *Access to Information and Protection of Privacy Act*, S.N. 2002, c. A-1.1 reviewed in *Newfoundland and Labrador (Attorney General) v. Newfoundland and Labrador (Information and Privacy Commissioner)*, 2010 NLTD 31, [2010] N.J. No. 52.  See also *Freedom of Information and Protection of Personal Privacy Act*, R.S.O. 1900, c. F.31, s. 52.

[205]   *Ibid.*

[206]   Moulton, *supra* note 203.

[207]   See Robert Benzie, "Ombudsman to investigate Ontario's 'secret' G20 law" *The (Toronto) Star* (9 July 2010), online: <http://www.thestar.com/news/gta/torontog20summit/article/834042--ombudsman-to-investigate-ontario-s-secret-g20-law>.

*Solicitor-Client Privilege in Canada: Challenges for the 21st Century*

Ontario's *Ombudsman Act* explicitly allows individuals to invoke the same privileges in relation to the giving of information or the production of documents as witnesses have in court.[208] It does not give the Ombudsman statutory authority to demand the production of privileged documents. Even if the government makes a limited waiver of privileged documents by voluntarily producing them to the Ombudsman, the Ombudsman may desire to make the substance of the legal advice public. Or, as in the case below, the public may demand disclosure of such privileged information.

In Manitoba, the family of Brian Sinclair, who died in 2008 after waiting 34 hours in the emergency waiting room at a Winnipeg hospital, is battling the Ombudsman over disclosure of the amount of legal fees that the Winnipeg Regional Health Authority is paying its lawyers in connection with the inquest into Sinclair's death.[209] The Ombudsman's report refusing to disclose such information on the grounds of privilege has met with strong public backlash.[210] The Manitoba Court of Queen's Bench is set to hear the appeal of the Ombudsman's decision later in 2011. Similar clashes have arisen in other jurisdictions.

Turning to the legislature, as a general matter, legislatures including Parliament do not demand solicitor-client privileged information from the Government.[211] However, as events in 2010 demonstrate, Parliament and provincial and territorial legislatures likely do have the constitutional power to demand the production of solicitor-client privileged documents from the Government. In a clash between Solicitor-Client Privilege and Parliamentary Privilege, which would prevail?

In 2009 and 2010, the House of Commons ordered the Government to produce documents related to the transfer of Afghan detainees from the Canadian Forces to Afghan authorities. Among the documents thought to exist are legal opinions related to this issue. In his April 27, 2010 ruling on questions of Parliamentary Privilege, Speaker Milliken held that the House of Commons' power to order the government to produce documents is absolute by virtue of its constitutional responsibility to hold the government to account.[212] No mention was made of Solicitor-Client Privileged documents in the Speaker's ruling and it was implicit that demanding the disclosure of such documents is within the powers of the House. This view is supported by the Memorandum of Understanding (MOU) entered into by the Government, the Official Opposition and the Bloc Quebecois which specifically authorized the Panel of Arbiters established by that MOU to determine that certain information should not be disclosed due to Solicitor-Client Privilege.[213] The NDP refused to sign the MOU because of the exceptions for Solicitor-Client Privilege and cabinet confidences. Thus, in theory Parliamentary Privilege prevails over Solicitor-Client Privilege but in practice it appears that Solicitor-Client Privilege is still pre-eminent, at least on this occasion.

---

[208]   *Ombudsman Act*, R.S.O. 1990, c. O.6, s. 19(5).

[209]   Manitoba Ombudsman, *Report Under the Freedom of Information and Protection of Privacy Act*, online: Manitoba Ombudsman, online: <www.ombudsman.mb.ca/.../2010-06-09_Investigation_Report_Case_2009-0602_Inquest_Sinclair.pdf> at 5.

[210]   Winnipeg Sun, "Ombudsman's Sinclair inquest legal fees ruling is idiotic" *The Winnipeg Sun* (6 June 2010), online: The Winnipeg Sun <http://www.winnipegsun.com/comment/editorial/2010/06/04/14271036.html>.

[211]   For discussion see Deborah MacNair, "Solicitor-Client Privilege and the Crown: When is a Privilege a Privilege?" (2003) 83 Canadian Bar Review 213 at 233-35.

[212]   House of Commons Debates, *Hansard* (27 April 2010).

[213]   Memorandum of Understanding between The Right Honourable Stephen Harper, Prime Minister and The Honourable Michael Ignatieff, Leader of the Official Opposition and Gilles Duceppe, Leader of the Bloc Quebecois.

## VI.    Current Challenges and Opportunities for the CBA

Until now, the Discussion Paper has analyzed the Privilege in other jurisdictions and in specific contexts with the point of demonstrating gaps in Canadian doctrine and challenging how we think about the Privilege in certain respects.  In this section, I turn to Privilege issues that are likely to arise in the coming years.  As the voice of the Canadian legal profession and a leading defender of the Privilege, the CBA will be called upon to opine on these issues and to provide guidance to its members and to the courts.

### A.    Solicitor-Client Privilege and Other Professionals

The Supreme Court has been zealous in its affirmation of the primacy of Solicitor-Client Privilege over all other privileges, expressly stating that it is "the highest privilege recognized by the courts."[214]  In *Martin v. Gray*, Justice Sopinka stated that nothing was more important to the preservation of public confidence in the law as a profession than the confidentiality of communications between lawyer and client.  He then asserted that "[t]he legal profession has distinguished itself from other professions by the sanctity with which these communications are treated.  *The law, too, perhaps unduly, has protected solicitor and client exchanges while denying the same protection to others.*"[215]  Not surprisingly, many other professionals seek legislative or judicial recognition of a *class privilege* akin to Solicitor-Client Privilege.  In the absence of class privilege, other professionals are forced to rely on the Wigmore case-by-case formulation of the Privilege which lacks the certainty and predictability of class privilege.

Legal associations have been quick to oppose such efforts and courts have been reluctant to recognize them.  Why have the efforts of other quasi-legal professionals been unsuccessful in securing recognition that courts should treat their confidential communications with clients as privileged?  What are the bases upon which lawyers and courts have opposed such assertions?  What has changed that is likely to make it more difficult for lawyers to oppose on principled grounds the extension of the Privilege to other professionals?  These questions are explored below.

### 1.    A Paralegal Privilege?

In 2004, the Law Society of Upper Canada (LSUC) recommended that "paralegals should be subject to the same confidentiality rule as lawyers,"[216] while acknowledging that "as it is a matter of law, the question of whether privilege attaches" to such communications is a matter for the courts.[217]  A 2007 decision of the Ontario Superior Court of Justice squarely addressed the paralegal privilege issue.  In *Chancey v. Dharmadi*,[218] the defendant was involved in a motor vehicle accident and retained a paralegal to defend her against charges under the *Highway Traffic Act*.  She was subsequently named as a defendant in the civil action arising out of the personal injuries suffered by the plaintiff in the accident.  A motion brought by the plaintiff sought to compel the defendant to answer questions refused at discovery because they were communications between the defendant

---

214    *Jones, supra* note 26 at para. 44.

215    *MacDonald Estate v. Martin*, [1990] 3 S.C.R. 1235 at para. 15 [*Martin v. Gray*].

216    Law Society of Upper Canada, *Report to Convocation: Task Force on Paralegal Regulation* (2004) at para. 183, online: <http://www.lsuc.on.ca/media/convsept04_paralegal_report.pdf>.

217    *Ibid.* at para. 184.

218    *Chancey v. Dharmadi* (2007), 86 O.R. (3d) 612 (Sup. Ct. J).

and her paralegal relating to the circumstances of the accident.[219]  As noted by the court: "the defendant retained a paralegal to defend her on the [*Highway Traffic Act*] charges because she could not afford to retain a lawyer. The motion raises issues of access to justice."[220]

In opposing the motion for disclosure, the defendant asserted that a privilege existed between her and her paralegal that was "analogous to a solicitor-client privilege."[221]  The court considered the two criteria for assessing whether a claim of privilege falls under class privilege.  In its analysis, the court asserted that "there is no principled reason why a class privilege should not be extended to paralegal-client communications,"[222] however, the criteria for class privilege require "an identifiable group, namely paralegals licensed by the Law Society.  Since the paralegal with whom the defendant communicated was not a licensed paralegal, no class privilege can be said to apply."[223]  While paralegal-client communications were not recognized as a traditionally protected class, the court did find that the communications met the criteria for case-by-case privilege as set out in the Wigmore test, finding that "the communications between the client and paralegal, in the circumstances of this case, have satisfied all of the elements of the Wigmore test and in my view those communications are privileged and should be protected from disclosure."[224]

On May 1, 2007, the LSUC became responsible for regulating paralegals as a result of amendments to the *Law Society Act*.[225]  Subsequently, the LSUC enacted confidentiality rules for paralegals that mirror those for lawyers.[226]  Under the rationale of *Chauncey v. Dharmadi*, paralegals in Ontario should now be entitled to class privilege.  Or, to be more precise, clients who consult with a licensed paralegal in Ontario should be entitled to the same protections regarding the confidentiality of their communications as they would if they consulted with a barrister or solicitor.  It is not clear on what principled basis such a claim for Privilege could be opposed.

## 2.   Notaries in Common Law Provinces and Territories

In Quebec, notaries provide legal advice in the areas of wills, real estate and marriage contracts.  They share the same legal standing as lawyers in Quebec in every respect, including being bound by professional secrecy.[227]  Thus, clients' communications with notaries and lawyers in Quebec are entitled to equal protection.  Not enough consideration is given to the law regarding professional secrecy by courts outside of Quebec.  We will return to this issue at the end of this section.

Among the common law provinces, notaries public in British Columbia bave the most expansive powers.  They can draft real estate conveyances, mortgages and simple wills "in addition to usual notarial functions of attesting documents and signing affidavits."[228]  As B.C. courts have

---

219   *Ibid.* at para. 5. Specifically, the plaintiff's counsel asked for "the complete POINTTS file." This file was the subject matter of the motion.

220   *Ibid.* at para. 3.

221   *Ibid.* at para. 7.

222   *Ibid.* at para. 39.

223   *Ibid.*

224   *Ibid.* at para. 58.

225   *Access to Justice Act*, 2006, S.O. 2006, c. 21 - Bill 14.

226   See Law Society of Upper Canada, Paralegal Rules of Conduct, Rule 3.03.

227   See: Chambre des notaires du Quebec, online: <http://www.cdnq.org/en/notariesInQuebec/>; CanLaw, online: <http://www.canlaw.com/notaries/quebecnotaries.htm>; and Service Canada, online: <http://www.servicecanada.gc.ca/eng/qc/job_futures/statistics/4112.shtml>.

228   Brad Daisley, "Battle Brewing Between Lawyers, Notaries in B.C." (1993) 12:40 *The Lawyers Weekly*.

recognized, these responsibilities clearly overlap with the provision of legal advice by lawyers in B.C.  Despite this overlap, notaries' communications with their clients have not been recognized as privileged, either in legislation or by the courts.  In fact, in one case involving a real estate transaction gone awry, the Court ordered the production of affidavits and documents that was to include instructions that the plaintiff "gave to all solicitors and/or notaries relating to the Conveyance" and "all documents relating to the basis upon which the listing price, the proposed selling price and the final sale price were arrived." [229] The court ordered that the notaries involved produce an affidavit "relating to the Conveyance, to which shall be exhibited copies of any and all file materials and documents in respective possession or control in any way relating to the Conveyance." [230] Similar requests were made of the Solicitors involved; however, the court articulated that the materials produced by the lawyers would be handled differently:

> The materials referred to in that Order were to be filed but sealed in the records of the Court so *solicitor-client privilege could be maintained relating to the affidavits and materials from lawyers* and so that counsel for the parties and for the third parties named in the Order would be in a position to make representations as to whether the materials to be produced should be available in these or other proceedings. Accordingly, the affidavits and documents referred to would remain sealed in the records of the court and not available to the Court, the general public or the parties until further Order [emphasis added]. [231]

That no such special considerations were applied to the notaries' materials, and that there was no mention of extending such consideration, makes the difference between the two professions, and the application of evidentiary privilege in B.C. courts, clear.  The closeness in services provided by notaries in B.C. applies subtle pressure on the legal profession and the courts to articulate reasons for different treatment.  This parallels closely the situation regarding licensed paralegals in Ontario.

### 3.   Patent Agents

In 1886, the Court of Chancery proclaimed that "communications between a man and his patent agent are not privileged." [232] Little has changed since.  Application of evidentiary privilege to patent agents, and trade-mark agents, provide what can be considered the most convoluted application of evidentiary privilege: A patent agent may or may not be a lawyer.  Canadian courts have found that a lawyer who is acting primarily as a patent agent will not have his or her communications with clients privileged.  In other words, a lawyer, giving legal advice, which would normally be privileged, while wearing his or her patent agent "hat" will not be granted class privilege.

In a leading case on the issue, the Federal Court of Appeal court echoed the Chancery Court's 1886 ruling:

> It is clear that, in this country, the professional legal privilege does not extend to patent agents. The sole reason for that, however, is that patent agents as such are not members of the legal profession. That

---

229   *Park v. B.P.Y.A 1610 Holdings*, 2005 BCSC 272, [2005] B.C.J. No. 463.

230   *Ibid.* at para. 1.

231   *Ibid.* at para. 2.

232   *Moseley v. Victoria Rubber Co.* (1886), 3 R.P.C. 351, 55 L.T. 482 (High Court of Justice, Chancery Division).

is why communications between them and their clients are not privileged even if those communications are made for the purpose of or giving legal advice or assistance.[233]

That the "sole reason" for denying such class privilege to patent agents is that they are not members of the legal profession is similar to the arguments made in Ontario regarding paralegals prior to their acceptance by the LSUC. This reasoning is circular and fails to provide a principled reason for denying the Privilege to *clients* who communicate with patent agents who are not lawyers. The issue is not whether patent agents are members of the legal profession; it is whether communications with patent agents should be afforded the same protection as those with lawyers.

In 1998, the U.K. enacted legislation to extend evidentiary privilege to patent agents. In 2006, the Federal Court evaluated the applicability of this legislation to Canadian proceedings.[234] It rejected the application of the Privilege in the U.K. legislation stating that it "would be difficult, absent strong evidence, to conclude that there was an expectation that the privilege would be enforceable in jurisdictions other than England, Wales, Northern Ireland and Scotland."[235]

This case raises the issue of how Canadian courts should treat communications that are considered privileged in other jurisdictions. By failing to respect the law of the foreign jurisdiction, this decision has the potential to undermine the application of the Canadian law of Solicitor-Client Privilege abroad. Here is how: As documented in this Discussion Paper, many jurisdictions contain restrictions on the Privilege that do not exist in Canada. If an issue were to arise in a foreign jurisdiction involving communications with a Canadian lawyer, those communications might be considered privileged under Canadian law but not under the law of a foreign jurisdiction. The Federal Court decision could be used to stand for the simple proposition that Canadian law does not take into account foreign law in applying the Privilege.  Faced with an analogous situation involving a Canadian client or lawyer, a foreign court might feel similarly licensed to disregard Canadian law. For these reasons, the CBA should consider articulating a position on the application of the Canadian law of privilege in foreign proceedings and the foreign law of privilege in Canadian proceedings.

In addition to the U.K., privilege has been extended to patent agents by statute in Australia,[236] New Zealand[237] and Japan.[238]  The Intellectual Property Institute of Canada (IPIC), an industry advocacy group, has sought similar legislation in Canada.  The IPIC have made two proposals for legislative change: (1) the creation of a privilege of communication between clients and patent and trade-mark agents; and (2) self-regulation for patent and trade-mark agents.[239]  No such status has yet been granted and no self-regulating body has yet been established.  The CBA should consider what position it would take on the creation of a privilege for communication between clients and patent and trade-mark agents should self-regulation be achieved.

233   *Lumonics Research Ltd. v. Gould et al.* (1983), 70 C.P.R. (2d) 11 (Federal Court of Appeal) para. 15.

234   *Lilly Icos LLC v. Pfizer Ireland Pharmaceuticals,* (2006) FC 1465, [2006] F.C.J. No. 1853.

235   *Ibid.* at para. 14.

236   *Patents Act 1990,* online: <http://www.austlii.edu.au/au/legis/cth/consol_act/pa1990109/>.

237   *Evidence Amendment Act (No. 2) 1980,* s. 34, online: <http://www.legislation.govt.nz/act/public/1980/0027/latest/DLM35689.html>.

238   *Civil Proceedings Act,* 1988.

239   Industry Canada, "Discussion Paper on Proposals for Privilege Protection and Self-Regulation of Patent and Trade-mark Agents" (November 2003) online: <http://www.cipo.ic.gc.ca/eic/site/cipointernet-internetopic.nsf/vwapj/con_dis_disc_agents-e.pdf/$FILE/con_dis_disc_agents-e.pdf>, 2.

### 4.   Tax Accountants

There is no privilege for tax accountants in Canada.  Similar to Canada's approach to patent agents, its position toward tax accountants is out of step with the developments in similar jurisdictions.  In the U.S., the U.K., Australia and New Zealand, communications with tax accountants are, to some degree, protected by an evidentiary privilege.  Moreover, the *Income Tax Act* in Canada allows for a particularly unrestrained obligation on tax accountants to disclose information to the Canada Revenue Agency.

In *Tower v. Minister of National Revenue* ,[240] a taxpayer argued that accountant-client privilege should be recognized as a class privilege for communications between a client and "all types of tax advice."[241]  The Federal Court of Appeal rejected this assertion and distinguished the Solicitor-Client Privilege from communications with accountants:

> Solicitor-client privilege is rooted in the proper administration of justice, made necessary by the need for confidential advice in prosecuting one's rights and preparing defences against improper claims.  Lawyers are legally and ethically required to uphold and protect the public interest in the administration of justice... In contrast, accountants are not so bound.  Nor do they provide legal advice... In my analysis, no overriding policy consideration exists so as to elevate the advice given by tax accountants to the level of solicitor-client privilege.[242]

The decision in *Tower* remains the opinion of Canadian courts on the extension of privilege to tax accountants.

It is important to consider the court's rationale for the Privilege in denying it to accountants in this case.  According to the court, the Privilege is (1) rooted in the proper administration of justice, (2) made necessary by the need for confidential advice in prosecuting one's rights and preparing defences against improper claims, and (3) lawyers are legally and ethically required to uphold and protect the public interest in the administration of justice.  On the one hand, this is a narrow articulation of the Privilege and because of the link to litigation in (2) would not apply to much of a solicitor's practice.  On the other hand, each of these elements would apply to regulated paralegals in Ontario.

Strong competition exists between lawyers and accountants in the area of providing tax advice.  Commentators have argued that the CRA practices, and the courts acceptance of them, have created a disincentive for clients to be open in speaking with accountants.[243]  This has led to taxpayers turning to lawyers with their tax problems, rather than specialized tax accountants, in order to have those communications protected by evidentiary privilege.[244]  Some lawyers appear to use the existence of the Privilege as part of their marketing campaigns to assert an advantage over

---

240    *Tower v. Minister of National Revenue*, 2003 FCA 307, [2004] 1 F.C.R. 183 at paras. 2, 37.

241    *Ibid.* at para. 37.

242    *Ibid.* at para. 38.

243    Paul D. Paton, "Accountants, Privilege, and the Problem of Working Papers" (2005) 28 Dalhousie L.J. 353.

244    *Ibid* at 21.  Paton quotes a senior partner from KPMG who made this point to the Canadian Tax Foundation in 1998:  "It is completely illogical that a taxpayer who seeks tax advice from two widely recognized and competent tax advisers should have privileged communications with one, but not the other, solely because one is a lawyer and the other is not.  Surely taxpayers' rights and the requirement of a fair justice system dictate that privilege over tax advice should not be governed by the profession to which the tax adviser belongs."

their accountant competitors by stating in marketing materials, quite correctly, that only lawyers can guarantee confidentiality (while accountants cannot).  Moreover, an anomaly exists in that if a client communicates directly with an accountant those communications will not be privileged, but if a client retains a lawyer who in turn retains an accountant, the communications between the client and the accountant will then be protected under the umbrella of Solicitor-Client Privilege.[245]

Other jurisdictions such as the United States have been more willing to grant privilege to communications between clients and tax advisers.  The matter recently came to a head.   The issue is whether evidentiary privilege should be extended to scenarios in which "a person obtains skilled legal advice about tax law from an accountant, as opposed to a lawyer."[246] The argument put forth was that, in modern times, tax accountants perform the same duties as lawyers, and thus, should be afforded privilege on a class basis by analogy.  However, in October 2010, the Court of Appeal ruled that communications with accountants do not fall within the common law doctrine of legal professional privilege.[247]  The Court of Appeal stated that the only way to extend the application of legal professional privilege to accountants is through legislation.

## 5.   Immigration Consultants

As shown above, a common argument against the extension of evidentiary privilege to other, non-lawyer, legal service providers is one of a lack of regulation.  It is interesting, then, to consider how the courts would handle a claim of privilege in relation to immigration consultants, as the *Immigration and Refugee Protection Act* provides for their regulation.[248]  The Canadian Society of Immigration Consultants (CSIC) was created in 2004 by way of amendment to the *Immigration and Refugee Protection Act*, which required that anyone who was an "authorized representative" of immigrants before Citizenship and Immigration Canada, the Immigration and Refugee Board, and the Canadian Border Services Agency needs to be "a member in good standing of a bar of a province, the Chambre des notaires du Québec or the Canadian Society of Immigration Consultants..."[249]  In a 2008 decision, the Federal Court of Appeal dismissed the LSUC's arguments against the establishment of a regulator body to oversee the conduct of immigration consultants.[250] Among other complaints about the implication of such a body for the independence of the bar, the LSUC argued that new requirements that non-lawyers must be members of the CSIC would, in fact, threaten Solicitor-Client Privilege.[251] The court rejected such arguments.

No claim has for the establishment of a new class privilege between immigration-consultants and their clients has yet been brought, either before Parliament or the courts.  Significant problems with the current regulatory structure have been identified which would likely hamper serious consideration of extending the privilege to regulated immigration consultants at

---

[245]   *Susan Hosiery Limited v. Minister of National Revenue,* [1969] 69 DTC 5278.

[246]   *Prudential PLC and Prudential (Gibraltar) Limited v. Special Commissioner of Income Tax and Philip Pandolfo (HM Inspector of Taxes),* [2009] EWHC 2494 at para. 7 (Admin).

[247]   See *Prudential PLC and Prudential (Gibraltar) Limited v. Special Commissioner of Income Tax and Philip Pandolfo (HM Inspector of Taxes),* [2010] EWCA Civ. 1094.

[248]   *Immigration and Refugee Protection Act,* S.C. 2001, c. 27, ss. 74(*d*), 91, 167(1).

[249]   *Ibid.*

[250]   *Law Society of Upper Canada v. Canada (Minister of Citizenship and Immigration)* 2008 FCA 243, [2009] 2 F.C.R. 466.

[251]   *Ibid.* at para. 64.

this time.[252] However, should the regulatory problems be addressed, the class privilege issue will be a much more difficult one to resolve.

### 6.   The Doctrine of Professional Secrecy in Quebec

In considering the extension of the Privilege to other professionals, it is worth reflecting upon the doctrine of *professional secrecy* in Québec. Solicitor-Client Privilege in Quebec differs from the rest of Canada in falling under the more general rubric of "professional secrecy" and thus Solicitor-Client Privilege is simply *secret professionnel de l'avocat* in the same way there is *secret professionnel du médecin* or other professions. The doctrine of professional secrecy is set out in various statutes with the common objective of securing the recognition and protection of communications with a variety of professions.

The central provision of the doctrine is rooted in section 9 of Quebec's *Charter of Human Rights and Freedoms* which states that "every person has a right to non-disclosure of confidential information."[253] Under the subheading of "disclosure of confidential information," it further provides that "no person bound to professional secrecy by law and no priest or other minister of religion may, even in judicial proceedings, disclose confidential information revealed to him by reason of his position or profession, unless he is authorized to do so by the person who confided such information to him or by an express provision of law."[254] Further, the *Professional Code* requires that all members of professional orders, not just lawyers and notaries, uphold professional secrecy.[255]

The Quebec situation is instructive because it demonstrates a willingness on behalf of the Legislature to treat communications with lawyers on the same level as communications with other professionals. Moreover, like Europe, the Privilege in Quebec is rooted in a human rights foundation. The doctrine of professional secrecy should be analyzed in detail by courts and the CBA to assist in formulating a response to these issues.

The challenge for the CBA is to attempt to develop a principled approach to the inevitable push for class privilege recognition by other professions. In so doing, the CBA will no doubt be concerned that the extension of the Privilege to other professionals will water down the protections that clients rightly enjoy under the current status of the Privilege. Moreover, it may become easier for governments to infringe on Solicitor-Client Privilege if the Privilege applies to a broader group of professionals. Much of the argument about the importance of Solicitor-Client Privilege rests on historical and rhetorical arguments. It would strengthen arguments for the protection of Solicitor-Client Privilege if the CBA were to develop evidence-based arguments for the Privilege. In short, instead of asking courts and legislators to take judicial notice of the importance of the Privilege, the

---

[252]   A Report of the Standing Committee on Citizenship and Immigration, entitled "Regulating Immigration Consultants" casts doubt on the regulatory efficiency of the newly formed body, which may have an impact on future claims: "Fundamentally, the Society has not been given the tools it needs to succeed as a regulator. As a federally-incorporated body, CSIC has no power to sanction immigration consultants who are not members of the Society, and it cannot seek judicial enforcement of the disciplinary consequences it imposes on those who are members. Further, because CSIC's jurisdiction is not governed by statute, there is no possibility for dissatisfied members and others to influence the Society's internal functioning though judicial review. In the view of the Committee, these shortcomings should be addressed by new legislation." *Report of the Standing Committee on Citizenship and Immigration: Regulating Immigration Consultants* (Ottawa: 39th Parliament, 2nd Session, June 2008).

[253]   *Charter of Human Rights and Freedoms*, R.S.Q. c. C-12, para. 9.

[254]   *Ibid.*

[255]   *Professional Code*, R.S.Q., c. C-26.

CBA should consider investing in empirical research into the lawyer-client relationship.  Granted, empirical research into lawyers and their work in Canada is underdeveloped.  The risk to the CBA and to other groups that assert the importance or the "sacred" nature of the Privilege is that in the absence of such empirical support, their arguments in support of restricting the Privilege to lawyers may be viewed simply in commercial rather than professional terms, as a means of protecting against competition from other professionals.

### B.     Solicitor-Client Privilege and Professionalism

Over the past decade, Bench and Bar have become increasingly concerned about the professional conduct of lawyers, both in and outside the courtroom.  We have witnessed the rise of the Civility movement within the legal profession.  The CBA has adopted the Advocate's Society's Principles of Civility as an appendix to the *Code of Professional Conduct*.  There have been calls for increased judicial oversight of courtroom behaviour of lawyers.  These developments raise a number of issues for Solicitor-Client Privilege.

Rules of Court and the inherent jurisdiction of superior courts permit courts to order that costs be paid personally by a solicitor.  The movement for increased judicial oversight of courtroom behaviour will likely lead to more motions for orders of costs against solicitors.  Such motions jeopardize the Privilege because solicitors are caught between defending themselves and preserving the Privilege of their clients.  In a 2010 case, an expanded panel of the British Columbia Court of Appeal recognized these concerns and others as "serious and legitimate" but held that they were to be considered by the drafters of the Rule at issue and should not inform the Rule's interpretation.[256]  Other courts have commented that restraint is necessary in this area because "Lawyers should not be placed in a conflict between their duties to their clients . . . and their pocketbooks."[257]

In the United States, a court may prevent a party from asserting the Privilege as a legitimate sanction for abusing the discovery process.  A court may order disclosure of Privileged documents where it finds, bad faith, willfulness, or fault.[258]  Should Canadian courts consider imposing such sanctions in the case of "overclaiming" the Privilege?  One expert has stated that the federal Government "overuses" Solicitor-Client Privilege in denying access to information requests.[259]  If the court finds that a party has been acting in bad faith in claiming the protections of the Privilege, is it legitimate for that Court to order production of all documents, including privileged ones?

When a conflict arises between lawyer and client and the lawyer is forced to withdraw, the lawyer must be careful not to reveal privileged communications.  In *R. v. Cunningham*, the Supreme Court held that courts could inquire into the basis for a lawyer's withdrawal from a case.  The court stated that the details of a lawyer's account were privileged but the fact that a lawyer has not been paid by the client is not.[260]  The Court accepted that the rules of professional conduct enacted by the

---

256     See *Nazmdeh v. Ursel*, 2010 BCCA 131, [2010] B.C.J. No. 443 at paras. 97-100.

257     *M.D. v. Windsor-Essex Children's Aid Society*, 2010 ONSC 2831, [2010] O.J. No. 2270.  See also *Young v. Young*, [1993] 4 S.C.R. 3 at para. 254.

258     *In re Teleglobe*, *supra* note 1 at 386 (citing cases).

259     See Stephen Chase, "No deal on Afghan detainee documents, but Tories make 'significant' concessions" *Globe and Mail* (14 June 2010), online: <http://m.tbeglobeandmail.com/news/politics/no-deal-on-afghan-detainee-documents-but-tories-make-significantconcessions/article1604050/?service=mobile&template=shareEmail>.

260     *Cunningham*, *supra* note 9 at paras. 27-31.

CBA and by Law Societies were important statements of public policy but that ultimately the courts are entitled to exercise oversight over the conduct of lawyers that appear before them. The case is a reminder that courts define the parameters of the Privilege with the input from the CBA and others but that courts are not prepared to defer to blanket concerns about infringing the Privilege. More justification is required.

## C.      Solicitor-Client Privilege and New Technology

Technology has dramatically transformed our society over the course of the last generation. While the practice of law is changing, the justice system has been slow to adapt. If we imagine someone from the year 1900 walking into most courtrooms today, they would soon be able to familiarize themselves with the proceedings. The most notable changes would be demographic not technological—a female judge presiding and "lady" barristers arguing—but otherwise, turn-of-the-century legal visitors would find themselves on quite familiar territory. In contrast, if they wished to do some banking, you would have to explain all of the changes that have occurred over the past four decades: interbranch banking; bankcards; ATMs; telephone banking; and now internet banking. In short, the justice system has never been at the forefront of adapting to technological change.

The justification for the Privilege dates back at least to 19th century conceptions of the interactions between lawyer and client. It is based on a paradigm of individual in-person interaction between lawyer and client at the lawyer's office. The fundamental question for the legal profession is whether the doctrine of the Privilege will adapt to new circumstances or whether lawyers' behaviors will have to adapt to deal with the strict rules of the Privilege.

On the later, it is not uncommon to hear people engaged in personal perhaps confidential discussions on their mobile phone or Bluetooth. Business people and lawyers may engage in discussions at an airport or on a train that they would never want to be disclosed to an adversary. The confidential nature of such communications is highly questionable. As the House of Lords has stated, the *sine qua non* of privilege is confidentiality: "Unless the communication or document for which privilege is sought is a confidential one, there can be no question of legal advice privilege arising. The confidential character of the communication or document is not by itself enough to enable privilege to be claimed but is an essential requirement."[261] The CBA has issued "Guidelines for Practicing Ethically with New Information Technologies,"[262] which declares that "Lawyers should exercise the same care to protect the confidentiality and privilege of electronic communications as is normally expected of them using any traditional form of communication."

The problem becomes much more difficult when it involves the transmission of electronic data. The internet is almost everywhere; one can find wireless hotspots in hotel lobbies, airports and coffee shops. They are on trains and soon they will be available on planes. While extremely convenient, these public wireless networks relied upon by lawyers and others are far less secure than one may think and have the potential to threaten client confidentiality and Solicitor-Client Privilege.

Even if a network is dependable, the people and devices sharing it may not be. When sharing a Wi-Fi hotspot for example, all the laptops and computers connected to the hotspot are

---

[261]    *Three Rivers DC v. Bank of England (No. 6)* (HL)(E)], [2005] 1 A.C. 610 at 646 per Lord Scott.

[262]    Canadian Bar Association, "Guidelines for Practicing Ethically with New Information Technologies," online: <http://www.cba.org/CBA/activities/pdf/guidelines-eng.pdf>.

part of a Local Area Network (LAN).  This is a similar network setup to those found in offices that use intranet and closed network systems.  This sort of networking allows people, with very little technical knowledge, to access the information sent over networks, and depending on the security of the devices connected to it, the data saved on hard disks.  In short, is the Wi-Fi at your local coffee shop that much different from the 1950s party line where neighbours shared a single phone line? Should the use of Wi-Fi networks defeat any claim for Privilege for inadvertently disclosed communications between lawyer and client?  Should it matter whether the communication originates from the lawyer or from the client?

Given the legal disclaimers that accompany the use of such networks, it would be difficult for a lawyer to assert an objective claim to confidentiality.  One such disclaimer provides:

> **Security and Privacy.** . . . Your Service Provider cannot ensure or guarantee privacy for users of the Service. It is therefore recommended that the Service not be used for the transmission of confidential information. . . . Hotspots represent additional security risks as compared with wired Internet connection because access to your compatible device is possible without being physically connected to your device, therefore, it is strongly recommended (and it is your responsibility to) ensure that the configuration of your computer is secure. In order to work with the widest variety of devices, you acknowledge that the Hotspots do not provide any level of encryption (such as WEP, WPA or other encryption and authentication mechanisms).

> **User Information.** Your messages may be the subject of unauthorized third party interception and review. . . . you agree that Your Service Provider reserves the right to monitor the Service electronically from time to time and to disclose any information necessary to satisfy any laws, regulations or other governmental request or as necessary to operate the Service or to protect itself or others.[263]

One could argue that sending data over such networks indicates a lack of intent to keep the information confidential, a requirement of the Privilege.[264]

Another challenge for the Privilege has been created through the revolution in data storage and transmission.  The cost of data storage has dropped dramatically over the past two decades. Huge amounts of data may be stored cheaply in a relatively small space.  E-mail facilitates the easy and quick generation and transmission of data.  Together, these two phenomena may challenge how courts deal with Privilege claims in the future.  One important example from the United States demonstrates the impact of data storage on the traditional process for adjudicating Privilege claims document-by-document hy a judge or master.

In *re Vioxx Products Liability Litigation*,[265] Merck claimed privilege over 30,000 documents totaling more than 500,000 pages.  If a judge or a master spent only one minute on each document (regardless of length) to evaluate the Privilege claim, it would have taken 500 hours of work.  A

---

[263]   Online: <http://logon.bellwifi.ca/BellHotspot/Default/TermsOfUse.aspx>.

[264]   The four-part "Wigmore Criteria" requires confidentiality of communication in order to establish privilege, *Howley, supra* note 30.

[265]   *In re Vioxx Products Liability Litigation*, 501 F. Supp. 2d 789 (E.D. La. 2007).

single individual spending five hours a day reviewing these documents would complete the task after 100 work days or nearly half a year.  Faced with this challenge, the District Court for the Eastern District of Louisiana developed a methodology for sorting and categorizing the documents that determined the documents' nature based on its circulation and routing within the corporation. This has been referred to as the "context-category primary purpose analysis."[266]  Under this analysis, documents sent to both lawyers and non-lawyers for both legal and non-legal purposes, had a 'mixed' purpose, and therefore were not sent primarily for the purpose of receiving legal advice, and privilege did not attach.  If the documents were circulated to non-lawyers, the court ruled out privilege, even if the documents would have been otherwise considered privileged if only sent to in-house counsel.[267]  Essentially, *Vioxx* created a requirement for a completely separate communication line with in-house counsel, which, if diverted to non-lawyers, would waive the Privilege.  The court found that that privilege attached to only 491 documents.

It was speculated after the decision in *Vioxx* that the simple and time-efficient method developed by the court would be widely adopted.  This has not been the case.  According to one analyst, "[s]ince 2008, there has been a steady stream of decisions that recognize the potential threat that the *Vioxx* methodology poses for ethical corporate behavior."[268]  Instead, courts have adopted much more rigorous document-by-document reviews in cases where privilege is claimed over large bodies of documents.  While the general trend in the U.S. to back away from the contextual approach is certainly welcomed by Privilege defenders, it does not address the central problem faced in *Vioxx*.  Corporations are not reducing the amount of electronic documents; in fact the opposite is true.  Globally, data storage rates increase tenfold every five years.[269]  Deciding to take a thorough, content-based, approach to preserving Privilege simply does not seem practical. U.S. courts must reconcile their conception of corporate privilege with the mountains of corporate documents that are easily circulated through in-house legal departments.  Canadian courts will face similar challenges.

The internet and e-mail create many "Privilege" traps that have the potential to trigger conflicts and disqualification.  The traditional mode of seeking legal advice involves a client calling up a lawyer or attending at the lawyer's office.  This enables the lawyer or the lawyer's staff to do intake and run a conflicts check.  However, the internet has altered the interaction between lawyer and potential client.  A potential client may e-mail a lawyer and provide confidential information about a case before the lawyer is able to do what she could do in person or over the phone: ask the client to wait so the lawyer can run a conflicts check and get back to the client.  Some lawyers attempt to do this through the use of a disclaimer when one attempts to e-mail them.  However, such disclaimers only appear if one attempts to contact the lawyer through the firm's web portal, the equivalent of walking through the firm's front door and being met by the receptionist. However, if one has the e-mail address of a lawyer or finds it elsewhere on the web, one may casually contact a lawyer via e-mail in the same manner as if one were at the proverbial cocktail party.  Moreover, the legal effect of such disclaimers on the Privilege and related conflicts is questionable.  An example of such a disclaimer states:

> Please note: Sending an e-mail to us will not make us your lawyers.
> You will not be considered a client of the firm until we have agreed

---

266   Thomas M. Spahn, "Corporate Attorney-Client Privilege in the Digital Age: War on Two Fronts?" (30 May 2010), online: SSRN <http://ssrn.com/abstract=1617989> at 9.

267   *Ibid.* at 11.

268   *Ibid.* at 16.

269   "A Special Report on Managing Information: Data, data everywhere" *The Economist* (25 February 2010), online: <http://www.economist.com/node/15557443>.

> to act for you in accordance with our usual policies for accepting clients. Unless you are a current client of [Law Firm], please do not include any confidential information in your e-mail, because no information you send us can be held in confidence, and no information we provide to you can be treated by you as legal advice, unless and until we have agreed to act for you.[270]

It is not clear from a Privilege perspective that the law firm could absolve itself of the requirement that it hold in confidence any information received by it from a putative client. The danger exists that if a putative client does reveal confidential information to the lawyer, those communications will be considered privileged and could raise conflicts problems, including potential disqualification. Many courts have taken a strict approach to casual in-person interactions between lawyers and putative clients. It is not clear how courts will approach such casual on-line interaction.

### D.  The Privilege and the Changing Practice of Law

In *The End of Lawyers?*, legal futurist and CBA Special Advisor Richard Susskind has set out various stages in the evolution of legal services. He identifies twelve categories of delivery of legal services: in-sourcing (lawyers undertaking legal work themselves), de-lawyering (handing over a legal task to a non-lawyer to discharge), relocating (transferring work to less costly locations in countries in which firms and organizations already have a presence), off-shoring (moving legal work to countries where firms had not previously operated), outsourcing (contracting work to specialist support companies usually in lower cost locations), subcontracting (of work to other law firms), co-sourcing (separate organizations collaborating on different parts of legal work), leasing (of lawyers on a project basis), home-sourcing (working from home), open-sourcing (public availability of legal information), computerizing (systemizing, packaging and commoditizing of legal information) and no-sourcing (doing nothing).[271] Susskind's work does not consider the impact that such changes will have on Solicitor-Client Privilege as this is not his mandate. However, it is clear that as the delivery of legal services moves away from the bespoke paradigm of one-to-one client to lawyer interaction upon which Solicitor-Client Privilege was constructed, this will create conceptual and practical challenges for the Privilege. To begin, any legal work that takes place across multiple jurisdictions will implicate choice of law issues regarding which law of Privilege applies. Moreover, when legal work is outsourced to non-lawyers, the question will be raised as to whether such advice will be covered by the Privilege. When confidential information is shared beyond the lawyer-client relationship with third parties, there is a risk that courts might find that such arrangements constitute a waiver of the Privilege. Outsourcing and subcontracting fall somewhere between sharing confidential information with unrelated third parties and the use of experts to assist in providing legal advice. It is likely that the determination of whether such arrangements are protected by the Privilege would be case specific and depend on the processes in place to protect confidentiality.

Law is a service profession and changes in client expectations have impacted the practice of law and will continue to do so. The suit was the standard uniform for corporate lawyers until lawyers in Silicon Valley started dressing more like the young and casual (and very rich) technology clients who they were advising. There is now much talk about the "virtual office" and many lawyers are now prepared to come to the client rather than forcing the client to trek to their office. Lawyers

---

270    See e.g. www.weirfoulds.com. Other firms have similar disclaimers.

271    Richard Susskind, *The End of Lawyers? Rethinking the Nature of Legal Services* (Oxford: OUP, 2008) 47.

making housecalls is not necessarily a bad thing.  However, ethical issues arise when lawyers meet with clients in public places.

It is not unusual to walk into your local coffee shop and sit down to read your newspaper and see and overhear a lawyer meeting with a client and discussing issues that they no doubt would like to be covered by the Privilege.  Under the standard rules of waiver, such conversations should not be considered confidential and therefore not privileged.  They are like counsel talking openly to her client in the corridor outside of court with many people around.  There can be no expectation of privacy.  In recognition of this problem, the Barreau du Quebec has enacted a rule which requires advocates to use a consulting room for meeting clients or holding conversations that are subject to professional secrecy.  This room must be closed and designed in a way that prevents others outside the room from hearing the conversations taking place inside.[272]  Will the courts follow the Barreau's lead in imposing stringent confidentiality requirements in order to preserve the Privilege?

Other law jurisdictions are liberalizing their rules restricting multi-disciplinary practices (MDPs) with non-lawyers.  In Australia, New Zealand and as of 2011 in England and Wales, "Alternative Business Structures" (ABS) have been or will be permitted.  When Canadian Law Societies debated MDPs a decade or more ago, concerns were raised regarding the protection of the Privilege in such circumstances.  Canadian Law Societies are likely to revisit the MDP issue in coming years and courts will then have to grapple as to how the Privilege applies in such contexts.

The *Legal Services Act* [273] in England and Wales will permit the introduction of Alternative Business Structures (ABS) in 2011.  These are true MDPs that need not be controlled by lawyers.  If we overlay some of Richard Susskind's predictions with the new ABS, we generate many questions about the Privilege.  What of an ABS which provides legal services by non-lawyers?  What of legal services that are outsourced to a call center with lawyers who are licensed in another jurisdiction?  Would they be covered by the Privilege?  What law of Privilege applies?  Is it the law in the jurisdiction where the lawyer is located or the law in the jurisdiction where the client is located?

The flip side of MDPs is lawyers providing multi-disciplinary services (MDS) and this already exists in Canada.  Canadian lawyers are expanding the services by offering non-legal services in direct competition with other professionals in areas such as corporate compliance, human resources, public policy and real estate.  When a lawyer engages in Multi-Disciplinary Services, how much of their communications with their client should be covered by the Privilege?  That question has the potential to be answered in a number of different ways.  It may result in the loss of Privilege over certain activities by lawyers or it may result in increased pressure for the Privilege to attach to comparable work done by other professionals as has been the case with tax accountants.  To take the example of lawyers branching out into real estate agency,[274] would all of their communications be covered by the Privilege?  The experience of Quebec notwithstanding, legal associations have been concerned that expanding the Privilege to other professionals may dilute the protections of Solicitor-Client Privilege for lawyers and their clients.  However, the greater threat to the Privilege may come from within: from lawyers branching out into the provision of clearly non-legal services which may be perceived by the courts and by regulators as diluting the unique importance of the services that lawyers provide to clients.

---

[272]   See *Regulation respecting accounting and standards of professional practice of advocates, Professional Code*, R.S.Q. c. C-26, ss. 89 and 91) s. 5.

[273]   *Legal Services Act*, 2007 c. 29.

[274]   See Gary Marr, "Lawyers jump into listing battle" *Financial Post* (17 May 2010), online: <http://www.financialpost.com/news/economy/Lawyers+jump+into+listing+battle/3036290/story.html>.

## VII.    Conclusion

The Supreme Court has demonstrated a willingness to speak clearly in defending the importance of Solicitor-Client Privilege.  To date, the high court has generally been receptive to the arguments submitted to it by the CBA.  However, it would be a mistake to think that the law and the practice relating to the Privilege are static.  As the CBA's interventions with governments demonstrate, legislative intrusions on the Privilege are frequent, possibly more so.  We live in an increasingly globalized legal world and Canadian law on the Privilege differs in significant respects from other jurisdictions which are important both in terms of their influence on Canadian law and our clients' interactions.  Moreover, the law and practice in these jurisdictions, especially the United States, shows that in Canada there are many Privilege issues that remain unresolved.  Finally, changes in society and in the practice law will generate more questions for the Privilege than answers.  The challenge for the CBA is to consider how this ancient concept which is a fundamental part of the administration of justice should apply and adapt to the changes of the 21st century.