# EXHIBITS A-H

# EXHIBIT A

| | |
|---|---|
| **From:** | Lane, Patrick |
| **To:** | 'Cross, Michael' |
| **CC:** | Roch, Nathalie; Eckroth, Kim; Merle, John |
| **Sent:** | 4/30/2007 5:18:52 PM |
| **Subject:** | RE: Workers Compensation Liabilities transferred to Domtar |

EXHIBIT
120
JUNE 9/15

We will make these payments (on your behalf from our perspective unless WY's not correct in this assumptin). I'll ask Lorrie Scott to advise us on next steps.

Regards,

Patrick

_____

From: Cross, Michael [mailto:Michael.Cross@domtar.com]
Sent: Monday, April 23, 2007 7:19 PM
To: Lane, Patrick
Subject: FW: Workers Compensation Liabilities transferred to Domtar

Patrick

We have done a tour of the parish on this issue and it is our collective understanding that this is not a liability that belongs to Domtar Corp. As such, we have not recorded the attached amount of $13.6 million.

Regards

Mike

_____

From: Roch, Nathalie
Sent: Monday, April 23, 2007 1:59 PM
To: Cross, Michael
Subject: FW: Workers Compensation Liabilities transferred to Domtar

As discussed.

Nath

_____

From: Brzezinski, Ania
Sent: Friday, April 20, 2007 11:48 AM
To: Hart, Tom; Rogerson, Kim; Roch, Nathalie; Blanchette, Stephane
Subject: RE: Workers Compensation Liabilities transferred to Domtar

I checked with Gilles and he never agreed to accept this liability. So nobody from Domtar legal agreed to this.

_____

From: Hart, Tom
Sent: Wednesday, April 18, 2007 11:11 AM
To: Brzezinski, Ania
Subject: Workers Compensation Liabilities transferred to Domtar

Ania,

We are going to meet tomorrow at 2-3 pm to discuss this WCB issue. Could you attend to explain

WEY00000518

Tom Hart
Domtar Inc.
514-848-5364
613-330-5992
Fax: 514-848-6735

_____

From: Lane, Patrick [mailto:patrick.lane@weyerhaeuser.com]
Sent: Tuesday, April 17, 2007 7:35 PM
To: Cross, Michael
Cc: Newing, Deborah; Wilson, Lisa; Martelli, Carl; Santman, Jerry; Hart, Tom
Subject: Workers Compensation Liabilities transferred to Domtar


We did not transfer any workers compensation liabilites to Domtar's opening balances because
we were uncertain of the right balance. We have resolved the uncertainties and the attached
summarizes the various components of the transferred Workers Compensation (W/C) that should
have been reflected in your opening balances:

SUS

Unit Level W/C Liabilities 6,236,307
Corporate Level W/C Liabilities 2,223,158
W/C liabilities related to Plymouth Asbestos Claims 1,805,387
Corporate IBNR (allocations based on actual claims) 4,349,916
SOP - 97 ( State assessment reserve allocation (based on actual claims in "Domtar" states))
478,639
15,093,407

Less: W/C liaibiltes retained by WY for employees for non-transferred employees receiving
claims 1,498,593

13,594,814


You will need to provide some instructions to Deborah Newing on how you want this adjustment
reflected in the P90 ledger.

Please call if you have any questions.

Regards,

Patrick

WEY00000519

# EXHIBIT B

Page 1

1

2

3           IN THE UNITED STATES DISTRICT COURT

4               OF THE DISTRICT OF DELAWARE

5

6

7   WEYERHAEUSER COMPANY,          )
                                    )
8                                   )
    Plaintiff,                      )
9                                   )
    -VS-                            ) C.A. No. 14-00024-SLR
10                                  )
    DOMTAR CORPORATION,             )
11  DOMTAR PAPER COMPANY LLC,       )
                                    )
12                                  )
    Defendants.                     )
13

14

            DEPOSITION OF PATRICK MICHAEL LANE
15             TUESDAY, JUNE 9, 2015
            MONTREAL, QUEBEC, CANADA
16

17

18  COURT REPORTER: CHERIE KLEIN

19

20  JOB NO. 94103

21

22

23

24

25

1

APPEARANCES

2

3    FOR DEFENDANT DOMTAR
4    DEBEVOISE & PLIMPTON
     BY:  GARY KUBEK, ESQUIRE
5         ALEX GINSBERG, ESQUIRE
     919 Third Avenue
6    New York, NY 10022
7

8

9

     FOR PLAINTIFF WEYERHAEUSER AND THE WITNESS
10
     HILLIS CLARK MARTIN & PETERSON
11   BY:  JAKE EWART, ESQUIRE
          LAURIE CHYZ, ESQUIRE
12   1221 Second Avenue
     Seattle, WA 98101
13

14

15

16   ALSO PRESENT:  ANIA BRZEZINSKI, ESQUIRE
                    IN-HOUSE COUNSEL FOR DOMTAR
17
                    CONRAD SMUCKER, ESQUIRE
18                  IN-HOUSE COUNSEL FOR WEYERHAEUSER
19

20

21

22

23

24

25

1                    PATRICK MICHAEL LANE

2        A.      Domtar had a position and couldn't

3   -- we didn't have a counter that said why they

4   were wrong, so there wasn't much of a discussion.

5   Reiteration of points and move on.

6        Q.      Was there a discussion during that

7   meeting about whether Weyerhaeuser would in fact

8   change the way in which it was invoicing Domtar

9   for workers compensation liabilities?

10       A.      I don't remember.

11       Q.      Was there any sort of agreement that

12  came out of that meeting with respect to workers

13  compensation liabilities?  And I don't mean a

14  written agreement.  Just a meeting of the minds

15  on any portion of that?

16       A.      I don't think there is an agreement.

17  I mean, I was looking to Anne for after the

18  meeting to give me direction.

19       Q.      And did Anne give you such

20  direction?

21       A.      I don't know.  I am assuming she

22  did.

23       Q.      You don't recall?

24       A.      I don't recall specific direction,

25  no.

1              PATRICK MICHAEL LANE

2      Q.     At some point though, you were

3 directed by someone to only invoice for a portion

4 of the workers compensation liabilities that were

5 previously being invoiced.  Is that correct?

6      A.     I am not sure exactly how that came

7 about, so I don't know.  There is two ways it

8 could go.  She could direct me or I could go back

9 and say:  I want to invoice.  What can I invoice?

10 So I am not sure which way it went.

11           MR. EWART:  Let's take a quick

12 break.

13           Upon recessing at 9:57 a.m.

14           Upon resuming at 10:10 a.m.

15 BY MR. KUBEK:

16      Q.     Weyerhaeuser changed -- following

17 the September 2008 meeting, when Weyerhaeuser

18 changed what it was invoicing Domtar for or which

19 claims it was invoicing Domtar for with respect

20 to workers compensation, what claims were

21 included in what you were then invoicing for?

22      A.     I believe it would have been

23 transfers to employees who actually went to work

24 for Domtar only.

25      Q.     And you stopped invoicing for other

1          PATRICK MICHAEL LANE

2    people who had not gone to work for Domtar;

3    correct?

4          A.     That's right.

5          Q.     And that would include former

6    employees who retired from the fine paper

7    business before the closing; correct?

8          A.     As I subsequently found out, yes.

9          Q.     And did that also include persons

10   who had left the Weyerhaeuser -- had left their

11   employment with Weyerhaeuser's fine paper

12   business for other reasons as well as retirement

13   prior to the closing?

14         A.     I don't remember.

15         Q.     As a logical matter, if you were

16   only invoicing for people who transferred, it

17   wouldn't have included anyone who had left the

18   business for whatever reason prior to the

19   closing; correct?

20         A.     I would think so, yes.

21         Q.     And you may have already testified

22   on this, but did anyone explain to you why you

23   were -- or explain to you who it was that going

24   to be included in the group that was being

25   invoiced?

1                    PATRICK MICHAEL LANE

2          A.      I don't remember.

3          Q.      Did you make that decision on your

4    own?

5          A.      No, that wouldn't be my decision.

6    Anne would clarify it for me.

7          Q.      Okay.  So to the best of your

8    recollection, it was Anne Giardini who decided or

9    instructed you, rather, to invoice only for

10   what's called the transferred employees, people

11   that went to work for Domtar?

12         A.      That's my recollection.

13         Q.      Do you recall whether there was any

14   written instruction to that effect?

15         A.      I don't remember.

16         Q.      Do you recall a conversation in

17   which you were told that?

18         A.      No.  It's a long time ago.

19         Q.      Did you notify Domtar that you were

20   changing the scope of the employees for whom you

21   were going to be sending them invoices?

22         A.      I don't remember.

23         Q.      Do you know if anyone did?

24         A.      I don't know.

25         Q.      Did you have any conversation

                    PATRICK MICHAEL LANE

1

2      A.      That was my understanding.

3      Q.      And I suspect I know the answer, but

4  when the next entry talks about allocation of

5  additional reserve and total additional reserve,

6  same page leading up to the total, the amount of

7  the total is four -- roughly $4.8 million.  Do

8  you have any idea what "additional reserve"

9  refers to?

10      A.      No.  I would only be guessing.

11      Q.      One of the components, the largest

12  component of that is incurred but not yet

13  reported.  Given your understanding of how

14  Weyerhaeuser used that term, what would that mean

15  in connection with workers compensation claims?

16      A.      My understanding is that that would

17  be a claim for something that occurred prior to

18  closing but, for whatever reason, we are not

19  aware of it yet or maybe the employees are not

20  aware of it yet.  I could give you an example.

21  It could be hearing loss.  We could have machine

22  centres that are very noisy, and it may be many

23  years before the employee actually makes a claim.

24      Q.      And is it your understanding that

25  incurred but not yet reported claims are based on

1                    PATRICK MICHAEL LANE

2      some sort of actuarial limits?

3           A.      I do know that these tie to

4      actuarial reports, yes.

5                    Exhibit 120 was marked for

6      identification.

7      BY MR. KUBEK:

8           Q.      120, Bates WEY 518 and 519.  If you

9      look at the document starting chronologically

10     from the bottom, you will see the first e-mail

11     appears to be an e-mail from you to Mr. Cross.

12     That's where I am going to start.  So the first

13     e-mail chronologically on here, the April 17th at

14     7:35 p.m. from you to Mr. Cross, copying a number

15     of other people.  What were you communicating in

16     this e-mail?

17          A.      I was -- I believe I am advising

18     Mike that his opening balance sheet is missing a

19     pretty significant number, and that I am giving

20     him the details of the number and for his

21     purposes he had reporting he had to get done, so

22     I wanted to make sure he was aware of it.

23          Q.      And you are referring to the roughly

24     $13.6 million number?

25          A.      Yes.

1              PATRICK MICHAEL LANE

2         Q.     Is there a dividing line in your

3    mind between the pretty significant number of

4    $13.6 million or minimal or small number

5    $6 million that you were referring to earlier

6    with respect to workers compensation claims?

7         A.     It's not for me to judge what's

8    material for Domtar.  Material for Domtar is very

9    different than what is material for Weyerhaeuser.

10   And so I worried that Mike had a pretty serious

11   obligation as a financial officer of Domtar, and

12   he needed to know about it and it was up to him

13   to determine whether it was material or not.

14        Q.     Was the $13.6 million liability

15   material for Weyerhaeuser?

16        A.     At that time?  Yes, it probably

17   would be.

18        Q.     Was a $6 million liability material

19   for Weyerhaeuser at that time?

20        A.     Yes, it probably would be material

21   for Weyerhaeuser.  I can't remember right now.  I

22   am not Weyerhaeuser's corporate controller.

23        Q.     Understood.  On the next page -- I

24   am sorry, on the first page, about three-quarters

25   of the way down, there is an e-mail from Ania

PATRICK MICHAEL LANE

1

2    Brzezinski to Tom Hart and others.  Who is Mr.

3    Hart, by the way?

4         A.    Tom Hart is a financial employee of

5    Domtar who, I believe, Mike or Ania assigned to

6    work to transition issues at the time.

7         Q.    The second e-mail from the top, an

8    e-mail back from Mr. Cross to you.  It says:

9                        "We have done a tour of the

10                       parish on this issue, and it

11                       is our collective

12                       understanding that this is not

13                       a liability to belongs to

14                       Domtar Corp. As such we have

15                       not recorded the attached

16                       amount of $13.6 million."

17              What was your understanding of what

18   Mr. Cross was communicating to you by that

19   e-mail?

20        A.    He is advising me that Weyerhaeuser

21   and Domtar had a difference of opinion on workers

22   compensation.

23        Q.    Were you surprised to get that

24   response from him?

25        A.    I don't remember, but I think I

1                    PATRICK MICHAEL LANE

2    probably would have been.

3         Q.      So to the best of your recollection,

4    had you had any discussions with Mr. Cross prior

5    to your April 17th e-mail as to the amount of the

6    workers compensation liability that would be

7    transferred?

8         A.      I don't remember.

9         Q.      I note that Mr. Cross's e-mail to

10   you came on April 23rd and your response to him

11   was seven days later on April 30th in which you

12   say:

13                        "We will make these payments

14                        on your behalf from our

15                        perspective unless WY is not

16                        correct in this assumption."

17            Do you recall why there was a week

18   between the time you received Mr. Cross's e-mail

19   and the time you responded?

20        A.      I don't remember why.

21        Q.      Do you believe that you were

22   consulting with other people at Weyerhaeuser

23   concerning this issue during that period?

24        A.      That's a very fair assumption.

25        Q.      Any recollection as to who you were

1                    PATRICK MICHAEL LANE

2    consulting with?

3         A.    I would have advised Scott Marshall

4    for sure, but I don't remember if there was more

5    than Scott.

6         Q.    And do you remember any

7    communications with Mr. Marshall with respect to

8    this set of e-mails?

9         A.    I remember that I would have advised

10   him, but that's it.  I don't remember the form of

11   it or anything.

12        Q.    Do you have any recollection of

13   whether you talked to him, or telephoned or just

14   sent him an e-mail?

15        A.    No, I don't.

16        Q.    Where was Mr. Marshall located?

17        A.    He works in Federal Way.

18        Q.    How would you typically communicate

19   with him during that period?

20        A.    If I was in Federal Way I would go

21   see him.  For the most part, if I was in

22   Vancouver, it would be e-mail or telephone.

23   Usually e-mail is preferable from my perspective.

24        Q.    And in your e-mail at the time you

25   say:

1                      PATRICK MICHAEL LANE

2                      "I will ask Lorrie Scott to

3                      advise us on next steps."

4           Ms. Scott was an Attorney at

5      Weyerhaeuser?

6           A.    Yes.

7           Q.    And why were you looking to her to

8      advise on next steps?

9           A.    Because we appeared to have a

10     difference of opinion between Weyerhaeuser and

11     Domtar, and there is a process to follow.

12          Q.    When you say there is a process to

13     follow, what do you mean?

14          A.    I think the agreement provides for

15     how you manage a transaction, and there are

16     steering teams in place -- steering teams in

17     place at Weyerhaeuser and steering teams in place

18     at Domtar.  There are supposed to be regular

19     meetings.

20          Q.    Let me show you a two-page document

21     previously labelled Exhibit 67.  Do you recall

22     ever seeing this letter?

23          A.    No, unless I saw it yesterday.

24          Q.    Do you recall that at some point

25     though, at or about this time, Domtar advised

1          PATRICK MICHAEL LANE

2  Weyerhaeuser that it disagreed with the --

3  formally -- strike that.  Do you recall that at

4  or about this time Domtar formally advised

5  Weyerhaeuser that it disagreed with the roughly

6  $13.6 million workers compensation liability in

7  connection with the working capital adjustment?

8      A.     Yes.

9      Q.     Were you having any discussions

10 during the period following, having heard from

11 Mr. Cross that Weyerhaeuser or that Domtar

12 disagreed with the responsibility for the

13 liability?  Do you recall any discussions

14 internally over the next month or two with anyone

15 at Weyerhaeuser concerning that?  And I will

16 start by saying that's a yes or no question,

17 because I don't want you to tell me what you

18 talked about with your Lawyers.

19           QUESTION WAS READ BACK.

20           THE WITNESS:  Yes.

21 BY MR. KUBEK:

22     Q.     Do you recall who you spoke with

23 during that period?

24     A.     I am not absolutely sure, but as far

25 as I recollect we were not doing anything with

Page 238

1                    PATRICK MICHAEL LANE

2

3

4

5              C E R T I F I C A T E

6

7       I, C.L. KLEIN, Official Court Reporter, duly

8       sworn as such, DO HEREBY CERTIFY that the

9       foregoing is a true and faithful transcription of

10      the evidence herein, AND I HAVE SIGNED:

11

12  Dated: June 19, 2015

13

14

          _____

15                    C.L. KLEIN, O.C.R.

16

17

18

19

20

21

22

23

24

25

# EXHIBIT C

| | |
|---|---|
| **From:** | Cross, Michael |
| **To:** | Levert, Eric; Jette, Pierre |
| **Sent:** | 7/31/2007 12:11:52 AM |
| **Subject:** | FW: Post Closing Working Capital Adjustment |
| **Attachments:** | post001.PDF |

---

**From:** Pharand, Gilles
**Sent:** Wednesday, June 06, 2007 7:12 PM
**To:** McDade, Sandy
**Cc:** Buron, Daniel; Cross, Michael
**Subject:** Post Closing Working Capital Adjustment

Sandy,

I attach our Notice of Disagreement with regard to the abovementioned subject. Should you wish to discuss the matter, please contact me or Daniel Buron.

Regards,

Gilles

"Avis de confidentialité: Ce message est à l'usage exclusif du destinataire ci-dessus, est confidentiel et peut être protégé par le secret professionnel. Si vous n'êtes pas un destinataire désigné, toute diffusion du message est interdite. Si vous avez reçu ce message par erreur, veuillez aviser l'expéditeur immédiatement et détruire ce message et toute copie de celui-ci. Merci."

"Confidentiality Notice : This message is intended for the sole use of the addressee. It may contain information that is privileged and confidential or protected under solicitor-client privilege. If you are not the intended recipient, any dissemination of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately and delete this message and destroy all copies. Thank you."

DOMWEY00003890

Domtar Corporation
395 de Maisonneuve Blvd. West
Montreal, QC  H3A 1L6

Tel.: (514) 848-5400



# Domtar

VIA FACSIMILE AND ELECTRONIC MAIL
1-253-924-2685

June 6, 2007

Mr. Sandy McDade
Vice President and General Counsel
Weyerhaeuser Company
33663 Weyerhaeuser Way South
Federal Way, WA 98003

Re:    Notice of Disagreement

Dear Mr. McDade:

I am writing to provide you with notice of Domtar's disagreement with the Post Closing Working Capital Adjustment in accordance with Section 2.4(b) of the Amended and Restated Contribution and Distribution Agreement.

Amongst other things, Domtar is in disagreement with the reference in the Post Closing Working Capital Adjustment to the "assumed workers' compensation liabilities" totaling $13,594,814. Domtar did not assume this liability and, as such, disagrees with Weyerhaeuser's treatment of this as a reduction to the Post-Closing Working Capital Adjustment. Please be further advised that Weyerhaeuser does not have the right to set-off the workers' compensation liabilities from any amounts owed to Domtar.

Further, the supporting work papers which correspond to the Post Closing Working Capital Adjustment do not reconcile to the "opening working capital in the opening Domtar balance sheet" delivered on May 7, 2007.

In the Shared Payment Amount included with the Post-Closing Working Capital Adjustment, $51,936,939 was calculated as a cash portion of the total settlement amount of $66,353,609. Please note that Domtar is in disagreement with these calculations. Amongst other things, Domtar does not agree that the inventory items (Shared Inventory; Lifo and 5% adjustment) in the "Total Settlement Due from Weyerhaeuser for Shared Payment Amounts" were calculated in accordance with Section 2.04(f) of the Amended and Restated Contribution and Distribution Agreement.

Additionally, Domtar requires further clarification from Weyerhaeuser with respect to the $17,334,100 of inventory acquired by Domtar in the Shared Payment Amount pursuant to the "Pulp Marketing Agreement".

www.domtar.com

Confidential                                                                                    DOMWEY00003891

Domtar further reserves the right to reject the transference of any liabilities not in accordance with the Amended and Restated Contribution and Distribution Agreement and other Transaction Documents.

Should you have any question regarding the foregoing, please do not hesitate to give the undersigned a call.

Yours truly,

Gilles Pharand

Senior Vice President, Law and Corporate Affairs

2

Domtar

Confidential

DOMWEY00003892

# EXHIBIT D

1          M. CROSS

2     IN THE UNITED STATES DISTRICT COURT

3        FOR THE DISTRICT OF DELAWARE

4     _____

5  WEYERHAEUSER COMPANY, a           )

6  Washington corporation,           )

7          Plaintiff,               ) Case No.

8                                    ) C.A. No. 14-00024-SLR

9  DOMTAR CORPORATION, a             )

10  Delaware corporation,            )

11  and DOMTAR PAPER COMPANY, LLC,   )

12  a Delaware limited liability     )

13  company,                         )

14          Defendants.             )

15  _____ )

16

17          Oral deposition of MICHAEL CROSS, a

18  representative of the Defendants, called by the

19  Plaintiffs herein, held before a stenographic court

20  reporter at the offices of Domtar Corporation, 395 Boulevard

21  de Maisonneuve Ouest, Hong Kong Room, Montréal, Canada

22  on Wednesday, the 28th day of May, 2015, at 9:00 a.m.

23

24  Job No. 93999

25  Reported by: KARIN A. JENKNER

1                         M. CROSS

2    A P P E A R A N C E S:

3    For the Plaintiff:

4    HILLIS CLARK MARTIN & PETERSON

5    BY:  Laurie Chyz, Esq.

6              1221 Second Avenue

7              Seattle, WA 98101

8

9

10

11

12   For the Defendants:

13   DEBEVOISE & PLIMPTON

14   BY:  Courtney Dankworth, Esq.

15        Alex Ginsberg, Esq.

16              919 Third Avenue

17              New York, NY 10022

18

19

20

21

22   ALSO PRESENT:

23   Conrad J. Smucker (Sr. Legal Counsel, Weyerhaeuser)

24   Ania Brzezinski (VP Legal Affairs, Domtar)

25

1                        M. CROSS

2    notes and that I reviewed my own notes before this

3    meeting, but I don't remember every little nuance of

4    the conversations.

5            Q.   And I understand that there will be

6    much that you don't remember.  I am just trying to ask

7    questions so that I get an understanding of the scope

8    of what you remember.  So I'm not trying to be a pest.

9            A.   No, no, I understand.

10           Q.   I'm just trying to explore what you do

11   remember.

12           A.   I understand.

13           Q.   Do you remember who spoke for

14   Weyerhaeuser?

15           A.   Patrick Lane.  Never shy to speak.  So,

16   and he had -- he was running point on all these

17   things, so Patrick Lane and Laurie Scott, I think, was

18   the lawyer on the other side.  I can't remember

19   exactly the...

20           (looking at reporter) I'm looking at you...

21                (query by reporter)

22       Laurie Scott, I think, was the lawyer on the

23   other side.

24           Q.   Was Anne Giardini there?

25           A.   I don't know, I'd have to go back to my

Page 50

1                            M. CROSS

2    notes.

3              Q.    Okay.

4              A.    There was whoever the lawyer was on the

5    other side.

6              Q.    Okay.  And what did they say?

7              A.    I don't recall.

8              Q.    Did you discuss retired employees at

9    that meeting?

10             A.    The first time that I've heard

11   reference to this "retired employee" thing is

12   recently.  So, no.

13             Q.    How recently?

14             A.    Like yesterday, the day before

15   yesterday.  The nuance, if you like, or the

16   categorization like that was never something.  It was

17   transferred/non-transferred.  It was never this --

18   well, I guess I would call it a third category of

19   "retired."  I never, never, never heard that until two

20   days ago.

21             Q.    Okay.  So at the September 11th

22   meeting, there was not a discussion of retired

23   employees?

24             A.    Transferred and non-transferred.  So,

25   no.  No.  But it was always

1                       M. CROSS
2      transferred/non-transferred.
3              Q.   Okay.  And it sounds like what you're
4      telling me is that both parties agreed to an
5      interpretation of the contract?
6              A.   At that meeting and confirmed quickly,
7      well, I guess how quickly, I don't know exact dates
8      but shortly thereafter by a fax from Anne Giardini.
9              Q.   Okay.  So, so the discussion led to an
10     agreement of what the contract required?
11             A.   It led to a fax from Anne Giardini
12     saying, we're in agreement on the position on
13     transferred employees.  Let's now keep talking about
14     the administrative.
15             Q.   Okay.  And in terms of the second
16     issue, the claims administration issue, what's your
17     understanding of how that process works?
18             MS. DANKWORTH:  Objection to the form.
19             A.   How it -- the last word you said?
20     BY MS. CHYZ:
21             Q.   Of how that process works?
22             A.   Works?  Well, it was a back-and-forth
23     between Michel and his people and their Weyerhaeuser
24     counterparts to demonstrate the list of employees and
25     what was paid for them, so that we would reimburse

1                        M. CROSS

2    them.

3            So it's some sort of supporting

4    documentation we would use to wire or cut them a

5    cheque.

6            Q.    Okay.

7            A.    So it's the:  How do you validate that

8    they actually paid that?  And that is, you know, an

9    error on the list.  It's not an employee, it's just

10   from -- you know, it's just a straight-up clerical

11   error, that there is an employee transferred to us,

12   that they are on our, I guess, on our payroll.

13           And so whatever validation I would have

14   done -- I definitely would have done -- would have

15   been to go back to the payroll system, make sure they

16   were actually an active employee, or contact the

17   location, or I would have done something to

18   substantiate that it's a valid employee and not a

19   clerical error; and then get some sort of supporting

20   documentation from Weyerhaeuser that they actually

21   paid that.

22           And again, not a -- I put an extra "1" on

23   the -- you know, or an extra zero on the list or what

24   have you.

25           Q.    Okay.  And in terms of the

1                          M. CROSS

2    by 13 million, and we're saying no.

3              Q.    Okay.

4              A.    That's what that is.

5              Q.    And so what's the basis for the

6    position that that number should be a zero?

7              MS. DANKWORTH:   Objection to the form.

8              A.    So around this time, June of 2007, or

9    just before, we would have already had those

10   conversations about retained versus transferred.

11   BY MS. CHYZ:

12             Q.    Okay.

13             A.    So, when he was trying to settle this

14   in final form, we would have said, well, no, we

15   disagree with you on that.

16             Q.    Okay.  But what's the basis for the

17   conclusion that Domtar was assuming no Workers'

18   Compensation liability?

19             A.    That's not what it's saying.  It's

20   saying in terms of the adjustment he's proposing.

21   Because, remember, there's already Workers' Comp

22   liability at the mill level for employees who were at

23   the mill level, and that was not being contested.  The

24   5.7 million that we had booked at corporate was not

25   being contested, this was being contested.

1                        M. CROSS

2            Q.    Okay.  So that 13 million doesn't

3    include the 5.7 million?

4            A.    I don't believe so, no.

5            Q.    Okay.  But you had booked 5.7 million?

6            A.    We did, yes.

7            Q.    -- for Workers' Compensation reserves?

8            A.    We did at Corporate, yes.

9    EXHIBIT 39 marked for identification:  E-mail string

10           with attach end letter, DOMWEY00003890-3892

11   BY MS. CHYZ:

12           Q.    Okay.  Tell me what Exhibit 39 is?

13           A.    Under the agreement with Weyerhaeuser,

14   we would have had, or we did have, a clause to settle

15   disagreements with regards to the working capital and

16   the post-working capital within the range or not.

17           We were within the range with and without

18   this adjustment, but it nonetheless was a disagreement

19   with them.

20           And the agreement called for us to give

21   notice.  And then I believe the next step was at least

22   a good-faith sit-down/negotiation, it was sort of an

23   escalation; and then ultimately arbitration or what

24   have you.

25           So this was the first notice that would have

1                          M. CROSS

2     been given to the other side to say that we have a

3     disagreement, formally, shall we say.

4               Q.   Okay.  And you saw this in the June

5     2007 time frame when it was delivered to Weyerhaeuser?

6               A.   I was copied on it, yeah.

7               Q.   Okay.  The dispute about the 13

8     million, was that a dispute about the ownership of the

9     claims or was that a dispute about the value or the

10    amount of the claims?

11              MS. DANKWORTH:  Objection to the form.

12              A.   Ownership.

13    BY MS. CHYZ:

14              Q.   And did you take any steps in response

15    to this letter dated June 6, 2007?

16              A.   I would not have because now it would

17    have been definitely in the hands of legal counsel.

18    EXHIBIT 40 marked for identification:  E-mail with

19              attached letter, DOMWEY00003986-3988

20              (witness perusing document)

21              THE DEPONENT:  Okay.

22    BY MS. CHYZ:

23              Q.   Do you recognize Exhibit 40?

24              A.   No.  But I am copied on it, so I must

25    have seen it at the time.

                          M. CROSS

1              Q.    In fact, it looks like it's directed to

2    you?

3              A.    It is directed to me.

4              Q.    Okay.  And it appears that Pierre

5    Leroux is laying out potential claims in connection

6    with the Weyerhaeuser post-closing disputes; is that

7    right?

8              A.    That's what it looks like, yeah.

9              Q.    Okay.  Looking at his section there on

10   Workers' Compensation, how did you interpret what he

11   was telling you under that section?

12             MS. DANKWORTH:  Objection to the form.

13             A.    Well, further to the same, the same

14   approach, I guess, that we had -- or the same

15   understanding we had, or I had formed starting in

16   March or April, 2007, was that the 13.6 million was

17   retained by them and the 5.7 was known and booked by

18   us.

19             Q.    And what is the reference there to

20   whether Weyerhaeuser should remain accountable for a

21   portion of the 5.7?

22             MS. DANKWORTH:  Objection to the form.

23             A.    I think Pierre was not -- there was a

24   couple people that, well, Pierre in particular, that

Page 141

M. CROSS

1

2      A.   We have liability related to this,

3   which is the transferred employees.  And I would have

4   been referring to the fact that we have the 5.7

5   million and the liabilities that are sitting at the

6   mill level.

7      Q.   Okay?

8      A.   We talked just ten minutes around

9   before about.

10      Q.   So, in terms of what you said to

11   Weyerhaeuser in the meeting, tell me what you said to

12   Weyerhaeuser.

13      A.   Well, it would have been this.  I don't

14   know what else -- what I said.  I don't remember a

15   six-year-ago meeting, so what I would have said, in

16   the essence, would have been this.

17      Q.   The essence would have been that

18   Domtar's liability is committed to the mill level and

19   the 5.7; is that what you would said?

20      MS. DANKWORTH:  Objection to the form.

21      A.   I would have said:  We pay for the

22   transferred employees.

23      Q.   Okay?

24      A.   It was always our position that it was

25   transferred/not transferred.

1                         M. CROSS

2   BY MS. CHYZ:

3            Q.   And what was the basis for that

4   position?

5            A.   Our people who negotiated the deal and

6   our lawyers, which I guess could be one and the same:

7   Michel Dagenais, our HR people, and our lawyers.

8            Q.   Okay.  And the section there where it

9   says:

10                    "The carve-out is found in the

11                    Transaction Agreement, 6.09(a)(iii)."

12           Would that have been something that you

13   pointed out, or would somebody else have point---

14           A.   That would have been Ladan or Zyg that

15   would have pointed that out.

16           Q.   Did you talk about retired employees,

17   in that meeting?

18           A.   Never.  The first time that came up was

19   two days ago.

20           Q.   Okay.

21           A.   In my -- to my knowledge, anyways.

22           Q.   And then what did Weyerhaeuser say at

23   that meeting?

24           A.   Specifically, I don't recall every word

25   they said.  But what I captured was the essence, and

1                          M. CROSS

2      the key aspect of it was, they ultimately agreed with

3      us.  The people in the room agreed to us.  And then

4      they had to, as I say here, a resolution:  (as read)

5                     "Next steps.  Anne will go back to

6                     interpretation of the agreement.  Anne

7                     needs to get sign-off from Laurie Scott."

8           Q.    Okay.  So there's a heading here that

9      says:  (as read)

10                    After discussion with Weyerhaeuser team

11                    in the afternoon."

12          Tell me your recollection of how that

13     discussion played out.

14          A.    Yeah, I don't recall that.  So that

15     would have been after the meeting broke up.  I was

16     just trying to distinguish between what was in the

17     meeting with/with not.  It was our point to our own

18     people that we think -- Weyerhaeuser thinks our

19     position is correct but they need to convince a few

20     people more internally.

21          Q.    Okay.  So as I understand this, after

22     discussions with Domtar, Anne Giardini agreed that the

23     contract required that non-transferred employees

24     stayed with Weyerhaeuser?

25          A.    That's correct.

1                        M. CROSS

2    Anne Giardini on this topic other than what's

3    contained in this letter or what happened in the

4    September 11 meeting?

5            A.   I never had direct contact with Anne

6    Giardini.

7            Q.   Okay.  And did you take any steps to

8    reduce this statement in the November 26 letter to a

9    formal written agreement?

10           MS. DANKWORTH:  Objection to the form.

11           A.   I'm sorry; could you say that again?

12   BY MS. CHYZ:

13           Q.   Did you take any steps to reduce the

14   statement here in the November 26 letter to a formal

15   written agreement?

16           MS. DANKWORTH:  Objection to the form.

17           A.   The reference, when you say "reduce,"

18   what do you mean when you say "reduce"?

19   BY MS. CHYZ:

20           Q.   To convert it into a formal written

21   agreement?

22           MS. DANKWORTH:  Objection.

23           A.   Okay.  It wasn't my role to do that.

24   BY MS. CHYZ:

25           Q.   Okay.  Did you talk to anybody about

1                      M. CROSS

2    whether Domtar should have this converted into a

3    formal written agreement?

4            A.   It was not my role to do that.  So no.

5    The answer's no.

6            Q.   Okay.  And did you understand the

7    process that was in place between Weyerhaeuser and

8    Domtar about dispute resolution processes and that

9    disputes, in order to be resolved, had to be reduced

10   to a formal written agreement?

11           MS. DANKWORTH:  Objection to the form.

12           A.   Again, while not my, not my role, I

13   participated in the September 11th meeting, and then

14   it was in the hands of our legal department after

15   that.

16           Q.   Okay.  At the top of this letter, on

17   the first page, it says "without prejudice."  Do you

18   know what that meant?

19           MS. DANKWORTH:  Objection to the form.

20           A.   I have seen that on various documents

21   in my career.  I have to -- I'm not a lawyer so I

22   don't exactly know the exact legal concepts that carry

23   that.  So I don't know if I could give you an exact

24   definition.  I don't know -- sometimes I see people

25   put it and other people complain as to why it's there,

1                           M. CROSS

2    and what's "with prejudice," what's "without

3    prejudice."

4             My understanding is, it means that it's not

5    to be used against me, you know, if you say something

6    along those lines.

7    BY MS. CHYZ:

8             Q.   Okay.  And did you have a concern about

9    the fact that this letter said:  "Without prejudice"?

10            MS. DANKWORTH:  Objection to the form.

11            A.   That's not -- no.  I don't, no I

12   don't -- I'd have to say I didn't know really when

13   it's applicable, when it's not applicable, and what

14   the legal ramifications are.  What I focused on was

15   the wording in it, which said:  "I agree that

16   Weyerhaeuser is, blah-blah, transferred employees."

17            So that was an important statement to me.  And

18   the rest, I guess, was an update on the rest of the

19   issues.

20            Q.   Okay.  So did you complain to anybody

21   about getting clarification of what is "with

22   prejudice" and what is "without prejudice"?

23            MS. DANKWORTH:  Objection to the form.

24            A.   Why would I complain?  Complain?  I

25   don't know...

M. CROSS

1

2  BY MS. CHYZ:

3          Q.   You said that when you see this on

4  letters, you know that people sometimes complain and

5  they want to know what is "with prejudice" and what is

6  "without prejudice."

7          And I was just wondering whether you had

8  that reaction to this letter, whether you raised the

9  issue with anybody in terms of what is "with

10  prejudice" and what is "without prejudice."

11          A.   No.  Again, it's not my role to worry

12  about those kinds of legal details between the

13  parties.

14          Q.   Okay.  And what steps did you take any

15  response to this November 26 letter?

16          A.   There was nothing for me to do, as it

17  pertains to Workers' Comp, other than it showed to me

18  that we were resolved on the issue.  And yet there was

19  still some back-and-forth on the administrative side

20  that still had to be done.

21  EXHIBIT 51 marked for identification:  E-mail string,

22          DOMWEY00004687-4689

23          THE DEPONENT:  Okay.  I think I know

24          where...

25  BY MS. CHYZ:

1                         M. CROSS

2

3          I, KARIN A. JENKNER, RPR, CRR, CSR (ONT.),

4    Certified Shorthand Reporter, certify:

5          That the foregoing proceedings were taken

6    before me at the time and place therein set forth, at

7    which time I placed the deponent under oath;

8          That the testimony of the deponent and all

9    objections made at the time of the examination were

10   recorded stenographically by me and were thereafter

11   transcribed;

12         That the foregoing is a true and correct

13   transcript of my shorthand notes so taken.

14         I further certify that I am not a relative or

15   employee of any attorney or of any of the parties, nor

16   financially interested in the action.

17

18         I declare that the foregoing is true and

19   correct.

20         Dated this 9th day of June, 2015.

21

22         _____

23         Karin A. Jenkner, CSR (Ontario), RPR, CRR

24     (Commissioner of Oaths expires July 19, 2016)

25

# EXHIBIT E

 Weyerhaeuser

**Weyerhaeuser Corporate Headquarters**

Mailing Address:
PO Box 9777
Federal Way, WA  98063-9777
Ship To Address:
33663 Weyerhaeuser Way South
Federal Way, WA  98001
(253) 924-5607; (253) 928-2185-fax
sandy.mcdade@weyerhaeuser.com

July 23, 2007

VIA FACSIMILE AND ELECTRONIC MAIL



Exhibit No. 68
Wns Anne Giardini
Date: June 3/15
Barbara Neuberger, CRS (Ontario)

Gilles Pharand
Senior Vice President, Corporate Affairs and
General Counsel
Domtar Corporation
395 De Maisonneuve Blvd West
Montreal, QC
Canada H3A 1L6

RE:    Domtar's Notice of Disagreement

Dear Gilles:

We recently received a request from Tom Hart at Domtar for information relating to our calculation of the Working Capital Statement.  This reminded me that we still have not set a date for a meeting to discuss the Working Capital Statement and other open issues between Domtar and Weyerhaeuser.  As I have indicated to you previously, we believe that the next step in resolving any outstanding issues regarding the Working Capital Statement would be a small team from each company to meet and I look forward to hearing from you regarding proposed dates.

In the meantime, it seems to us that before our people spend much more time analyzing the Working Capital Statement, it would be helpful for us to share with you our response to the points raised in your Notice of Disagreement.  For your convenience, I have set forth below each of the objections raised in Domtar's Notice of Disagreement together with our response.

DOMWEY00010205

Gilles Pharand
July 23, 2007
Page 2

1.  Underline: First Paragraph – Worker's Compensation Liabilities

**Domtar Notice:**

*"Amongst other things, Domtar is in disagreement with the reference in the Post Closing Working Capital Adjustment to the 'assumed workers' compensation liabilities' totaling $13,594,814. Domtar did not assume this liability and, as such, disagrees with Weyerhaeuser's treatment of this as a reduction to the Post-Closing Working Capital Adjustment. Please be further advised that Weyerhaeuser does not have the right to set-off the workers' compensation liabilities from any amounts owed to Domtar."*

**Weyerhaeuser Response:**

We disagree with Domtar's position regarding workers' compensation liabilities for the following reasons. Section 2.03(a) of the Contribution Agreement transfers liabilities to Domtar other than "Retained Liabilities" and Section 2.03(a)(vii) in particular transfers to Domtar all liabilities relating to any action, suit or proceeding arising out of the Newco business, whether before or after closing.

Section 2.03(b)(iv) of the Contribution Agreement includes as "Retained Liabilities" all Liabilities to be expressly retained by Weyerhaeuser pursuant to the Transaction Documents.

Section 6.09(a)(iii) of the Transaction Agreement requires Weyerhaeuser to retain the obligation to pay *worker compensation benefits to employees of the transferred business not transferred to the business at closing until the time they are eligible to return to work and join Domtar.* There is no provision in either the Contribution Agreement or the Transaction Agreement that requires Weyerhaeuser to retain any other worker compensation liabilities.

Based upon the foregoing, all outstanding and future worker compensation claims relating to the businesses combined with Domtar belong to Domtar, EXCEPT worker compensation payments due and owing to US employees who were absent from work on the closing date and receiving workers comp benefits related to such absence, but solely for the period leading up to the time such employees join Domtar.

Domtar's assertion that Weyerhaeuser does not have a right of set-off is incorrect. Section 9.09 of the Contribution Agreement provides that both parties retain all remedies available to them at law and in equity. Set-off is a remedy available to a party under U.S. law.



DOMWEY00010206

Gilles Pharand
July 23, 2007
Page 3

2.  Paragraph 2 – Reconciliation to the opening Domtar balance sheet

Domtar Notice:

*"Further, the supporting work papers which correspond to the Post Closing Working
Capital Adjustment do not reconcile to the 'opening working capital in the opening
Domtar balance sheet' delivered on May 7, 2007.*

Weyerhaeuser Response:

We are having some difficulty determining the nature of Domtar's specific disagreement
with our Working Capital Statement.  Weyerhaeuser is not required to reconcile the
Closing Working Capital to the opening working capital in the opening Domtar balance
sheet.  Section 2.04(a) of the Contribution Agreement requires Weyerhaeuser to deliver
to Domtar within 60 days after the Closing Date a statement setting forth the Working
Capital (as defined in the Contribution Agreement) and the amounts of Shared Inventory,
Shared Accounts Receivable and Shares Accounts Payable.  "Working Capital" is defined
in Section 2.04(d) of the Contribution Agreement as "Current Assets minus Current
Liabilities."  "Current Assets and Current Liabilities" are defined as the current assets
and liabilities of the Newco Business, calculated in the same way, using the same
methods, policies, principles and methodologies as the Interim Newco Balance Sheet
(dated March, 2006), subject to adjustment in accordance with the working capital
principles set forth in Section 2.04(d) and Schedule 2.04(d) to the Contribution
Agreement.

We note that the methods, policies, principles and methodologies used to prepare the
Interim Newco Balance Sheet are not identical to the methods, policies, principles and
methodologies used to prepare the Domtar opening balance sheet.

Weyerhaeuser prepared the Closing Working Capital on the same basis as the Newco
Balance Sheet and adjusted the Working Capital as required by Section 2.04 of the
Contribution Agreement.  Attached to the Working Capital Statement sent by
Weyerhaeuser to Domtar on May 7, 2007 was a reconciliation of the Closing Working
Capital to the Interim Newco Balance Sheet.

3.  Paragraph 3 – Calculation of the Shared Payment Amount

Domtar Notice:

*"In the Shared Payment Amount included with the Post-Closing Working Capital
Adjustment, $51,936,939 was calculated as a cash portion of the total settlement
amount of $66,353,609.  Please note that Domtar is in disagreement with these
calculations.  Amongst other things, Domtar does not agree that the inventory items
(Shared Inventory; LIFO and 5% adjustment) in the "Total Settlement Due from*



DOMWEY00010207

Gilles Pharand
July 23, 2007
Page 4

*Weyerhaeuser for Shared Payment Amounts" were calculated in accordance with Section 2.04(f) of the Amended and Restated Contribution and Distribution Agreement."*

**Weyerhaeuser Response:**

We do not understand Domtar's disagreement with the calculation of the Shared Payment Amount.  Section 2.04(f) of the Contribution Agreement requires Weyerhaeuser to pay to Domtar an amount equal to the Shared Payment Amount *plus*, the "Pulp Inventory Adjustment Amount."  "Pulp Inventory Adjustment Amount" is defined in Section 2.04(f) of the Contribution Agreement to equal 100% of the sum of:

(1)    the LIFO reserve applicable to the Shared Inventory reflected on the Statement (in this case ($3,045,574)); and
(2)    an amount equal to 5% multiplied by the sum of the Shared Inventory plus the LIFO reserve amount (in this case, $522,517).

The Shared Inventory reflected on the Statement is $13,495,916 and when added to a LIFO reserve applicable to such Inventory of ($3,045,574), yields a net value of $10,450,342.  Five percent of $10,450,342 equals $522,517.

If Domtar's disagreement relates to the difference between the amount of Shared Inventory for purposes of Section 2.04(f) of the Contribution Agreement and the actual amount of shared inventory at the time of Closing, Domtar's disagreement is with the terms of the Contribution Agreement, not our calculations.  The Contribution Agreement defines "Shared Inventory" as "all finished pulp manufactured at the Transferred Real Property owned by Weyerhaeuser or any other member of the Weyerhaeuser Group and that, as of the close of business on the Contribution Date, is located at Weyerhaeuser's facilities other than the Transferred Real Property *to the extent allocated to Newco in accordance with Schedule 2.04(d).*

Schedule 2.04(d) of the Contribution Agreement sets forth a methodology for allocation that was agreed by the parties, and was followed by Weyerhaeuser in determining the Shared Inventory.

4.    Paragraph 4 – Pulp Marketing Agreement

**Domtar Notice:**

*"Additionally, Domtar requires further clarification from Weyerhaeuser with respect to the $17,334,100 of inventory acquired by Domtar in the Shared Payment Amount pursuant to the 'Pulp Marketing Agreement."*



Confidential

Gilles Pharand
July 23, 2007
Page 5

**Weyerhaeuser Response:**

When Section 2.04 of the Contribution Agreement was negotiated, the parties contemplated that Weyerhaeuser would purchase from Domtar all of the Shared Inventory at Closing to facilitate the transition. In fact, Domtar retained some of the inventory at the time of Closing for purposes of third-party sales, thereby reducing the amount of Shared Inventory to be purchased by Weyerhaeuser. The figure for the amount of Shared Inventory sold by Domtar was determined on a lot by lot basis. We will provide Domtar information regarding the lots involved upon request.

5. **Paragraph 5 – Disagreements Generally**

**Domtar Notice:**

*"Domtar further reserves the right to reject the transference of any liabilities not in accordance with the Amended and Restated Contribution and Distribution Agreement and other Transaction Documents."*

**Weyerhaeuser Response:**

Section 2.04(a) of the Amended and Restated Contribution Agreement requires Domtar to submit to Weyerhaeuser a Notice of Disagreement within 30 days following delivery of the Working Capital Statement, specifying in reasonable detail the nature of any disagreement. The Working Capital Statement becomes final and binding on Domtar when the items specified in the Notice of Agreement are resolved by the parties or by the Accounting Firm. Domtar cannot reserve the right to further disagree with the Working Capital Statement.

Please do not hesitate to call if you have any questions regarding the foregoing.

Sincerely,

Sandy D. McDade
Senior Vice-President and
General Counsel

SDM:mh

# EXHIBIT F

1              Shirley Dawn Yeager
2        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF DELAWARE
3

_____
4   WEYERHAEUSER COMPANY, a              )
    Washington corporation,             )
5                                        )
            Plaintiff,                   ) Case No.
6                                        ) C.A. No.
                                         ) 14-00024-SLR
7   DOMTAR CORPORATION, a                )
    Delaware corporation,               )
8   and DOMTAR PAPER COMPANY, LLC,       )
    a Delaware limited liability        )
9   company,                            )
                Defendants.             )
10                                       )
_____)
11
12
13                  DEPOSITION
14                     OF
15            SHIRLEY DAWN YEAGER
16        33663 Weyerhaeuser Way South
17             Federal Way, WA
18              JUNE 17, 2015
19
20
21
22
23
24  Reported by:
    Monna J. Nickeson, CRR, CLR, RPR, CRR
25  Job No. 94144

1          Shirley Dawn Yeager

2

3

4

5              June 17, 2015

6               9:19 a.m.

7

8

9

10

11

12          Deposition of SHIRLEY DAWN YEAGER, held

13    at the offices of 33663 Weyerhaeuser Way South,

14    Federal Way, WA, before Monna J. Nickeson, a

15    Certified Court Reporter, Certified Livenote

16    Reporter, Registered Professional Reporter and

17    Certified Realtime Reporter.

18

19

20

21

22

23

24

25

```
 1                   Shirley Dawn Yeager
 2    A P P E A R A N C E S
 3
 4          DEBEVOISE & PLIMPTON
            Attorneys for the Plaintiff
 5          BY:  Gary Kubek, Esq.
                 Jeff Hughes, Esq.
 6          919 Third Avenue
            New York, NY 10022
 7
 8
 9
            HILLIS CLARK MARTIN & PETERSON
10          Attorneys for the Defendant
            BY:  Laurie Chyz, Esq.
11          1221 Second Avenue
            Seattle, WA 98101
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 54

1                        Shirley Dawn Yeager

2        A.    Just information.

3        Q.    Do you believe there was anything that you

4   were supposed to do with that information?

5        A.    No.

6              MR. KUBEK:   Let's take a break.

7                    (A recess was taken.)

8    BY MR. KUBEK:

9        Q.    I'm going to show the witness what has been

10   marked previously as Exhibit 67, which is a letter

11   from Gilles Pharand at Domtar to Sandy McDade at

12   Weyerhaeuser.

13             Ms. Yeager, have you ever seen this

14   document?

15       A.    I don't believe so.

16       Q.    There's a reference in the second paragraph

17   to the post closing working capital adjustment, if you

18   could take a look at that.  I believe you said that

19   you weren't aware of there being a working capital

20   adjustment, but does that refresh your recollection at

21   all?

22       A.    No.

23       Q.    And as a reference to an amount for assumed

24   Workers' Compensation liabilities totalling just under

25   13.6 million dollars, does that number ring a bell or

Shirley Dawn Yeager

1  do you have any recollection of that being an amount

2  of assumed Workers' Compensation liability that

3  Weyerhaeuser was asserting Domtar was taking on?

4       A.   It's the same number as on Chee's form.

5       Q.   Other than seeing it on the other document,

6  is that a number that you have a recollection of?

7       A.   Not specifically, no.

8       Q.   And in the next sentence, Mr. Pharand says:

9  Domtar did not assume this liability and as such

10 disagrees with Weyerhaeuser's treatment of this as a

11 reduction to the post closing working capital

12 adjustment.

13          You've already testified you were aware

14 there was a disagreement?

15      A.   Uh-huh (affirmative response).

16      Q.   Do you have any knowledge or recollection

17 as to how that related to this post closing working

18 capital adjustment?

19      A.   No.

20      Q.   I'm going to show the witness what was

21 previously marked as Exhibit 68.  And Exhibit 68 is a

22 letter from Mr. McDade back to Mr. Pharand.

23          First, do you know who Sandy McDade was?

24      A.   Yes.

Shirley Dawn Yeager

1

2      Q.    And who was he?

3      A.    He was part of our law department.

4      Q.    Did you work with him at all?

5      A.    Not directly.

6      Q.    What do you mean by that?

7      A.    Well, he didn't handle any of the workers'

8  comp claims.

9      Q.    So you worked with people who were in his

10  department, though, from time to time?

11     A.    Yes.

12     Q.    Do you recall any one in particular in the

13  legal group that you worked with?

14     A.    Yes.

15     Q.    Who would those be?  Strike that.

16           Who did you work with most frequently?

17     A.    Jack Eng.

18     Q.    What was his role?

19     A.    He was, as far as I know, the only attorney

20  in the law department who handled workers' comp

21  issues.

22     Q.    Did he have any involvement so far as you

23  know between the dispute between Domtar and

24  Weyerhaeuser Workers' Compensation liability for the

25  Domtar business?

1           Shirley Dawn Yeager

2           C E R T I F I C A T E

3   STATE OF WASHINGTON          )

4                                )

5   COUNTY OF BENTON             )

6

7           I, Monna J. Nickeson, a Certified Court

8   Reporter within and for the State of Washington, do

9   hereby certify:

10          SHIRLEY DAWN YEAGER, the witness whose

11  deposition is hereinbefore set forth, was duly sworn

12  by me and that such deposition is a true record of

13  the testimony given by such witness.

14          I further certify that I am not related

15  to any of the parties to this action by blood or

16  marriage; and that I am in no way interested in the

17  outcome of this matter.

18          IN WITNESS WHEREOF, I have hereunto set

19  my hand this day, June 29, 2015.

20

21

22          _____

            MONNA J. NICKESON, CRR, CLR, RPR, CRR

23

24

25

# EXHIBIT G

 Weyerhaeuser

**Vancouver, British Columbia**

Law Department, Canada

925 West Georgia Street
5ᵗʰ Floor
Vancouver BC V6C 3L2
604.661.8086 phone
604.687 2314 fax
anne.giardini@weyerhaeuser.com

June 3, 2008

**VIA FACSIMILE and MAIL**

Gilles Pharand
Senior Vice President, Corporate Affairs
and General Counsel
Domtar Corporation
395 de Maisonneuve Blvd West
Montreal, QC H3A 1L6



Exhibit No. 69
Wns: Anne Giardini
Date: June 3/15
Barbara Neuberger, CRS (Ontario)

Dear Gilles:

**Re:    Certain Outstanding Issues – Purchase Agreement among Domtar Paper Company,
Domtar Pulp and Paper Products, Inc., Domtar (Canada) Paper Inc., Weyerhaeuser
Company Limited and Weyerhaeuser Saskatchewan Ltd.**

We are writing to set dates on which to meet to discuss open issues between Domtar and
Weyerhaeuser. On the agreed date, we propose that a small team from each company meet to
endeavour to close all outstanding issues. I ask that you please provide dates on which your
team will be available in the next few weeks.

I have included a summary of issues to be discussed below. Please provide your comments on
these items, and please advise of any other issues you may be aware of or wish to review at our
meeting.

| No. | Issue | Domtar Position | Weyerhaeuser Response |
|-----|-------|-----------------|-----------------------|
| 1. | Worker's Compensation Liabilities | *"Amongst other things, Domtar is in disagreement with the reference in the Post Closing Working Capital Adjustment to the 'assumed workers' compensation liabilities' totaling $13,594,814.* | As previously advised, we disagree with Domtar's position regarding workers' compensation liabilities for the following reasons. Section 2.03(a) of the Contribution Agreement transfers liabilities to Domtar other than "Retained Liabilities" and Section 2.03(a)(vii) in particular transfers to Domtar all liabilities relating to any action, suit or proceeding arising out of the Newco |

1

WEY00002351

▲ Weyerhaeuser

| No. | Issue | Domtar Position | Weyerhaeuser Response |
|-----|-------|-----------------|-----------------------|
| | | *Domtar did not assume this liability and, as such, disagrees with Weyerhaeuser's treatment of this as a reduction to the Post-Closing Working Capital Adjustment.  Please be further advised that Weyerhaeuser does not have the right to set-off the workers' compensation liabilities from any amounts owed to Domtar."* | business, whether before or after closing. Section 2.03(b)(iv) of the Contribution Agreement includes as "Retained Liabilities" all Liabilities to be expressly retained by Weyerhaeuser pursuant to the Transaction Documents. Section 6.09(a)(iii) of the Transaction Agreement requires Weyerhaeuser to retain the obligation to pay worker compensation benefits to employees of the transferred business not transferred to the business at closing until the time they are eligible to return to work and join Domtar.  There is no provision in either the Contribution Agreement or the Transaction Agreement that requires Weyerhaeuser to retain any other worker compensation liabilities. As a result, all outstanding and future worker compensation claims relating to the businesses combined with Domtar belong to Domtar, except only worker compensation payments due and owing to US employees who were absent from work on the closing date and receiving workers comp benefits related to such absence, but in those cases solely for the period leading up to the time such employees join Domtar. The outstanding amount due from Domtar with respect to this issue is approximately $3,543,789 plus accumulated interest. |
| 2. | Profit Participation Fee | | Weyerhaeuser owned the business between May 5 and March 7, 2007 and remains entitled to profits from that period. In order to avoid dispute, Weyerhaeuser and Domtar agreed to a profit participation fee comprising a flat fee plus a price adjustment mechanism for actual pricing in March.  The price adjustment was calculated by Domtar staff in Fort Mill and reviewed by Peter Martin.  Domtar has failed to pay the bill notwithstanding that the price |

2

WEY00002352

⚠ Weyerhaeuser

| No. | Issue | Domtar Position | Weyerhaeuser Response |
|-----|-------|-----------------|------------------------|
| | | | adjustment was at Domtar's request. The amount outstanding is $203,890.00 plus accumulated interest. |
| 3. | Reconciliation to the Opening Domtar Balance sheet | *"Further, the supporting work papers which correspond to the Post Closing Working Capital Adjustment do not reconcile to the 'opening working capital in the opening Domtar balance sheet' delivered on May 7, 2007.* | We are having difficulty determining the nature of Domtar's specific disagreement with our Working Capital Statement.  Weyerhaeuser is not required to reconcile the Closing Working Capital to the opening working capital in the opening Domtar balance sheet.  Section 2.04(a) of the Contribution Agreement requires Weyerhaeuser to deliver to Domtar within 60 days after the Closing Date a statement setting forth the Working Capital (as defined in the Contribution Agreement) and the amounts of Shared Inventory, Shared Accounts Receivable and Shares Accounts Payable. "Working Capital" is defined in Section 2.04(d) of the Contribution Agreement as "Current Assets minus Current Liabilities."  "Current Assets and Current Liabilities" are defined as the current assets and liabilities of the Newco Business, calculated in the same way, using the same methods, policies, principles and methodologies as the Interim Newco Balance Sheet (dated March, 2006), subject to adjustment in accordance with the working capital principles set forth in Section 2.04(d) and Schedule 2.04(d) to the Contribution Agreement. We note that the methods, policies, principles and methodologies used to prepare the Interim Newco Balance Sheet are not identical to the methods, policies, principles and methodologies used to prepare the Domtar opening balance sheet. Weyerhaeuser prepared the Closing Working Capital on the same basis as the Newco Balance Sheet and adjusted the Working Capital as required by Section 2.04 of the Contribution |

3

WEY00002353

Weyerhaeuser

| No. | Issue | Domtar Position | Weyerhaeuser Response |
|---|---|---|---|
| | | | Agreement. Attached to the Working Capital Statement sent by Weyerhaeuser to Domtar on May 7, 2007 was a reconciliation of the Closing Working Capital to the opening Newco Balance Sheet. |
| 4. | Calculation of the Shared Payment Amount | *"In the Shared Payment Amount included with the Post-Closing Working Capital Adjustment, $51,936,939 was calculated as a cash portion of the total settlement amount of $66,353,609. Please note that Domtar is in disagreement with these calculations. Amongst other things, Domtar does not agree that the inventory items (Shared Inventory; LIFO and 5% adjustment) in the "Total Settlement Due from Weyerhaeuser for Shared Payment Amounts" were calculated in accordance with Section 2.04(f) of the Amended and Restated Contribution and Distribution Agreement."* | We do not understand Domtar's disagreement with the calculation of the Shared Payment Amount. Section 2.04(f) of the Contribution Agreement requires Weyerhaeuser to pay to Domtar an amount equal to the Shared Payment Amount *plus*, the "Pulp Inventory Adjustment Amount." "Pulp Inventory Adjustment Amount" is defined in Section 2.04(f) of the Contribution Agreement to equal 100% of the sum of: 1. the LIFO reserve applicable to the Shared Inventory reflected on the Statement (in this case ($3,045,574)); and 2. an amount equal to 5% multiplied by the sum of the Shared Inventory plus the LIFO reserve amount (in this case, $522,517). The Shared Inventory reflected on the Statement is $13,495,916 and when added to a LIFO reserve applicable to such Inventory of ($3,045,574), yields a net value of $10,450,342. Five percent of $10,450,342 equals $522,517. If Domtar's disagreement relates to the difference between the amount of Shared Inventory for purposes of Section 2.04(f) of the Contribution Agreement and the actual amount of shared inventory at the time of Closing, Domtar's disagreement is with the terms of the Contribution Agreement, not our calculations. The Contribution Agreement defines "Shared Inventory" as "all finished pulp manufactured at the Transferred Real Property owned by Weyerhaeuser or any other member |

4

WEY00002354

⚠️ Weyerhaeuser

| No. | Issue | Domtar Position | Weyerhaeuser Response |
|---|---|---|---|
| | | | of the Weyerhaeuser Group and that, as of the close of business on the Contribution Date, is located at Weyerhaeuser's facilities other than the Transferred Real Property to the extent allocated to Newco in accordance with Schedule 2.04(d). Schedule 2.04(d) of the Contribution Agreement sets forth a methodology for allocation that was agreed by the parties, and was followed by Weyerhaeuser in determining the Shared Inventory. |
| 5. | Pulp Marketing Agreement | *"Additionally, Domtar requires further clarification from Weyerhaeuser with respect to the $17,334,100 of inventory acquired by Domtar in the Shared Payment Amount pursuant to the 'Pulp Marketing Agreement.'"* | When Section 2.04 of the Contribution Agreement was negotiated, the parties contemplated that Weyerhaeuser would purchase from Domtar all of the Shared Inventory at Closing to facilitate the transition. Domtar elected to sell some of the inventory to third-parties. The sale price from Weyerhaeuser to Domtar was determined on a lot by lot basis, which has been provided to you previously. |
| 6. | Disagreements Generally | *"Domtar further reserves the right to reject the transference of any liabilities not in accordance with the Amended and Restated Contribution and Distribution Agreement and other Transaction Documents."* | Section 2.04(a) of the Amended and Restated Contribution Agreement requires Domtar to submit to Weyerhaeuser a Notice of Disagreement within 30 days following delivery of the Working Capital Statement, specifying in reasonable detail the nature of any disagreement. The Working Capital Statement becomes final and binding on Domtar when the items specified in the Notice of Agreement are resolved by the parties or by the Accounting Firm. Domtar cannot reserve the right to further disagree with the Working Capital Statement. |
| 7. | Prince Albert FMA | | We have written several times to ask Saskatchewan to finalize the formal transfer of the Prince Albert FMA from Weyerhaeuser to Domtar. The Saskatchewan Government has |

WEY00002355

▲ Weyerhaeuser

| No. | Issue | Domtar Position | Weyerhaeuser Response |
|-----|-------|-----------------|------------------------|
| | | | said that consent is dependent on: 1. consultation with aboriginal groups; and 2. Domtar confirming that it has assumed all of the obligations of the FMA including planning, public and First Nation consultation and forest renewal. We ask that Domtar confirm to the Saskatchewan Government that Domtar has assumed these obligations. |
| 8. | Kerfoot et al v. Weyer-haeuser Company Limited | | Weyerhaeuser has asked Domtar to assume the defence of and indemnify Weyerhaeuser liabilities and costs arising in this matter.  Weyerhaeuser looks to Domtar for all fees, costs and expenses and may elect to join Domtar in the action. Weyerhaeuser has asked Domtar to fulfill its obligation to use reasonable best efforts to minimize losses from third party claims and to act in good faith in responding to, defending against, settling or otherwise dealing with claims, to cooperate in any defence, and to give each other reasonable access to all information relevant to the defence.  We have made several requests for all relevant information including a copy of work done by Domtar and/or its advisors with respect to the comparability of Domtar's employment offer before or after closing but have not had any response to date. |
| 9. | Employees on disability | | We have encountered several situations in which employees have been deemed medically able to return to graduated work and Domtar has declined to accommodate medically documented limitations.  In one instance, by way of example, the Dryden operations sought assurance that a staff person on long term disability who had almost completed a prescribed program) was able to return to work 100%.  The law |

WEY00002356

Weyerhaeuser

| No. | Issue | Domtar Position | Weyerhaeuser Response |
|---|---|---|---|
| | | | provides that employees on long-term disability plan who present themselves for re-employment shall be offered continuing employment, to the extent such employee is able to return to employment (including with any reasonable accommodation). |
| 10 | Interest | | Weyerhaeuser invoices provide for interest if unpaid on the date due. Domtar has not kept its payments current, thus incurring interest.<br><br>On May 15, 2008, Weyerhaeuser delivered notice to terminate the TSA for non-payment including interest. Although Domtar has paid the face value, Domtar has not paid the interest component. Weyerhaeuser has proposed a resolution of the interest issue, but has not had a response. At this time, nine days remain under the termination notice. |
| 11 | Wapawekka | | All liabilities of Weyerhaeuser to Wapawekka were assigned to and assumed by Domtar Pulp and Paper Products, Inc. pursuant to the Canadian Purchase Agreement. By a letter dated February 15, 2007, Wapawekka consented to the assignment by Weyerhaeuser to Domtar of all outstanding agreements with Wapawekka and released Weyerhaeuser from any further liability under these agreements. These potential liabilities were reflected in the working capital that was transferred to Domtar Corporation and its subsidiaries at Closing.<br><br>At closing, there were several outstanding issues, which Weyerhaeuser assumes (without knowing) that you have resolved:<br>1. An estimate in the amount of $680,000 as at the beginning of March, 2007 of the 6.06 liability |

WEY00002357

Weyerhaeuser

| No. | Issue | Domtar Position | Weyerhaeuser Response |
|---|---|---|---|
| | | | (under the Custom Cutting Contract).  Domtar was to determine the amount of this liability at the end of June 2007. 2. A proposed payment to Wapawekka in the amount of $457,000 for interest on CVD/AD refunds. In addition, Weyerhaeuser anticipates receiving one or more demands or claims with respect to Wapawekka including a claim by the Bank of Nova Scotia under Weyerhaeuser's guarantee and from the municipality for unpaid taxes.  Domtar has assumed all of Weyerhaeuser's obligations with respect to Wapawekka and Weyerhaeuser will pass on to Domtar all such demands or claims.  Please advise who Weyerhaeuser should notify of any such matters. |

We propose that our companies meet within a reasonable period of time and endeavour to resolve all of the issues as set out above, as such list may be amended in our further discussions and correspondence. To the extent resolution is not achieved, it would be our intention to:

1. Submit any Working Capital issues to Deloitte & Touche for arbitration;
2. Seek to recover our reasonable fees, costs, outlays and expenses incurred in defending any third party claims; and
3. Seek such other orders or rulings as are relevant and appropriate to any unresolved dispute.

I would be grateful if we could hear from you at your earliest opportunity.

Yours sincerely,

Anne Giardini
Vice President and General Counsel

AEG/dls

cc:     Alan H. Paley and Paul S. Bird, Debevoise & Plimpton LLP – 1.212.909.6836

8

WEY00002358

# EXHIBIT H

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF DELAWARE

3    WEYERHAEUSER COMPANY, a       )

4    Washington corporation,       )

5                     Plaintiff,   )

6        v.                        )   C.A. No. 14-00024-SLR

7    DOMTAR CORPORATION, a         )

8    Delaware corporation, and     )

9    DOMTAR PAPER COMPANY,         )

10   LLC, a Delaware limited       )

11   liability company,            )

12       Defendants.               )

13   _____   )

14

15

16       The deposition of ANNE GIARDINI, taken in the

17   above-entitled cause, before Barbara Neuberger, BCSRA No.

18   582, official reporter, on the 3rd day of June, 2015, at

19   925 West Georgia Street, Vancouver, B.C.

20

21

22

23

24   Job NO. 93963

25

1    APPEARANCES:

2            HILLIS CLARK MARTIN & PETERSON

3            1221 Second Avenue

4            Seattle, WA  98101

5            BY:  LAURIE CHYZ, ESQ.

6                 JAKE EWART, ESQ.

7                    On behalf of the Plaintiff;

8

9

10           DEBEVOISE & PLIMPTON

11           919 Third Avenue

12           New York, NY  10022

13           BY:  COURTNEY DANKWORTH, ESQ.

14                ETHAN ROMAN, ESQ.

15                   On behalf of the Defendant;

16

17           WEYERHAEUSER

18           33663 Weyerhaeuser Way South

19           Federal Way, WA  98003

20           BY:  CONRAD SMUCKER, ESQ.

21                   Weyerhaeuser In-house Counsel.

22

23

24

25

Page 48

1                          Anne Giardini

2        A.   Was I familiar with them?  Had I read them, is

3   that what you mean?

4        Q.   Yes.

5        A.   I had read them.

6        Q.   Drawing your attention to the next paragraph.

7        A.   Which paragraph?

8        Q.   I'm sorry, the paragraph that begins "Based upon

9   the foregoing".

10       A.   Yes.

11       Q.   It says:

12            "...all outstanding and future worker

13            compensation claims relating to the

14            businesses combined with Domtar belong to

15            Domtar..."

16            And then it has an exception.

17            Was this consistent with your understanding of

18   the transaction documents?

19       A.   This is consistent with my understanding of the

20   transaction documents.

21       Q.   Do you recall having discussions with Sandy

22   McDade around this time regarding the allocation of

23   workers' compensation liabilities?

24       A.   I don't recall.

25       Q.   This letter is addressed to Gilles Pharand, the

1                    Anne Giardini

2  general counsel of Domtar Corporation.  Did you have any

3  discussions with Gilles regarding the allocation of

4  workers' compensation liabilities?

5      A.  I don't recall.

6      Q.  Did you have any conversations with Gilles

7  regarding anything else?

8      A.  I don't recall.  I'm sure I had discussions with

9  him but I don't recall when or what about.

10     Q.  I'm going to show you a document we'll mark as

11 Exhibit 69.

12          (Exhibit No. 69 was marked for identification and

13           is attached hereto)

14          THE WITNESS:  All right.

15          MS. DANKWORTH:

16     Q.  Exhibit 69 is a letter sent by you to Gilles

17 Pharand dated June 3rd, 2008.  Do you recognize this as a

18 letter you prepared?

19     A.  I do.

20     Q.  Who else was involved in the preparation of this

21 letter?

22     A.  I don't recall.

23     Q.  Was anyone else involved in the preparation of

24 this letter?

25     A.  Well, my assistant, Deanna Stad, would have

1                         Anne Giardini

2    prepared it, and I would have had input from others but I

3    don't recall who.

4         Q.   Between Exhibit 68 and Exhibit 69 almost a year

5    elapses, and whereas Exhibit 68 was sent by Sandy McDade,

6    Exhibit 69 was sent to Gilles by you.  Is there a reason

7    that you sent this letter as opposed to Sandy McDade?

8         A.   Just allocation of who would carry on the task.

9         Q.   The volunteerism spirit you mentioned before?

10        A.   Yes.

11        Q.   Okay.  Are you aware of whether there had been

12   any discussions on the workers' compensation issue between

13   Exhibit 68 and Exhibit 69?

14        A.   I don't recall.

15        Q.   Drawing your attention to the first issue there,

16   the workers' compensation issue, the Weyerhaeuser response

17   concludes at the very last line by saying:

18             "The outstanding amount due from Domtar

19             with respect to this issue is approximately

20             3.5 million plus accumulated interest."

21   Do you see where I'm --

22        A.   Yes, at the end of the box, yes.

23        Q.   Yes, exactly.  How was that amount determined?

24        A.   I do not recall.

25        Q.   Did you calculate that amount?

                          Anne Giardini

1

2  your practice to insert text into your letters that was

3  written by someone else; is that correct?

4      A.  Put information that was written by someone else,

5  yeah.

6      Q.  Who would provide you with information that you

7  would include in such letters?

8      A.  Business people, finance people, HR people, legal

9  people.

10      Q.  Was it your practice to verify the information

11  before putting it in a letter?

12      A.  By and large, yes.

13      Q.  And how would you go about verifying information?

14      A.  Either because I knew I could rely on the person

15  or by making queries.

16          (Exhibit No. 73 was marked for identification and

17           is attached hereto)

18          THE WITNESS:  Yes.

19          MS. DANKWORTH:

20      Q.  I'm showing you what has been marked as Exhibit

21  73.  It starts with an email from you to Ladan Nassiry on

22  September 9th, 2008.  Have you seen this document before?

23      A.  I don't recall.

24      Q.  Do you recall sending it in or about September

25  9th, 2008?

1                    Anne Giardini

2        A.   No.

3        Q.   Do you have reason to doubt that you did send it

4   on September 9th, 2008?

5        A.   I've got no reason to doubt it.  I just don't

6   recall.

7        Q.   Looking at the attachment, it's titled "Domtar -

8   Weyerhaeuser Meeting September 11th, 2008, Domtar House".

9   What is this document?

10       A.   Just what it appears to be.  I can only tell you

11  what it appears to be.

12       Q.   It appears to me to be an agenda.  Would you

13  agree with that?

14       A.   It appears to be an agenda.  I would agree with

15  that.

16       Q.   Do you recall a meeting between Domtar and

17  Weyerhaeuser on September 11th, 2008?

18       A.   I didn't recall it until I was preparing for this

19  deposition and then I recalled it.

20       Q.   So preparing for this deposition refreshed your

21  recollection about the meeting?

22       A.   Yes.

23       Q.   Who was at the meeting from each side?

24       A.   I did not recall until I was preparing for this

25  deposition and, on reviewing some material about this

<sub>1</sub>                        Anne Giardini

<sub>2</sub>  meeting, it appears that Patrick Lane and I attended for

<sub>3</sub>  Weyerhaeuser, and Zyg and Michel and Michael from Domtar

<sub>4</sub>  attended for Domtar, and I believe one or two others

<sub>5</sub>  attended for parts of that meeting for Domtar.

<sub>6</sub>        Q.  It appears from this email that you made some

<sub>7</sub>  edits to the agenda at this meeting; correct?

<sub>8</sub>        A.  It appears from this email that I made some edits

<sub>9</sub>  to the agenda for this meeting, correct.

<sub>10</sub>       Q.  It actually appears that you added workers'

<sub>11</sub>  compensation to the topics to be discussed in the morning;

<sub>12</sub>  is that right?

<sub>13</sub>       A.  It appears so.

<sub>14</sub>       Q.  What do you recall about the substance of the

<sub>15</sub>  discussion regarding workers' compensation?

<sub>16</sub>       A.  When?

<sub>17</sub>       Q.  At the meeting on September 11th, 2008?

<sub>18</sub>       A.  I recalled nothing about it until refreshing my

<sub>19</sub>  memory for this deposition by looking at documents, and

<sub>20</sub>  then just what appears in the documentation.  I have no

<sub>21</sub>  independent recollection of the meeting other than

<sub>22</sub>  attending it.

<sub>23</sub>       Q.  What documents did you review regarding this

<sub>24</sub>  meeting?

<sub>25</sub>       A.  I don't recall right at this moment.  I'd have to

1          Anne Giardini

2    have them in front of me, but I believe there were letters

3    subsequent -- exchanged subsequent to the meeting that

4    reflects on what was talked about at the meeting.

5         Q.  Based on your preparation for today's deposition,

6    what is your current recollection of what happened at that

7    meeting regarding workers' compensation?

8         A.  I believe Zyg made a pitch for his interpretation

9    on workers' compensation liability concerning employees

10   who were working for Domtar now for the fine paper

11   business and employees who were going to be returning

12   back, and that at the time I found his views persuasive

13   and so said I would come back to Weyerhaeuser and review

14   his views with others.

15        Q.  Do you recall telling Zyg at that meeting that

16   you found his views persuasive?

17        A.  No, I don't.

18        Q.  Do you recall presenting Weyerhaeuser's view on

19   workers' compensation liabilities at that meeting?

20        A.  No, I don't.

21        Q.  Do you recall whether workers' compensation was

22   discussed once that day or more than once?

23        A.  No, I don't recall.

24        Q.  Were you authorized to agree with Domtar's

25   position at this meeting?

Page 68

Anne Giardini

1      A.   I don't recall what the scope of my authorization

2 was going into that meeting.

3      Q.   You indicated you needed to go back to others at

4 Weyerhaeuser to discuss the interpretation.  Who else did

5 you need to discuss it with?

6      A.   I don't recall.

7      Q.   Did you indicate you needed to confirm the

8 position with Laurie Scott?

9      A.   Do I recall that or did I indicate it?

10      Q.   Do you recall that?

11      A.   I don't recall.

12      Q.   What was Laurie Scott's role as of September

13 2008?

14      A.   I don't recall what date she left Weyerhaeuser.

15 She left working -- we were working for the affiliated

16 companies and she went to work for another real estate

17 company, I believe, and I would have thought it would be

18 before this, but I'd be speculating.

19      Q.   You would have thought she'd departed

20 Weyerhaeuser before this?

21      A.   Meeting.

22      Q.   Did you have -- before Laurie Scott departed

23 Weyerhaeuser, did you have any reporting relationship with

24 her?

1              Anne Giardini

2    just be as reflected in the correspondence.

3         Q.   Based on what you have seen in the documents and

4    your refreshed recollection, did your view change based on

5    the September 2008 meeting?

6         A.   I believe that my view became that with respect

7    to at least the two groups that I referred to, that being

8    employees who went to work for -- stay with the fine paper

9    business as active employees, sort of an active

10   transaction, and with respect to employees who went to

11   join the fine paper business after because they were on

12   some sort of leave at the time of the transaction, that

13   with respect to those people, Zyg's interpretation was

14   accurate.

15        My belief at the time was that those were the two

16   categories of employees we were dealing with and I believe

17   those were Zyg's beliefs too.  Subsequently I learned that

18   we're dealing with another -- there is another group of

19   employees that we did not turn our mind to, that being

20   prior employees of the fine paper business.

21        Q.   And by "prior employees," you mean employees who

22   retired before the transaction?

23        A.   I mean employees who had left for some reason

24   before the transaction and who might then or in the future

25   have workers' compensation claims.

Anne Giardini

1

2    Q.  So based on the letters that we've reviewed today

3  and what you just told me is your recollection following

4  the meeting, did your view change based on the September

5  2008 meeting?

6    A.  That's a hard question to answer.  My thoughts

7  coalesced around those first two groups of employees and I

8  believe Zyg's did too, and we did not turn our minds to

9  the third group of employees.  And there's a reason for

10  that.  In Canada, the workers' compensation system is very

11  different and we are both Canadian trained and we simply

12  did not turn our minds to that third group.

13    Q.  Based on the two groups that you just mentioned

14  that Domtar would accept liability for, did Domtar state

15  that they would accept liability for those two groups of

16  employees?

17    A.  I don't recall at this length of time.

18    Q.  But you recall that you and Zyg seemed to be in

19  agreement about those two groups of employees following

20  this meeting?

21    A.  Yes.  How we got to that exact state of agreement

22  at this length of time many years later I don't recall the

23  exact iteration of getting there.

24    Q.  You mentioned that you didn't turn your minds to

25  another group of employees.  When is the first time that

                        Anne Giardini

1

2    that group of employees was raised to your attention?

3         A.  I think it had been raised previously because

4    they're mentioned in the earlier iterations of what was in

5    dispute, and in the meeting -- in and around this meeting,

6    because I don't specifically recall what happened at this

7    meeting, we began to focus simply on the first two groups,

8    the groups as I've defined them earlier.

9         Q.  Can you tell me what documents you've seen that

10   pre-date this meeting that reflect retired employees?

11        A.  I believe the earliest correspondence, I'm not

12   sure I have them in order here, so Exhibit 67, my belief

13   is the total number includes that third group.

14        Q.  What total number are you looking at?

15        A.  In the second paragraph.

16        Q.  13.6 million?

17        A.  That's my belief.  As I said, you'd have to

18   confirm it with somebody who did the calculation.

19        Q.  Just to make sure we're clear, your understanding

20   is that the 13.6 million in Exhibit 67 reflects all

21   current and former employees of the fine paper business?

22        A.  That's my belief.  You'd have to confirm it with

23   someone that did the actual calculation.

24        Q.  Okay.  I apologize for interrupting.

25        A.  And in the Exhibit 68, I believe the full and

1                    Anne Giardini

2  being billed to Domtar.

3       Q.  But you don't recall today who gave you that

4  advice?

5       A.  No.

6       Q.  And you don't recall what they said was being

7  included in those invoices?

8       A.  I do not have an independent recollection, no,

9  just what's on the page here.

10           (Exhibit No. 77 was marked for identification and

11            is attached hereto)

12           THE WITNESS:  All right.

13           MS. DANKWORTH:

14       Q.  Exhibit 77 is an email chain, at the top there's

15  an email from Patrick Lane dated November 4th, 2008.  Have

16  you seen this document before?

17       A.  I don't recall it.  I may have.  I may not have.

18       Q.  Drawing your attention to Chee-Tuck Wong's

19  October 21st email at the very bottom of the page, he

20  says:

21           "Hi Anne and Patrick, sorry for taking so

22            long to get back to you but we wanted to

23            double check the claim list based on the

24            employees who transferred to Domtar."

25  Do you know what prompted Mr. Wong to double check the

1                         Anne Giardini

2     claim list?

3         A.   No.

4         Q.   Drawing your attention to Patrick Lane's November

5     4th, email at the top of the string, he says in the second

6     paragraph:

7                   "Just so we're consistent, my understanding

8                   is that our previous invoices were based on

9                   our understanding that all workers'

10                  compensation liability transferred to

11                  Domtar - whereas our September discussions

12                  with Domtar clarified that the workers'

13                  compensation liability went to Domtar only

14                  for employees that showed up to work at

15                  Domtar..."

16    Is his characterization of why the previous invoices were

17    incorrect consistent with your understanding of the issue?

18        A.   Yes, and it was based on mistaken advice from me.

19        Q.   Okay.  The previous invoices were mistaken based

20    on mistaken advice from you?

21        A.   No.  The conclusion that workers' compensation

22    liability went to Domtar only for employees that showed up

23    to work at Domtar is mistaken advice from me.  That

24    conclusion is based on mistaken advice from me and

25    misreading of the agreements.

1                    Anne Giardini

2        Q.   Patrick says:

3             "...our September discussions with Domtar

4             clarified that the workers' compensation

5             liability went to Domtar only for employees

6             that showed up to work at Domtar..."

7        A.   Right.

8        Q.   And Mr. Lane was at the September meeting;

9   correct?

10       A.   Yes, but that refers to other discussions, I

11  believe, not just the meeting.

12       Q.   And why do you think that Mr. Lane is referring

13  to discussions with you here?

14       A.   I'm sorry, what's the question?

15       Q.   Why do you believe that Mr. Lane is referring to

16  discussions with you when he states this?

17       A.   I didn't say that.  What I said was other

18  discussions.  Oh, why is he coming to that conclusion?

19       Q.   No.  What's the basis for your understanding that

20  his statement here reflects mistaken advice from you?

21       A.   Because I remember giving him the mistaken

22  advice.

23       Q.   When did you give him the mistaken advice?

24       A.   In approximately this time frame.

25       Q.   Why was your advice mistaken?

1                    Anne Giardini

2       A.   Because it was based on simply focussing on

3    section 6.09, the transferred employees section instead of

4    focussing on the correct overall transaction transfer of

5    liabilities was the mistake.

6       Q.   When did you come to the conclusion that your

7    advice was mistaken?

8       A.   I don't recall, but I subsequently came to the

9    conclusion my advice was mistaken.

10      Q.   Did you tell Patrick Lane you believed your

11   previous advice was mistaken?

12      A.   I didn't tell him that.  I believe others did.

13      Q.   Do you recall telling anyone that your previous

14   advice was mistaken?

15      A.   Yes, I've told counsel in this room and I've told

16   Conrad, and I may have told others.  I certainly told

17   Patrick.

18      Q.   But just to be clear, as of November 2008 does

19   Patrick's email reflect your view of the allocation of

20   workers' compensation liabilities?

21      A.   I just don't recall at any specific point in time

22   what my view was so it's hard to pin that down.  I think

23   -- I just can't specify a date.  I might have changed my

24   mind again.  I just don't recall at this point.

25      Q.   You're included on this email chain.  If you

Anne Giardini

1  believe that Patrick was mistaken, would you have reached

2  out to him to correct his understanding?

3     A.  It's hard to say.  It's hard to say.

4     Q.  What's your understanding of how the invoices for

5  billings made by Weyerhaeuser to Domtar changed before and

6  after the September meeting?

7     A.  In preparation for this deposition, I have been

8  shown documents that showed that Weyerhaeuser returned to

9  its books liability reflecting previously -- employees who

10 had previously worked for the fine paper business who did

11 not effectively become transferred employees.

12    Q.  And by "returned to its books," do you mean added

13 to its reserves?

14    A.  I can't give you the specifics of the accounting

15 terminology.  That would be best left to an accountant.

16    Q.  And in terms of billings or invoices that went

17 from Weyerhaeuser to Domtar, is it your understanding that

18 those changed in the fall of 2008 following the September

19 2008 meeting?

20    A.  That would be my broad understanding, yes.

21    Q.  And how did they change?

22    A.  I'm not the right person to talk to about that.

23    Q.  Do you believe that different categories of

24 employees were included in those invoices before and

Page 103

1        Anne Giardini

2        (PROCEEDINGS RECONVENED AT 11:36 A.M.)

3        MS. DANKWORTH:  So I think the understanding of

4   counsel is that Exhibit 78 will be replaced with only the

5   second page of the exhibit.

6        THE WITNESS:  All right.

7        MS. DANKWORTH:

8        Q.  I'm showing you what's been marked as Exhibit 78.

9   It's a single page chart with the Bates number

10  WEY00019289.  Have you seen this document before?

11       A.  I don't know.

12       Q.  I will represent to you that this came from

13  Patrick Lane's files.  Do you know under item -- about six

14  items down what "WC settlement" refers to?

15       A.  No.

16       Q.  Do you know what the $360,000 to be received that

17  corresponds to "WC settlement" refers to?

18       A.  No.

19       Q.  So does that number seem familiar to you from any

20  workers' compensation liability discussions?

21       A.  No.

22       (Exhibit No. 79 was marked for identification and

23        is attached hereto)

24       THE WITNESS:  All right.

25       MS. DANKWORTH:

Page 104

1                     Anne Giardini

2        Q.  Exhibit 79 is a letter from you to Mr. Jablonski

3    dated November 26th, 2008.  Have you seen this letter

4    before?

5        A.  I assume so.

6        Q.  Do you know who else was involved in preparing

7    the letter?

8        A.  No.

9        Q.  Directing your attention to page 3, section 5 is

10   the workers' compensation section, and your first sentence

11   says:

12              "Our Chee-Tuck Wong has sent to your Michel

13              Dagenais a list of workers' compensation

14              payments made on behalf of Transferred

15              Employees from March 2007 to October 2008

16              and a list of claims (open and closed)

17              where the claimant is a Transferred

18              Employee."

19   Did you see the records that Mr. Wong sent to

20   Mr. Dagenais?

21       A.  I don't recall.

22       Q.  Have you seen them since this time?

23       A.  I don't recall.

24       Q.  Your next sentence says:

25              "Previous invoices were based on our

1                      Anne Giardini

2            employees' understanding that all workers'

3            compensation liability transferred to

4            Domtar."

5    Which Weyerhaeuser employees were previously under the

6    impression that all workers' compensation liability went

7    to Domtar?

8         A.   I would say me at one point, Patrick Lane, Kim

9    Eckroth, Laurie Scott, and others.

10        Q.   Do you know why they had that previous

11   understanding?

12        A.   Because they were reading the agreements

13   correctly.

14        Q.   Who told you that the previous invoices were

15   based on misunderstanding?

16        A.   I don't recall.

17        Q.   You had previously told Domtar that the invoices

18   included only transferred employees; right?

19        A.   I had previously told Domtar what?

20        Q.   That the invoices included only transferred

21   employees.

22        A.   I don't recall what I told them.  Can you refer

23   me back to a document?

24        Q.   Exhibit 75 at the bottom of page 2.

25        A.   Yes, 75, the bottom of page 2.

1              Anne Giardini

2    this letter that the previous invoices sent to Domtar were

3    incorrect?

4         A.   I believe that some of them were incorrect, yes.

5    Which specific ones, I can't say.

6         Q.   The next sentence says:

7              "In fact, we are all agreed that US

8              workers' compensation liability went to

9              Domtar only for employees who became able

10             to work in some capacity at Domtar."

11   Did you believe this statement when you wrote it?

12        A.   That was my -- I believe this statement reflects

13   my incorrect understanding of the agreement, yes.

14        Q.   So regardless of whether your understanding was

15   correct or incorrect, this is what you believed at the

16   time that you wrote this?

17        A.   That "US workers' compensation liability went to

18   Domtar only for employees who became able to work in some

19   capacity at Domtar"; you're asking me that question?

20        Q.   Yes.

21        A.   Yes, it reflects my belief, turning my mind, as I

22   have said, only to the two groups of employees referred to

23   in section 6.09.

24        Q.   Okay.  You have indicated that you believe your

25   statement here is incorrect, today you believe the

1                         Anne Giardini

2    statement is incorrect?

3         A.   Yes.

4         Q.   At any time did you notify Domtar that your

5    statement in Exhibit 79 was incorrect?

6         A.   I'm not sure I did, but, as I've said also, it

7    remained an open matter.   It was an unresolved matter, so

8    there really wasn't a need to do so.

9         Q.   You didn't feel any need to correct your

10   statement to Domtar?

11        A.   It remained an open matter.   This is a document,

12   it's without prejudice, includes discussion of various

13   items.   So, no, as matters went forward when they were

14   finalized, they were documented in an agreement.

15        Q.   Was it your practice -- strike that.

16             In your practice as general counsel when you were

17   negotiating with a counter party, if a counter party

18   changed their mind on something, would you expect them to

19   notify you?

20        A.   Not in negotiations, no.

21        Q.   How would you expect them to notify you?

22        A.   It depends on the context.

23        Q.   Did you ever tell Domtar -- strike that.

24             Did anyone at Weyerhaeuser ever tell Domtar that

25   what you wrote in Exhibit 79 wasn't Weyerhaeuser's

1                         Anne Giardini

2    position?

3         A.   I believe Conrad did, yes, and perhaps others.

4         Q.   When did Conrad do that?

5         A.   I don't know.  You'd have to ask Conrad.

6         Q.   Were employees who retired before the sale

7    employees who became able to work in some capacity at

8    Domtar?

9         A.   Some of them could have.  I don't know.

10        Q.   You mean some of them could have --

11        A.   Retired and come back.

12        Q.   -- retired and then gotten a new job at Domtar?

13        A.   Yeah.

14        Q.   And what about employees who were terminated

15   before the sale, were they employees able to work in some

16   capacity at Domtar?

17        A.   Some of them could have been.  I don't know.

18        Q.   Are you aware of any employees who retired or

19   were terminated before the transaction who then went to

20   work for Domtar?

21        A.   I've heard of some, yes.

22        Q.   And are you aware of whether they filed any

23   workers' compensation claims?

24        A.   No.

25        Q.   What's your opinion on or what is your belief as

1                          Anne Giardini

2    correct?

3         A.  Me personally?

4         Q.  Yes.

5         A.  Yes.

6         Q.  Including some of the disputes -- other disputes

7    we see in this letter; right?

8         A.  Yes.

9         Q.  As part of those continuing conversations with

10   Domtar, did you raise the workers' compensation

11   non-payment of invoices?

12        A.  Others were doing that.  I don't know that I did

13   or didn't.  I think I probably did in meetings, yes.

14        Q.  And do you remember what you said in those

15   meetings?

16        A.  No.  I said probably along the lines we'd like to

17   get paid.

18        Q.  Sure.  We have now looked at a number of letters

19   going back and forth between the parties in 2007 and 2008.

20   Did you also communicate with anyone at Domtar by phone

21   about the allocation of workers' compensation liabilities

22   during this time?

23        A.  I don't recall.

24        Q.  Do you recall having conference calls with Kim

25   Rogerson regarding workers' compensation?

1                     Anne Giardini

2         A.   No, I don't recall.

3         Q.   Looking back at Exhibit 79, which I think you

4    still have in front of you; right?

5         A.   Yeah.

6         Q.   You noted at the top it says "Without prejudice"?

7         A.   Yes.

8         Q.   What did you mean when you wrote that?

9         A.   Without prejudice, broadly speaking, permits two

10   things.   One is that it should not be used against the

11   party drafting it as a fixed position, and secondly, it

12   encourages full discussion of issues in a manner that

13   allows the parties to lay forth positions and arguments

14   without being tied to them or fixed by them or bound by

15   them unless and until they're memorialized in a duly

16   executed, negotiated agreement.

17        Q.   In your role as general counsel, how often did

18   you include "Without Prejudice" on letters to parties with

19   whom you were negotiating?

20        A.   How long is a piece of string?   When it was

21   appropriate.

22        Q.   By November 2008 you were president and not

23   general counsel; right?

24        A.   Yes.

25        Q.   How often did you include "Without Prejudice" on

Anne Giardini

2   your letters as president?

3       A.   I don't recall with what frequency at all.   Quite

4   often, but I can't tell you whether 12 percent or 28

5   percent or 5 percent.   I just can't give a number to it.

6       Q.   Does without prejudice mean that the recipients

7   of your letters could not rely on what you said in the

8   letter?

9       A.   "Without prejudice," as I've said, the two

10  things, yes, that it can't be used as a fixed position by

11  you unless and until the position has been memorialized in

12  a duly executed agreement, yes.

13      Q.   In conduct, following the letter that says

14  "Without Prejudice," could a party act on a position that

15  you took in a letter in terms of their conduct?

16      A.   You're asking me generally if parties can act or

17  not act.   I don't know if it's possible to answer that

18  question.

19      Q.   Do you consider it an obligation to correct the

20  record when you change your position on something in a

21  letter that states without prejudice?

22      A.   It depends on the context.

23      Q.   When would it be appropriate to correct your

24  position?

25      A.   I can't state categorically when it would be

Anne Giardini

1  correct or not correct.  It would be entirely contextual.

2      Q.  Would it be appropriate as negotiating practice

3  to correct your position if you changed your mind about

4  something?

5      A.  In a large transaction where you're negotiating

6  literally hundreds of thousands often of items, probably

7  an impossible standard to meet.

8      Q.  When you wrote "Without Prejudice" at the top of

9  this letter, did you consider it to apply to the entire

10 letter?

11     A.  I'm not sure I thought about it.

12     Q.  If you could please refer back to Exhibit 69.

13 It's probably at the very beginning of your pile.

14     A.  Yes.

15     Q.  This is a letter from you to Gilles in 2008 that

16 sets out Domtar's position and Weyerhaeuser's position

17 with regard to several issues.  You'll note that this

18 letter does not say "Without Prejudice" on the top.  Is

19 there a reason for that?

20     A.  I don't recall what my thinking was at the time,

21 but if I wanted myself to be able to rely on a document,

22 then I would not mark it "Without Prejudice" because then

23 I would have the ability to rely on it myself.  And in the

24 early stages of a dispute, when you're required to set

1          Anne Giardini

2   forth a dispute in order to trigger notices and various

3   legal consequences, you're best advised often not to have

4   without prejudice letters.

5       Q.  Which part of this letter do you think you wanted

6   to rely on?

7       A.  I can't tell you at this length of time, but I

8   would expect all of it.

9       Q.  You wouldn't need this letter in order to rely on

10  Weyerhaeuser's position; correct?

11      A.  I don't know what you mean by that.

12      Q.  Well, I just mean you wouldn't need to refer to

13  this letter in order to know or present what

14  Weyerhaeuser's position was; correct?

15      A.  No, I just said I did need to rely on it in order

16  to present -- to say that Domtar had been put on notice

17  about the issues.

18      Q.  The fact that these were the issues.  I

19  understand.

20      A.  Yeah.

21          (Exhibit No. 80 was marked for identification and

22          is attached hereto)

23          MS. DANKWORTH:

24      Q.  I'm sorry, Anne, before we go on to this, I just

25  want to ask you one more question about without prejudice.

Page 121

Anne Giardini

How do you expect an opposing party to negotiate with you if they can't rely on a position that you take in a letter?

A.   I can't speculate on that.   I don't know how you could respond to a question like that.   It's a constant practice by many, many counsel to mark their negotiating letters without prejudice and folks understand, lawyers understand, Domtar had three lawyers representing itself at all stages in this transaction, that for something to be relied on it needs to be on without -- a letter that isn't without prejudice that's accepted by the parties is a binding commitment.   That's seldom a letter.   It's usually a contract.   It's usually an agreement.   Domtar had three lawyers working for it during this entire period of time.   If they wanted to rely on this, then they needed to do what I've done and say I need your letter to be marked "With Prejudice" or at least have the "Without Prejudice" removed from it.

Q.   Did you indicate to Domtar that you needed letters from them to state "With Prejudice" or not include "Without Prejudice"?

A.   When I needed to be able to rely on something, yes.

Q.   With regard to the workers' compensation issue?

1     Anne Giardini

2  A. I don't recall.

3  Q. Turning to Exhibit 80, take your time and let me

4 know when you're ready.

5  A. All right.

6  Q. Exhibit 80 is a letter from Ladan Nassiry to you

7 dated December 23rd, 2008.  Have you seen this document

8 before?

9  A. I assume it came to me and I saw it.

10  Q. In paragraph 3 on the second page it says:

11    "We understand that our human resources

12    colleagues are making good progress on

13    these issues, and we trust that they will

14    be resolved in the near future."

15 And the heading there is "Employees on workers'

16 compensation".

17  A. Yeah.

18  Q. Did you agree with this statement?

19  A. I don't recall whether I did or didn't.

20  Q. Which issues were the human resources colleagues

21 working on?

22  A. I don't recall at this length of time which

23 issues they were working on.

24  Q. Do you recall whether they were resolved?

25  A. To my recollection they were never resolved.

1                          Anne Giardini

2   of that page, second last paragraph, the letter reads:

3              "Based upon the foregoing, all outstanding

4              and end future worker compensation claims

5              relating to the businesses combined with

6              Domtar belong to Domtar, except..."

7   Just a small carve out that's described there.

8         And turning to Exhibit 69, it's much the same

9   language.

10        Q.  I think you'll find it's identical, actually.

11        A.  Sorry?

12        Q.  I think you'll find it's identical, actually.

13        A.  Yes, I'm assuming you're right, but I haven't

14   compared it word for word.

15        Q.  There is an extra sentence in 69 that offers the

16   $3.5 million amount.

17        A.  And then turning to Exhibit number 70, Domtar is

18   asking for the derivation of the 13.6 million, and so they

19   were clearly digging into what was comprised in that

20   number at that point in time.

21             I'm assuming there's other references.  We may

22   not have all the documents.  I certainly don't.

23        Q.  So, Ms. Giardini, I understand that you interpret

24   that language today to include retired employees.  Were

25   there any explicit references to retired employees in

1                        Anne Giardini

2     those exhibits you just read?

3          A.   In my view, yes, they're explicit references to

4     retired employees when it talks about all past liabilities

5     of the merged business, yes.

6          Q.   Did you ever discuss explicitly with Domtar the

7     category of retired employees?

8          A.   I do not recall.

9          Q.   When you wrote the letter that is in Exhibit 69,

10    did you have in mind retired employees?

11         A.   I can't recall.  I have no independent

12    recollection of what I had in mind.  I may have and I may

13    have not.  I just don't recall.

14         Q.   But according to your testimony in September

15    2008, four months after this letter, when you met with

16    Domtar you did not have retired employees in your mind?

17         A.   I did not have them in mind at that point in

18    time, yes.

19         Q.   I believe you offered testimony this morning

20    about Canadian law as an explanation for why that may not

21    have been in your mind.  Can you just remind me what you

22    said and explain it a little further, please?

23         A.   The treatment of retiree -- sorry, of workers'

24    compensation is very different in the two different

25    countries.  In Canada workers' compensation, in the

Anne Giardini

2  provinces where I have been involved, aside from Quebec,

3  is essentially an entire insurance scheme.  So once a

4  person is on workers' compensation they get all their

5  payments from the scheme and not from the company.  And

6  the only effect on the company is in its insurance rates,

7  the premiums, and eligibility for rebates and not in the

8  form of having an ongoing financial outlay to former

9  employees on workers' compensation.

10      Q.  In terms of the effect of the insurance rates on

11  a company, that would be the company from which they

12  retired; correct?

13      A.  Depends.  That's a very complicated area.  Whole

14  textbooks are written about it.  So I would not venture --

15  I wouldn't even say if that's correct in a simplified way.

16  It's much more complicated than that.  You can transfer

17  your claims rating.  There's a number of different ways to

18  treat that issue.

19      Q.  So when you testified that this was not in your

20  mind and you didn't believe that it was in Zyg's mind

21  either, that's because there's a statutory scheme in

22  Canada that assigns the responsibility for workers'

23  compensation claims by former employees?

24      A.  That's one reason.  Another one was we were

25  focussing specifically on a very narrow section of the

1                      Anne Giardini

2  agreement and I failed to then read it in the scope of the

3  greater transaction at that time as well.  There are

4  probably other reasons too.  Being rushed perhaps.

5          But certainly it was a mistake on my part to not

6  go back and read the rest of the agreement and read this

7  in context.

8      Q.  I'm going to direct your attention back to the

9  complaint which is Exhibit 89, paragraph 53.  Paragraph 53

10  says:

11          "Responsibility for administering these

12          Transferred Employee workers' compensation

13          claims transferred to Domtar in the Sale."

14  Is that consistent with your understanding?

15      A.  For administering?

16      Q.  Correct.

17      A.  Responsibility for administering?

18      Q.  Right.

19      A.  Yes.

20      Q.  And then in paragraph 57 at the bottom of the

21  page it says:

22          "Domtar has refused to reimburse

23          Weyerhaeuser for the expenses incurred by

24          Weyerhaeuser in administering workers'

25          compensation claims made by Transferred

1                    Certification

2                 REPORTER'S CERTIFICATE

3        I, Barbara Neuberger, Official Reporter in the

4   Province of British Columbia, Canada, BCSRA No. 582, do

5   hereby certify:

6        That the proceedings were taken down by me in

7   shorthand at the time and place therein set forth and

8   thereafter transcribed, and the same is a true and correct

9   and complete transcript of said proceedings to the best of

10  my skill and ability.

11       IN WITNESS WHEREOF, I have hereunto subscribed my

12  name and seal this 15th day of June, 2015

13

14  _____

15  Barbara Neuberger

16  Official Reporter

17  CSR/RPR

18

19

20

21

22

23

24

25