# EXHIBITS I-N

# EXHIBIT I

Domtar Inc.
395, boul. de Maisonneuve Ouest
Montreal QC H3A 1L6 Canada
Tél.: (514) 848-5400

Domtar Inc.
395 de Maisonneuve Blvd. West
Montreal, QC H3A 1L6 Canada
Tel.: (514) 848-5400



# Domtar

July 11, 2008

Anne Giardini, Esq.
Vice President and General Counsel
Weyerhaeuser Company
925 West Georgia Street, 5th Floor
Vancouver, BC V6C 3L2

Exhibit No. 70
Wns: Anne Giardini
Date: June 3/15
Barbara Neuberger, CRS (Ontario)

Re:     Your Letter Dated June 3, 2008

Dear Ms. Giardini:

I am writing to follow up on our discussions concerning the issues raised in your letter
dated June 3, 2008. We share your desire to resolve the issues between our two
companies promptly through a meeting among relevant members of our senior
management teams.

As I explained during our telephone call earlier today, those discussions will be more
productive if certain information is exchanged in advance of the meeting. In particular,
we ask that Weyerhaeuser make available relevant personnel to discuss the following
issues and share related documentation:

1.    Workers' Compensation Liabilities/Vacation. We would like to understand with
      greater specificity, on an employee-by-employee basis, the derivation of (i) the
      $13,594,814.00 reduction in Closing Working Capital shown in the Statement
      delivered by Weyerhaeuser, and the $3,543,789 cash amount Weyerhaeuser
      claims is owed to it, in each case in respect of workers' compensation claims, and
      (ii) the $72,541.86 amount charged by Weyerhaeuser for the vacation payments it
      had made. We would wish to see the underlying lists of workers and how the
      amounts related to each of them add up to these figures.

2.    Shared Payment Amount. We would like to understand with greater specificity
      the basis for Weyerhaeuser's calculation of the Shared Payment Amount and the
      Pulp Inventory Adjustment Amount (as those terms are defined in the
      Contribution and Distribution Agreement).

3.    Set-Offs. For a period of time after closing, Weyerhaeuser received funds from
      Domtar's customers that Weyerhaeuser was obliged to remit to Domtar.
      Weyerhaeuser deducted from those funds certain amounts that it alleged were
      owed to it by Domtar. In particular, Weyerhaeuser deducted (i) from the payment



Mixed Sources · Sources Mixtes
Product group from well-managed forests
and other controlled sources
Groupe de produits issu de forêts bien gérées
et d'autres sources contrôlées.
www.fsc.org   Cert no. SW-COC-472
© 1996 Forest Stewardship Council
FSC

www.domtar.com

Confidential                                                                                     DOMWEY00004550

made on June 8th, 2007 (cash settlement, week 11) an amount of, $1,624,000 and (ii) from the payment made on May 16th, 2007 (cash settlement, week 9) an amount of $2,315,000 that in each case Weyerhaeuser claims were owed to it by Domtar.  We need a detailed explanation of Weyerhaeuser's deductions and of the reasons why these amounts were withheld.

The team leaders for Domtar will be Michel Dagenais (to the extent the issues pertain to the HR area) and Michael Cross (to the extent the issues pertain to finance).

The matters that are subject to this letter clearly do not represent all of the issues to be resolved by Domtar and Weyerhaeuser; rather they represent the issues, with regard to which Domtar needs information in advance of a meeting designed to address the totality of the disputed items.

My colleague Ladan Nassiry stands ready to coordinate the calls with your team regarding the information requested in this letter.  She will call you next week.  Please feel free to forward in advance of the calls any documentation that you think it would be helpful for us to review.

We are looking forward to resolving the disputes between our companies expeditiously and in a cooperative fashion, and appreciate your assistance.

Sincerely,

Zygmunt Jablonski
Vice President – Legal Services


cc:    Cravath, Swaine & Moore LLP
       Attention: Richard Hall, Esq.
       (By Fax: 212-474-3700)

2

**Domtar**

Confidential

# EXHIBIT J

1

2    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF DELAWARE
3    - - - - - - - - - - - - - - - -x
     WEYERHAEUSER COMPANY, a Washington
4    corporation,
5                           Plaintiff,
6            -against-
7    DOMTAR CORPORATION, a Delaware corporation,
     and DOMTAR PAPER COMPANY, LLC, a Delaware
8    limited liability company,
9                           Defendant.
10   - - - - - - - - - - - - - - - -x
11
12
13
14
15       DEPOSITION OF ZYGMUNT JABLONSKI
             New York, New York
16            June 30, 2015
17
18
19
20
21
22
23
     Reported by:
24   Pessi Goldstein
     JOB NO. 95056
25

1

2                          June 30, 2015

                            9:05 a.m.

3

4

5          DEPOSITION of ZYGMUNT JABLONSKI, on

6    behalf of the Defendant herein, held at the

7    offices of Debevoise & Plimpton, 919 Third

8    Avenue, New York, NY  10022, taken before

9    Pessi Goldstein, a shorthand reporter and

10   Notary Public within and for the State of

11   New York.

12

13                    *      *      *

14

15

16

17

18

19

20

21

22

23

24

25

1

2     A P P E A R A N C E S:

3

4         HILLIS CLARK MARTIN & PETERSON
              Attorneys for Plaintiff
5             1221 Second Avenue
              Seattle, Washington  98101
6         BY:  LAURIE LOOTENS CHYZ, ESQ.

7

8         WEYERHAEUSER
              Chief Competition Counsel &
9             Senior Legal Counsel
              33663 Weyerhaeuser Way South
10            Federal Way, Washington  98003
          BY:  CONRAD SMUCKER, ESQ.

11

12

          DEBEVOISE & PLIMPTON
13            Attorneys for Defendant
              919 Third Avenue
14            New York, New York  10022
          BY:  GARY KUBEK, ESQ.
15            ALEX GINSBERG, ESQ.
              GENA MILLER, Law Clerk

16

17

18

19                *       *       *

20

21

22

23

24

25

1                 ZYGMUNT JABLONSKI

2       Exhibit 244 as well as 245, Exhibit 244

3       talks about a meeting coming up in

4       Kingsport.  And then Exhibit 245 appears to

5       be an agenda for a meeting in Kingsport.

6       Does 245 reference the meeting that you were

7       discussing in Exhibit 244?

8            A.   Judging by the close proximity of

9       time, and the content of both, I would have

10      to guess yes, but that's a guess.  I don't

11      know for sure.

12               MR. KUBEK:  Let me just put on

13           the record that during the break we

14           discussed the fact that we clawed back

15           the version of Exhibit 245 that was

16           originally marked and we tried to

17           identify portions that have been

18           redacted.

19           We will find a new reproduced

20           copy later today and I guess we can,

21           want to substitute it then for the

22           Exhibit 245 that's in the record.

23               MS. CHYZ:  Correct.  We will

24           substitute a redacted copy for the

25           existing Exhibit 245.

1                    ZYGMUNT JABLONSKI

2        Q.    Okay.  So taking a look at what

3   has been marked as Exhibit 245, do you

4   recall what you did to prepare for -- well,

5   let me back up.  Did you make any

6   presentations at this meeting?

7        A.    I have no independent

8   recollection of making such presentations.

9   I can look at the document and see whether

10  it is related or not but I don't remember

11  without looking at it.

12       Q.    Okay.  Do you recall any actions

13  related to the fine paper transaction that

14  came out of this meeting?

15       A.    I don't remember.

16       Q.    I'm handing you what has been

17  previously marked as Exhibit 70 (handing).

18  And tell me if this is a letter that you

19  wrote to Anne Giardini on July 11, 2008?

20       A.    It so appears.

21       Q.    And what was your position at

22  Domtar in July of 2008?

23       A.    Vice president legal services.

24       Q.    Had you taken over for Gilles

25  Pharand at that point?

ZYGMUNT JABLONSKI

1

2     A.   In some areas, yes.  In some

3  areas, no.

4     Q.   Okay.  Do you remember this

5  letter?

6     A.   I had no independent recollection

7  of this letter until I saw it.

8     Q.   And it appears that you are

9  responding to Anne's letter dated June 3rd,

10  2008, which has been marked as Exhibit 69?

11     A.   If I can see that other exhibit.

12  My letter refers to Anne's letter of

13  June 3rd, and since I have no reason to

14  believe there was another letter, I would

15  say yes.

16     Q.   And you're addressing the issue

17  of Workers' Compensation liabilities.  At

18  the time you prepared this letter in

19  response to Exhibit 69, is it fair to expect

20  that you had read and evaluated the

21  information on Workers' Compensation

22  liabilities that was laid out in Exhibit 69?

23     A.   One can assume but it's an

24  assumption.

25     Q.   Okay.  And based on what we are

ZYGMUNT JABLONSKI

1

2    recollection of this letter until I perused

3    it yesterday.

4         Q.   And do you have an independent

5    recollection of this letter having perused

6    it yesterday?

7         A.   I'm not understanding.

8         Q.   You looked at this letter

9    yesterday; correct?

10         A.   Correct.

11         Q.   So did it refresh your

12    recollection so that you now have an

13    independent memory about this letter, dated

14    July 17, 2008?

15         A.   No, it has not.

16         Q.   Okay.  Do you recall reviewing

17    the exhibit that is attached to Exhibit 71?

18         A.   I glanced at it yesterday.

19         Q.   Aside from looking at it

20    yesterday, do you have any recollection of

21    it?

22         A.   No, nothing independent of this.

23         Q.   Nothing independent of the

24    document itself?

25         A.   Yes.

1                    ZYGMUNT JABLONSKI

2        Q.    Okay.   I'm handing you what has

3    been previously marked as Exhibit 72

4    (handing).   Which appears to be a letter

5    from you to Anne Giardini dated September 8,

6    2008.   Do you recall this letter?

7        A.    I didn't recall it until I saw it

8    yesterday.

9        Q.    And when you reviewed it

10   yesterday, do you have any recollection

11   independent of the document itself?

12       A.    No.

13       Q.    Under the first paragraph

14   entitled "Workers' Compensation," about the

15   middle of that paragraph you state, "While

16   Domtar has assumed certain Workers'

17   Compensation claims with respect to the

18   transferred employees, Domtar's obligation

19   to reimburse Weyerhaeuser would include only

20   liabilities and expenses actually paid by

21   Weyerhaeuser with respect to the new

22   co-liability assumed."  Do you see that

23   portion of that paragraph?

24       A.    I see that.

25       Q.    Do you recall when Domtar reached

1                  ZYGMUNT JABLONSKI

2    the conclusion that it was responsible for

3    Workers' Compensation claims with respect to

4    transferred employees?

5         A.   I don't recall when that

6    transpired.

7         Q.   And do you recall the basis on

8    which Domtar reached the conclusion that it

9    was responsible for certain Workers'

10   Compensation claims with respect to the

11   transferred employees?

12        A.   No.

13        Q.   I'm going to hand you what has

14   been previously marked as Exhibit 73

15   (handing).  And I'm going to ask if you

16   recognize this document?

17        A.   No independent recollection until

18   yesterday.

19        Q.   Okay.  So you saw this document

20   yesterday?

21        A.   Yes.

22        Q.   And the second page of this

23   appears to be a meeting agenda for a meeting

24   at Domtar House on September 11, 2008.  Do

25   you recognize that as the agenda for the

1              ZYGMUNT JABLONSKI

2    issue, she would be expected to run it by

3    someone more senior or get it approved by an

4    outside counsel.  But for more routine

5    matters, she had authority to do whatever

6    she needed to do to get it done.

7         Q.   Did she have the same level of

8    authority that Ania had at the time Ania

9    left on her maternity leave?

10        A.   I can only refer here to the

11   reporting relationships at that time.  My

12   understanding is that at the time Ania left

13   on maternity leave, the VP of legal services

14   was Guy Boucher, who had a gentleman by the

15   name of Yves Vinette, Y-v-e-s,

16   V-i-n-e-t-t-e, and Guy Boucher would be

17   G-u-y, B-o-u-c-h-e-r.

18             And Ania was reporting to Yves

19   Vinette and Guy Boucher was under Gilles

20   Pharand so Ania was relatively low in the

21   corporate ladder.  And Ladan Nassiry entered

22   the law department on a contract basis to

23   handle some of the work that Ania was

24   handling, so she would be in a similar

25   reporting position at that time.

                    ZYGMUNT JABLONSKI

1                That chain was somewhat reduced

3  with Guy Boucher's departure for his role as

4  the VP environment so there would be one

5  less person in it.  But we have a very small

6  law department, people did whatever they had

7  to do.

8       Q.   And how long did Ladan stay at

9  Domtar?

10      A.   I think two or three years.

11      Q.   Did she stay after Ania came back

12 from maternity leave?

13      A.   I don't remember exactly but I

14 don't want to say that she left just before.

15 Although I'm not certain, I really don't, I

16 don't remember.

17      Q.   I'm handing you what has been

18 previously marked as Exhibit 167 (handing).

19 It is a letter from, it is a cover sheet and

20 attached letter from Ladan Nassiry to Anne

21 Giardini, dated November 5, 2008.  Have you

22 seen this before?

23      A.   I don't remember if I did or not.

24 I may have seen it yesterday in the binder

25 that I reviewed but I don't remember that

1                    ZYGMUNT JABLONSKI

2      either.

3           Q.    Okay.   Is this the kind of letter

4      that Ladan Nassiry would have authority to

5      write on behalf of Domtar?

6           A.    I say she would because all she's

7      doing here is she states the facts that she

8      might have determined somewhere.

9           Q.    And what is your understanding of

10     the designation without prejudice at the top

11     of the letter?

12          A.    I find it difficult to find any

13     relevance without prejudice than what she

14     says there because she is just stating

15     facts.

16          Q.    And what is your understanding of

17     the meaning of "without prejudice"?

18          A.    This is in a Canadian context so

19     I can't say anything authoritatively about

20     it.   But that's a term that is rather

21     frequently used in the Canadian legal world

22     and it appears on a lot of letters, very

23     often whether they make sense to do it or

24     not, people just stick it on here.   Here,

25     for example, I don't know why she would do

ZYGMUNT JABLONSKI

1

2     that.

3          Q.    What is your understanding of the

4     meaning of the "without prejudice"

5     designation?

6               MR. KUBEK:   Objection; lack of

7               foundation but he can answer.

8          A.    I'm not an expert on Canadian law

9     and that is a Canadian term so I can't give

10    you an definitive answer on that.

11         Q.    To clarify, Ladan Nassiry was a

12    Canadian lawyer; right?

13         A.    Yes.

14         Q.    Take a look at what has been

15    marked as Exhibit 168 (handing).  Have you

16    seen this exhibit before?

17         A.    I may have seen it yesterday.

18         Q.    And if you look at the bottom of

19    Exhibit 168 it appears to match up with

20    Exhibit 167?

21         A.    It so appears.

22         Q.    So the bottom of this is a letter

23    from Ladan Nassiry, the transmission of the

24    letter from Ladan Nassiry to Anne Giardini.

25    And the top of this is Anne Giardini's

1                  ZYGMUNT JABLONSKI

2    response to Ladan's letter.

3             And as you see in Anne's

4    response, she says, "Thank you for this

5    letter, I am not sure, however, why it is

6    marked 'without prejudice.'  We do need to

7    rely on it and it does not contain any

8    concessions on the part of Domtar.  Can you

9    please provide a version that we are able to

10   rely on?"

11            Do you have any recollection of

12   seeing this communication at the time it was

13   written on or about November 7, 2008?

14        A.   No.

15        Q.   Did you have any communication

16   with Ladan Nassiry in which she indicated

17   that Anne Giardini's view was that a letter

18   that is marked "without prejudice" cannot be

19   relied upon?

20        A.   I don't remember any such

21   communication.

22        Q.   Did you ever have any discussion

23   with Ladan Nassiry regarding of the

24   significance of the "without prejudice"

25   designation?

1                ZYGMUNT JABLONSKI

2   the discussion as such, but I do have a

3   recollection that at some point and it would

4   be well before the Vancouver meeting that

5   just became part of our understanding of the

6   Workmen's Compensation issues.

7        Q.   What became part of your

8   understanding?

9        A.   What Anne states precisely.  We

10  all agreed that U.S. Workers' Compensation

11  liability went to Domtar only for employees

12  who became able to work in some purpose at

13  Domtar.

14       Q.   So this is consistent with your

15  recollection that the parties reached

16  agreement on the contractual requirements

17  related to Workers' Compensation liability?

18       A.   I would say the recollection is

19  that about that time that issue just went

20  away.

21       Q.   Do you have any further

22  recollection other than the fact that the

23  issue went away?

24       A.   Not in a specific fact or

25  circumstance but this is one of the things

ZYGMUNT JABLONSKI

1
2    that was agreed on and we moved on with

3    regard to this, while some other issues

4    remained.

5         Q.   And do you recall any steps taken

6    to document the agreement regarding the

7    Workers' Compensation liability?

8         A.   No, I don't.

9         Q.   Did you have any ongoing

10   responsibilities for Workers' Compensation

11   issues after the September 11, 2008, meeting

12   in Montreal?

13        A.   I would say I was involved

14   somewhat tangentially in the sense that I

15   was being informed.  There was something

16   remaining at that point that had to do with

17   the mechanics of how the Workmen's Comp was

18   being administered.

19            Because at some point, and I

20   frankly don't know until when, Weyerhaeuser

21   was handling those all Workmen's comp claims

22   on behalf of Domtar, and there were some

23   issues having to do with whether that should

24   continue that way or whether they should be

25   transferred for those who are in Domtar's

1                    ZYGMUNT JABLONSKI

2    domain, whether they should be handled by

3    Domtar.

4            But there were some issues with

5    state law that made it difficult and at some

6    point it just was turned over, at least, I

7    thought it was turned over to the insurance

8    specialist, trying to figure this out and HR

9    people.

10       Q.   After the September 2008 meeting

11   and before your recollection of it being

12   turned over to the insurance specialist and

13   HR people, what was your role in that matter

14   related to the administration of Workers'

15   Comp.  Claims?

16       A.   I think I was copied on e-mails

17   and I may have participated in the meeting

18   or phone conversation.  I don't remember

19   exactly what the role was but this was no

20   longer a question of one of the mutual legal

21   responsibilities but how are we just going

22   to practically administer this.  That is

23   just an overall recollection that I have of

24   that particular aspect of it.

25       Q.   Do you recall giving any guidance

ZYGMUNT JABLONSKI

1  understand what is the meaning of "excluded"

2  understand what is the meaning of "excluded"

3  by putting in the context of excluded from

4  what.

5      Q.   The discussion that Mike Cross

6  and Tom Hart and Patrick Lane that's

7  reported in Exhibit 250, where they discuss

8  the outstanding miscellaneous credits and

9  detects arising from the transaction but did

10 not attempt to resolve Workers'

11 Compensation?

12     A.   I'm not certain that they are

13 referring to resolution of Workmen's Comp.

14 issue.  They may be just as well be

15 referring to the specific amount of the

16 mechanics of Workmen's Comp.

17         There is nothing about that

18 statement here that would have me confirm in

19 some way Patrick didn't think that the

20 Workmen's Compensation was not resolved

21 versus some minor or incidental aspect of

22 it.  So if you are asking me to confirm

23 exclusion, I can't, because I don't know

24 what he's referring to.

25     Q.   Okay.  Did you follow up in any

ZYGMUNT JABLONSKI

1

2    way on Ladan's e-mail to Anne Giardini's

3    dated December 10, 2008 which is marked as

4    Exhibit 249?

5         A.   I personally don't recall doing

6    so, but I don't see, I see nothing there

7    that requires a follow-up other than

8    providing transfer instructions.

9         Q.   Okay.  Take a look at what has

10   been previously marked as Exhibit 80.  Have

11   you seen this before?

12        A.   No specific recollection of when

13   I saw it but since it is addressed, since I

14   have been copied on it, I'm not copied on

15   it.  Well, I must have seen it because it

16   was part of the chain of communications that

17   was going on.

18        Q.   Okay.

19        A.   I saw it yesterday for sure.

20        Q.   And it's signed by Ladan Nassiry.

21   Is this the kind of letter that she would be

22   authorized to write or did somebody at

23   Domtar have to review this before she could

24   send it out?

25        A.   That is something that I

                     ZYGMUNT JABLONSKI

1

2    definitely would have reviewed.

3         Q.    So you would have reviewed it

4    yourself?

5         A.    I would most likely reviewed it

6    myself.

7         Q.    And what's the significance of

8    the fact that this letter is written without

9    prejudice?

10             MR. KUBEK:   Objection; lack of

11         foundation.

12         A.    I see no significance other than

13   it seems Ladan liked to include it in her

14   letters.

15         Q.    And when you reviewed this letter

16   that Ladan proposed, did you talk to her

17   about the fact that it was designated

18   "without prejudice"?

19         A.    I have no recollection of talking

20   to her about the issue of no prejudice.

21         Q.    And in the introductory portion

22   of her letter, she says further to Zygmunt

23   Jablonski's letter of December 19, 2008, "I

24   am writing to respond to the matters raised

25   in your letter of November 26, 2008 that

ZYGMUNT JABLONSKI

1

2    were not addressed in the November 19th

3    letter and remain open issues."

4            So Ladan is writing to address

5    open issues, that's correct?  That's what

6    you reviewed and approved?

7        A.   Yes.

8        Q.   And if you look at paragraph 3,

9    one of the open issues is employees and

10   Workers' Compensation?

11       A.   Yes.

12       Q.   And Ladan says that, "We

13   understand that our human resources

14   colleagues are making good progress on these

15   issues and we trust that they will be

16   resolved in the near future."

17           So is it a fair interpretation of

18   this communication that the Workers'

19   Compensation issues are not resolved as of

20   December 23, 2008?

21           MR. KUBEK:  Objection.

22       A.   It is not fair to the extent that

23   if it refers to the agreement on the

24   principal, it is fair to the extent that

25   there were some remaining mechanical things

ZYGMUNT JABLONSKI

1  back-charge because Domtar would already be

2  incurring that cost.  So back-charging here

3  is reference to mechanism of Weyerhaeuser

4  handling the claims and charging Domtar for

5  the liability associated with it.

6  Q.  It appears here that there is

7  some lack of clarity within Domtar related

8  to the, these Workers' Compensation claims

9  and that there is some ongoing discussion

10 about the ownership of those claims.  What

11 did you do to try to clarify that within

12 Domtar?

13 MR. KUBEK:  Objection to form.

14 A.  I don't recall trying to clarify

15 anything about this.  It seems to me that

16 the person who was knowledgeable was Paul

17 Bierley, made a fairly clear statement of

18 our agreement.

19 Q.  Okay.  And then after Paul

20 Bierley made his comment, the e-mail chain

21 continues although the substance of it has

22 been redacted.  It continues all the way up

23 to Ladan Nassiry reaching out to Barb May

24 and suggesting that she be available to

ZYGMUNT JABLONSKI

1

2   assist her.  Do you know what happened with

3   the underlying claim?

4        A.   No.

5        Q.   And given the ongoing discussion

6   within Domtar, did you give any

7   consideration to entering into a written

8   agreement with Weyerhaeuser that would

9   clarify the allocation of liability for the

10  Workers' Compensation claims so that the

11  agreement between the parties was in

12  writing?

13       A.   No, it wasn't necessary.

14       Q.   And why was it not necessary?

15       A.   Because we had a clear agreement

16  as to what the allocation liability was.

17       Q.   And what did you do to make that

18  clear within Domtar?

19       A.   I don't recall.

20       Q.   Go back for a minute to

21  Exhibit 127.  Which is your letter to Anne

22  Giardini dated March 20, 2009; correct?

23       A.   Correct.

24       Q.   Why did you write "without

25  prejudice" on this letter?

Page 156

ZYGMUNT JABLONSKI

1

2      A.    I don't know.  Often letters like

3  this would be drafted by my associates for

4  my signature, so it is not necessarily that

5  I sat down and typed the thing out.  Very

6  often, given my position, letters are

7  written under my supervision for me and I

8  signed them if I agreed with them.

9      Q.    So you agreed with the fact that

10  this said "without prejudice"?

11      A.    I don't think I paid attention to

12  it.

13      Q.    Okay, so you signed it without

14  paying attention to the fact that it says

15  "without prejudice"?

16      A.    I don't think that was a factor

17  in my thinking.

18      Q.    Okay.  So did that have any

19  significance for you the fact that the

20  letter was to be designated to be "without

21  prejudice"?

22      A.    I don't remember if I gave it any

23  consideration at the time or not.

24          MS. CHYZ:  Please mark this.

25              ***

1                    ZYGMUNT JABLONSKI

2             (Plaintiff's Exhibit 259, E-mail

3             dated April 6, 2009, was marked for

4             identification, as of this date.)

5                          * * *

6        Q.   Take a look at what has been

7   marked as Exhibit 259.

8        A.   I see that.

9        Q.   And my question is based on this

10  e-mail.  Would you agree with me that

11  despite the fact that you have approved the

12  payment of the Workers' Compensation amount

13  due to Weyerhaeuser and Michel Dagenais has

14  approved the payment of the Workers'

15  Compensation amount due to Weyerhaeuser, the

16  payment has not been made as of April 6,

17  2009?

18             MR. KUBEK:  Objection to form.

19       A.   I can't comment because I have no

20  recollection of what the other

21  correspondence was about.  Based on what I

22  see here, payments have been made and new

23  invoices issued, so I would have to look at

24  both e-mails to be able to comment on it.

25       Q.   Okay.

                    ZYGMUNT JABLONSKI

1   it or I would have agreed to whatever

2   changes she made ahead of time.

3        Q.   And if you look at the release

4   paragraph in the settlement agreement, it

5   appears unchanged from Exhibit 170.  So in

6   Exhibit 265 the releases are still limited

7   to the items that were specifically

8   submitted to the dispute resolution process;

9   correct?

10        A.   The document speaks for itself.

11  I can try to compare versions but if you

12  wish, I can do that.

13        Q.   Well, you would agree with me

14  it's still structured so that the releases

15  are limited to the specific issues that were

16  submitted to the dispute resolution process;

17  correct?

18        A.   Well, I would refer to the

19  language in the agreement which I think

20  speaks for itself.

21        Q.   Okay.  And "each of the parties

22  reserved all rights and granted no releases

23  with respect to any matter other than the

24  post-closing resolved items that are set

ZYGMUNT JABLONSKI

1    forth herein"; correct?

3    A.   That's a quotation from this
4    agreement.

5    Q.   Okay.  Take a look at what has
6    been marked as Exhibit 84 (handing) and tell
7    me what that is.

8    A.   It appears to me as settlement
9    agreement to which we were just referring in
10   the previous questions.

11   Q.   This is the final version that
12   has been signed by both parties; correct?

13   A.   Sandy signed it and I did.

14   Q.   Okay.  And that is your signature
15   then on behalf of Domtar?

16   A.   Looks like my signature, yes.

17   Q.   Again, the release is structured
18   in the same way that the parties have been
19   negotiating all along, correct, as they have
20   been in paragraph 4?

21   A.   I haven't had an opportunity to
22   compare it to the previous documents and I'm
23   happy to do it.

24   Q.   Well, without comparing to the
25   previous documents, if you look at Exhibit

ZYGMUNT JABLONSKI

1

2 84, would you agree with me that the

3 releases are limited to claims arising out

4 of any of the post-closing resolved issues?

5     A.   I think it speaks for itself.

6     Q.   And, again, the parties reserved

7 all rights and granted no releases with

8 respect to any matter other than the

9 post-closing resolved items; correct?

10     A.   If that's what it says, that's

11 what it says.

12     Q.   Okay.  I'm going to hand you what

13 has been marked as Exhibit 179 (handing).

14 Tell me if you recognize that?

15     A.   I don't remember the document but

16 I'm glad to read it.  Appears to me to be a

17 document sent from Weyerhaeuser to Domtar

18 with a notice of termination of transition

19 service agreement.

20     Q.   And it appears that it was faxed

21 to you.  Do you recall receiving it?

22     A.   I don't remember the specific

23 fact of receiving it but given fact that I

24 have little recollection of it, I probably

25 just referred it to Ania.

1                             CERTIFICATION

2

3

4       I,  Pessi Goldstein, a Notary Public for and within the

5    State of New York, do hereby certify:

6       That the witness whose testimony as herein set forth, was

7    duly sworn by me; and that the within transcript is a true record

8    of the testimony given by said witness.

9       I further certify that I am not related to any of the

10   parties to this action by blood or marriage, and that I am in no

11   way interested in the outcome of this matter.

12      IN WITNESS WHEREOF, I have hereunto set my hand this 13th

13   day of July, 2015.

14

15

                     _____

16                     PESSI GOLDSTEIN

17

18

19

20

21

22

23

24

25

# EXHIBIT K

Domtar Inc.
395, boul. de Maisonneuve Ouest
Montréal QC  H3A 1L6  Canada
Tél. : (514) 848-5400

Domtar Inc.
395 de Maisonneuve Blvd. West
Montreal, QC  H3A 1L6  Canada
Tel.: (514) 848-5400



# Domtar

September 8, 2008

**BY FEDEX**

Ms. Anne Giardini
Vice President and General Counsel
Weyerhaeuser Company
925 West Georgia Street, 5th Floor
Vancouver, BC  V6C 3L2



Exhibit No. _72_

Wns _Anne Giardini_

Date _June 3/15_

Barbara Neuberger, CRS (Ontario)

Re:    **Certain Outstanding Issues – Transaction Documents among
       Domtar and Weyerhaeuser**

Dear Anne:

    We look forward to meeting with you on Thursday.  We are prepared to engage on all of issues noted in your letter of June 3, 2008 to Gilles Pharand, and your July 17, 2008 letter to me.  We will provide a topical agenda in advance of the meeting to help organize our work.  In anticipation of our meeting, please note the following:

1.    <u>Workers' Compensation</u>.  With respect to the workers' compensation issues, we are still waiting for your response to our request for information.  It would be more productive if we had this information prior to the meeting.  So far, you have provided us in your July 17, 2008 letter with what appears to be actuarial information as to how Weyerhaeuser calculates balance sheet reserves.  While Domtar has assumed certain workers' compensation claims with respect to the Transferred Employees, Domtar's obligation to reimburse Weyerhaeuser would include only liabilities and expenses actually paid by Weyerhaeuser with respect to the Newco Liability assumed.  There is no requirement anywhere in the Transaction Documents for Domtar to pay Weyerhaeuser for any accounting accrual for a Newco Liability.  Accordingly, please provide us with a list of the Transferred Employees for whom you have paid workers' compensation claims following the Closing, together with the actual amounts paid to each such employee and appropriate backup information with respect to those payments.  In particular, we will need to see this information to support the $3,543,789 amount claimed in your June 3, 2008 letter, and the additional set –off amounts referred to in your July 17, 2008 letter as relating to workers' compensation payments.

2.    <u>Vacation Payments</u>.  Similarly, with respect to any vacation payments that you are requesting reimbursement for, please provide a list of the Transferred Employees



FSC   © Mixed Sources - Sources Mixtes
Product group from well managed forests
and other controlled sources
Groupe de produits issu de forêts bien gérées
et d'autres sources contrôlées
www.fsc.org  Cert no. SW-COC-313
© 1996 Forest Stewardship Council

www.domtar.com

WEY00019055

2

to whom you have made a payment, including the payments made on a per-employee basis and the Weyerhaeuser policy or applicable Law entitling the Transferred Employee to such payment.

3.    <u>Working Capital Settlement Deduction</u>.  You note in your July 17, 2008 letter that a deduction was taken from amounts owed to Domtar in respect of a "working capital settlement amount of $535,160…."  We do not believe that Weyerhaeuser has a right to such a deduction under the Transaction Documents.  We would appreciate if you could explain the basis for this deduction during our meeting.

4.    <u>Kamloops/Kerfoot</u>.  Enclosed is the information you have requested relating to the Kamloops/Kerfoot matter, including:

- An analysis prepared by Mercer comparing the total compensation paid to the employees referenced in the Kerfoot claim by Domtar for 2007 and anticipated for 2008 to the Weyerhaeuser compensation structure.  Please note that the Weyerhaeuser information included in the Mercer analysis was provided by Weyerhaeuser in connection with the transactions contemplated by the Transaction Documents.  Accordingly, Domtar cannot confirm the accuracy of such data.

  The Mercer information includes as Appendix B a summary of the Domtar defined benefit pension plan.  Please note that the Weyerhaeuser Transferred Employees are included in the Domtar defined benefit pension plan on the same basis as pre-1998 Domtar employees, with the additional benefits noted on Appendix B.

  Appendix C includes, per your request, salary and other compensation and benefit information on an employee-by-employee basis.

- A copy of the Domtar Pension Plan for the Non-Negotiated Employees, together with a summary of the benefits for legacy Weyerhaeuser employees.

- FlexVision Insurance Benefits Program, together with a supplement for legacy Weyerhaeuser employees.  Please note that, for 2007, Transferred Employees at Kamloops participated in Weyerhaeuser's health and welfare plans.  For 2008, Kamloops' employees were provided additional flex plan credits to increase the value of their health and welfare benefits.

- A copy of the resolution of the board of directors of Domtar Inc. dated November 7th, 2007 adopting the suspension of contributions by Transferred Employees to Domtar Pension Plan for Non-Negotiated Employees until December 31st, 2008.

WEY00019056

3

No RRSP is provided as Domtar does not maintain such a plan for Kamloops employees.

As noted in Gilles Pharand's letter of April 23, 2007, Domtar has no obligation to indemnify you for the Kamloops matter. Accordingly, this information is being provided pursuant to Section 7.04 of the Canadian Purchase Agreement and 7.01 of the Amended and Restated Contribution and Distribution Agreement (the "Contribution Agreement"). As contemplated by those provisions, Weyerhaeuser is responsible, and must reimburse Domtar, for Domtar's out-of-pocket costs and expenses, including Mercer's fees, for providing this information. We will be sending an invoice for such costs and expenses in due course.

Please forward this information to Ron A. Skolrood at Lawson Lundell LLP who represents Weyerhaeuser in this matter.

5.  Employees on Disability. With respect to the employees on disability referred to in your June 3, 2008 letter, please provide us with the names of the relevant employees so that we can investigate the situation.

6.  Working Capital; Shared Payment Amount / Pulp Inventory Adjustment Amount. We will wish to discuss these issues with you as previously noted.

7.  Additional Issues. In addition to the issues referred to in our previous correspondence, we would like to raise the following:

    • Early Retirement Pension Subsidy. We would like to discuss treatment of the early retirement pension subsidy for U.S. unionized employees who were not age 55 at the time of Closing but who reach age 55 during their post Closing employment with Domtar, as provided for in the collective bargaining agreements. Pursuant to the Contribution Agreement, Weyerhaeuser was required to transfer to Domtar all of its interests in the assets supporting any benefit plan liability under the collective bargaining agreements assumed by Domtar. No assets supporting the Transferred Employees' early retirement subsidy under the collective bargaining agreements with respect to service with Weyerhaeuser have been transferred to date. Accordingly, Domtar expects to receive a transfer of those assets or Weyerhaeuser's confirmation that it has retained liability for this early retirement subsidy.

    • IT. We understand that there are still some issues being discussed between our respective IT teams in relation to the completion of the Transition Services Agreement. We would like to reserve the right to address such issues if they are not resolved to our IT teams' satisfaction.

WEY00019057

4

- <u>Thune Press Screw</u>.  A Thune Press Screw, a material asset shown on the books of the Newco Business, was not in fact transferred with the Newco Business.  We ask that Weyerhaeuser locate this asset and transfer it to Domtar in accordance with Section 2.01(d) of the Contribution Agreement.

We look forward to seeing you and your team later this week, and to resolving the disputes between our companies in an expeditious and cooperative fashion.

Sincerely,

Zygmunt Jablonski
Vice President – Legal Services

Phone:  514-848-6743
Fax:     514-848-6850
Email:  Zygmunt.jablonski@domtar.com

ZJ/lmr

# EXHIBIT L

**▲ Weyerhaeuser**

**Vancouver, British Columbia**

Law Department, Canada

VIA FACSIMILE
1 514 848 6850

925 West Georgia Street
5ᵗʰ Floor
Vancouver BC  V6C 3L2
604.661.8086 phone
604.687.2314 fax
anne.giardini@weyerhaeuser.com

November 26, 2008

**WITHOUT PREJUDICE**

Domtar Inc.
395 de Maisonneuve Blvd. West
Montreal, Quebec H3A 1L6

Attention:  Zygmunt Jablonski

Exhibit No.  79

Wns:

Date:

Barbara Neuberger, CRS (Ontario)

Dear Sir:

**Re:       Update on Issues**

Further to our recent internal enquiries and the exchanges of information and perspectives
between our companies, this is an update on outstanding issues we discussed in Montreal in
September and have since advanced by correspondence, and includes updated information and
comments.

1.  Wapawekka

Thank you for your reimbursement in the amount of $1,172,828.00.

2. Kerfoot

In your letter of October 3, 2008, you assert that Weyerhaeuser and Domtar agreed during the TA
negotiations that "substantially as favourable in the aggregate" means compensation and benefits
on a level of at least 80% of the level of the pre-Transaction compensation and benefits provided
by Weyerhaeuser.  Can you kindly provide evidence of this assertion as soon as possible. No such
agreement has been previously raised by you, and such an agreement is not reflected in any of the
documentation. Further, the Contribution and Distribution Agreement expressly provides:

> SECTION 9.05. Entire Agreement. This Agreement, taken together with the other Transaction
> Documents, constitute the entire agreement, and supersede all prior agreements and
> understandings, both written and oral, among the parties hereto with respect to the
> Contribution and the Distribution.

Please provide your further response on this issue. If it appears we are unable to agree, then it
appears this will need to be resolved using the dispute resolution procedures set out in the
Contribution and Distribution Agreement.



1

WEY00022324

▲ Weyerhaeuser

3. Early retirement subsidy for US hourly workers

Section 2.02(a)(xvi) of the Contribution and Distribution Agreement provides:

> Newco Assets. (a) For purposes of this Agreement, "Newco Assets" means all the business, properties, assets, goodwill and rights (including lease, license and other contractual rights) of whatever kind and nature, real or personal, tangible or intangible, that are owned by Weyerhaeuser or any other member of the Weyerhaeuser Group immediately prior to the Contribution and used or held for use primarily in the operation or conduct of the Newco Business, other than (A) the Excluded Assets and (B) as otherwise provided for in this Section 2.02(a), which Newco Assets shall include (in each case, other than the Excluded Assets):
> …
> (xvi) all assets to be transferred to Newco or any member of the Spinco Group set forth on Schedule 2.02(a)(xvi) (the "Benefit Plan Assets").

The applicable schedule expressly contemplates the transfer to Domtar of certain specified accounts. This makes sense because these are real accounts that were in existence at closing. The schedule also provides for the transfer to Domtar of Weyerhaeuser's interests in the collective bargaining agreements described. The Canadian version provides for the transfer of pension funds that were, again, actually in existence at closing.

We understand you to be saying that this potential future contingent cost was or should have been a funded liability at the time of the transaction and that Domtar is therefore entitled to the assets that fund this liability. The problem with this argument is that there are no such assets or fund that could have been transferred. There is simply no separate reserve set up for this.

There is no requirement in the collective bargaining agreements or otherwise for a fund to be in place to fund any early retirement subsidy. Are you able to point to something that requires that the employer establish or maintain such a fund?

4. IT Transition Services Agreement ("TSA")

Domtar has made requests for lower IT transaction fees, in particular lower network connectivity and access fees. These requests seem to us to have increased after Weyerhaeuser agreed to a one-time, without prejudice reduction for July. Our position with respect to the continued provision of access to the Weyerhaeuser private network, and the payment of the TSA fees is:

1) Weyerhaeuser will continue to support Domtar's conversion from Weyerhaeuser's IT Transition services.
2) Specific to networks, Weyerhaeuser will continue to invoice for network connectivity and access until Domtar is completely off our networks as provided in the TSA. Weyerhaeuser has not been unreasonable in considering Domtar's requests for lower fees in the context of our overall resolution of the outstanding transaction and transition issues on the basis of a mutual understanding that any such reductions are outside the fee schedule of the TSA and that Weyerhaeuser may elect not to provide any fee reductions. I have, as you know, made several such concessions on this basis.

2

WEY00022325

▲ Weyerhaeuser

3) Failures to pay Weyerhaeuser TSA invoices as required in the agreement will result in the issuance of a termination notice unless other arrangements are made and agreed to in a written document executed by the parties after legal review.
4) Weyerhaeuser's Transition Services Manager, Patrick Lane, will work on any issues associated with discontinuing the network connectivity and access as provided in the TSA.
5) With the Fort Mill conversion in November, we are working on the assumption that all but *approximately* eleven sites will be off the Weyerhaeuser network and as such no longer subject to the TSA invoice for network connectivity after November. I understand that Domtar has asked that Weyerhaeuser keep two other subnets open, at Montreal and at Dorval. We would need to work out fees for this if agreed to.
6) Regarding our discussion Domtar's Voice circuit transition that is being performed by Verizon under Domtar's new calling plan contract, it appears that the number of sites (excluding the MacPac sites) that are involved is greater than we had believed. There are nine outstanding T1 VNet circuits that were supposed to be migrated in November, but were not completed by Domtar's service provider. The circuits are now scheduled to be transferred on December 5. Six of those circuits are at three non-MacPac sites as follows: Rothschild, Plymouth and Kingsport. I have agreed on a without prejudice basis that notwithstanding that the TSA calls for charging for full months (i.e., no partial months), a fixed fee, "no step down" in a service category for service components, and the 25% escalation fee schedule at 18 months and 24 months, Weyerhaeuser will charge Domtar the network connection fee for the portion of December that the voice ports (T1s) are on Weyerhaeuser's calling plan. This is notwithstanding that some costs comprising the TSA fee structure are average costs that were distributed over the services Weyerhaeuser provides, or are fixed. In some cases, the cost is not reflective of Weyerhaeuser's actual costs. My agreement is dependent on Domtar achieving circuit cutover by December 5, 2008. Domtar signed its own contract with Verizon in mid October and transitioned most of the ports and services in November, but some sites extended into December.
7) Can you please advise of any IT issues you are aware of that will need to be discussed or resolved.

5. Employees on Workers Compensation

Our Chee-Tuck Wong has sent to your Michel Dagenais a list of workers compensation payments made on behalf of Transferred Employees from March 2007 to October 2008 and a list of claims (open and closed) where the claimant is a Transferred Employee. Previous invoices were based on our employees' understanding that all workers compensation liability transferred to Domtar. In fact, we are all agreed that US workers compensation liability went to Domtar only for employees who became able to work in some capacity at Domtar. Please confirm that you are in agreement with the information provided by Mr. Wong.

6. Vacation pay

We are still waiting for you to provide an understanding of your concerns with respect to vacation pay.



3

**Λ** Weyerhaeuser

7.  Working Capital adjustment

Patrick Lane and Michael Cross have met to resolve outstanding a number of Working Capital settlement issues. I understand that they are agreed that these items would be netted and settled with Weyerhaeuser making a payment to Domtar of CDN$142,407.89 and US$ 168,612,26 for the Canadian and US operating companies respectively. Can you please confirm.

8. Profit participation

We are still waiting for you to provide an understanding of your internal documentation in support of your position as well as the recollections from the Domtar officials who were present in New York when the final issues were resolved. We have previously provided our documentation and the recollection from our officials.

9. Plymouth steam supply

It appears that there are several open issues. I will provide these in a follow up letter.

10.  Transfer of Prince Albert FMA

We have provided our proposed language for a letter from Domtar that could go to Saskatchewan government in a mutual effort to get Weyerhaeuser's name off the Prince Albert FMA. We look to you for your response. We draw your attention to the positive obligation in the Contribution and Distribution Agreement for each party to execute and deliver as and when requested by any party such documents and instruments, and to take, or cause to be taken, all such further or other actions, as such other party may reasonably deem necessary or desirable to consummate the transactions contemplated by the agreements between the parties. It is unclear to us why this matter has not been resolved.

11. EPA Bonds

Enclosed is an invoice (Invoice 07-006 DTA) for two EPA bonds to reflect return premium for cancellation prior to expiration. This invoice replaces 06-005 DTA issued June 27, 2008. We have provided backup for the credits and have been promised payment from Mr. Michael Maiorino. However Michael informs us that the reimbursement requires approval from Domtar's legal department and the approval has not been forthcoming.

Yours sincerely,

Anne Giardini
President

WEY00022327

 Weyerhaeuser

INVOICE

Invoice Date:   08/04/08
Invoice Number:  07-006 DTA

**Bill To:**   Domtar
Attn:  Michael Maiorino

Remit Payment To:
Weyerhaeuser Company
General Accounting I/C Accountant
Mailstop:  EC4-2 D 3
PO Box 9777
Federal Way, WA  98063-9777

TIN No. 91-0470860
Payment Terms:  Net 30 days

| Description | Amount |
|---|---|
| **To revise invoice 06–005 DTA** for US EPA Bonds as follows: | |
| 1)  Bond 104354448 with Travelers Surety: | |
|       **Plymouth Chlorine Plant** | |
|       Bond Amount $5,624,000 | |
|       Annual Premium $44,992 | |
|       3/7/07-9/8/07 = 185 days/366 days X $44,992 | $22,721 |
|       9/8/07-9/8/08 | $44,992 |
|       Less credit for cancellation July 8, 2008 | ($7,622) |
| | |
| 2)  Bond 6198213 with Safeco Surety: | |
|       **Plymouth Wood Treatment Plant Landfill** | |
|       Bond Amount $11,935,000 | |
|       Annual Premium $77,578 | |
|       3/7/07-9/18/07= 195 days/366 days X $77,578 | $41,349 |
|       9/18/07-9/18/08 | $77,578 |
|       Less credit for cancellation July 16, 2008 | ($13,568) |
| | |
| NOTICE: A service charge at the rate of 1-1/2% per month | |
|   (or the maximum allowed by State Law) on the unpaid balance will be made | |
| on all past due accounts. | |

**Weyerhaeuser Accounting Only**

| Credit:   0060-6575000-9000002743 | *Please pay this amount:* | $165,450.00 |
|---|---|---|

Weyerhaeuser Cont act:   mark.taylor@weyerhaeuser.com

WEY00022328

# EXHIBIT M

1                         M. DAGENAIS

2          IN THE UNITED STATES DISTRICT COURT

3            FOR THE DISTRICT OF DELAWARE

4  _____

5  WEYERHAEUSER COMPANY, a     )

6  Washington corporation,    )

7        Plaintiff,      )  Case No.

8                      )  C.A. No. 14-00024-SLR

9  DOMTAR CORPORATION, a      )

10  Delaware corporation, and  )

11  DOMTAR PAPER COMPANY, LLC,  )

12  a Delaware limited liability  )

13  company,                )

14        Defendants.     )

15  _____  )

16

17        Oral deposition of MICHEL DAGENAIS, a

18  representative of the Defendants, called by the

19  Plaintiff herein, held before a stenographic court

20  reporter at the offices of Domtar Corporation, 395

21  Boulevard de Maisonneuve Ouest, Hong Kong Room,

22  Montréal, Canada on Wednesday, the 27th day of May,

23  2015, at 10:00 a.m.

24

25  Job No. 93998

1                        M. DAGENAIS

2    A P P E A R A N C E S:

3    For the Plaintiff:

4    HILLIS CLARK MARTIN & PETERSON

5    BY:  Laurie Chyz, Esq.

6             1221 Second Avenue

7             Seattle, WA 98101

8

9

10

11

12   For the Defendants:

13   DEBEVOISE & PLIMPTON

14   BY:  Courtney Dankworth, Esq.

15        Alex Ginsberg, Esq.

16             919 Third Avenue

17             New York, NY 10022

18

19

20

21

22   ALSO PRESENT:

23   Conrad J. Smucker (Sr. Legal Counsel, Weyerhaeuser)

24   Ania Brzezinski (VP Legal Affairs, Domtar)

25

1                          M. DAGENAIS

2          A.    What do you mean by "contracts?"

3    BY MS. CHYZ:

4          Q.    The transaction documents --

5          A.    Oh.

6          Q.    -- the transaction agreements.

7          A.    Yes, this is exactly our understanding.

8    Definitely.

9          Q.    What communication did you have with

10   Weyerhaeuser in connection with post-closing disputes?

11         A.    To be very precise, okay, concerning

12   the dispute as such, we -- I never had discussions

13   with Weyerhaeuser people.  I had a lot of discussions

14   with Weyerhaeuser people concerning the transfer --

15   not the transfer, but the way that we were going to

16   transfer the employees and how we would apply, okay,

17   the -- well, the agreement and the -- how can I say

18   that? -- you know, the -- we need to do the

19   integration.

20          And in order to do the integration in the

21   right manner, we need to do it very closely with HR

22   people at Weyerhaeuser, which we did.  Honestly, it

23   was for us, you know, very -- it went very well, very

24   well.

25         Q.    Okay.  So you were working productively

                              M. DAGENAIS

1

2    with Weyerhaeuser on the integration issues?

3         A.   Exactly.

4         Q.   In terms of post-closing disputes, you

5    weren't discussing those directly with Weyerhaeuser?

6         A.   Well, the only discussions that I have

7    is when I was the member of the team, okay, when we

8    had a meeting here in -- at Domtar House, okay, with

9    Weyerhaeuser representatives, to discuss those issues.

10        But those people were, you know, like Anne

11   Giardini and other people were there.  But they were

12   not those kind of discussion with the HR people of

13   Weyerhaeuser.

14                   (query by reporter)

15        Q.   Okay.  Let's talk about that meeting

16   you had with Anne Giardini.

17        And do you remember when that meeting

18   occurred?

19        A.   It was in 2008, I believe.

20        Q.   2008?

21        A.   Well, yeah, '8 or '9.  But '8 -- I

22   believe, 2008.

23        Q.   Okay.  And I've seen documents that

24   showed that meeting happened on September 11th, 2008.

25        Does that sound right to you?

M. DAGENAIS

1

2        A.    Yeah.

3        Q.    So when we refer to the September 11th

4   meeting, that's the meeting that you had with Anne

5   Giardini and others?

6        A.    I believe so.

7        Q.    Okay.  Tell me what you remember about

8   that meeting.

9        A.    There was, as I said, three or four HR

10  issues that were discussed.  And I remember the

11  Kamloops.  I remember the -- the three that I told you

12  I remember:  Kamloops, transferred of people that were

13  on long-term disability, and the Workers' Comp.  And

14  the fourth one, you need to help me because I don't

15  remember.

16       Q.    Early retirement subsidies?

17       A.    Maybe.  But this I would not, you know,

18  put my pay on that.  I'm not sure.

19       Q.    Okay.  And how much time was spent

20  talking about the Kamloops deal?

21       A.    Maybe... I don't... this is difficult

22  for us.  The thing that I remember is that, you know,

23  we had -- we would discuss how we would address that.

24  Both companies, we need to help each other to build

25  the file in order, you know, to be successful.

1                       M. DAGENAIS

2           So maybe we spent one hour on that.

3           Q.   Okay.

4           A.   I don't recall exactly.

5           Q.   In terms of that -- were you there for

6    the entire meeting, or were you there for just a

7    portion of the meeting?

8           A.   I was there for the HR portion of the

9    meeting.

10          Q.   Okay.  And in terms of the HR portion

11   of the meeting, how was the time allocated between

12   these four topics?  What got the most attention?  What

13   got the least attention?  Do you remember?

14          A.   No.  I'm pretty sure it was a meeting

15   that last at least two hours.  Definitely it last.

16   But I don't recall the portion of it, no.  It's 2008.

17          Q.   Right.  I'm just trying to figure out,

18   was there something that took up all the time or

19   something that was easier in terms of your

20   recollection of how this --

21          A.    Well, easier was liabil- -- was

22   long-term disability.  Long-term disability was an

23   easier topic because, you know, we agree on how it

24   should work and, you know, we gave ourselves some

25   explanations.  And as you can see in the documents, it

1                        M. DAGENAIS

2    was after resolve easy.

3              I would say that the second easiest one was

4    Kerfoot, more complex because of legal and all the

5    prep work that we need to do.

6              And the third one, the most difficult one,

7    was Workers' Comp.

8              Q.   Do you remember -- tell me what you

9    remember about the discussion about Workers' Comp?

10             A.   Well, the discussion, it was around,

11   you know:  What was the concept?   How should we

12   understand the concept of transferred employees?

13             And, concerning the liability, so who was

14   right by saying that, okay, under the transaction

15   agreement, well, then, you know, you retain that

16   liability or you didn't retain that liability?

17             And our position was that, well, we retained

18   the liability for those employees who were transferred

19   on day one, and for those employees who were

20   eventually -- no, who could eventually be transferred

21   if they become fit to work.

22             That is exactly what I said at that meeting,

23   I'm sure.

24             Q.   Okay.  So the focus -- as I understand

25   what you're telling me, the focus was on the

1                        M. DAGENAIS

2       correction interpretation of the agreement?

3              A.   Yes.

4              Q.   And there was a focus on employees that

5       transferred at closing and then employees that were on

6       Workers' Comp but then later transferred; is that

7       correct?

8              MS. DANKWORTH:  Objection to the form.

9              A.   Could be transferred.

10      BY MS. CHYZ:

11             Q.   Could be transferred?

12             A.   Yeah.

13             Q.   Okay.

14             A.   Because if you were on Comp -- on

15      Workers' Comp, and if, you know, your disability was

16      such that you could not come back to work, then you

17      would never be transferred.  Then you were not part of

18      Newco's liability.  You will be with Weyerhaeuser.

19             Q.   Okay.  Was there any discussion of

20      future Workers' Compensation claims filed by retired

21      Weyerhaeuser employees?

22             A.   No.

23             Q.   And what was the outcome of the

24      discussion?

25             MS. DANKWORTH:  Objection to the form.

1                          M. DAGENAIS

2          A.    The outcome of the discussion was, if I

3    recall correctly, that, you know, since all the

4    arguments have been put on the table, both parties

5    will think about it.  And I recall very well that

6    after a while, then Weyerhaeuser came back and say:

7    Okay, we agree on -- you know, on the way you believe

8    that we should address the Workers' Comp issue.

9               And that triggered a list, okay, or an

10   invoice, from Weyerhaeuser that -- you know, that

11   included all the employee -- that should include only

12   the employees that were transferred, okay, to Newco,

13   to Domtar.

14              So if that invoice, we will have to check

15   the invoice, we will have to have all the background

16   information concerning that invoice.  And once this

17   would have been checked, then we will pay Weyerhaeuser

18   for the money that we will due to them because those

19   employees will have been transferred employees --

20   would become transferred employees, if I can...

21   BY MS. CHYZ:

22          Q.    Okay.  So when Weyerhaeuser came back,

23   who was speaking on behalf of Weyerhaeuser?

24              MS. DANKWORTH:  Objection to the form.

25          A.    Anne Giardini.

1                         M. DAGENAIS

2          Q.    And what role did this group play in

3    connection with Workers' Comp?

4          MS. DANKWORTH:  Objection to the form.

5          A.    Well, when I was there, none.  And

6    after, well, then I was no longer there, and they

7    tried to help.  So they need to transmit the

8    information to the right person.

9    BY MS. CHYZ:

10         Q.    Okay.  But while you were at Domtar,

11   they didn't have anything to do with Workers' Comp?

12         A.    No.

13         Q.    Okay.

14         A.    Except Kim, which is on the top of this

15   e-mail.

16         MS. CHYZ:  Okay.  Okay.  Let's take a break

17              for five minutes, and let me see if I've got

18              everything covered that I need to cover.

19         MS. DANKWORTH:  Okay.

20   --- Upon recessing at 4:06 p.m.

21   --- Upon resuming at 4:16 p.m.

22   BY MS. CHYZ:

23         Q.    Take a look at what's been marked as

24   Exhibit 21, which is a letter from Anne Giardini to

25   Domtar dated November 26, 2008.  At the top of the

1                    M. DAGENAIS

2    first page, there is a designation there that says

3    "without prejudice."

4          Do you have an understanding of what that

5    designation means?

6          A.    Yes.

7          Q.    What does it mean?

8          A.    "Without prejudice" is something that

9    you will put on the paper to -- and make sure that you

10   preserve your rights.    Okay?  So...

11         Q.    And what do you mean by that?

12         A.    Well, you're writing that, and you want

13   to -- just don't want to commit too much.  That's kind

14   of... or I said to preserve your rights for, in case

15   of.

16         Q.    Okay.  So if you get a letter that says

17   "without prejudice," you know that you can't rely on

18   that letter, correct?

19         MS. DANKWORTH:  Objection to form.

20         A.    Not in my mind, but... I leave your

21   interpretation.  But this is not what I believe is --

22   it is.

23   BY MS. CHYZ:

24         Q.    Okay.

25         A.    It is -- I would say that that's kind

1                           M. DAGENAIS

2      of a legal form.  But when you negotiate with someone

3      and when you agree on something, well, then you have

4      an agreement.

5                Q.   Okay.  And in terms of confirming that

6      agreement, if you've got a letter that says "without

7      prejudice," how do you go about confirming the

8      agreement?

9                MS. DANKWORTH:  Objection to the form.

10     BY MS. CHYZ:

11               Q.   Based on your experience?

12               A.   Well, you know, the way I understand

13     the thing here is that everything was not resolved.

14     So... and, you know, I can make a link with the answer

15     that -- the question that I asked Zyg.  When I said:

16     Shall I pay?  You know, is it okay in regards of all

17     your negotiation?

18               So that's the way I see it, because I recall

19     that at that time, everything was not formally

20     resolved.  But some issues in that were resolved, and

21     this is why we were acting.  And we should have say,

22     we will pay without prejudice, in the sense that --

23     you understand what I mean?  You have an agreement on

24     the overall picture or you don't.  Okay?  But we were

25     ready to proceed because we knew that that topic was

Page 175

1                      M. DAGENAIS

2                 REPORTER'S CERTIFICATE

3

4        I, KARIN A. JENKNER, RPR, CRR, CSR (ONT.),

5   Certified Shorthand Reporter, certify:

6        That the foregoing proceedings were taken

7   before me at the time and place therein set forth, at

8   which time I placed the deponent under oath;

9        That the testimony of the deponent and all

10  objections made at the time of the examination were

11  recorded stenographically by me and were thereafter

12  transcribed;

13       That the foregoing is a true and correct

14  transcript of my shorthand notes so taken.

15       I further certify that I am not a relative or

16  employee of any attorney or of any of the parties, nor

17  financially interested in the action.

18

19       I declare that the foregoing is true and

20  correct.

21       Dated this 8th day of June, 2015.

22

23  _____

24       Karin A. Jenkner, CSR (Ontario), RPR, CRR

25       (Commissioner of Oaths expires July 19, 2016)

# EXHIBIT N

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2                OF THE DISTRICT OF DELAWARE

3

4

5    WEYERHAEUSER COMPANY,        )
                                  )
6                                 )
     Plaintiff,                   )
7                                 )
     -VS-                         ) C.A. No. 14-00024-SLR
8                                 )
     DOMTAR CORPORATION,          )
9    DOMTAR PAPER COMPANY LLC,    )
                                  )
10

     Defendants.
11

12

            DEPOSITION OF ANIA BRZEZINSKI
13              ON WEDNESDAY, JUNE 10, 2015
                IN MONTREAL, QUEBEC, CANADA.
14

15

16

17

18

19

20

21

22

23

24   Reported By: CHERIE KLEIN

25   Job No: 94141

```
 1
     APPEARANCES
 2

 3    FOR DEFENDANT DOMTAR

 4    DEBEVOISE & PLIMPTON
      BY:  GARY KUBEK, ESQUIRE
 5         ALEX GINSBERG, ESQUIRE
      919 Third Avenue
 6    New York, NY 10022

 7

 8

 9    FOR PLAINTIFF WEYERHAEUSER AND THE WITNESS

10    HILLIS CLARK MARTIN & PETERSON
      BY:  JAKE EWART, ESQUIRE
11         LAURIE LOOTENS CHYZ, ESQUIRE
      1221 Second Avenue
12    Seattle, WA 98101

13

14

15

16    ALSO PRESENT:  CONRAD J. SMUCKER, ESQUIRE
                     IN-HOUSE COUNSEL FOR WEYERHAEUSER
17

18

19

20

21

22

23

24

25
```

1                    ANIA BRZEZINSKI

2        A.     I think there is enough in the

3   courts if you were to look in terms of Canadian

4   litigation or even in England, there is probably

5   enough out there in terms of litigation on this

6   very point.

7        Q.     Is it your practice when you are

8   entering into a binding agreement to mark it

9   "without prejudice"?

10        A.     It's not my practice.  It's more of

11   a Canadian practice.  I have used it in some

12   instances, but I am always mindful of using it

13   for that reason.

14        Q.     Okay.  You are mindful of using it

15   because when it's marked "without prejudice" it

16   can't be relied upon by the opposing parties;

17   correct?

18        A.     I am mindful that, even despite

19   being labelled "without prejudice", it can be

20   relied upon by the other party.

21        Q.     So what's the point of putting

22   "without prejudice" on there?

23                MR. KUBEK:  Object to form.  Just

24   objection.

25                THE WITNESS:  Some people honestly

1                    ANIA BRZEZINSKI

2    put it on automatically, and they label

3    everything "without prejudice" and it waters its

4    meaning down considerably.

5    BY MS. CHYZ:

6        Q.     But your understanding is "without

7    prejudice" means that it's without prejudice to

8    somebody's legal rights; correct?

9        A.     That is what it's supposed to mean.

10       Q.     Okay.

11              Exhibit 168 was marked for

12   identification.

13   BY MS. CHYZ:

14       Q.     Take a look at what has been marked

15   as Exhibit 168, which is Anne Giardini's response

16   to Ladan Nassiry's letter which was marked as

17   Exhibit 167.  Did you review this material as

18   part of your return from maternity leave?

19       A.     No.  I have never seen this.

20       Q.     Okay.  And in this e-mail Anne

21   Giardini -- this e-mail dated November 7, 2008,

22   which is a response to Ladan Nassiry's letter

23   dated November 6, 2008, Anne specifically says:

24                      "I am not sure why the letter

25                      is marked without

1                    ANIA BRZEZINSKI

2    prejudice."

3                She says:

4                        "We do need to rely on it and

5                        it does not contain any

6                        concessions on the part of

7                        Domtar.  Can you please

8                        provide a version that we are

9                        able to rely on?

10               In November 7, 2008, it should have

11   been clear to Domtar -- strike that. On

12   November 7, 2008 Domtar was on notice that Anne

13   Giardini's view of "without prejudice" meant that

14   she could not rely on it; correct?

15               MR. KUBEK:  Objection.

16               THE WITNESS:  I don't -- I mean, on

17   notice?  This would have been an e-mail to Ladan

18   Nassiry who was on contract with Domtar.

19   BY MS. CHYZ:

20        Q.    Right, and Ladan Nassiry on contract

21   with Domtar had written a letter to Anne Giardini

22   dated November 6, 2008 on behalf of Domtar;

23   correct?

24        A.    She wrote a letter, yes.

25        Q.    And were you aware.  When Ladan

1                    ANIA BRZEZINSKI

2        A.     I think there would have been some

3    subsequent communication, because if it related

4    to Prince Albert, that was a facility that we had

5    subsequently then sold and the purchaser was

6    responsible for paying that portion of the

7    invoice.  So I think there was some subsequent

8    follow-ups to that, and I think Patrick Lane was

9    involved with -- I think Marguerite Goraczko from

10   our department did some exchanges relating to

11   that.

12       Q.     So it's not that Weyerhaeuser wasn't

13   owed the money.  It was a situation where you

14   wanted the new owner of the mill to pay rather

15   than Domtar?

16       A.     Right.  And so we had some time.  We

17   had to chase down the new owner to get their

18   attention to pay it, and I think ultimately they

19   paid it, from my recollection.

20                    Exhibit 189 was marked for

21   identification.

22   BY MS. CHYZ:

23       Q.     Take a look at what's been marked as

24   Exhibit 189, and this is the tender to Domtar of

25   the claim brought by Robert Brown Dickerson.  Do

1                    ANIA BRZEZINSKI

2    you recall seeing this tender on or about

3    January 13, 2012?

4         A.    It's addressed to me.

5         Q.    Okay.  Do you have any reason to

6    believe that you didn't see this?

7         A.    I do not.

8         Q.    Do you know what Domtar's response

9    was to this claim?

10        A.    If I look at just the 18B form, I

11   would have said we most likely rejected it.

12        Q.    On what grounds?

13        A.    It shows he was employed at the mill

14   up until 2006.

15        Q.    Okay. And how does that lead you to

16   the conclusion that it's not Domtar's

17   responsibility?

18        A.    He was not a transferred employee.

19              Exhibit 190 was marked for

20   identification.

21   BY MS. CHYZ:

22        Q.    Okay.  Take a look at Exhibit 190

23   and let me know if you have seen this before.

24        A.    I probably would have seen it at the

25   time.

1                    ANIA BRZEZINSKI

2        Q.      Okay.

3        A.      I am on this chain.

4        Q.      So this confirms that Domtar rejects

5   the tender of the Robert Brown Dickerson claim

6   that we saw marked as an Exhibit; correct?

7        A.      Correct.

8                Exhibit 191 was marked for

9   identification.

10   BY MS. CHYZ:

11       Q.      Okay.  Take a look at what's been

12   marked as Exhibit 191 and let me know if you have

13   seen this before.

14       A.      It's addressed me, so I would have.

15       Q.      And this e-mail exchange starts with

16   an e-mail to you from Conrad Smucker dated

17   January 31, 2012.  Is that right?

18       A.      It does.

19       Q.      Do you recall reading this e-mail

20   around the time you received it around

21   January 31, 2012?

22       A.      I must have read it at the time,

23   yes.

24       Q.      Okay.  And Conrad is taking issue

25   with your rejection of the tender of the Robert

1                    ANIA BRZEZINSKI

2     Brown Dickerson claim; correct?

3          A.     Correct.

4          Q.     And he states:

5                    "Weyerhaeuser's position that

6                    Domtar's position is contrary

7                    to the parties' agreement."

8                 And he explains why.  Do you see

9     that?

10         A.     No.  If you can point me.

11         Q.     If you look at the second page of

12    the Exhibit, which is marked 6244.

13         A.     Yes.

14         Q.     In the third paragraph:

15                    "Weyerhaeuser believes your

16                    position is contrary to the

17                    parties' agreement."

18         A.     Yes.

19         Q.     And in that paragraph he explains

20    why.  That paragraph and the next, he explains

21    why he thinks that the agreement requires Domtar

22    to take that liability; correct?

23         A.     Yes.

24         Q.     And then he goes on to say in the

25    fifth paragraph:

1                          ANIA BRZEZINSKI

2                          and expressly reserves the

3                          right to cover any defence and

4                          indemnity costs incurred in

5                          connection with this matter

6                          from Domtar."

7                Did you see that on or about

8    February 3, 2012?

9        A.      Most likely, yes.

10       Q.      Did you respond to that?

11       A.      I don't believe I did.

12       Q.      Okay.  Is it fair to say that Domtar

13   was on notice at that point that Weyerhaeuser

14   considered the ownership of the claims of the

15   non-transferred workers compensation claims to be

16   an open issue?

17       A.      I think at this point it's appearing

18   to be an issue.

19       Q.      Okay.

20               Exhibit 192 was marked for

21   identification.

22   BY MS. CHYZ:

23       Q.      Take a look at what's been marked as

24   Exhibit 192 and tell me what that is.

25       A.      It's another tender.

1                    ANIA BRZEZINSKI

2         Q.    So this is Weyerhaeuser's tender to

3    Domtar of the workers compensation claim of Nelly

4    Garner Perry, and the tender is dated March 23,

5    2012.  Is that correct?

6         A.    It appears to be so, yes.

7         Q.    Okay.  And did you receive this

8    tender on or about March 23, 2012?

9         A.    Most likely, yes.

10        Q.    Do you have any reason to believe

11   that you did not receive this?

12        A.    I do not.

13        Q.    Did you review it at the time?

14        A.    I would have.

15              Exhibit 193 was marked for

16   identification.

17   BY MS. CHYZ:

18        Q.    Did you prepare a response to the

19   tender shown in Exhibit 192?

20        A.    Yes, I did.

21        Q.    Take a look at Exhibit 193 and tell

22   me if that's your response to the tender that was

23   marked as Exhibit 192.

24        A.    It appears it is.

25        Q.    So this is your response that you

1                        ANIA BRZEZINSKI

2    prepared and signed on March 28, 2012?

3        A.     Yes.

4        Q.     And tell me where in your response

5    you state that Domtar believes that the ownership

6    of non-transferred employees workers compensation

7    claims has been resolved.

8        A.     I do not state that.

9        Q.     Tell me where in this letter you

10   cite Anne Giardini's letter dated November 26,

11   2008.

12       A.     I don't.

13              Exhibit 194 was marked for

14   identification.

15   BY MS. CHYZ:

16       Q.     Take a look at what has been marked

17   as Exhibit 194 which is an e-mail response from

18   Conrad Smucker to you in response to your letter

19   which was marked as Exhibit 193.  Is that

20   correct?

21       A.     Yes.

22       Q.     And did you receive this e-mail on

23   or about May 15, 2012?

24       A.     I have no reason to believe I

25   didn't.

1                     ANIA BRZEZINSKI

2        Q.     Okay.  And Conrad addresses Domtar's

3   rejection of the tender of the Perry workers

4   compensation claim and says that it's giving

5   notice that it's assuming the defence of the

6   Perry workers compensation claim and expressly

7   reserves the right to recover any defence and

8   indemnity costs incurred in connection with this

9   matter from Domtar.  Did you see that on or about

10  May 15, 2012?

11       A.     Most likely, yes.

12       Q.     Did you respond to that in any way?

13       A.     I don't believe so.

14       Q.     And you would agree with me that on

15  or about March -- on or about May 15, 2012 Domtar

16  was on notice that Weyerhaeuser considered the

17  ownership of non-transferred workers compensation

18  claim to be an open issue?

19       A.     It was beginning to be an issue.

20              Exhibit 195 was marked for

21  identification.

22  BY MS. CHYZ:

23       Q.     Take a look at what has been marked

24  as Exhibit 195.  And you are not shown on this,

25  but this appears to me to be part of the

1                    ANIA BRZEZINSKI

2    frame of April 2012 about any progress she was

3    making toward working toward a buy-out of the

4    workers compensation claims?

5         A.     I specifically don't recall.

6         Q.     Okay.

7                 Exhibit 196 was marked for

8    identification.

9    BY MS. CHYZ:

10        Q.     Take a look at what has been marked

11   as Exhibit 196 and tell me what this is.

12        A.     It's another tender.

13        Q.     So this is a tender from

14   Weyerhaeuser to Domtar of a workers compensation

15   claim on behalf of Samuel Burnett?

16        A.     That's what it appears to be, yes.

17        Q.     And this was directed to you on

18   April 10, 2012.  Do you recall receiving this

19   from Weyerhaeuser on or about April 10, 2012?

20        A.     Not specifically.

21        Q.     Okay.  Do you have any doubt that

22   you received that from Weyerhaeuser --

23        A.     I don't have a reason to doubt.

24        Q.     -- on or about April 10, 2012?

25        A.     No.

1               ANIA BRZEZINSKI

2               Exhibit 197 was marked for

3    identification.

4    BY MS. CHYZ:

5         Q.    Take a look at what's been marked as

6    Exhibit 197 and tell me what this is.

7         A.    It's a cover letter e-mail from

8    Nathalie Aubin to Conrad, and it has the

9    rejection of the tender attached.

10        Q.    Okay.  So you are rejecting the

11   tender of the Burnett workers compensation claim?

12             MR. KUBEK:  Objection.  It appears

13   actually to relate to David Spencer Smithwick.

14             MS. CHYZ:  Look at the next page.

15             MR. KUBEK:  Sorry.

16             THE WITNESS:  We are rejecting both.

17   BY MS. CHYZ:

18        Q.    You are rejecting the tender of

19   both the Smithwick claim and the Burnett claim;

20   correct?

21        A.    It appears so, yes.

22        Q.    And where do you say in your letter

23   that the issue of the allocation of liability for

24   non-transferred employees is a matter that has

25   been resolved by the parties?

1                    ANIA BRZEZINSKI

2              MR. KUBEK:  Objection.  The document

3     speaks for itself.  You can answer.

4              THE WITNESS:  I do not mention it in

5     the document.

6     BY MS. CHYZ:

7         Q.    And where did you cite Anne

8     Giardini's letter dated November 26, 2008?

9              MR. KUBEK:  Same objection.

10             THE WITNESS:  I don't cite Anne

11    Giardini's letter.

12             Exhibit 198 was marked for

13    identification.

14    BY MS. CHYZ:

15        Q.    Take a look at what has been marked

16    as Exhibit 198, which is an e-mail from Conrad

17    Smucker to you dated May 15, 2012 in response to

18    Domtar's rejection of the Smithwick and Burnett

19    workers compensation claims. Is that correct?

20        A.    That's correct.

21        Q.    And Mr. Smucker says that -- that:

22                  "Weyerhaeuser is hereby

23                  assuming the defence of the

24                  Smithwick and Burnett workers

25                  compensation claims and hereby

1              ANIA BRZEZINSKI

2                    expressly reserves the right

3                    to recover any defence and

4                    indemnity costs incurred in

5                    connection with these matters

6                    from Domtar."

7              So you would agree with me that at

8     this point Domtar is on notice that Weyerhaeuser

9     considers the ownership of the non-transferred

10    employee workers compensation claims to be an

11    open issue; correct?

12         A.    That's what it says.

13         Q.    And you received this e-mail on or

14    about May 15, 2012?

15         A.    I presumably did.

16         Q.    Did you respond to it?

17         A.    I don't think so.

18              Exhibit 199 was marked for

19    identification.

20    BY MS. CHYZ:

21         Q.    Looking at what has been marked as

22    Exhibit 199, is this Weyerhaeuser's tender to

23    Domtar of a worker's compensation claim on behalf

24    of Bailey Caswell Phelps, tender being dated

25    April 27, 2012.

1                    ANIA BRZEZINSKI

2   settlement and authorized the payment.

3          Q.     Okay.

4                  Exhibit 218 was marked for

5   identification.

6   BY MS. CHYZ:

7          Q.     Take a look at what's been marked as

8   Exhibit 218, and is this Brigitte's response that

9   you were just telling me about?

10         A.     Yes.

11         Q.     Okay.  And so this is an e-mail from

12  Brigitte to Patrick Lane dated February 28, 2013,

13  and you are copied on it saying that Domtar

14  agrees with the last version of the agreement

15  circulated by Conrad Smucker without the need for

16  any further modifications.  Did you see this

17  e-mail when it went out?

18         A.     I was copied on it.

19         Q.     Did you see it?

20         A.     I was copied, so I am sure I saw it.

21         Q.     And is that your -- was that

22  consistent with your understanding of Domtar's

23  position, which is that the final version of the

24  agreement circulated by Conrad Smucker was

25  acceptable without need for further

1                    ANIA BRZEZINSKI

2    modifications, and that Domtar was ready to sign?

3         A.    Yes.

4         Q.    I am now going to use what was

5    marked as Exhibit 143, which is the termination

6    of services agreement.  I do have extra copies

7    here.  Take a look at what's been marked as

8    Exhibit 143 and tell me if this is the signed

9    termination of services agreement between Domtar

10   and Weyerhaeuser.

11        A.    Yes, it is.

12        Q.    And is that Melissa Edison's

13   signature on what is marked as page six of six?

14        A.    Yes, it looks like her signature.

15        Q.    And paragraph nine, which is on page

16   four of six, that shows the workers compensation

17   language as modified by Domtar; correct?

18        A.    Yes.

19             MR. KUBEK:  Objection to form.

20   BY MS. CHYZ:

21        Q.    And as you said before, this

22   expresses the parties' intent to address the

23   workers compensation issues, the U.S. workers

24   compensation issues at a later date; correct?

25        A.    Correct.

1                    ANIA BRZEZINSKI

2        Q.      Including liability for U.S. workers

3    compensation claim filed by Weyerhaeuser

4    employees who were not transferred to Domtar as

5    part of the sale, but whose claims relate to a

6    site or operation that was transferred to Domtar

7    as part of the sale; correct?

8        A.      Yes.

9        Q.      Okay.  If you thought that

10   Weyerhaeuser had waived those claims, why did you

11   agree in this agreement to address those claims

12   at a later date?

13       A.      We were aware that Weyerhaeuser

14   started tendering these claims in 2012, and we

15   just wanted to finalize the settlement of the

16   health and welfare benefits buy-out and then deal

17   with it afterwards.

18       Q.      Okay.  Why didn't you say to them:

19   These changes are waived.  This whole paragraph

20   has to go?

21       A.      Because at that point that would

22   have meant a further delay in this, and we had

23   some sense of getting this done because we

24   weren't able to put our plans in place, so we

25   didn't want to muddy the issues.

1                     ANIA BRZEZINSKI

2    product since litigation had commenced, but given

3    that it reflects a set of documents sent to

4    outside Counsel, but assuming we agree there is

5    no waiver of claim on the basis of sending this,

6    we can go ahead.

7                 MS. CHYZ:  I agree.

8                 QUESTION WAS READ BACK.

9                 MR. KUBEK:  I would object in part

10   and just advise the Witness that you can state

11   your view as to whether it had any relevance and

12   we will take it from that point, but I would

13   advise and instruct you not to describe any

14   discussions you may have had with anyone

15   concerning the relevance of any of these

16   documents to the litigation position.

17                 THE WITNESS:  The relevance for me

18   would have been that this was not one of the open

19   issues that we had gone to Vancouver to speak to

20   Weyerhaeuser about, that we had then a definitive

21   settlement agreement that was supposed to have

22   dealt with all those post-closing disputed items,

23   and that would have been the relevance.

24

25   BY MS. CHYZ:

Page 260

1                    ANIA BRZEZINSKI

2        Q.      Okay.

3                Exhibit 222 was marked for

4     identification.

5     BY MS. CHYZ:

6        Q.      Take a look at what's been marked as

7     Exhibit 222 and tell me what that is.

8        A.      It is our response to Mr. Smucker's

9     letter.

10       Q.      Okay.  So it's Domtar's response to

11    Weyerhaeuser's notice of intent to litigate dated

12    July 8, 2013?

13       A.      Yes.

14       Q.      And Domtar's response is dated July

15    31, 2013?

16       A.      Correct.

17       Q.      And who prepared Domtar's response?

18       A.      I was involved.  Outside Counsel was

19    involved and Zyg was involved.

20       Q.      Okay.  In the third paragraph of the

21    letter it starts out:

22                    "Indeed Weyerhaeuser

23                    acknowledged this

24                    understanding several years

25                    ago."

Page 261

1                      ANIA BRZEZINSKI

2              Do you see that paragraph?

3        A.      Yes.

4        Q.      And a little way down the paragraph

5    it says:

6                          "Following much correspondence

7                          and several discussions,

8                          Weyerhaeuser acknowledged in

9                          Anne Giardini's letter dated

10                         November 26, 2008 that we are

11                         all agreed that U.S. workers

12                         compensation liability went to

13                         Domtar only for employees who

14                         became able to work in some

15                         capacity at Domtar."

16             Does Domtar have any other written

17   documentation of the alleged agreement in

18   connection with the workers compensation --

19   allocation of workers compensation liability

20   between Weyerhaeuser and Domtar?

21       A.      I think you would have seen some of

22   the documents produced.  So outside of the formal

23   letter that was sent there would have been the

24   e-mails and things that would have been

25   exchanged, and the invoicing that would have been

1                          ANIA BRZEZINSKI

2    transferred employees?

3          A.      I don't believe I did.

4          Q.      Is Domtar interested in pursuing any

5    kind of settlement related to transferred

6    employees?

7          A.      Not with pending litigation.

8                  Exhibit 224 was marked for

9    identification.

10   BY MS. CHYZ:

11         Q.      Take a look at what has been marked

12   as Exhibit 224 and tell me what this is.

13         A.      It's a tender by Weyerhaeuser of

14   various workers compensation claims.

15         Q.      And this tender was directed to you

16   on or about December 13, 2013.  Is that correct?

17         A.      It was my Christmas present, yes.

18         Q.      Did you review this package of

19   materials when it arrived?

20         A.      Not in any particular depth.  We

21   would have looked through it.  We would have

22   looked through what was attached, but I would

23   have not taken any further steps.

24         Q.      Not taken any further steps at all?

25         A.      No.  We did respond, but we would

1                    ANIA BRZEZINSKI

2   have assumed that litigation was imminent.

3        Q.    Okay.  And you forwarded this tender

4   on and you said:  "They finally responded."

5             What does that mean?

6        A.    Well, they have taken -- we

7   responded at the end of July and then we had not

8   heard anything back from Weyerhaeuser.

9        Q.    Okay.

10            Exhibit 225 was marked for

11  identification.

12  BY MS. CHYZ:

13       Q.    Take a look at Exhibit 225 and tell

14  me what that is.

15       A.    That is an e-mail from me to Conrad

16  Smucker.

17       Q.    And is that your response to the

18  tender of claims that he delivered on

19  December 13, 2013, which we marked as

20  Exhibit 224?

21       A.    Yes.

22       Q.    And your response to him is dated

23  January 27, 2014?

24       A.    That's correct.

25       Q.    And did you prepare the substance of

1                    ANIA BRZEZINSKI

2    this response?

3         A.    I think I would have also spoken to

4    outside Counsel at this point.

5         Q.    And where in your response do you

6    say that Domtar views the workers compensation

7    claims of non-transferred employees to be a

8    resolved issue?

9              MR. KUBEK:  Objection.  The document

10   speaks for itself.

11             THE WITNESS:  It's not mentioned.

12   BY MS. CHYZ:

13        Q.    And where are you saying here that

14   Weyerhaeuser has waived its claims to its right

15   to tender the workers compensation claims of

16   non-transferred employees?

17        A.    It's not mentioned.

18             MR. KUBEK:  Same objection.

19             Exhibit 226 was marked for

20   identification.

21   BY MS. CHYZ:

22        Q.    Take a look at what has been marked

23   as Exhibit 226 and tell me what that is.

24        A.    It's a tender by Weyerhaeuser.

25        Q.    Okay.  And it's a tender of a claim

1                    ANIA BRZEZINSKI

2    that's pending in the Third Judicial Circuit of

3    Madison County, Illinois; correct?

4         A.    Yes.

5         Q.    So it's not a workers compensation

6    claim.  Is that correct?

7         A.    It may look like it is, because it

8    says he alleges he was employed by Weyerhaeuser.

9         Q.    Okay.  So he was a Weyerhaeuser

10   employee, but this is a lawsuit that's pending in

11   Madison County, Illinois; correct?

12        A.    Correct, but if he was a former

13   employee then it should have been a workers

14   compensation claim.

15        Q.    And what did you do to determine

16   that this should have been a workers compensation

17   claim?

18        A.    I think we would have looked at the

19   information we would have had available, either

20   through the actual complaint or to the extent we

21   were able to get interrogatories.

22        Q.    Did you review the Illinois Workers

23   Compensation Statutes?

24        A.    I don't think I would have.  Perhaps

25   our outside Counsel may have.

1                    ANIA BRZEZINSKI

2        Q.     Did you ask them to?

3               MR. KUBEK:  Objection to testimony

4    about a request for legal advice.

5    BY MS. CHYZ:

6        Q.     Were you interested in knowing the

7    requirements of the Illinois Workers Compensation

8    Statutes in terms of how that would have applied

9    to this person's claim?

10       A.     I think it's something I would have

11   spoken to outside Counsel about.

12       Q.     Okay.  And did Domtar accept the

13   tender of this claim?

14       A.     I don't recall.  He was not a

15   transferred employee.

16       Q.     He was not a transferred employee?

17       A.     If he was not a transferred

18   employee, I doubt it.

19       Q.     So if he was not a transferred

20   employee, Domtar would have rejected the claim.

21   Is that what you are saying?

22       A.     If he was a non-transferred employee

23   they would have rejected.

24               Exhibit 227 was marked for

25   identification.

1                     ANIA BRZEZINSKI

2    BY MS. CHYZ:

3         Q.     Take a look at what's been marked as

4    Exhibit 227 and tell me what that is.

5         A.     It's an e-mail from Conrad Smucker

6    to myself.

7         Q.     And he is requesting that Domtar

8    reconsider the rejection of the tender of the

9    Stan Wesner claim, and that's the claim marked as

10   Exhibit 226.  Is that correct?

11        A.     Yes.

12        Q.     And Mr. Smucker points out in this

13   e-mail that this claim is not a workers

14   compensation claim.  It is part of the ongoing

15   litigation between the companies in Delaware.  Is

16   that your understanding that this was not part of

17   the ongoing litigation?

18        A.     I don't think it was.

19        Q.     Okay.  That was a bad question,

20   because that was a completely ambiguous answer.

21   Did you agree with Mr. Smucker's statement that

22   the Wesner claim was not a workers compensation

23   claim, that it's part of the ongoing litigation

24   between the companies in Delaware?

25        A.     I would have to read.

1                    ANIA BRZEZINSKI

2        Q.      Take your time.

3        A.      I think there was some confusion, I

4    think, on Conrad's part, because he is saying

5    it's not consistent with what we had been

6    accepting to date, but it was, because James

7    Modlin was, in his capacity as the executor of

8    the estate of Faye Modlin, and Faye Modlin was a

9    take-home premises claim so we had thought that

10   that was a third-party claim.  Joseph Voight,

11   from what I recall, was a third-party contractor,

12   and Audrey Williams Brown was another take-home

13   case where she was doing the laundry of her

14   relatives' clothes, and that's how she allegedly

15   was exposed.

16       Q.      So it's your position that these

17   claims that you had previously accepted were

18   third-party claims?

19       A.      Modlin -- Faye Modlin, Joseph Voight

20   and Audrey Brown, yes.

21       Q.      Is it your contention that Domtar's

22   rejection of the Stan Wesner tender is consistent

23   with the way Domtar has been managing the

24   liability for former employees since the closing

25   of the fine paper transaction?

1               ANIA BRZEZINSKI

2       A.      I believe so.

3       Q.      Okay.

4               Exhibit 228 was marked for

5   identification.

6   BY MS. CHYZ:

7       Q.      Take a look at what's been marked as

8   Exhibit 228 and let me know what that is.

9       A.      It's an e-mail originally from me to

10  Charlie Douthwaite, and then there is a follow-up

11  by Conrad.

12      Q.      And this is related to the tender of

13  the Charles Bowen case.  Is that right?

14      A.      That's the subject, yes.

15      Q.      And Domtar rejected the tender of

16  the Charles Bowen case?

17      A.      Yes.

18      Q.      And is it your position that

19  Domtar's decisionmaking on that case is

20  consistent with the way Domtar has managed the

21  tender of workers compensation liabilities from

22  Weyerhaeuser since the closing of the fine paper

23  transaction?

24      A.      Yes.

25      Q.      Does Domtar dispute its obligation

1                    ANIA BRZEZINSKI

2    to pay administration fees for administration

3    services that Weyerhaeuser is providing to Domtar

4    in connection with workers compensation claims

5    for transferred employees?

6        A.    To my knowledge, we have never

7    disputed paying the administration fee for the

8    claims that were transferred to us.

9        Q.    And is Domtar current on paying the

10   administration fees for claims that Weyerhaeuser

11   is handling on Domtar's behalf?

12       A.    To my knowledge, there is no

13   outstanding invoice to that effect.

14       Q.    And you say you never have disputed.

15   As you sit here today does Domtar dispute its

16   obligation to pay fees for the administrative

17   services provided by Weyerhaeuser for the

18   transferred employees?

19           MR. KUBEK:  Let me object to that as

20   being ambiguous in terms of what you mean by

21   "fees for the services rendered by Weyerhaeuser."

22   I believe the only fees for services that have

23   been invoiced related to third-party providers

24   that were working for Weyerhaeuser, SRS or

25   whoever it was, and I gathered from Mr. Lane's

1                    ANIA BRZEZINSKI

2

3

4

5            C E R T I F I C A T E

6

7    I, C.L. KLEIN, Official Court Reporter, duly

8    sworn as such, DO HEREBY CERTIFY that the

9    foregoing is a true and faithful transcription of

10   the evidence herein, AND I HAVE SIGNED:

11   Dated: June 22, 2015

12

13

14          _____

15             C.L. KLEIN, O.C.R.

16

17

18

19

20

21

22

23

24

25